IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>**ALLEGIANCE COAL USA LIMITED**, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-10234 (CTG)<br><br>Joint Administration Requested |

**MOTION OF THE DEBTORS FOR ENTRY OF AN INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) CONTINUE THEIR EXISTING CASH MANAGEMENT SYSTEM, (B) MAINTAIN THEIR BANK ACCOUNTS AND EXISTING BUSINESS FORMS, (C) IMPLEMENT CHANGES TO THE EXISTING CASH MANAGEMENT SYSTEM AS NECESSARY, AND (D) CONTINUE ORDINARY COURSE INTERCOMPANY TRANSACTIONS, (II) EXTENDING THE TIME TO COMPLY WITH THE REQUIREMENTS OF 11 U.S.C. § 345(b) AND THE U.S. TRUSTEE'S OPERATING GUIDELINES, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") move (the "Motion") as follows:

**RELIEF REQUESTED**

1. The Debtors request entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), (i) authorizing, but not directing, the Debtors to (a) continue their existing cash management system, (b) maintain their existing bank accounts and business forms, (c) implement any changes to the existing cash management system as the Debtors deem necessary or appropriate, including, without limitation, opening new bank accounts or closing existing bank accounts, and (d) continue ordinary course Intercompany Transactions (as defined below); (ii) extending the Debtors' time to comply with the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Allegiance Coal USA Limited (1324); New Elk Coal Holdings LLC (1314); New Elk Coal Company LLC (0615); and Black Warrior Minerals, Inc. (6486). The Debtors' mailing address for purposes of these chapter 11 cases is 12250 Highway 12, Weston, CO 81091.

requirements of section 345(b) of the Bankruptcy Code and the operating guidelines (the "U.S. Trustee Guidelines") established by the Office of the United States Trustee (the "U.S. Trustee") on an interim basis; and (iii) granting any related relief that is necessary to carry out the foregoing or continued operation of the cash management system, or is otherwise appropriate under the circumstances.

## JURISDICTION

2.  This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.  The Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.  The statutory bases for the relief requested herein are sections 105(a), 345(b) and 363(c)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code"), as supplemented by rules 2015, 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rules 2015-2 and 9013-1(m).

## BACKGROUND

5.  On February 21, 2023 (the "Petition Date"), the Debtors each commenced a voluntary case under chapter 11 of the Bankruptcy Code in this Court. The Debtors have

2

sought joint administration of their chapter 11 cases for procedural purposes. The Debtors are operating their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee has been appointed in these cases.

6. The Debtors' core business is mining and processing metallurgical coal for export to steel mills on the seaborne market. The Debtors operate two coal mines in the United States, and are also advancing a development project for an additional mine in British Columbia. Through both underground and surface mining methods, the Debtors extract met coal—also known as metallurgical, steelmaking or coking coal—for use in steel production. Once extracted, the Debtors transfer their coal to various ports in the United States for exporting to the global seaborne market.

7. Additional detail regarding the Debtors, their business, the events leading to the commencement of these cases, and the facts and circumstances supporting the relief requested herein is set forth in the *Declaration of Jonathan Romcke in Support of Emergency Relief* (the "Romcke Declaration"), filed concurrently herewith and incorporated herein by reference.

## THE CASH MANAGEMENT SYSTEM

8. The Debtors maintain cash management systems (the "Cash Management System") for Debtors Allegiance Coal USA Limited ("ACUSA"), Black Warrior Minerals, Inc. ("BWM") and New Elk Coal Company LLC ("NECC") to collect, transfer, manage and disburse funds generated and used in their operations. The Cash Management System comprises 7 bank accounts (collectively, along with any bank accounts the Debtors may open in the ordinary course of business, the "Bank Accounts"), maintained at 3 banks: BMO Harris Bank, N.A. ("BMO"), InBank, and Servis 1st Bank ("Servis") (collectively, the "Banks").

3

9. The Cash Management System is managed by the Debtors out of their offices in Weston, Colorado, for their NECC operations and Birmingham, Alabama, for their BWM operations, and all funds in the Bank Accounts are denominated and held in U.S. Dollars. The Debtors maintain daily oversight of the Cash Management System and implement cash management controls for entering, processing, and releasing funds. Additionally, the Debtors regularly reconcile books and records to ensure that all transfers are accounted for properly.

