IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>**ALLEGIANCE COAL USA LIMITED**, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-10234 (CTG)<br><br>Joint Administration Requested |

## DECLARATION OF JONATHAN ROMCKE IN SUPPORT OF EMERGENCY RELIEF

I, Jonathan Romcke, hereby declare as follows:

1. I am the Chief Executive Officer of debtors Allegiance Coal USA Ltd., New Elk Coal Holdings LLC, and New Elk Coal Company LLC. I am also the Vice President and Secretary for debtor Black Warrior Minerals Inc. In addition, I am a director of the boards of each of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). In my time with the Debtors, I have become familiar with the Debtors' business, day-to-day operations, financial affairs, and books and records. I have over 35 years of experience in underground and open pit mining operations in the coal and iron ore mining industries.

2. On February 21, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code") in this Court. The Debtors continue to operate their business and manage their affairs in the ordinary course of business as debtors in possession. The Debtors have filed several motions

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Allegiance Coal USA Limited (1324); New Elk Coal Holdings LLC (1314); New Elk Coal Company LLC (0615); and Black Warrior Minerals, Inc. (6486). The Debtors' mailing address for purposes of these chapter 11 cases is 12250 Highway 12, Weston, CO 81091.

identified herein requesting emergency relief. I submit this declaration in support of such emergency relief, as well as to provide details on the Debtors' background and these chapter 11 cases.

3. Except as otherwise indicated, the statements set forth in this declaration are based upon my personal knowledge of the Debtors' operations and financing, information learned from my review of relevant documents, information supplied to me from other members of the Debtors' management or the Debtors' advisors, or my opinion based on my knowledge, experience and information concerning the Debtors' operations and financial condition. I am authorized to submit this declaration on behalf of the Debtors. If called to testify, I could and would testify competently to the matters set forth in this declaration.

## I. The Debtors' Business

4. The Debtors' core business is mining and processing metallurgical coal for export to steel mills on the seaborne market. The Debtors operate two coal mines in the United States.[2] Debtor New Elk Coal Company LLC ("NECC") operates the New Elk Coal mine located 25 miles west of Trinidad, Colorado. The New Elk Coal mine was acquired by the Debtors' parent company in October 2020. The New Elk Coal mine was historically mined under the name of Allen Mine, which first began production in 1951.

5. NECC operates an underground mine that uses the room and pillar system to mine—the predominant coal mining method in the United States. Under this system, coal deposits are mined by cutting a network of rooms in to the coal, leaving pillars to support the roof of the mine. After the coal is mined, it is washed at the Debtors' processing facility then by truck

---

[2] The Debtors are also advancing a development project for an additional metallurgical mine in British Columbia with non-debtor affiliate Telkwa Coal Limited.

to the Jansen rail loading facility and then by rail to the McDuffie Coal Terminal at Mobile, Alabama. From Mobile, the Debtors export their coal to the global seaborne market, by seagoing ships.

6. Debtor Black Warrior Minerals, Inc. ("BWM") operates the Black Warrior mine located 25 miles north of Birmingham, Alabama, which has been actively mined since 2009. The Debtors' parent company acquired BWM in August 2021 to have a fully permitted operating coal mine to supply coal on the seaborne market.

7. BWM operates a surface mine. The coal at Black Warrior is mined by removing the overburden (the layer of rock and soil above the coal seams) to expose and remove the coal seams and then replace the overburden to its approximate original contour. After the coal at Black Warrior is mined it is washed and transported by barge on the Black Warrior River to the McDuffie Coal Terminal in Mobile, Alabama, and from there exported in the same manner as the coal from the New Elk Coal mine.

8. The Debtors recently made the decision to pivot back from thermal coal to metallurgical coal production at both mines. Metallurgical coal, also known as steelmaking or coking coal, is a necessary ingredient to make steel. The Debtors' decision to return to metallurgical production is in response to the decline in thermal coal prices for coal delivered to Europe as well as the significant recovery in metallurgical coal prices in recent months. The New Elk Coal mine is currently transporting its last rail shipment of thermal coal and then adjustments will be made at the coal preparation plant to produce metallurgical coal. Production of metallurgical coal has already begun at Black Warrior mine.

## II. The Debtors' Ownership and Corporate Structure

9. The Debtors are all directly or indirectly owned and controlled by non-debtor affiliate Allegiance Coal Limited ("AHQ"), a publicly traded Australian corporation listed on the Australian Securities Exchange. AHQ directly owns 100% of Debtor Allegiance Coal USA Limited ("ACUSA"), a Delaware corporation. ACUSA in turn directly owns 100% of New Elk Coal Holdings LLC ("NECH"), a Delaware limited liability company, and BWM, an Alabama corporation. NECH directly owns 100% of NECC, a Colorado limited liability company.