**I.     The Bank Accounts**

10. Debtor ACUSA operates its cash management system through one Bank Account at BMO; Debtor BWM operates its cash management system through four Bank Accounts—one at BMO and three at Servis; and Debtor NECC operates its cash management system through two Bank Accounts—one at BMO and one at InBank. Debtor New Elk Coal Holdings LLC does not maintain any Bank Accounts.

11. A schedule of the Bank Accounts, including the last four digits of each Bank Account number, the name of the Debtor that holds the account, and the Bank at which the account is held, is attached as **Exhibit 1** to the Proposed Order. The following table summarizes the nature and purposes of the Bank Accounts:

| **BMO** ||
|---|---|
| **Account(s)** | **Description of Account(s)** |
| **NECC Operating Account**<br><br>Account ending in 250-5 | The Debtors maintain an operating account at BMO in the name of NECC (the "NECC Operating Account"), in which funds generated by the Debtors' operations at NECC are deposited and held. The NECC Operating Account is also funded at times by funds held in the Intermediary Account (defined below). The NECC Operating Account disburses funds on account of NECC's operating expenses, accounts payable, and payroll, payroll taxes, and other withholding obligations that do not need to be paid by check. The NECC Operating Account also disburses funds to the Intermediary Account on account of intercompany transactions. The NECC Operating Account also funds the NECC Check Account (defined |

4

| | |
|---|---|
| | below) to satisfy NECC's operating expenses, accounts payable, and payroll, payroll taxes, and other withholding obligations that must be paid by check.<br><br>As of the Petition Date, the balance of the NECC Operating Account is approximately $984,500. |
| **Intermediary Account**<br><br>Account ending in<br><br>450-8 | The Debtors maintain an intermediary account (the "Intermediary Account") at BMO in the name of ACUSA to facilitate intercompany transactions between and among NECC, BWM, and the Debtors' non-debtor parent company, Allegiance Coal Limited ("AHQ"). The account is funded by transfers from the NECC Operating Account, BWM Operating Account and accounts of AHQ sufficient to cover the intercompany transactions.<br><br>As of the Petition Date, the balance of the Intermediary Account is approximately $20,500. |
| **Inactive Account**<br><br>Account ending in<br><br>270-7 | The Debtors maintain an inactive bank account at BMO in the name of BWM, which does not hold a balance as of the Petition Date and has never held more than a nominal balance, if any. |
| **InBank** ||
| **Account(s)** | **Description of Account(s)** |
| **NECC Check Account**<br><br>Account ending in 5814 | The Debtors maintain an operating account at InBank in the name of NECC to fund disbursements on account of NECC's operating expenses, accounts payable, and payroll, payroll taxes, and other withholding obligations that must be paid by check (the "NECC Check Account"). The account is funded by transfers from the NECC Operating Account sufficient to cover obligations drawn on the NECC Check Account.<br><br>As of the Petition Date, the balance of the NECC Check Account is approximately $86,000. |
| **Servis** ||
| **Account(s)** | **Description of Account(s)** |
| **BWM Depository Account**<br><br>Account ending in 6792 | The Debtors maintain a depository account at Servis in the name of BWM (the "BWM Depository Account"), in which funds generated by the Debtors' operations at BWM are deposited and held. The BWM Depository Account is also funded at times by funds held in the Intermediary Account. The BWM Depository Account funds |

5

| | |
|---|---|
| | the BWM Operating Account (defined below) and BWM Payroll Account (defined below) to satisfy BWM's operating expenses, accounts payable, and payroll, payroll taxes, and other withholding obligations. The BWM Depository Account also disburses funds to the Intermediary Account on account of intercompany transactions.<br><br>As of the Petition Date, the balance of the BWM Depository Account is approximately $568,300. |
| **BWM Operating Account**<br><br>Account ending in 6768 | The Debtors maintain an operating account at Servis in the name of BWM (the "BWM Operating Account") to fund disbursements on account of BWM's operating expenses, accounts payable, and withholding obligations other than on account of garnishments. The account is funded by transfers from the BWM Depository Account sufficient to cover obligations drawn on the BWM Operating Account.<br><br>As of the Petition Date, the balance of the BWM Operating Account is approximately $48,700. |
| **BWM Payroll Account**<br><br>Account ending in 8390 | The Debtors maintain a payroll account at Servis in the name of BWM (the "BWM Payroll Account") to fund disbursements on account of BWM's payroll and garnishment obligations. The account is funded by transfers from the BWM Depository Account sufficient to cover obligations drawn on the BWM Payroll Account.<br><br>As of the Petition Date, the balance of the BWM Payroll Account is approximately $22,000. |

**II.     Service Charges.**

12.    In the ordinary course of business, the Banks charge, and the Debtors pay, honor or allow deduction from the appropriate account, certain service charges, fees and other costs and expenses associated with maintaining the accounts in accordance with the applicable agreements or schedules of fees governing the Bank Accounts (collectively, the "Service Charges").  As of the Petition Date, the Debtors do not believe they have any accrued but unpaid Service Charges that will become due in the first two weeks of these chapter 11 cases.