10. The following chart depicts the Debtors' organizational structure with the Debtor entities highlighted in orange:




## III. The Debtors' Debt Obligations

11. As of the Petition Date, the majority of the Debtors' liabilities consists of senior secured funded indebtedness. The Debtors' debt obligations comprise the following principal components.[3]

12. <u>Collins Note</u>. On May 24, 2022, Debtor ACUSA and non-Debtor AHQ entered into that certain *Convertible Note Agreement* with Collins St Convertible Notes Pty Ltd ACN 657 773 754, as trustee for The Collins St Convertible Notes Fund ABN 30 216 289 383, dated May 24, 2022 (as amended, the "<u>Collins Note Agreement</u>"). Under the Collins Note Agreement, ACUSA issued to Collins two tranches of convertible notes (the "<u>Collins Notes</u>"): (i) Tranche 1, with a face value of A$30,700,000, and (ii) Tranche 2, with a face value of A$12,157,143. The Collins Notes bear a non-default interest rate of 10% *per annum* and a default interest rate of 15% *per annum*, with a maturity date of three years from the date that each note is issued. The Collins Notes are convertible into outstanding shares of AHQ, subject to a conversion rate. Pursuant to that certain *Guaranty and Security Agreement* by and between Debtors ACUSA, NECH, NECC, and BWM, non-Debtors AHQ, North Central Energy Company, and Raton Basin Analytic LLC, as grantors (collectively, the "<u>Grantors</u>") and Collins, dated May 24, 2022 (as amended, the "<u>Guaranty and Security Agreement</u>"), the obligations arising under the Collins Notes are guaranteed by each Grantor and secured by first-priority liens (by virtue of the Subordination Agreement) on substantially all of the assets of the Grantors, subject to certain customary exclusions (the "<u>Collins Collateral</u>").

---

[3] Nothing contained in this Declaration is intended or shall be construed as an admission as to the validity, amount or priority of any claim or lien against the Debtors. The Debtors reserve all rights to dispute any claim or lien, including those of their prepetition lenders.

13. As of the date of this filing, the aggregate principal amount outstanding under the Collins Notes is approximately A$42,857,000.

14. Cline Note. On October 26, 2020, NECC entered into that certain *Promissory Note* in favor of Cline Mining Corporation in the amount of US$35,120,670.84 (as amended and restated, the "Cline Note"). The Cline Note has a maturity date of July 1, 2030. NECC's obligations under the Cline Note were guaranteed by (i) NECC's non-Debtor subsidiaries, Raton Basin Analytical, LLC, and North Central Energy Company, and (ii) NEHC pursuant to that certain *Guarantee Agreement*, dated October 26, 2020.

15. Pursuant to that certain *Pledge and Security Agreement*, dated October 26, 2020, the obligations under the Cline Note were secured by substantially all the assets of NECC and North Central, and NEHC's pledged membership interests in NECC (the "Cline Collateral"). Cline's security interest in the Cline Collateral is subordinate only to certain customary permitted liens and the obligations arising under the Collins Notes pursuant to that certain *Subordination Agreement* by and between Cline and Collins, dated May 24, 2022 (the "Subordination Agreement").

16. As of the date of this filing, the aggregate principal amount outstanding under the Cline Note is approximately US$26,000,000

17. Trade and Miscellaneous Unsecured Debt. The Debtors estimate that as of the Petition Date claims of trade and miscellaneous unsecured creditors total approximately US$15,200,000.

**IV. Events Leading to Filing these Chapter 11 Cases.**

18. The emergency filing of these chapter 11 cases was precipitated by two events: (1) the threatened termination of the lease for BWM's right to mine by the lessor of the

6

Black Warrior mine and (2) Collins' notice of an event of default under the Collins Note Agreement and Guaranty and Security Agreement, demanding repayment of its debt in full (a value of no less than AU$42,857,143) within 5 business days.

19. The recent turmoil began when the lessor of the mineral rights at the Black Warrior mine threatened to terminate the lease granting BWM the right to mine. BWM and Warrior Met Coal Land, LLC ("Warrior Met") are parties to that certain *Surface Coal Mining Lease*, dated March 17, 2009 (the "Lease"), pursuant to which Warrior Met, as lessor, granted to BWM the right to mine and remove, by surface mining methods only, the coal that existed in, on or under the property described in the Lease. In exchange, BWM agreed to pay Warrior Met certain royalties—an actual-production royalty based on the sales price of the coal that it mines and a monthly minimum royalty if the actual-production royalty payment is less than a certain amount. On Friday, February 17, 2023, Warrior Met unexpectedly informed the Debtors that it was terminating the Lease effective immediately and ordered that all mining operations at Black Warrior cease.

20. In August 2022, BWM requested that Warrior Met allow an alternative calculation to determine the amount of actual-production royalty payments owed because changes in BWM's sales model called for a more reasonable calculation for actual-production royalty payments. BWM stopped making actual-production royalty payments until an agreement as to the appropriate calculation was reached. During this time, BWM continued to operate the mine and the parties agreed to an extension of the Lease until December 31, 2023. BWM also continued to make the monthly minimum royalty payment.

21. Despite the ongoing discussions regarding the actual-production royalty payments, Warrior Met abruptly issued a termination notice of the Lease. Three hours after issuing

the notice, Warrior Met rescinded its termination until Monday, February 20, 2023, at 9:00 a.m. Concerned with preserving the Lease and the jobs of the approximately 80 employees at the Black Warrior mine, the Debtors negotiated extensively with Warrior Met over the weekend of February 18–19 to broker a deal that would allow the Debtors to continue operating the mine with the Lease intact.  The Debtors kept Collins informed of the negotiations with Warrior Met in real time.