6

**III.     Funds Flow within the Cash Management System**

13. The Cash Management System generally facilitates the following principal cash management functions: (a) cash collection and (b) disbursements to fund the Debtors' operations. While certain intercompany transfers may occur on an *ad hoc* basis between the Debtors, the Debtors currently maintain two separate systems within the larger Cash Management System—one at NECC and one at BWM.

14. With respect to NECC, receipts from NECC's operations are deposited and held in the NECC Operating Account. In the ordinary course of business, the Debtors make disbursements on account of NECC's operating expenses, accounts payable, and payroll, payroll taxes, and other withholding obligations that do not need to be paid by check from the NECC Operating Account. Cash from the NECC Operating Account funds the NECC Check Account to satisfy NECC's operating expenses, accounts payable, and payroll, payroll taxes, and other withholding obligations that must be paid by check.

15. With respect to BWM, receipts from BWM's operations are deposited and held in the BWM Depository Account. The BWM Depository Account funds the BWM Operating Account and BWM Payroll Account. In the ordinary course of business, the Debtors make disbursements on account of BWM's operating expenses, accounts payable, and withholding obligations other than on account of garnishments from the BWM Operating Account and disbursements on account of BWM's payroll and garnishment obligations from the BWM Payroll Account.

**IV.     Intercompany Transactions**

16. In the ordinary course of business, the Debtors engage in intercompany transactions on an *ad hoc* basis using ACUSA as the intermediary that facilitates such transactions (the "Intercompany Transactions") related to, among other things, certain accounts

7

payable at the Debtors' operating entities (the "Intercompany Claims").  The Intercompany Transactions and Intercompany Claims are detailed in the Debtors' accounting ledgers and reconciled on a regular or, at a minimum, monthly basis.  The Debtors will continue to maintain such records of the intercompany accounts in connection with the Intercompany Transactions, including records of all intercompany accounts receivable and payable to the extent applicable.

## V. Existing Business Forms

17. The Debtors use a variety of business forms in the ordinary course of business, including, among others, checks, invoices and letterhead (the "Business Forms").  To minimize expenses and disruption, the Debtors seek authority to continue to use all Business Forms in substantially the form used immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.  The Debtors will communicate with the various vendors and counterparties with whom the Debtors conduct business to notify them of the commencement of these cases, which the Debtors believe will provide adequate notice of the Debtors' status as debtors in possession.  In accordance with Local Rule 2015-2(a), to the extent the Debtors exhaust their existing supply of checks during these cases and require new checks, the Debtors will order checks with a notation indicating the designation "debtor in possession" and the lead case number of these cases.

## BASIS FOR RELIEF

**I. The Court should approve the Debtors' request to continue to utilize their Cash Management System, including authorizing continued use of existing Bank Accounts and implementing changes to the Cash Management System.**

18. The U.S. Trustee Guidelines require debtors in possession to, among other things:

   a. establish one debtor in possession bank account for all estate monies required for the payment of taxes, including payroll taxes;

      b.     close all existing bank accounts and open new debtor in possession accounts;

      c.     maintain a separate debtor in possession account for cash collateral; and

      d.     obtain checks that bear the designation "debtor in possession" and reference the bankruptcy case number and type of account on such checks.

19.    These requirements are designed to provide a clear line of demarcation between prepetition and postpetition claims and payments and help protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date. Considering, however, that the Debtors' business and financial affairs are complex and require the collection, disbursement and movement of funds through their Bank Accounts, enforcement of the provisions of the U.S. Trustee Guidelines during these chapter 11 cases would severely disrupt the Debtors' operations. Accordingly, the Debtors respectfully request that the Court allow them to operate each of their Bank Accounts as they were maintained in the ordinary course of business before the Petition Date.