22. Shortly before the Monday forbearance deadline, the Debtors reached an agreement with Warrior Met, whereby Warrior Met agreed to not terminate the Lease in exchange for the Debtors' payment of the actual-production royalty payments on an agreed-to payment schedule, with an initial payment to be made on February 22, 2023.

23. Despite the Debtors' good-faith negotiations and resolution with Warrior Met, the Debtors' prepetition lender, Collins, sought to prevent payment to Warrior Met.  Late on February 20, 2023, Collins sent a formal notice to the Debtors' parent company, AHQ, calling an event of default under the Collins Note Agreement and Guaranty and Security Agreement.  In particular, Collins asserted that an event of default had occurred, and was continuing, as a result of the Debtors' inability to pay their debts as they come due in connection with Warrior Met's February 17 termination letter and the termination of the Lease, even though a payment schedule had been reached and the termination rescinded.  As a result of the alleged default, Collins demanded that the Debtors pay all funds due under the Collins Note Agreement (an amount no less than AU$42,857,143) within 5 business days.  In accordance with the terms of the Collins Note Agreement, the notice of default increased the interest rate payable under the Collins Note Agreement from 10% to 15% retrospectively from the date the debt was first issued and imposed the default rate of interest going forward.

8

24. The Debtors immediately requested that Collins withdraw the notice of default. To date, Collins has refused to do so. Therefore, AHQ had no alternative but to enter bankruptcy protection and appoint an administrator in Australia because AHQ and the Debtors are not able to repay Collins' prepetition debt in full on 5 business days' notice.

25. Unfortunately, as a result of the foregoing recent events, the Debtors were forced to file these chapter 11 cases on an emergency basis. The Debtors perceived an imminent threat that, absent a bankruptcy filing and the imposition of the automatic stay, the Debtors would have to layoff substantially all their workforce and cease operating the mines to the detriment of the Debtors' creditors and stakeholders. The Debtors intend to make use of the breathing spell afforded to them by the imposition of the automatic stay to further evaluate their strategic alternatives with input from their various stakeholders.

**V.     First Day Motions**

26. Shortly after filing their chapter 11 petitions, the Debtors filed the following motions:

    i. *Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases*

    ii. *Debtors' Motion for Interim Order Authorizing the Debtors to Honor Prepetition Workforce Obligations*

    iii. *Debtors' Motion for an Order (I) Authorizing Debtors to (A) Continue their Existing Cash Management System, (B) Maintain their Bank Accounts and Existing Business Forms, (C) Implement Changes to the Existing Cash Management System as Necessary, and (D) Continue Ordinary Course Intercompany Transactions, (II) Extending the Time to Comply with the Requirements of 11 U.S.C. § 345(b) and the U.S. Trustee's Operating Guidelines, and (III) Granting Related Relief*

    iv. *Debtors' Motion for Interim Order (I) Authorizing the Debtors to Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Lender; (III) Waiving any Stay of the Effectiveness of the Relief Granted; and (IV) Granting Related Relief*

27. The Debtors' principal focus is to obtain Court authority to use cash collateral to ensure that the Debtors are able to satisfy their payroll obligations on February 24 and March 3, 2023, and pay certain vendors critical to maintaining operations at the mines. The facts set forth in the motions are incorporated herein in their entirety. The Debtors have tailored their requests to seek relief necessary in the first two weeks of these chapter 11 cases to minimize further disruption to their business and importantly, to ensure that the Debtors' employees do not experience undue hardship. The Debtors, with the assistance of their legal and financial advisors, are preparing several typical motions and applications for first day relief, which the Debtors expect to be in a position to file the week of February 27, 2023. The Debtors expect to supplement certain of the above-listed motions.

28. The Debtors have also tailored their requests for immediate relief to those circumstances where the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates. I believe an orderly transition into chapter 11 is critical to the viability of the Debtors' operations and deleveraging of the Debtors' funded-indebtedness, and that any delay in granting the relief described in the first day motions could hinder the Debtors' operations and cause irreparable harm.

29. I have reviewed each of the first day motions and am familiar with the content and substance contained therein. The facts set forth in each first day motion are true and correct to the best of my knowledge and belief with appropriate reliance on other members of the Debtors' management and the Debtors' advisors, and I can attest to such facts. I believe that the relief requested in each of the first day motions listed above (a) is necessary to allow the Debtors to operate with minimal disruption and productivity losses during these chapter 11 cases, (b) is critical to maximize value of the Debtors' estates through preserving customer and supplier

relationships, among other things, (c) is essential to pursuing a plan of reorganization that maximizes the value of the Debtors' estates, and (d) serves the best interests of the Debtors' creditors and other stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: February 22, 2023   *Jonathan Romcke*_____
Jonathan Romcke
Chief Executive Officer for Debtors Allegiance Coal USA Ltd., New Elk Coal Holdings LLC, and New Elk Coal Company LLC
Vice President for Black Warrior Minerals, Inc.