20.    Continuing the Cash Management System is permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." Additionally, courts in this and other districts have recognized that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993). The United States Court of Appeals for the Third Circuit has agreed, emphasizing that requiring a debtor to maintain separate accounts "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061; *see also In re Southmark Corp.*, 49

9

F.3d 1111, 1114 (5th Cir. 1995) (finding cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").

21.     Bankruptcy courts treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter." *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). In *In re Charter Co.*, 778 F.2d 617 (11th Cir. 1985), for example, the bankruptcy court entered an order authorizing the debtor and certain of its subsidiaries "to continue to consolidate the management of their cash as has been usual and customary in the past, and to transfer monies from affiliated entity to entity, including operating entities that are not debtors." *Id*. at 620. The Eleventh Circuit Court of Appeals then affirmed a subsequent district court decision denying a creditor's motion for leave to appeal the bankruptcy court's cash management order, holding that authorizing the debtors to utilize their prepetition "routine cash management system" was "entirely consistent" with applicable provisions of the Bankruptcy Code. *Id*. at 621. Indeed, in large chapter 11 cases, bankruptcy courts in this Circuit routinely grant chapter 11 debtors similar authority to continue using existing cash management systems.

22.     Here, the Debtors utilize the Cash Management System in its current form as part of their ordinary and usual business practices, and as such, the Debtors believe the continued use of the Cash Management System falls within the purview of ordinary course transactions permitted under section 363(c)(1) of the Bankruptcy Code. Moreover, appropriate circumstances exist for the Court to authorize the Debtors' continued use of the Cash Management System under sections 363(b)(1) and 105(a) of the Bankruptcy Code. Furthermore, the Debtors have in place internal controls and procedures to prohibit payments on account of prepetition debts and to account for intercompany transactions within their Cash Management

System and Bank Accounts. Disrupting the current Cash Management System and forcing the Debtors to create new bank accounts would unnecessarily complicate such controls and procedures. In light of existing protective measures, the Debtors submit that maintaining the Cash Management System will benefit parties in interest and is in the best interests of the Debtors' estates and creditors.

23. Additionally, the relief requested in this Motion will help minimize any disruption in the Debtors' business operations during these chapter 11 cases and preserve the value of the Debtors' estates. Indeed, any disruptions in the Cash Management System could lead to delays in satisfying the Debtors' obligations to their vendors and suppliers and meeting the demands of customers. To avoid the potential erosion of value that could ensue from any such interruptions in the Debtors' ordinary course business operations, the Debtors believe it is imperative that they be authorized to continue the Cash Management System and use of the Bank Accounts.

24. Strict adherence to the U.S. Trustee Guidelines would be burdensome to the Debtors and their management, and reduce efficiencies and cause unnecessary expense. The delays that would result from opening the new accounts and revising cash management procedures would disrupt the Debtors' business operations at this critical time, have little or no benefit to the Debtors' estates, and erode the value of the Debtors' enterprise to the detriment of all stakeholders.

25. For these reasons, the Debtors should be allowed to continue using the Cash Management System and Bank Accounts consistent with historical practice.

26. The Debtors further request that the Court grant further relief from the U.S. Trustee Guidelines to the extent they require the Debtors to make all disbursements by

check.  In particular, the U.S. Trustee Guidelines require that all receipts and all disbursements of estate funds must be made by check with a notation representing the reason for the disbursement.  In the ordinary course of business, the Debtors conduct transactions through ACH, wire transfer and other similar methods.  If the Debtors' ability to conduct transactions according to historical practice is impaired, the Debtors may be unable to timely perform under certain contracts, the Debtors could incur penalties and fines with taxing authorities, their business operations may be unnecessarily disrupted, and their estates will incur additional costs. Accordingly, the Debtors submit that they should be allowed to continue utilizing all existing payment methods.

**II.     The Court should authorize the Debtors to continue using their existing Business Forms.**

27.     The U.S. Trustee Guidelines require a debtor in possession to immediately obtain new checks printed with the designation "debtor in possession" and the corresponding number of the lead bankruptcy case.  To avoid unnecessary expense and further disruption of the Cash Management System, the Debtors request authorization to continue to use their existing Business Forms substantially in the forms existing immediately before the Petition Date, without reference to their status as debtors in possession.  The Debtors will communicate with the various vendors and counterparties with whom the Debtors conduct business to notify them of the commencement of these cases, which the Debtors believe will provide adequate notice of the Debtors' status as debtors in possession. Furthermore, in accordance with Local Rule 2015-2(a), to the extent the Debtors exhaust their existing supply of checks during these cases and require new checks, the Debtors will order checks with a notation indicating the designation "debtor in possession" and the lead case number of these cases.  In light of these steps, the Debtors submit

that parties in interest will not be prejudiced if the Debtors are authorized to continue to use their Business Forms substantially in the form existing immediately before the Petition Date.

**III.    The Court should authorize the Debtors to continue Intercompany Transactions in the ordinary course of business and afford administrative expense priority to such Intercompany Transactions.**

28.    Intercompany Transactions are made between the Debtors on an *ad hoc* basis in the ordinary course of business as part of the Cash Management System to fund certain accounts payable and other operating expenses of the Debtors' operating entities.[2] The Debtors track the Intercompany Transactions on their accounting ledgers and can ascertain, trace, and account for the Intercompany Transactions.

29.    The Debtors respectfully submit that the continued performance of the Intercompany Transactions is in the best interest of the Debtors' estates and creditors, and, therefore, the Debtors should be permitted to continue performing such Intercompany Transactions. Since these transactions represent extensions of intercompany credit made in the ordinary course of business, the Debtors respectfully request the authority to continue conducting the Intercompany Transactions in the ordinary course of business without need for further Court order. Moreover, the Debtors respectfully request that all postpetition payments between or among a Debtor and another Debtor be accorded administrative expenses status to ensure that each Debtor will not permanently fund the operations of any affiliate Debtor.

**IV.    The Court should extend the Debtors' time to comply with the requirements of section 345(b) of the Bankruptcy Code on an interim basis.**

30.    Section 345(a) of the Bankruptcy Code authorizes deposit or investment of the money of the estate, such as cash, as "will yield the maximum reasonable net return on such

---

[2] The Debtors submit the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking authority to engage in such transactions on a postpetition basis.

13

money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). While section 345(a) requires that with respect to deposits and investments that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the Unites States," the estate must require a bond in favor of the United States secured by the undertaking of a U.S. Trustee-approved corporate surety, section 345(b) permits the court to dispense with this undertaking "for cause." 11 U.S.C. § 345(b); *see also In re Serv. Merch. Co.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (quoting the 1994 amendments to the Bankruptcy Code which explained that the new amendments to the Code would allow the courts to approve investments other than those permitted by section 345(b) for just cause).

31.    In *Service Merchandise*, the court identified the following factors for determining whether cause to waive the requirements of section 345(b) exists: (i) the sophistication of the debtor's business; (ii) the size of the debtor's business operations; (iii) the amount of investments involved; (iv) the bank ratings of the financial institutions where the debtor's funds are held; (v) the complexity of the case; (vi) the safeguards in place within the debtor's own business for insuring the safety of the funds; (vii) the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions; (viii) the benefit to the debtor of current practices; (ix) the harm, if any, to the estate; and (x) the reasonableness of the debtor's request for relief from the section 345(b) requirements in light of the overall circumstances of the case. *Serv. Merch.*, 240 B.R. at 896–97.

32.    With respect to the Bank Accounts held at BMO, the Debtors believe they are in compliance with the requirements of section 345(b) because BMO Harris Bank of Montreal is a U.S. Trustee-approved depository institution. However, the Debtors request (i) a

75-day extension of time to comply with the deposit and investment requirements of section 345(b) without prejudice to the right to seek a further extension, (ii) that the Banks be authorized and directed to accept and hold such funds at the Debtors' direction, and (iii) that the Banks be authorized and directed to honor the Debtors' directions with respect to the opening and closing of any Bank Account.

33. In light of the foregoing, the Debtors submit that cause exists for an extension of time to comply with the requirements of Bankruptcy Code section 345(b). In accordance with Local Rule 2015-2, the Debtors request a 75-day extension of time to comply with the section 345 requirements.

**V. The Court should authorize the Banks to continue to maintain, service and administer the Debtors' Bank Accounts in the ordinary course of business.**

34. The Debtors submit that parties in interest will not be prejudiced or injured by the Debtors' maintenance of their Bank Accounts in the ordinary course of business. As discussed above, the Debtors strongly believe that replacing the Bank Accounts with new accounts pursuant to the U.S. Trustee Guidelines would fruitlessly disrupt their operations and derail the Debtors' efforts to preserve and maximize the value of their estates.

35. To further implement continued use of their existing Cash Management System and Bank Accounts, the Debtors respectfully request that the Court authorize and direct the Banks to: (i) continue to maintain, service and administer the Bank Accounts as accounts of the Debtors as debtors in possession and provide related treasury, account and cash management services, all without interruption and in the ordinary course of business; (ii) receive, process, honor and pay, to the extent of available funds, any and all checks, drafts, EFT (including wires or ACH transfers), credit card payments and other items presented, issued or drawn on the Bank Accounts; *provided*, *however*, that any check, draft or other notification that the Debtors advise

the Banks to have been drawn, issued or otherwise presented before the Petition Date may be honored by the Banks only to the extent authorized by order of the Court; (iii) accept and honor all representations from the Debtors as to which checks, drafts, EFT (including wires or ACH transfers), credit card payments and other items presented, issued or drawn should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, EFT (including wires or ACH transfers), credit card payments and other items are dated before or after the Petition Date; and (iv) debit or charge the Bank Accounts for all undisputed bank fees, whether arising before, on or after the Petition Date.

36. In addition, to protect the Banks, the Debtors also request that, to the extent a Bank honors a prepetition check or other item drawn on any account that is the subject of the Motion: (a) at the direction of the Debtors; or (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, such Bank will not be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item honored postpetition. The Debtors respectfully submit that such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

37. The Debtors represent that if the relief requested herein is granted, they will implement appropriate mechanisms to ensure that no payments will be made on account of debts incurred before the Petition Date (other than those authorized by the Court). To prevent the inadvertent, unauthorized payment of prepetition claims, the Debtors will work closely with the Banks to ensure that appropriate procedures are in place to prevent checks that were issued prepetition from being honored without Court approval.

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

38. Bankruptcy Rule 6003 empowers the Court to issue an order, within 21 days after the Petition Date, granting a motion to "use . . . property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" if such requested relief is "necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(b). For the reasons discussed above, immediate and irreparable harm would result if the relief requested herein were not granted. Accordingly, the Debtors submits that it has satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## WAIVER OF BANKRUPTCY RULES 6004(a) and 6004(h)

39. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), 7062, 9014 or otherwise for all of the reasons described above.

**RESERVATION OF RIGHTS**

40. Nothing contained herein is intended or shall be construed as: (i) an admission as to the validity, amount or priority of any claim against the Debtors; (ii) a waiver of the Debtors' rights to dispute any claim; (iii) a promise or requirement to pay any claim; (iv) a waiver of any claim or cause of action of the Debtors that exist against any entity; (v) a ratification or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code; (vi) a waiver of limitation of the Debtors' rights under the Bankruptcy Code, any other applicable law, or any agreement; or (vii) an admission or concession by the Debtors that any lien acknowledged or satisfied under this Motion is valid, and the Debtors expressly reserve and preserve their rights to contest the extent, validity, or perfection, or seek avoidance of, any such lien.

**NOTICE**

41. Notice of this Motion is being provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) Collins St, as Debtors' prepetition secured lender; (c) Cline Mining Corporation; (d) the Debtors' banks; (e) the Securities and Exchange Commission; (f) the Internal Revenue Service; (g) the United States Attorney's Office for the District of Delaware; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the relief requested, the Debtors submit that no further notice need be given.[3]

---

[3] The Debtors have not yet filed a list of their top 20 unsecured creditors pursuant to Bankruptcy Rule 1007(d) (the "Top 20 List") and therefore have not served this Motion on the Top 20 List. The Debtors intend to file the Top 20 List as soon as possible.

## **CONCLUSION**

WHEREFORE the Debtors respectfully request that the Court enter the Proposed Order granting the relief requested in this Motion, and such other and further relief as the Court may deem just and appropriate.

| | |
|---|---|
| Dated: February 22, 2023<br>Wilmington, Delaware | MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br><br>*/s/ Paige N. Topper*<br>Robert J. Dehney (No. 3578)<br>Matthew B. Harvey (No. 5186)<br>Paige N. Topper (No. 6470)<br>Taylor M. Haga (No. 6549)<br>Evanthea Hammer (No. 7061)<br>1201 N. Market Street, 16th Floor<br>Wilmington, Delaware 19801<br>Telephone: (302) 658-9200<br>Facsimile: (302) 658-3989<br>rdehney@morrisnichols.com<br>mharvey@morrisnichols.com<br>ptopper@morrisnichols.com<br>thaga@morrisnichols.com<br>ehammer@morrisnichols.com<br><br>*Proposed Counsel to the Debtors and*<br>*Debtors in Possession* |