**Exhibit 2**
**Convertible Note Agreement**

# Convertible Note Agreement

| | |
|---|---|
| **Date** | 24 / 5 / 22 |

**Parties**

**Allegiance Coal Limited ACN 149 490 353**
of Suite 107, 109 Pitt Street Sydney NSW 2000
**(AHQ)**

**Allegiance Coal USA Limited**
a Delaware corporation with registered address of 1209 Orange Street,
Wilmington, Delaware, 19801, USA
**(Allegiance USA)**

**Collins St Convertible Notes Pty Ltd** ACN 657 773 754 as trustee for The
Collins St Convertible Notes Fund ABN 30 216 289 383
of Level 9, 365 Little Collins Street, Melbourne VIC 3000
**(Subscriber)**

The parties agree as follows:

## 1 Definitions and Interpretations

### 1.1 Definitions

In this Agreement:

**Agreement** means:

(a)     this Convertible Note Agreement;

(b)     each Option;

(c)     the Note; and

(d)     each document, agreement or instrument entered into under, pursuant to or for the purposes of anything in paragraphs (a) to (c) of this definition;

**Allotment Date** means the date on which Ordinary Shares are issued in respect of a Conversion;

**ASX** means ASX Limited or the Australian Securities Exchange, as the context requires;

**Authorisation** means:

(a)     any consent, registration, filing, agreement, notice of non-objection, notarisation, certificate, licence, approval, permit, authority or exemption from, by or with a Governmental Agency or the ASX; or

(b)     in relation to anything which a Governmental Agency or the ASX may prohibit or restrict within a specific period, the expiry of that period without intervention or action or notice of intended intervention or action;

**Bonus Entitlement Date** means a date on which entitlements to participate in a bonus issue are ascertained for the holders of the Ordinary Shares by way of capitalisation of profits or otherwise (but for the avoidance of any doubt does not relate to a date for determining entitlements to any issue which is not a bonus issue);

**Business Day** means a day on which banks are open for business in Melbourne excluding a Saturday, Sunday or public holiday;

**Change of Control Event** occurs when:

(a)   the offeror under a takeover offer in respect of all Ordinary Shares declares that it has achieved acceptances in respect of more than 50.1% of Ordinary Shares and that takeover bid has become unconditional; or

(b)   the announcment by AHQ that AHQ's shareholders have at a Court convened meeting of shareholders voted in favour, by the necessary majority, of a proposed scheme of arrangement under which all AHQ securities are to be either cancelled or transferred to a third party, and the Court, by order, has approved the proposed scheme of arrangement.

**Cleansing Statement** has the meaning given in clause 11.2(d);

**Closing Price** means the closing price per Ordinary Share on the trading day immediately preceding execution of this Agreement;

**Compulsory Acquisition** means an actual or proposed compulsory acquisition, resumption, appropriation or confiscation of, or freezing, restraining or forfeiture order in connection with, assets under legislation or otherwise, including a restriction or order under which compensation is payable in connection with assets;

**Conditions Precedent** means each conditions precedent set out in clause 3.1;

**Conversion** means the conversion of all or any portion of the Outstanding Face Value into Ordinary Shares in accordance with this Agreement;

**Conversion Date** means, in respect of a Note, the date on which a Conversion Notice is given to Allegiance USA and to AHQ;

**Conversion Notice** means a notice given by the Subscriber substantially in the form set out in Schedule 1;

**Conversion Price** means $0.816 per Ordinary Share as adjusted in accordance with clause 12;

**Corporations Act** means the *Corporations Act 2001* (Cth);

**Encumbrance** means an interest or power:

(a)   reserved in or over an interest in any asset including, but not limited to, any retention of title; or

(b)   created or otherwise arising in or over any interest in any asset under a security agreement, bill of sale, mortgage, charge, lien, pledge, trust or power or any other agreement having similar effect,

by way of, or having similar commercial effect to, security for the payment of a debt, any other monetary obligation or the performance of any other obligation, and includes, but is not limited to, any agreement to grant or create any of the above and includes a security interest within the meaning of section 12(1) of the *Personal Property Security Act 2009* (Cth);

**Establishment Fee** means in respect of Notes issued under:

(a)   clause 4, a fee equivalent to 2.5% of the Tranche 1 Face Value plus any applicable GST; and

(b)   clause 5, a fee equivalent to 2.5% of the Tranche 2 Face Value plus any applicable GST;

**Event of Default** means any of the events or circumstances described in clause 17.1;

**Financial Indebtedness** means any indebtedness, present or future, actual or contingent, in respect of moneys borrowed or raised in any financial accommodation whatever including, without limitation, under or in respect of any overdraft facility, bill, bond, note, certificate or deposit, transferable or negotiable instrument, acceptance, Guarantee, redeemable or repurchasable share or stock, discounting arrangement, finance lease, swap, option, futures contract or analogues transaction, put option, hire purchase, deferred purchase price (for more than 90 days) of any asset or service, or any obligation to deliver goods or provide services paid for in advance by any financier or in connection with any other financing

2

transaction provided that, in all cases, financial indebtedness shall not include trade creditors incurred in the ordinary course of the Group's business;

**Financial Report** means in relation to an entity, the following financial statements and information in relation to the entity, prepared for its financial half year or financial year:

(a)    a statement of financial performance;

(b)    a statement of financial position; and

(c)    a statement of cashflows,

together with any notes to those documents and any accompanying reports, statements, declarations and other documents or information;

**Governmental Agency** means any government or government department, any governmental, semi-governmental or judicial authority or person, any statutory body exercising any administrative or legislative function;

**Group** means AHQ, Allegiance USA, New Elk Coal Holdings LLC, New Elk Coal Company LLC, North Central Energy Company, Raton Basin Analytic LLC, Black Warrior Minerals, Inc and any other of AHQ's Subsidiaries;

**Guarantee** means a guarantee, indemnity, letter of credit or letter of comfort which gives rise to legal liabilities, whether of suretyship or otherwise, or any other obligation (whatever called and of whatever nature):

(a)    to pay, to purchase, to provide funds (whether by way of advance of money, the purchase of or subscription for, shares or other securities the purchase of assets, rights or services or otherwise) for the payment or discharge of;

(b)    to indemnify against the consequences of default in the payment of; or

(c)    otherwise to be responsible for,

any obligation or indebtedness, any dividend, capital or premium on shares or stock, or the insolvency or financial condition of any other person;

**Immediately Available Funds** means cash, bank cheque wire transfer, electronic funds transfer or any other payment that the relevant parties agree in writing;

**Issue Date** means the date of issue of the Note in accordance with this Agreement;

**Liquidity Event** means the happening of one or more of the following events in respect of any member of the Group

(a)    except for the purpose of a solvent reconstruction or amalgamation which has the prior written consent of the parties, process is filed in a court seeking an order that it be wound up or that a controller be appointed to it or any of its assets, unless the application is withdrawn, struck out or dismissed within 21 days of it being filed;

(b)    an order is made that it would be wound up or that a controller be appointed to it or any of its assets;

(c)    a resolution that it be wound up is passed or proposed;

(d)    a liquidator, provisional liquidator, controller or any similar official is appointed to, or takes possession or control of, all or any of its assets or undertaking;

(e)    an administrator is appointed to it, a resolution that an administrator be appointed to it is passed or proposed, or any other steps are taken to appoint an administrator to it;

(f)    it enters into, or resolves to enter into, an arrangement, compromise or composition with any of, or any class of, its creditors or members, or an assignment for the benefit of any of, or any class of, its creditors, or process is filed in a court seeking approval of any such arrangement, compromise or composition;

(g)    a reorganisation, moratorium, deed of company arrangement or other administration involving one or more of its creditors is proposed or effected;

3

(h)     any action is taken by the Australian Securities & Investments Commission or any other Governmental Agency with a view to cancelling its registration or to dissolving it, or an application is made to the Australian Securities & Investments Commission or any other Governmental Agency that any such action be taken;

(i)     it is insolvent:

    (i)     within the meaning of Section 95A of the Corporations Act;

    (ii)    as disclosed in its accounts or otherwise;

    (iii)   as it is unable to pay its debts;

    (iv)    as it is presumed to be insolvent under any applicable law;

    (v)     as a result of the operation of section 459F(1) of the Corporations Act , it is taken to have failed to comply with a statutory demand;

    (vi)    as it stops or suspends or threatens to stop or suspend:

        (A)     the payment of all or a class of its debts; or

        (B)     the conduct of all or a substantial part of its business or threatens to do so;

(j)     a Change of Control Event occurring;

(k)     completion of a sale, lease or other disposition of all or substantially all of the assets of the Group; or

(l)     anything having a substantially similar effect to any of the events specified in the preceding paragraphs happens to it under the law of any jurisdiction;

**Listing Rules** means the listing rules of the ASX;

**Material Adverse Effect** means:

(a)     a material adverse effect on the ability of a member of the Group to perform and comply with its obligations under the Note or on the Noteholder's rights under this Agreement provided that, for the avoidance of doubt, an event or circumstances which is general in nature (including, for example, an outbreak in hostilities, general operating performance, a pandemic or a change in market conditions generally) is not a Material Adverse Effect; or

(b)     a matter where the adverse effect on the Group is in an amount greater than $2,000,000;

**Nebari** means Nebari Natural Resources Credit Fund I, LP a Delaware limited partnership;

**Note** means any note issued under and in accordance with this Agreement;

**Noteholder** means the person who is or, if more than one, the several persons who are, for the time being the holder or holders of a Note;

**Note Certificate** means a certificate in the form set out in Schedule 2 and issued to the Subscriber in respect of a Note held by it for the time being;

**Option** means an option to subscribe for an Ordinary Share at the Conversion Price at any time before the 36 month anniversary of the Issue Date and otherwise on the terms set out in Schedule 4;

**Option Certificate** means a certificate in the form set out in Schedule 3 and issued to the Subscriber in respect of each Option held by it for the time being;

**Optionholder** means the person who is or, if more than one, the several persons who are, for the time being the holder or holders of an Option;

**Ordinary Share** means a fully paid ordinary share in the capital of AHQ;

**Outstanding Face Value** means, in respect of the Note:

(a)     upon the issue of the Note pursuant to clause 4, but before Tranche 2 Completion:

        (i)       an amount in dollars equal to the difference between the Tranche 1 Face Value and the portion or those portions of that Note that have been previously repaid, redeemed and or converted (if at all and as the case may be) in accordance with these terms; and

        (ii)      which amount is evidenced in the Note Certificate;

(b)     after Tranche 2 Completion:

        (i)       an amount in dollars equal to the difference between the Total Face Value and the portion or those portions of the Note that has been previously repaid, redeemed and or converted (if at all and as the case may be) in accordance with these terms; and

        (ii)      which amount is evidenced in the Note Certificate;

**Permitted Encumbrance** means:

(a)     an Encumbrance that is expressly permitted under a Security Document;

(b)     a deemed Security Interest under section 12(3) of the *Personal Property Security Act 2009* (Cth) which does not secure any payment or the performance of any obligation;

(c)     a purchase money security interest in Secured Property to the extent it secures the obligation to pay all or part of the purchase price of the Secured Property and in respect of which a member of the Group purchased the Secured Property in the ordinary course of its ordinary business;

(d)     an Encumbrance which arises only by operation of law in the ordinary course of ordinary business and in respect of which the money secured is not overdue for payment or is being contested in good faith; or

(e)     an Encumbrance to which the Subscriber has given its express prior written consent.;

**Prepaid Interest Calculation Date** means the date that is 24 months before the Prepaid Interest Repayment Date;

**Prepaid Interest Calculation Period** means the period:

(a)     commencing on Prepaid Interest Calculation Date; and

(b)     ending on the Prepaid Interest Repayment Date;

**Prepaid Interest Repayment Date** means the Repayment Date on the basis that the Repayment Date is the date referred to in paragraph (a) of the definition of the term Repayment Date.

**Quarter** means each period of three calendar months starting on a day after a Quarter End Date and ending on a Quarter End Date;

**Quarter End Date** means each 31 March, 30 June, 30 September and 31 December;

**Register of Noteholders** means the register of Noteholders maintained by Allegiance USA in accordance with clause 14.1(a)14.2(b);

**Register of Optionholders** means the register of Optionholders maintained by AHQ in accordance with clause 14.1(b);

**Repayment Date** means, in respect of the Note, the earlier of:

(a)     three years from the date a Note is first issued under this Agreement;

(b)     the happening of an Event of Default, unless the Event of Default is capable of remedy, in which case within 5 Business Days of the happening of the Event of Default, where the Event of Default has not been remedied within that 5 Business Day period; and

(c)     any other date as agreed between Allegiance USA and the Noteholder;

**Security Documents** means the Tranche 1 Security Documents and the Tranche 2 Security Documents (if any);

**Security Interest** means a mortgage, pledge, lien, charge, assignment, hypothecation, secured interest, title retention arrangement, preferential right or other arrangement (including a conditionally repayable deposit or "flawed asset" arrangement), trust or power, in each case having the same or a similar commercial effect as a grant of security, and any agreement to create or give any such arrangements and, to the extent not covered above, includes a security interest within the meaning of the *Personal Property Securities Act 2009* (Cth);

**Secured Property** means the property secured under any Transaction Document;

**Subscription Monies** means the Tranche 1 Subscription Monies and Tranche 2 Subscription Monies that have been advanced or may be advanced by the Subscriber in accordance with this Agreement;

**Subsidiary** of a body corporate means a subsidiary as defined in Part 1.2, Division 6 of the Corporations Act (or any similar provision under an analogous law in any other relevant jurisdiction) and includes any subsidiary formed or acquired after the date of this Agreement;

**Tax** means:

(a)     any tax, including goods and services tax, levy, charge, impost, duty, fee, deduction, compulsory loan or withholding; or

(b)     any income, stamp or transaction duty, tax or charge,

which is assessed, levied, imposed or collected by any Governmental Agency and includes, but is not limited to, any interest, fine, penalty, charge, fee or other amount imposed on or in respect of any of the above;

**Tax Act** means the *Income Tax Assessment Act 1936* (Cth) or the *Income Tax Assessment Act 1997* (Cth), as the context requires;

**Tax Consolidated Group** means a consolidated group (as defined in the Tax Act);

**Total Face Value** means the sum total of the Tranche 1 Face Value and the Tranche 2 Face Value;

**Tranche 1 Completion** means completion of each of the acts set out in clauses 4.2, 4.3 and 4.4;

**Tranche 1 Completion Date** means the date of this Agreement or such other date agreed between the parties in writing;

**Tranche 1 Face Value** means $30,700,000;

**Tranche 1 Security Documents** means the following documents in the form agreed between the parties before the Tranche 1 Completion Date:

(a)     the Guaranty and Security Agreement, dated on or about the date of this Agreement between the Subscriber, Allegiance Coal USA, AHQ, New Elk Coal Company LLC, a Colorado limited liability company, New Elk Coal Holdings LLC, a Delaware limited liability company, North Central Energy Company, a Colorado corporation, Raton Basin Analytic LLC, a Colorado limited liability company and Black Warrior Minerals, Inc., an Alabama corporation; and

(b)     the Deed of Guarantee, Indemnity and charge dated on or about the date of this Agreement between AHQ and the Subscriber;

(c)     the Payoff Letter, dated on or about the date of this Agreement, in connection with the Loan and Security Agreement dated as of November 21, 2021, by and among Allegiance USA, AHQ, New Elk Coal Holdings LLC, New Elk Coal Company LLC, and Black Warrior Minerals, Inc. and Nebari, and providing for the automatic termination of all liens held by Nebari upon the payment to it of the amount stated therein, shall have been executed and delivered by the parties to the Loan and Security Agreement;

(d)     the Subordination Agreement dated on or about the date of this Agreement by and between the Subscriber and Cline Mining Corporation, a British Columbia corporation: and

(e)     the Specific Security Deed dated on or about the date of this Agreement between AHQ and the Subscriber;

**Tranche 1 Subscription Monies** means the amount of the Tranche 1 Face Value to be paid by the Subscriber in accordance with clause 4.4;

**Tranche 2 Completion** means completion of each of the acts set out in clauses 5.2, 5.3 and 5.4;

**Tranche 2 Completion Date** means 7 days after satisfaction or waiver, in accordance with clause 3, of the Conditions Precedent or such other date agreed between the parties;

**Tranche 2 Deadline** means 10 June 2022 or such other date agreed between the parties;

**Tranche 2 Face Value** means $12,157,143;

**Tranche 2 Security Documents** means the documents to be agreed between the parties to take security over the Tranche 2 Secured Property;

**Tranche 2 Secured Property** means all the assets of the Group other than:

(a)     assets in respect of which security is granted to the Subscriber under the Tranche 1 Security Documents; and

(b)     those assets that the Subscriber expressly agrees in writing are not "Tranche 2 Secured Property";

**Tranche 2 Subscription Monies** means the amount of the Tranche 2 Face Value to be paid by the Subscriber in accordance with clause 5.4;

**Transaction Documents** means:

(a)     this Agreement;

(b)     each Security Document;

(c)     any other document that the parties agree is a Transaction Document for the purposes of this document;

(d)     each document, agreement or instrument entered into under, pursuant to or for the purposes of anything in paragraphs (a) to (c); and

**Transaction Party** means Allegiance USA, AHQ and each person who gives any collateral or who gives a guarantee under any Transaction Document, or any one or more of them.

1.2     **Interpretation**

In this Agreement, headings and boldings are for the convenience only and do not affect the interpretation of this Agreement and, unless the context otherwise requires:

(a)     words importing the singular include the plural and vice versa;

(b)     words importing a gender include any gender;

(c)     other parts of speech and grammatical forms of a word or phrase defined in this Agreement have a corresponding meaning;

(d)     an expression importing a natural person includes any company, partnership, joint venture, association, corporation or other body corporate and any Governmental Agency;

(e)     a reference to any thing (including, but not limited to, any right) includes a part of that thing but nothing in this clause 1.2(e) implies that performance of part of an obligation constitutes performance of the obligation;

(f)     a reference to a clause, party, annexure, exhibit or schedule is a reference to a clause of, and a party, annexure, exhibit or schedule to, this Agreement and a reference to this Agreement includes any annexure, exhibit and schedule;

(g)     a reference to a statute, regulation, proclamation, ordinance or by-law includes all statutes, regulations, proclamations, ordinances or by-laws amending, consolidating

or replacing it, and a reference to a statute includes all regulations, proclamations, ordinances or by-laws issued under that statute;

(h) a reference to a document includes all amendments or supplements to, or replacements or novations of, that document;

(i) a reference to a party to a document includes that party's successors and permitted assigns;

(j) a reference to an asset includes all property of any nature, including, but not limited to, a business, and all rights, revenues and benefits;

(k) no provision of this Agreement will be construed adversely to a party solely on the ground that the party was responsible for the preparation of this Agreement or that provision;

(l) "related body corporate" or "security" respectively has the same meaning as in the Corporations Act;

(m) $ means the lawful currency of the Commonwealth of Australia and USD means the lawful currency of the United States of America.

**1.3    Business Day**

Where the day on or by which any thing is to be done is not a Business Day, that thing must be done on or by the preceding Business Day.

## 2    Consideration

(a) At the request of AHQ and Allegiance USA, the Subscriber has agreed to enter into this Agreement with Allegiance USA and AHQ.

(b) AHQ acknowledges and agrees that the Subscriber's entry into this Agreement with Allegiance USA is sufficient and satisfactory consideration in respect of AHQ's obligations to the Subscriber under this Agreement.

## 3    Conditions precedent

**3.1    Conditions**

The Subscriber's obligation to advance the Tranche 2 Subscription Monies is subject to the following conditions being satisfied or waived before the Tranche 2 Deadline:

(a) a mining valuation specialist nominated and engaged by the Subscriber to review, consider, evaluate and value (on an as is and where is basis) the Tranche 2 Secured Property:

(i) completing such work; and

(ii) presenting a report of such work to the Subscriber (**Valuation Report**),

and Allegiance USA must pay the costs of the Valuation Report on demand, irrespective of whether Tranche 2 Completion occurs;

(b) the Valuation Report valuing the Secured Property in respect of which the Subscriber will be taking first ranking security at a value that must be satisfactory to the Subscriber, such value to be determined by the Subscriber in its absolute discretion (which amount will not be less than USD 30 million);

(c) the Subscriber undertaking due diligence in respect of the affairs of AHQ, Allegiance USA and each member of the Group and it being satisfied, to be determined in its absolute direction, with the results of that due diligence; and

(d) the parties agreeing the form of the Tranche 2 Security Documents.

| 3.2 | **Obligation to co operate** |

Each party must use its best endeavours to ensure that the Conditions Precedent are satisfied as soon as possible but in any event before the Tranche 2 Deadline.

| 3.3 | **Further obligation to co operate** |

Without limiting the generality of clause 3.2:

(a)    each party must make all necessary and appropriate applications and supply all necessary and appropriate information for the purpose of enabling the Conditions Precedent to be satisfied;

(b)    no party may take any action, or fail to take any action, that would or would be likely to prevent or hinder the satisfaction of the Conditions Precedent; and

(c)    each party must:

   (i)    supply to the other party copies of all notices and applications made and all information supplied for the purpose of enabling the Conditions Precedent to be satisfied; and

   (ii)   keep the other party informed in a timely manner of the status of any discussions or negotiations with relevant third parties regarding the Conditions Precedent.

| 3.4 | **Obligation to notify** |

If a party becomes aware:

(a)    that a Condition Precedent has been satisfied; or

(b)    of any facts, circumstances or matters that may result in a Condition Precedent not being or becoming incapable of being satisfied;

that party must promptly notify each other party accordingly.

| 3.5 | **Waiver of Conditions Precedent** |

The Conditions Precedent are for the benefit of the Subscriber and may only be waived in writing by the Subscriber.

| 3.6 | **Failure to satisfy Conditions Precedent** |

If, by the Tranche 2 Deadline, the Conditions Precedent are not satisfied (to the satisfaction of the Subscriber), capable of being satisfied or waived, then the parties will not be obliged to effect Tranche 2 Completion.

# 4    Completion – Tranche 1

| 4.1 | **Time and place** |

Tranche 1 Completion must occur at 11.00am on the Tranche 1 Completion Date at:

(a)    the office of the Subscriber's solicitors as notified by the Subscriber to Allegiance USA in writing; or

(b)    any other place or time agreed by the Subscriber and Allegiance USA in writing.

| 4.2 | **Issue of Note** |

At Tranche 1 Completion, Allegiance USA must:

(a)    issue a Note to the Subscriber with a face value in the amount of the Tranche 1 Face Value; and

(b)    deliver to the Subscriber a duly executed Note Certificate in respect of the Note with a face value in the amount of the Tranche 1 Face Value.

| 4.3 | **Further obligations of Allegiance USA** |

Contemporaneously with Tranche 1 Completion Allegiance USA must:

(a)  deliver to the Subscriber a payout letter setting out the amounts payable to Nebari to settle all liability of the Group to Nebari;

(b)  execute the Tranche 1 Security Documents to which it is described as a party and deliver such documents to the Subscriber;

(c)  cause each party to the Tranche 1 Security Documents other than the Subscriber to execute each Tranche 1 Security Document to which it is described as a party and to deliver each such document to the Subscriber;

(d)  enter the Subscriber's name in the Register of Noteholders in respect of the Note issued pursuant to clause 4.2;

(e)  pay the Establishment Fee to Collins St Convertible Notes Pty Ltd ACN 657 773 754 by way of set off against the Tranche 1 Subscription Monies; and

(f)  pay to the Subscriber the amount determined in accordance with clause 7.2(a)(iii) to be paid by way of set off against the Tranche 1 Subscription Monies.

| 4.4 | **Subscriber's obligations at Completion** |

At Tranche 1 Completion the Subscriber may set off against the Tranche 1 Subscription Monies the amounts to be paid:

(a)  pursuant to clauses 4.3(e) and 4.3(f) of this Agreement;

(b)  in respect of costs and fees payable by AHQ or Allegiance USA under this Agreement; and

(c)  in respect of costs and fees payable by AHQ or Allegiance USA under the term sheet in respect of the transaction set out in this Agreement,

and the Subscriber must pay the balance in Immediately Available Funds into the bank account of Allegiance USA notified before the Tranche 1 Completion Date or as otherwise instructed by Allegiance USA in writing before the Tranche 1 Completion Date.  The Subscriber and Allegiance USA acknowledge that Subscriber has been instructed to pay Nebari the amount set out in the letter referred to in clause 4.3(a).

| 4.5 | **Interdependent obligations** |

(a)  The requirements of clauses 4.2, 4.3, and 4.4 are interdependent and are to be carried out contemporaneously and, as nearly as may be possible, simultaneously. No delivery, payment or other event referred to in clauses 4.2, 4.3, and 4.4 may be treated as having been made or occurred until all deliveries and payments have been made and all other events have occurred.

(b)  If Tranche 1 Completion does not occur on the Tranche 1 Completion Date, then the Subscriber will not be required to effect Tranche 1 Completion.

# 5  Completion – Tranche 2

| 5.1 | **Time and place** |

Tranche 2 Completion must occur at 11.00am on the Tranche 2 Completion Date at:

(a)  the office of the Subscriber's solicitors as notified by the Subscriber to Allegiance USA in writing; or

(b)  any other place or time agreed by the Subscriber and Allegiance USA in writing.

| 5.2 | **Issue of Note** |

At Tranche 2 Completion, Allegiance USA must:

     (a)      issue a Note to the Subscriber with a face value in the amount of the Tranche 2 Face Value; and

     (b)      deliver to the Subscriber a duly executed Note Certificate in respect of the Note with a face value in the amount of the Tranche 2 Face Value plus the Outstanding Face Value as at that date.

## 5.3 Further obligations of Allegiance USA

Contemporaneously with Tranche 2 Completion Allegiance USA must:

     (a)      execute the Tranche 2 Security Documents to which it is described as a party and deliver such documents to the Subscriber;

     (b)      cause each party to the Tranche 2 Security Documents other than the Subscriber to execute each Tranche 2 Security Document to which it is described as a party and to deliver each such document to the Subscriber

     (c)      enter the Subscriber's name in the Register of Noteholders in respect of the Note issued pursuant to clause 5.2;

     (d)      pay the Establishment Fee to Collins St Convertible Notes Pty Ltd ACN 657 773 754 to be paid by way of set off against the Tranche 2 Subscription Monies; and

     (e)      pay to the Subscriber the amount determined in accordance with clause 7.2(a)(iv) to be paid by way of set off against the Tranche 2 Subscription Monies.

## 5.4 Subscriber's obligations at Completion

At Tranche 2 Completion the Subscriber:

     (a)      must deliver to Allegiance USA the existing Note it holds for cancellation by Allegiance USA; and

     (b)      may set off against the Tranche 2 Subscription Monies the amounts to be paid:

          (i)      pursuant to clauses 5.3(d) and 5.3(e); and

          (ii)     in respect of costs and fees payable by AHQ or Allegiance USA under this Agreement,

and the Subscriber must pay the balance in Immediately Available Funds into the bank account of Allegiance USA notified before the Tranche 2 Completion Date or as otherwise instructed by Allegiance USA in writing at least 2 Business Days before the Tranche 2 Completion Date.

## 5.5 Interdependent obligations

The requirements of clauses 5.2, 5.3 and 5.4 are interdependent and are to be carried out contemporaneously and, as nearly as may be possible, simultaneously. No delivery, payment or other event referred to in clauses 5.2, 5.3 and 5.4 may be treated as having been made or occurred until all deliveries and payments have been made and all other events have occurred.

# 6 Convertible Note

## 6.1 General

The Note:

     (a)      is governed by this Agreement;

     (b)      does not carry a right to vote at a general meeting of AHQ, unless provided for by law;

     (c)      is paid for in full on issue by the Subscriber; and

     (d)      may be converted into Ordinary Shares in accordance with this Agreement.

| 6.2 | **Acknowledgement of indebtedness of Allegiance USA** |
|---|---|

Allegiance USA acknowledges that, on and from the Issue Date, and at all times until the full amount of the Outstanding Face Value has been unconditionally repaid in full or has been fully converted into Ordinary Shares (as the case may be), Allegiance USA will be indebted to the Subscriber in the amount of the Outstanding Face Value.

**6.3    Obligations cease**

Upon the redemption of the Outstanding Face Value of the Note in full in accordance with clause 9, or Conversion of the Outstanding Face Value of the Note in full in accordance with clause 10, the obligations of Allegiance USA and AHQ with respect to the repayment or conversion of that Outstanding Face Value are extinguished in full.

# 7    Interest

**7.1    Ordinary interest**

(a)    Allegiance USA must pay to the Subscriber interest on the Outstanding Face Value in the manner set out in this clause.

(b)    Subject to clause 7.5, interest will be calculated on the Outstanding Face Value at an interest rate of 10% per annum.

**7.2    Interest payable contemporaneously with the advance of Subscription Monies**

(a)    On any day that the Subscriber advances Subscription Monies to Allegiance USA (**Advance Date**), Allegiance USA becomes immediately indebted to the Subscriber for the interest in respect of the Prepaid Interest Calculation Period such interest to be calculated on the basis that:

    (i)    interest is payable on the Outstanding Face Value at an interest rate of 10% per annum; and

    (ii)    no amount of the Outstanding Face Value is converted into Ordinary Shares or repaid before the Prepaid Interest Repayment Date,

and Allegiance USA must pay such amount to the Subscriber on the Advance Date, which amounts will be paid by way of the Subscriber withholding such amounts from amounts that it is required to pay to Allegiance USA on the relevant Advance Date.

The parties acknowledge and agree that in respect of:

    (iii)    the Tranche 1 Subscription Monies, the amount to be withheld under this clause is $6,140,000; and

    (iv)    the Tranche 2 Subscription Monies, the amount to be withheld under this clause is $2,431,428.

(b)    If any amount of the Outstanding Face Value is converted into Ordinary Shares or redeemed at any time before the Prepaid Interest Calculation Date then the Subscriber must, within 7 days after the date of conversion or redemption repay to Allegiance USA an amount determined in accordance with the following formula:

$$X = A / B * (C - D)$$

    where

X is the amount to be repaid under this clause;

A is the amount of the Outstanding Face Value that is converted into Ordinary Shares or redeemed;

B is the Outstanding Face Value immediately before the conversion or redemption referred to in the definition of A;

C is the interest paid to the Subscriber pursuant to clause 7.2(a); and

D is any amount previously paid to Allegiance USA under this clause 7.2(b).

(c)   If any amount of the Outstanding Face Value is converted into Ordinary Shares or redeemed at any time after the Prepaid Interest Calculation Date then the Subscriber must repay to Allegiance USA the notional interest that was paid on the amount of the Outstanding Face Value that was converted or redeemed in respect of the period commencing on the date of conversion or redemption and ending on the Prepaid Interest Repayment Date.

By way of example, if:

(i)   the Outstanding Face Value on the Prepaid Interest Calculation Date is $10,000,000;

(ii)   the prepaid interest on that date is $2,000,000;

(iii)   $4,000,000 of the Outstanding Face Value is converted 12 months before the Prepaid Interest Repayment Date such that the new Outstanding Face Value is $6,000,000

then

(iv)   the Subscriber must repay $400,000 to Allegiance USA on the basis that of the $2,000,000 prepaid interest:

(A)   $1,000,000 of prepaid interest is retained for the first 12 months after the Prepaid Interest Calculation Date; and

(B)   $600,000 of prepaid interest is retained in respect of the balance of the Outstanding Face Value until the Prepaid Interest Repayment Date.

**7.3   Payment of monthly interest**

As a separate and independent obligation to clause 7.2(a), Allegiance USA must pay interest on the Outstanding Face Value:

(a)   at an interest rate of 10% per annum;

(b)   monthly in advance;

(c)   from the date of issue of the Note until the Prepaid Interest Calculation Date; and

(d)   in Immediately Available Funds.

**7.4   Interest on an Event of Default**

If an Event of Default occurs:

(a)   the interest rate payable under clause 7.3 will be 15% per annum and will be payable on demand retrospectively from the Issue Date and clause 7.3(a) is to be read as if the number "10%" was, on the date of this Agreement, "15%"; and

(b)   Allegiance USA must pay to the Subscriber an additional amount of interest of 5% per annum in respect of the period:

(i)   commencing on the later of the occurrence of the Event of Default and the Prepaid Interest Calculation Date; and

(ii)   ending on the Prepaid Interest Redemption Date,

such interest payable on demand.

**7.5   Default Interest**

(a)   Allegiance USA must pay interest on:

(i)   any amount of the Outstanding Face Value that is due and payable, but unpaid; and

(ii)   any interest payable but unpaid under clause 7.1.

(b)   The rate of interest payable under this clause is 15% per annum.

| 7.6 | **Accrual of Interest** |
|---|---|

The interest payable under clause 7.5:

(a) accrues day to day from and including the due date for payment up to the actual date of payment, before and, as an additional and independent obligation, after any judgment or other thing into which the liability to pay the Outstanding Face Value becomes merged; and

(b) may be capitalised by the Subscriber at monthly intervals.

| 7.7 | **Exercise of conversion right** |
|---|---|

The issue and allotment of Ordinary Shares on Conversion does not discharge any obligation to pay interest under this clause 7 in respect of any amount of Outstanding Face Value or accrued interest which has not been capitalised up to the date of Conversion.

## 8 Use of funds and Audit

| 8.1 | **Use of funds** |
|---|---|

Allegiance USA must, until the Outstanding Face Value has been unconditionally repaid in full or has been fully converted into Ordinary Shares:

(a) use the Subscription Monies strictly in accordance with the budget set out in Schedule 6;

(b) not increase the remuneration or benefits it pays or provides to any of its directors, senior executives or other officers by more than the movement in the CPI during the previous period of 12 consecutive months without first obtaining the prior written consent of the Subscriber. The expression 'movement in the CPI' means upward movement in the All Groups Consumer Price Index (Australia) during the previous period of 12 consecutive months; and

(c) not declare or pay any dividend or distributions.

| 8.2 | **Audit** |
|---|---|

(a) AHQ must permit any representative of the Subscriber, with reasonable notice, from time to time (including in respect of any request by the Subscriber made in accordance with clause 16.9(b)) but no more than once every 12 months, to visit and inspect the property, projects and operations of the Group, and inspect and take copies of the bank accounts of any member of the Group's, accounts, books and records, at reasonable times and at those times permit any representatives of the Group to discuss the affairs, finances, accounts, use of the Subscription Monies, debt levels of the Group and condition of the  Group with the officers and employees of the Subscriber and the advisers of the Subscriber (including independent accountants).

(b) Within 30 days after each Quarter End Date, AHQ must provide to the Subscriber a consolidated unaudited financial report of the Group in respect of the immediately preceding Quarter, such report to include a profit and loss statement and cash flow statement for the relevant Quarter and a balance sheet as at the Quarter End Date. At least two directors of AHQ must confirm to the Subscriber, in writing, that to the best of their knowledge, having made reasonable enquiries, each such report is true and accurate and not misleading, including by omission.

(c) Within 5 Business Days after a request by the Subscriber to AHQ, AHQ must provide to the Subscriber, to the reasonable satisfaction of the Subscriber, documentary evidence that AHQ has at all times complied with clause 8.1.

## 9 Redemption

| 9.1 | **Redemption on Repayment Date** |
|---|---|

Subject to this clause 9 and subject to clause 10.1, on the Repayment Date Allegiance USA must redeem the Note and pay the Outstanding Face Value in respect of the Note to the

Subscriber together will all costs, fees and unpaid interest required to be paid pursuant to this Agreement.

9.2    **Early Redemption**

(a)    Allegiance USA may, on or before the Repayment Date, deliver to the Subscriber notice of its intention to redeem all of the Outstanding Face Value of the Note in a single tranche by paying the full amount of the Outstanding Face Value to the Subscriber (**Repayment Notice**).  The Repayment Notice must:

(i)    be dated; and

(ii)    state that the full amount of the Outstanding Face Value to be redeemed; and

(iii)    specify:

(A)    that the Outstanding Face Value of the Note that will remain immediately following the redemption will be zero; and

(B)    the date the Note is to be redeemed and the Outstanding Face Value paid to the Subscriber, which must not (unless agreed otherwise between Allegiance USA and the Subscriber in writing) be less than 30 days after the date of the Repayment Notice is received by the Subscriber (**Notice Period**) and not more than 40 days after that date.

(b)    The Subscriber may (at its sole discretion):

(i)    convert, in one or more tranches, the Outstanding Face Value (or any portion of the Outstanding Face Value) into Ordinary Shares in accordance with clause 10 during the Notice Period and prior to the Note being redeemed in accordance with this clause 9; or

(ii)    reject any Repayment Notice that does not materially meet the requirements of clause 9.2(a), in which case Allegiance USA shall not be entitled to redeem the Note on the basis of the rejected Repayment Notice.

(c)    Provided the relevant Repayment Notice has not be rejected pursuant to clause 9.2(b)(ii), Allegiance USA must pay the Outstanding Face Value less any amount converted pursuant to clause 9.2(b)(i) to the Subscriber in Immediately Available Funds, as directed in writing by the Subscriber, on the date for payment set out in the Repayment Notice.

(d)    Allegiance USA need not (but may at its election) make a payment to the Subscriber pursuant to this clause unless the Subscriber surrenders to it the Note Certificate for the Note.

(e)    Contemporaneously with redemption of the Note pursuant to this clause 9.2:

(i)    Allegiance USA must pay to the Subscriber a fee equivalent to 2.5% of the Outstanding Face Value that is redeemed so that the amount to be repaid pursuant to this clause is increased to 102.5% of the Outstanding Face Value; and

(ii)    Allegiance USA must cause AHQ to, and AHQ must issue to the Subscriber (at no cost to the Subscriber) the number of Options determined in accordance with the below formula:

$$N = RA/C$$

where

$N$ = Number of Options to be issued

*RA* = *the amount to be repaid pursuant to this clause; and*

*C* = *the Conversion Price.*

For the avoidance of doubt, where Allegiance USA has issued a Repayment Notice and the Subscriber has elected to convert all or some of the Outstanding Face Value under clause 6.2(b)(i) no Options will be issued to the Subscriber in respect of the amount converted.

(f) Notwithstanding any other provision in this Agreement, the obligation to issue Options pursuant to clause 9.2(e)(ii) is not conditional on the receipt by AHQ of prior shareholder approval. Accordingly, Allegiance USA may only exercise its early redemption rights pursuant to clause 9.2(a) if AHQ has sufficient placement capacity under ASX Listing Rule 7.1 or has obtained prior shareholder approval in accordance with ASX Listing Rule 7.2 to issue the number of Options required by clause 9.2(e)(ii) and AHQ must ensure that if Allegiance USA exercises the early redemption right that AHQ maintains that placement capacity until the Options are issued.

(g) Allegiance USA must not exercise its redemption rights under this clause 9.2 if it is reasonably likely that AHQ will be subject to a Control Event.

(h) Allegiance USA does not have the right to redraw on any portion of the Note that has been redeemed.

## 9.3 Payments in gross

(a) All payments due to the Subscriber under this Agreement must be paid without any set off counterclaim or condition or any deduction or withholding for any Tax or any other reason, unless the required to make a deduction or withholding by applicable law.

(b) The Subscriber must provide Allegiance USA with a W-8 and any other associated or required documentation as required to ensure the debt can meet the portfolio interest exemption to the U.S. tax/withholding tax rules in order that the interest would be subject to 0% U.S. withholding when paid.  Allegiance USA shall report the payment of interest on Form 1042 and Form 1042-S.

## 9.4 Additional payments

Subject to the Subscriber's compliance with clause 9.3(b), if there is a deduction or withholding in respect of Tax from any payment to be made to the Subscriber, AHQ or Allegiance USA (as the case may be):

(a) indemnifies the Subscriber against that Tax; and

(b) must pay to the Subscriber an additional amount which the Subscriber determines to be necessary to ensure that the Subscriber receives when due a net amount (after payment of any Tax in respect of each additional amount) that is equal to the full amount it would have received if a deduction or withholding or payment of Tax had not been made.

# 10 Conversion

## 10.1 Conversion

(a) Subject to clause 10.1(c), the Subscriber may, at any time before midnight on the day immediately preceding the Repayment Date, convert a Note (or a portion of a Note) into Ordinary Shares by giving a Conversion Notice to Allegiance USA and AHQ. To the extent that any portion of the Outstanding Face Value of a Note remains unconverted, more than one Conversion Notice may be issued in respect of the same Note.

(b) Allegiance USA and AHQ must convert a Note upon receipt of a valid Conversion Notice given by the Subscriber to Allegiance USA and AHQ in accordance with clause 10.1(a), with allotment of Ordinary Shares on Conversion in accordance with clause 11.2.

(c) Notwithstanding any other provision of this Agreement:

    (i) the issue of Ordinary Shares on Conversion is subject to and conditional upon the issue of the relevant Ordinary Shares not resulting in any person being in breach of section 606(1) of the Corporations Act and if a the issue of Ordinary Shares on Conversion would result in a breach of section 606(1) of the Corporations Act then the notice will be taken to have be withdrawn to the extent that it cannot be converted and Allegiance USA must issue a replacement Note for the amount not able to be converted and any unconverted Outstanding Face Value; and

    (ii) AHQ will not be required to seek the approval of its members for the purposes of item 7 of section 611 of the Corporations Act to permit the issue of any Ordinary Shares on Conversion.

## 10.2 Conversion Notice

(a) A Conversion Notice requires Allegiance USA to convert the Note (or a portion of any Note) in the Conversion Notice:

    (i) as at the relevant Conversion Date; and

    (ii) to the extent specified in the Conversion Notice.

(b) A Conversion Notice must specify in respect of the Note (or a portion of a Note) to be converted, the amount (or portion) of the Outstanding Face Value to be converted. Where a portion of the Outstanding Face Value is to be converted, the portion must be no less than $200,000 (or the balance of the Outstanding Face Value if less than $200,000).

(c) A Conversion Notice for Conversion of some or all of a Note must be accompanied by the Note Certificate for the Note to be converted. Where:

    (i) the Conversion Notice is not accompanied by the Note Certificate for a Note to be converted because it is lost or destroyed; and

    (ii) Allegiance USA would be obliged to issue a replacement Note Certificate in accordance with this Agreement,

then the Conversion Notice will be deemed to have been properly given on the date that is received by Allegiance USA in accordance with this Agreement.

(d) A Conversion Notice given under this clause 10 cannot be withdrawn without the consent of Allegiance USA.

## 10.3 Conversion Ratio

Upon receipt of a Conversion Notice, Allegiance USA must procure, and AHQ must issue to the Subscriber (or any transferee of the Subscriber) that number of Ordinary Shares for each Note (or a portion of any Note) calculated by applying the following formula (**Conversion Ratio**):

$$A = \frac{B}{C}$$

where:

    A   =   the number of Ordinary Shares to be issued;

    B   =   the portion of the Outstanding Face Value of the Note specified in the Conversion Notice; and

    C   =   the Conversion Price.

## 11    Conversion Notice

### 11.1    New Note Certificate

If less than the Outstanding Face Value of the Note immediately before the Conversion Date is to be converted Allegiance USA must issue to the Subscriber a new Note Certificate for the Outstanding Face Value immediately following the Conversion Date and must update the Register of Noteholders accordingly.

### 11.2    Allotment and ranking of shares

(a)    Each Ordinary Share issued upon Conversion must:

(i)    be allotted within five Business Days after the Conversion Date;

(ii)    be issued in accordance with the constitutional documents of AHQ and the relevant provisions of the Corporations Act and Listing Rules; and

(iii)    rank equally with, and have all rights, benefits and obligations identical with, the existing Ordinary Shares.

(b)    The Ordinary Shares issued on Conversion will participate in full in any dividend payment or other entitlement in respect of Ordinary Shares where the Subscriber gives a Conversion Notice on or before the entitlement date (including a Bonus Entitlement Date) for the dividend payment or other entitlement.

(c)    The issue of the Ordinary Shares calculated in accordance with this Agreement will be treated for all purposes as full repayment by Allegiance USA of that portion of the Outstanding Face Value converted.

(d)    If required for any Ordinary Shares issued on Conversion to be freely tradable, AHQ must on or within 5 Business Days after the Allotment Date lodge with the ASX a notice in accordance with section 708A of the Corporations Act (**Cleansing Statement**) in relation to those Ordinary Shares, or if AHQ is unable to do so, AHQ must lodge a disclosure document with ASIC within 5 Business Days of the Allotment Date.

(e)    Allegiance USA must cause AHQ to, and AHQ must make an application for official quotation by the ASX of all Ordinary Shares issued and allotted on Conversion as soon as reasonably practicable after such issue and allotment and in any event within the time stipulated by the Listing Rules.

(f)    Within 5 Business Days of an Allotment Date, Allegiance USA and AHQ must procure that the Subscriber is issued with a holding statement from the registry of AHQ for the Ordinary Shares.

(g)    Unless otherwise directed by the Subscriber, any issue and allotment of Ordinary Shares to the Subscriber under the terms of this Agreement is to be settled electronically with the Subscriber to the account notified in writing by the Subscriber to Allegiance USA for the purposes of this clause.

## 12    Reconstructions and anti dilution

### 12.1    Reconstructions

(a)    If there is a reconstruction of the issued capital of AHQ, including without limitation any:

(i)    reduction, repayment by way of reduction, consolidation or reclassification or division of the issued capital of AHQ;

(ii)    an issue of Ordinary Shares by way of capitalisation of profits or reserves; or

(iii)    an issue of Ordinary Shares in lieu of dividends or distributions,

then the basis for conversion of the Note will be reconstructed in the same proportion and manner as the reconstruction of the issued capital of AHQ or otherwise in a manner that would eliminate any disadvantage to the Subscriber and subject to the

same provisions (if any) with respect to the rounding of entitlements as are sanctioned by the meeting of shareholders of AHQ which approves that reconstruction. Such reconstruction must not result in the Subscriber receiving a benefit that holders of Ordinary Shares do not receive.

(b)     Until such time as the Outstanding Face Value has been unconditionally repaid in full or has been fully converted into Ordinary Shares (as the case may be), AHQ must not enter into any agreement with a third party for the issue of any options, performance rights, warrants or other convertible instruments, without the prior written consent of the Subscriber (such consent not to be unreasonably withheld or delayed). This restriction does not apply to any options and performance rights issued pursuant to any employee incentive scheme of AHQ or any issue of Ordinary Shares on conversion or exercise of any convertible securities on issue before the date of this Agreement.

(c)     If AHQ conducts a bonus issue while the Note is on issue, the basis for conversion of the Note as at the record date of the bonus issue must be adjusted by the number of bonus Ordinary Shares that the Subscriber would have received if the Note had been exercised prior to the record date for the bonus issue.

(d)     If AHQ issues Ordinary Shares (other than on conversion of Note or pursuant to a pro rata (other than a bonus issue) the Conversion Price must be adjusted by applying a discount equivalent to the amount raised as part of a fundraise as a proportion of AHQ's market capital immediately prior to the fundraise. For example, if AHQ undertakes a capital raise to raise $10 million when its market capital is $100 million, then the Conversion Price must be reduced by 10%. This clause will not apply in respect of an issue or Ordinary Shares for which the subscription price is above the Conversion Price. To avoid doubt, if any other benefit is to be granted a subscriber for Ordinary Shares (such as a free option), then this clause will apply to such fundraise.

(e)     If there is a pro rata issue (except a bonus issue), the Conversion Price will be reduced according to the following formula (or as otherwise defined in the ASX listing rules):

$$Cn = Co - \frac{[P - (S + D)]}{N + 1}$$

where:

**Cn**  =  the new Conversion Price

**Co**  =  the old Conversion Price

**P**  =  the average market price per security (weighted by reference to volume) of the underlying securities during the 5 trading days ending on the day before the ex-right date or the ex-entitlements date;

**S**  =  the subscription price for a security under the pro rata issue;

**D**  =  dividend due but not yet paid on the existing underlying securities (except those issued under the pro rata issue);

**N**  =  the number of securities with rights or entitlements that must be held to receive a right to one new security.

However this does not apply to Ordinary Shares issued as part of a bonus share plan, share top up plan, share purchase plan, dividend reinvestment plan or an employee incentive plan.

## 13   Transfer of the Note

### 13.1   Transfer of Notes

Other than in respect of a transfer of the Note by the Subscriber to an associated entity, the Subscriber may only transfer the Note with the consent of Allegiance USA, such consent not to be unreasonably withheld, by an instrument in writing in common form or in such other form as Allegiance USA may approve (acting reasonably).

### 13.2   Procedure on transfer

(a)   Every instrument of transfer must be signed by the transferor and transferee unless complying with the provision of any law whereby such instrument is deemed to be signed in the event of such compliance.

(b)   Every instrument of transfer must be sent to Allegiance USA and must be accompanied by the Note Certificate and evidence of the payment of any applicable stamp duty.

(c)   Where:

(i)   an instrument of transfer is not accompanied by a Note Certificate because it is lost or destroyed; and

(ii)   Allegiance USA would be obliged to issue a replacement Note Certificate in accordance with this Agreement,

the instrument of transfer will be deemed to have been properly given on the date that it is received by Allegiance USA in accordance with this Agreement.

### 13.3   Restrictions on transfer

(a)   No transfer will be effected during the five Business Days (or such shorter period as Allegiance USA may decide) immediately preceding the Repayment Date of the Note.

(b)   Unless otherwise directed by the Noteholder in writing, Allegiance USA will retain the Outstanding Face Value of the Note which is the subject of any transfer notice given to Allegiance USA within the period specified in clause 13.3(a) until the specified transferee is registered as the holder of the Note and payment can be made to the specified transferee.

### 13.4   Recognition of transferees

A Noteholder registered pursuant to a transfer will be recognised by Allegiance USA as entitled to the Note free from any equity, set off or cross claim on the part of Allegiance USA against the original or any intermediate holder of the Note.

## 14   Registers

### 14.1   Register of Noteholders and Optionholders

(a)   Allegiance USA must establish and maintain a register of Noteholders (**Register of Noteholders**) at its registered office or at such other place permitted by relevant law as Allegiance USA may determine.

(b)   AHQ must establish and maintain a register of Optionholders (**Register of Optionholders**) at its registered office or at such other place permitted by the Corporations Act as AHQ may determine.

(c)   The Register of Noteholders must set out the name and address of the Noteholder and the Outstanding Face Value on the Note from time to time.

(d)   The Register of Optionholders must set out the name and address of the Optionholder, the number of Options issued to the Optionholder, the exercise price and expiry date of each Option.

(e)   The Subscriber must promptly notify Allegiance USA and AHQ of any change of its name or registered address accompanied, in the case of change of name, by such

evidence as Allegiance USA and AHQ may reasonably require and Allegiance USA must promptly update the Register of Noteholders and AHQ must promptly update the Register of Optionholders accordingly.

## 14.2 Note Certificates

(a) Where the portion of the Outstanding Face Value specified in any Note Certificate that is cancelled in connection with the Conversion of any Note is less than the entire Outstanding Face Value in respect of that Note, Allegiance USA must issue to the Noteholder a Note Certificate in respect of the difference within 10 Business Days from the date when the conversion is recorded in the Register of Noteholders. The amount equal to the difference will comprise the new Outstanding Face Value in respect of that Note.

(b) Upon receipt by Allegiance USA of evidence from the Subscriber of the loss, theft, destruction or mutilation of a Note Certificate, Allegiance USA must promptly cancel that certificate and issue to the Subscriber a new Note Certificate that is identical to, and which replaces, the certificate that was lost, stolen, destroyed or mutilated.

## 14.3 Option Certificates

(a) Where a portion of the Options specified in any Option Certificate that is cancelled in connection with the exercise of any Option is less than the entire number of Options in respect of that Option Certificate, AHQ must issue to the Optionholder an Option Certificate in respect of the difference within 10 Business Days from the date when the exercise is recorded in the Register of Optionholders. The amount equal to the difference will comprise the new Option.

(b) Upon receipt by AHQ of evidence from the Subscriber of the loss, theft, destruction or mutilation of an Option Certificate, AHQ must promptly cancel that certificate and issue to the Subscriber a new Option Certificate that is identical to, and which replaces, the certificate that was lost, stolen, destroyed or mutilated.

# 15   Warranties

## 15.1 AHQ and Allegiance USA representations and warranties

Each of AHQ and Allegiance USA represent and warrant to and for the benefit of the Subscriber, on the date of this Agreement, on the Tranche 1 Completion Date, on the Tranche 2 Completion Date, on each date on which a Note is on issue and the date any Options or Ordinary Shares are issued under this Agreement, that:

(a) **Registration**: it is a corporation duly incorporated or registered (or taken to be registered) and validly existing under the Corporations Act or under analogous legislation in its place of incorporation;

(b) **Corporate power**: it has the corporate power to own its assets and to carry on its business as it is now being conducted;

(c) **Authority**: it has power and authority to enter into and perform its obligations under the Transaction Documents to which it is a party

(d) **Board approval**: its board, by unanimous resolution, approved the execution of this Agreement;

(e) **Authorisations**: it has taken all necessary action to authorise the execution, delivery and performance of the Transaction Documents to which it is a party;

(f) **Binding obligations**: each Transaction Document to which it is a party constitutes legal, valid and binding obligations and, subject to any necessary stamping and registration, is enforceable in accordance with its terms subject to laws generally affecting creditors' rights and to principles of equity;

(g) **Transaction permitted**: the execution, delivery and performance by it of the Transaction Documents to which it is a party will not breach or result in a contravention of:

(i) any law, regulation or Authorisation;

(ii) its constitution or other constituent documents; or

(iii) any agreement which is binding on it,

and will not result in:

(iv) the creation or imposition of any Encumbrance on any of its assets other than as permitted under a Transaction Document; or

(v) the acceleration of the date for payment of any obligation under any agreement which is binding on it;

(h) **Disclosure**: all information provided to the Subscriber by or on its behalf in relation to the Group, the Group's assets, business or affairs was correct and not misleading (by omission or otherwise) as at the time it was provided;

(i) **No failure to disclose**: it has not withheld from the Subscriber any information which a reasonable person in the Subscriber's position would consider material to enter into any Transaction Document;

(j) **No Event of Default**: no Event of Default has occurred or will occur as a result of entering into any Transaction Document;

(k) **Legal and beneficial owner** there is no Compulsory Acquisition affecting the Group or any of the Group's assets;

(l) **Commercial benefit**: the entering into and performance by it of its obligations under each Transaction Document is for its commercial benefit and is in its commercial interests;

(m) **Compliance with laws**: the Group has complied in all material respects with all applicable laws and regulations;

(n) **No litigation**: there is no current, pending or (to its knowledge, having made due enquiry), threatened proceeding, investigation or claim affecting any member of the Group or any of their assets before a court, authority, commission or arbitrator;

(o) **Financial Reports**:

(i) its most recent Financial Report complies with all applicable law and standards;

(ii) that Financial Report gives a true and fair view of its financial position and performance and, if it is required to prepare consolidated financial statements, the financial position and performance of the consolidated entity constituted by it and the entities it is required to include in those statements; and

(iii) there has been no material change in its financial position since the date of its most recent Financial Report that has not been disclosed on the ASX;

(p) **Taxes**:

(i) each member of the Group has paid or procured payment of all Taxes when due and payable;

(ii) no outstanding claims for Taxes not reflected in its most recent accounts exist, which are required to be reflected in the accounts;

(iii) no Group member is overdue in the filing of any Tax returns or other information required to be filed by it with any relevant tax authority to ensure that it complies with any obligation to pay Tax; and

(iv) no Group member has incurred any tax liabilities on behalf of any entity or person;

(q) **Not a trustee**: it does not enter into any Transaction Document or hold any asset as trustee;

22

| (r) | **Continuous disclosure**: if listed on the ASX, there is no current failure to comply with its periodic and continuous disclosure obligations under the Listing Rules (including, without limitation, Listing Rule 3.1) and the Corporations Act, as applicable; |

(s) **No reliance:**

    (i) it has entered into the Transaction Documents to which it is a party without relying on the Subscriber or its advisers or on any representation, warranty, statement, undertaking or conduct of any kind made by any of them or on their behalf except as expressly set out in the Transaction Documents; and

    (ii) it has obtained its own tax and legal advice on the Transaction Documents and the transactions in connection with them.

(t) **Claims**: to the best of its knowledge, information and belief there are no claims in respect of the Group's assets which are reasonably likely to have a Material Adverse Effect;

(u) **No orders**: it has not received from any Governmental Agency any notice or order requiring it or any other person to perform or cease to perform any act in relation to its business;

(v) **Intellectual property**: each member of the Group is entitled to use, or will be entitled to use at the relevant time, all intellectual and commercial property rights necessary for, or intended to be used by it in conjunction with the operation of its business;

(w) **No other interests**: other than any Permitted Encumbrance:

    (i) no person holds or has the benefit of an Encumbrance or other interest in its Secured Property; and

    (ii) there is no agreement, filing or registration that would enable another party to obtain priority over the security granted by a Security Document;

(x) **Security:**

    (i) each Security Document creates the Encumbrance purported to be created by it over the assets purported to be encumbered by it; and

    (ii) each Security Document has the priority it is intended to have;

(y) **Securities on issue**: AHQ warrants that, on the date of this Agreement, it has on issue the number of securities set out in Schedule 5;

(z) **Shareholder approval**: the issue of Ordinary Shares on Conversion does not require shareholder approval under Listing Rule 7.1;

(aa) **Entitlement to rely on disclosure exemption**: as of the date of this Agreement, each date on which Notes, Shares or Options are issued, and each date on which AHQ issues a Cleansing Statement under this Agreement (each, a **Cleansing Statement Date**) AHQ and the Subscriber are entitled to rely on the sale offer exemption under section 708A(5) of the Corporations Act in respect of the Ordinary Shares or Options issued;

(bb) **Section 713(6) of the Corporations Act**: ASIC has not made a determination in relation to AHQ under section 713(6) of the Corporations Act;

(cc) **Non-public information**: Neither Allegiance USA, AHQ nor any person acting on their behalf has provided the Subscriber or its agents, representatives or counsel with any inside information (as defined in the Corporations Act) or any material non-public information, and to the knowledge of Allegiance USA or AHQ, the Subscriber does not possess any inside information or material non-public information (and, to the extent this warranty is breached, AHQ must immediately release the relevant inside information to the market); and

(dd) **Excluded Information**: As at the date of this Agreement, the Tranche 1 Completion Date and the Tranche 2 Completion Date, AHQ has no information that has not been told to the ASX in accordance with Listing Rule 3.1A.

15.2 **Subscriber representations and warranties**

The Subscriber represents and warrants to and for the benefit of each of AHQ and Allegiance USA, on the date of this Agreement and on the Tranche 1 Completion Date and on the Tranche 2 Completion Date, that:

(a) **Organisation, good standing and qualification**:

(i) The Subscriber is a validly existing entity and has all requisite power and authority to enter into and consummate the transactions contemplated in the Transaction Documents and otherwise to carry out its obligations under this Agreement.

(ii) The Subscriber is in good standing under the laws of the jurisdiction of its place of incorporation and has all requisite power and authority to carry on its business as now conducted and to own its properties;

(b) **Authorisation**: The execution, delivery and performance by the Subscriber of the Transaction Documents have been duly authorised and will each constitute a valid and legally binding obligation of the Subscriber, enforceable against the Subscriber in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganisation, moratorium and similar laws of general applicability, relating to or affecting creditors' rights generally;

(c) **Trustee**:

(i) the Subscriber is the sole trustee of The Collins St Convertible Notes Fund ABN 30 216 289 383 (**Trust**) and no action has been taken to remove or replace them;

(ii) the Subscriber has the power under the trust deed for the Trust to execute and perform their obligations under the Transaction Documents;

(iii) all necessary action has been taken to authorise the execution and performance of the Transaction Documents under the constituent documents of the Trust;

(iv) this Agreement is executed and all transactions relating to this Agreement are or will be entered into as part of the due and proper administration of the Trust and are or will be for the benefit of the beneficiaries; and

(v) no controller, liquidator, administrator, statutory manager, trustee for creditors or in bankruptcy (or an analogous person) has been appointed in respect of the Trust or any part of the assets or undertaking of Trust; and

(d) **Status of Subscriber and disclosure**: The Subscriber is a sophisticated investor or professional investor as set out in section 708(8) and 708(11) of the Corporations Act, or otherwise falls within an exemption contained in section 708 of the Corporations Act as a person to whom the securities of AHQ can be issued without a requirement for disclosure on the part of AHQ under section 706 of the Corporations Act and, the Subscriber shall provide supporting documentation to AHQ upon request to establish its ability to rely on such sections.

15.3 **Survival and repetition of representations and warranties**

(a) The representations and warranties given under this Agreement survive the execution of each Transaction Document.

(b) The representations and warranties under this Agreement which are given on:

(i) the date of this Agreement;

(ii) the Tranche 1 Completion Date;

| (iii) | the Tranche 2 Completion Date; |
|---|---|
| (iv) | the date of issue of any Ordinary Shares under this Agreement; |
| (v) | the date of issue of any Options under this Agreement |
| (vi) | the date of each Transaction Document; and |

are given by reference to the facts and circumstances then existing.

### 15.4 Reliance

(a) AHQ and Allegiance USA each acknowledge that the Subscriber has entered into this Agreement in reliance on the representations and warranties given by AHQ and Allegiance USA under this Agreement.

(b) The Subscriber acknowledges that AHQ and Allegiance USA have entered into this Agreement in reliance on the representations and warranties given by the Subscriber under this Agreement.

## 16   Undertakings

### 16.1 Attendance at members' meetings

Without prejudice to the rights of the Subscriber in its capacity as a shareholder of AHQ, AHQ will permit the Subscriber to attend but not to vote at any general meeting of its members in its capacity as a Noteholder.

### 16.2 Information: miscellaneous

AHQ must supply to the Subscriber:

(a) copies of all documents dispatched by AHQ to its shareholders (or any class of them) or its creditors generally (or any class of them) at the same time as they are dispatched to the extent such document and information is not available on the ASX website;

(b) promptly upon becoming aware of them, the details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against any member of the Group and which might, if adversely determined, have a Material Adverse Effect;

(c) promptly after receipt, copies of any notices of default or claims of breach received or sent relating to any contract to which any member of the Group is a party which might, if adversely determined, have a Material Adverse Effect; and

(d) any other information which the Subscriber reasonably requests in relation to a member of the Group or any of their assets.

### 16.3 Notification of default

(a) AHQ and Allegiance USA must notify the Subscriber of any Event of Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence.

(b) At the request of the Subscriber, AHQ and Allegiance USA must provide to the Subscriber a certificate signed by at least 2 directors of AHQ and Allegiance USA stating:

(i) if an Event of Default has occurred; and

(ii) if so, full details of the relevant Event of Default and the remedial action being taken or proposed.

### 16.4 Proper accounts

AHQ must keep accounting records which give a true and fair view of the financial condition and state of affairs of the Group and which are prepared in accordance with the Corporations Act and the Listing Rules.

| 16.5 | **Inspection** |
|---|---|

(a)     AHQ must permit any representatives of the Subscriber, with reasonable notice, from time to time to visit and inspect the property, projects and operations of the Group, and inspect and take copies of their associated books and records, at reasonable times and at those times permit any representatives of any member of the Group to discuss the affairs, finances, accounts and condition of the Group with the officers and employees of the Subscriber and the advisers of the Subscriber (including independent accountants) appointed by the Subscriber to exercise its rights under this clause.

(b)     Without limiting the preceding clause, at any time following the occurrence of an Event of Default, AHQ must permit any representatives designated by the Subscriber to visit and inspect the financial records and the property of the Group, at reasonable times and as often as reasonably requested and to make extracts from and copies of the financial records, and permit any representatives of the Group to discuss the affairs, finances, accounts and condition of the Group with the officers and employees of the Subscriber exercising the rights under this clause (including independent accountants) and the advisers of the Subscriber (including independent accountants) appointed by the Subscriber.

(c)     AHQ shall pay or reimburse the Subscriber for all reasonable costs and expenses of the Subscriber incurred in connection with the exercise of the rights:

(i)     under Clause 16.5(a) for two site visits by the Subscriber or its representatives per calendar year; and

(ii)    under Clause 16.5(b) at any time while an Event of Default is continuing.

## 16.6   Taxes

AHQ must ensure that each member of the Group:

(a)     pays all rates and Taxes due and payable by them, except those which they are contesting in good faith;

(b)     pays all rates and Taxes contested in good faith which remain due and payable by them after final determination or settlement of the contest; and

(c)     if not a member of a Tax Consolidated Group as at the date of this document, only become a member of one with the consent of the Subscriber.

## 16.7   Insurance

AHQ must insure and keep insured with reputable insurers the assets of the Group which are of an insurable nature in a manner and to an extent which is reasonable and customary for a business enterprise engaged in a similar business and in a similar locality and for property of a similar nature.

## 16.8   Business

AHQ undertakes to take or procure to be taken all action necessary to:

(a)     operate the Group's business in accordance with good industry practice; and

(b)     ensure that all material assets used in the operation of the Group are:

(i)     maintained in good and efficient operating condition and working order (ordinary wear and tear excepted); and

(ii)    are protected from theft, loss or damage,

to the extent that a prudent operator would do so and that any material defects in their condition which will or may prejudice the development or operation of the Group's business are promptly rectified.

## 16.9   Cash holdings

(a)     AHQ must, from the:

(i) Tranche 1 Completion Date until the Outstanding Face Value has been unconditionally repaid in full or has been fully converted into Ordinary Shares, maintain at all times a cash balance of no less than $5,714,286; and

(ii) if Tranche 2 Completion occurs, from the Tranche 2 Completion Date until the Outstanding Face Value has been unconditionally repaid in full or has been fully converted into Ordinary Shares, maintain at all times a cash balance of no less than $7,142,857,

such funds to be held in an Authorised Deposit Taking Institution (which term has the meaning given in the *Banking Act 1959* (Cth)).

(b) Within the first 5 Business Days of each calendar month and within 5 Business Days of the Subscriber making a request under this clause, AHQ must provide to the Subscriber copies of all bank or account statements in respect of any bank, savings or other accounts owned or controlled by each member of the Group together with such verification requirements as may be demanded by the Subscriber.

(c) Each document provided to the Subscriber pursuant to clause 16.9(b) must be accompanied by a statement signed by at least two directors of AHQ:

(i) attesting that the document is genuine, true, accurate and complete in all respects; and

(ii) confirming that the document shows a true and fair picture of the affairs of the relevant member of the Group to which that document relates and that it is not misleading or deceptive, including by omission.

## 16.10 Payment

Allegiance USA must:

(a) pay interest on the Note in accordance with clause 7; and

(b) repay the Note on maturity in accordance with clause 9,

subject to and in accordance with this Agreement.

## 16.11 Negative undertakings

AHQ undertakes and covenants that unless the Subscriber otherwise consents:

(a) the Group will not deal in any way with any person except at arm's length in the ordinary course of business for valuable commercial consideration;

(b) other than:

(i) as permitted by law;

(ii) as permitted under the Listing Rules;

(iii) as permitted existing contracts or arrangements; or

(iv) as approved by shareholders of AHQ,

but subject always to the provisions of this Agreement, no member of the Group will pay or distribute any money or other asset (including by management or other fee, interest, dividend, distribution, return of capital, repayment or redemption) to or for the benefit of a shareholder or a beneficiary of a trust (or declare its intention to do so); and

(c) no member of the Group will cease or materially changes its business (whether by way of acquisition or otherwise).

## 16.12 Term of undertakings

Unless the Subscriber otherwise agrees in writing, AHQ and Allegiance USA must, at their own cost, comply with their undertakings in this Clause 16 until the Outstanding Face Value has been unconditionally repaid in full or has been fully converted into Ordinary Shares.

## 17    Events of Default

### 17.1    Events of Default

Each of the following is an Event of Default:

(a)    **ASX determination:** the ASX makes a determination that the terms of any Transaction Document do not comply with the Listing Rules, including, for the avoidance of doubt, Listing Rule 6.1;

(b)    **Non-payment:** any member of the Group fails to pay any amount when due and payable under any of the Transaction Documents and that failure is not remedied within three Business Days of the relevant member of the Group becoming aware of that failure;

(c)    **Other obligations:** any member of the Group fails to perform or breaches any other undertaking, covenant or obligation required of it under any Transaction Document, unless the failure:

(i)    is capable of remedy; and

(ii)    is remedied within five Business Days of the receipt by Allegiance USA or AHQ of a notice from the Subscriber specifying the failure;

(d)    **Authorisations:** any member of the Group fails to obtain any Authorisation necessary to enable it continue to undertake its business operations, or to comply with its obligations under any Transaction Document or any Authorisation of that kind ceases to be in full force and effect;

(e)    **Misrepresentation:** a representation, warranty or statement made, or taken to be made, by or on behalf of any member of the Group in a Transaction Document (or any document given by or on behalf of any member of the Group in connection with a Transaction Document) is incorrect or misleading when made or taken to be made and the error is reasonably likely to have a Material Adverse Effect and, if the circumstances giving rise to the misrepresentation can be remedied, the relevant member of the Group does not remedy them within five Business Days of the Subscriber notifying Allegiance USA or AHQ, or any member of the Group becoming aware of the relevant circumstances (whichever is the earlier);

(f)    **Winding-up:** an application or order is made for the winding-up or dissolution of any member of the Group or a resolution is passed or any steps are taken to pass a resolution for the winding-up or dissolution of any member of the Group otherwise than for the purpose of an amalgamation or reconstruction which has the prior written consent of the Subscriber not to be unreasonably withheld;

(g)    **Receiver:** a receiver, controller (within the meaning of section 9 of the Corporations Act) or analogous person is appointed to, or the holder of a Security Interest takes possession of all or any part of the assets of any member of the Group;

(h)    **Statutory demand:** any member of the Group is taken to have failed to comply with a statutory demand pursuant to section 459F of the Corporations Act;

(i)    **Compromise or arrangement:** any member of the Group takes any step for the purpose of entering into a compromise or arrangement with any of its members or creditors except for the purpose of reconstruction, amalgamation, merger or consolidation on terms approved by the Subscriber;

(j)    **Insolvency:** any member of the Group is or becomes unable to pay its debts when they are due or is or becomes unable to pay its debts within the meaning of the Corporations Act or is presumed to be insolvent under the Corporations Act;

(k)    **Bankruptcy:** any member of the Group commences any case or proceeding under Title 11 of the United States Code or any US state bankruptcy law or there is commenced again any member of the Group such a case or proceeding which remains undismissed, undischarged or unstayed for 30 days;

(l)      **Ceasing business**: any member of the Group ceases or threatens to cease to carry on business;

(m)     **Liquidity Event**: a Liquidity Event occurs in respect of any member of the Group;

(n)      **Administrator**: an administrator is appointed or a resolution is passed or any steps are taken to appoint, or to pass a resolution to appoint, an administrator to any member of the Group;

(o)      **Analogous event**: anything analogous to or having a substantially similar effect to any of the events specified in Clauses 17.1(f) to 17.1(n) happens in relation to any member of the Group under the laws of any jurisdiction;

(p)      **Distress or other execution**: the process of any court of authority (with reasonable grounds) is invoked against any member of the Group or a material part of the property of any member of the Group to enforce any judgement or order for any amount;

(q)      **Encumbrance**: any Encumbrance is or becomes enforceable against any asset of any member of the Group for amounts totalling more than $2,000,000 in aggregate;

(r)      **Cross-default**: any of the following occurs in each case provided that the event would be reasonably likely to have a Material Adverse Effect:

    (i)      any Financial Indebtedness of any member of the Group becomes due (other than at the option of the member of the Group) prior to its stated maturity by reason of the occurrence of an event of default or analogous occurrence and is unable to be remedied within 5 Business Days (however described);

    (ii)     any Financial Indebtedness of any member of the Group is not paid when due (having regard to any applicable grace period);

    (iii)    any Security Interest granted by any member of the Group is enforced or becomes capable of enforcement by reason of the occurrence of an event of default or analogous occurrence and is unable to be remedied within 5 Business Days (however described);

    (iv)    any stock, share, debenture, bond or similar instrument issued by any member of the Group is required or becomes capable of being required to be redeemed or repurchased prior to its stated maturity by reason of the occurrence of an event of default or analogous occurrence (however described);

(s)      **Termination**: any termination or failure, or threatened termination with reasonable cause of any material licenses, permits and consents necessary for the operation of the business of any member of the Group.

(t)      **Judgment**: a judgment in an amount exceeding $2,000,000 is obtained against any member of the Group and is not set aside or satisfied within 7 days or has not been stayed pending the outcome of an appeal to any higher court;

(u)      **Vitiation of Transaction Documents**:

    (i)      all or any material part of any provision of any Transaction Document is or becomes illegal, void, voidable, unenforceable or otherwise of limited force or effect;

    (ii)     any person becomes entitled to terminate, rescind or avoid all or any material part or material provision of any Transaction Document;

    (iii)    the execution, delivery or performance of any Transaction Document by any member of the Group violates, breaches or results in a contravention of any law, regulation or Authorisation; and

(v)      **Delisting or suspension**: AHQ is removed from the official list of ASX or suspended from trading on the ASX for more than 5 trading days in any 12 month period;

(w) **Deregistration**: any member of the Group is deregistered without the prior written consent of the Subscriber (which must not be unreasonably withheld or delayed);

(x) **Reduction of capital**: without the consent of the Subscriber, any member of the Group takes any action to reduce its capital, buy back any of its shares or make any of its shares capable of being called up only in certain circumstances (such as by passing a resolution or calling a meeting to consider such a resolution);

(y) **Compulsory acquisition**:

    (i) all or a material part of the property of any member of the Group is compulsorily acquired by any Governmental Agency; or

    (ii) any member of the Group sells or divests itself of all or a material part of its property pursuant to a binding order from a Governmental Agency;

(z) **Failure to comply with waiver**: if any Event of Default (or occurrence which would otherwise have been or become an Event of Default) is conditionally waived by the Subscriber and the relevant member of the Group does not comply with those conditions, or those conditions are not fulfilled (whether by AHQ or any other person) or are or become incapable of fulfilment;

(aa) **Investigations**: a person is appointed under any legislation to investigate or manage any part of the affairs of any member of the Group in relation to a material matter;

(bb) **Material adverse change**: an event with a Material Adverse Effect occurs;

(cc) **Inability to perform**: any member of the Group ceases for any reason to be able to lawfully carry out, at any time, any or all the transactions or obligations contemplated in any of the Transaction Documents;

(dd) **Use of funds**: any member of the Group:

    (i) breaches any of the requirements or restrictions in clause 8.1;

    (ii) takes any action to allow, or interferes with the Subscriber's ability to undertake the audit referred to in clause 8.2(a);

    (iii) does not provide the information as and when required by clause 8.2(b); or

    (iv) does not comply with a demand made pursuant to clause 8.2(c);

(ee) **Cash holding**: the relevant party does not:

    (i) comply with clause 16.9;

    (ii) provide the information as and when required by clause 16.9(b); or

    (iii) provide a statement in the form and within the timeframe required by clause 16.9(c);

(ff) **Allegiance USA**: AHQ ceases for any reason to hold (legally or beneficially) 100% of the issued share capital in Allegiance USA;

(gg) **Other obligations**: a Transaction Party fails to perform or breaches any other undertaking, covenant or obligation required of it under any Transaction Document or any condition of any waiver or consent by the Subscriber under or in connection with any Transaction Document; and

(hh) **Results write down**: the results of any member of the Group are adjusted or restated or are required to be adjusted or restated by an amount greater than $2,000,000 (in aggregate).

17.2 **Consequences of default**

(a) If an Event of Default occurs, and fails to be remedied, the Subscriber may then, or at any time subsequently while the Event of Default is continuing, by notice to Allegiance USA:

    (i) convert the Notes into Ordinary Shares at the Conversion Price;

(ii)    declare all money owing under any of the Transaction Documents (including the Outstanding Face Value) (other than any amounts Converted or to be Converted under clause 17.2(a)(i)) to be due and payable within 5 Business Days, and Allegiance USA must pay that money (including accrued interest and fees) and provide cash cover for the full amount of any money contingently owing under any of the Transaction Documents; and/or

(iii)    cancel its obligations (if any) under any of the Transaction Documents, other than with respect to clause 22.13).

(b)    For the avoidance of doubt, if the Subscriber does not exercise its rights under clause 17.2(a) the Agreement will remain on-foot and both parties shall comply with their respective obligations under the Agreement and any Transaction Document.

## 18    Guarantee

### 18.1    Guarantee and indemnity

(a)    AHQ and Allegiance USA (each a **Guarantor Party**) jointly and severally:

(i)    guarantee (unconditionally and irrevocably) to the Subscriber on demand, the due and punctual performance of the other Guarantor Party's obligations under the Transaction Documents; and

(ii)    as a separate and additional liability, indemnify the Subscriber against all losses, actions, proceedings and judgments of any nature, incurred by, brought, made or recovered against the Subscriber arising from any default or delay in the due and punctual performance of a Guarantor Party's obligations under the Transaction Documents.

(b)    If a Guarantor Party is not bound by some or all of the Guarantor Party's obligations under any Transaction Document, or if for any other reason the guarantee in clause 18.1(a) is not effective, each Guarantor Party agrees, by way of indemnity and principal obligation, to pay to the Subscriber the amount which would have been payable by the other Guarantor Party to the Subscriber under the guarantee in clause 18.1(a) had the guarantee been effective and the Guarantor Party been bound.

(c)    Each Guarantor Party remains liable under this clause 18 even if:

(i)    the other Guarantor Party:

(A)    enters into any composition or scheme or deed of arrangement with creditors; or

(B)    enters into receivership, administration or liquidation or is wound up or dissolved;

(ii)    the Subscriber cannot for any reason enforce a Transaction Document against a Guarantor Party;

(iii)    a Guarantor Party becomes a bankrupt or is otherwise incapacitated; or

(iv)    any part of the Guarantor Party's liability to the Subscriber is satisfied by a payment which (whether because it is a preference or for any other reason) the Subscriber must pay back or otherwise lose the benefit of, to the extent of the repayment or benefit so lost.

(d)    Until the Subscriber has received in full all money to which this clause 18 applies:

(i)    this clause 18 continues to bind each Guarantor Party;

(ii)    the Guarantor Parties are not entitled to prove in the liquidation of a Guarantor Party in competition with the Subscriber; and

(iii)    the Guarantor Parties are not entitled to claim the benefit of any security which the Subscriber may hold.

(e)     Each Guarantor Party acknowledges that it has not been induced to enter into any Transaction Document by virtue of any representation by or on behalf of the Subscriber, but acts entirely on its own responsibility.

(f)     Each Guarantor Party acknowledges that it has received consideration for entering into the guarantee and indemnity in this clause 18 in that the Subscriber has agreed to enter into the Transaction Documents at the request of the Guarantor Parties and in reliance upon the guarantee and indemnity given by them.

## 18.2    Extent of guarantee and indemnity

The liability of the Guarantor Parties under this clause is not affected by anything which, but for this clause 18, might operate to release or exonerate a Guarantor Party in whole or in part from their obligations including, without limitation, any of the following, whether with or without the consent of a Guarantor Party:

(a)     the grant to a Guarantor Party or any other person of any time, waiver or other indulgence, or the discharge or release of a Guarantor Party or any other person from any liability or obligation;

(b)     any transaction or arrangement that may take place between the Subscriber, a Guarantor Party or any other person;

(c)     the Subscriber exercising or refraining from exercising its rights under any security or any other rights, powers or remedies against a Guarantor Party or any other person;

(d)     the amendment, replacement, extinguishment, unenforceability, failure, loss, release, discharge, abandonment or transfer either in whole or in part and either with or without consideration, of any security now or in the future held by the Subscriber from a Guarantor Party or any other person or by the taking of or failure to take any security;

(e)     the failure or omission or any delay by the Subscriber to give notice to a Guarantor Party of any default by a Guarantor Party or any other person under a Transaction Document; and

(f)     any legal limitation, disability, incapacity or other circumstances related to the a Guarantor Party or any other person.

## 18.3    Principal, independent and continuing obligation

This clause 18 is a:

(a)     principal obligation and is not to be treated as ancillary or collateral to any other right or obligation and extends to cover this agreement as amended, varied, supplemented, renewed or replaced; and

(b)     continuing obligation of each Guarantor Party and remains in full force and effect for so long as the Guarantor Party has any liability or obligation to the Subscriber under a Transaction Document and until all of those liabilities or obligations have been fully discharged.

## 18.4    No withholdings

(a)     The Guarantor Parties must, jointly and severally, make all payments which become due under this clause 18, free and clear and without deduction of all present and future withholdings (including, without limitation, taxes, duties, levies, imposts, deductions and charges of Australia or any other jurisdiction).

(b)     If a Guarantor Party is compelled by law to deduct any withholding, it must pay to the Subscriber an amount equal to the withholding, in addition to any payment due under this clause 18.

## 18.5    No set off

The Guarantor Parties have no right to set off, deduct or withhold any moneys which they may be or become liable to pay under this clause 18, against any moneys which the Subscriber

may be, or become, liable to pay to a Guarantor Party whether under a Transaction Document or otherwise.

## 19    Notices

(a)    Any notice or other communication including, but not limited to, any request, demand, consent or approval, to or by a party to this Agreement:

    (i)    must be in legible writing and in English addressed as shown at the commencement of this Agreement or as otherwise specified to the sender by notice.

    (ii)    must, where the sender is a company, be signed by an officer or under the common seal of the sender;

    (iii)    is regarded as being given by the sender and received by the addressee:

        (A)    if by delivery in person, when delivered to the addressee;

        (B)    if by post within Australia, three Business Days from and including the date of postage;

        (C)    if by post to an address outside Australia or from outside Australia to an address inside Australia, six Business Days from and including the date of postage; or

        (D)    if sent by email, when a delivery confirmation report is received by the sender which records the time that the email was delivered to the addressee's email address,

    but if the delivery or receipt is on a day which is not a Business Day or is after 4.00pm (addressee's time) on a Business Day it is regarded as received at 9.00am on the following Business Day; and

    (iv)    can be relied upon by the addressee and the addressee is not liable to any other person for any consequences of that reliance if the addressee believes it to be genuine, correct and authorised by the sender.

(b)    In this clause 18, a reference to an addressee includes a reference to an addressee's officers, agents or employees.

## 20    Costs, Fees and Indemnity

### 20.1    Costs

Allegiance USA must pay (including by way of set off against the Subscription Monies) all costs and expenses of the Subscriber and any employee, officer, agent or contractor of the Subscriber in relation to:

(a)    the enforcement, protection or waiver, or attempted or contemplated enforcement or protection, of any rights under any Transaction Document;

(b)    any amendment to, consent, waiver, release or approval under any Transaction Document; and

(c)    any enquiry by any Government Agency involving AHQ,

including, but not limited to, any reasonable administration costs of the Subscriber in connection with the matters referred to in clauses 20.1(a) to 20.1(c) and any professional consultant's fees and any legal costs and expenses on a full indemnity basis.

### 20.2    Fees

(a)    AHQ and Allegiance USA must each pay their own costs and expenses in relation to the negotiation, preparation, execution, delivery, stamping, registration, completion, variation and discharge of any Transaction Document.

(b)    Allegiance USA must pay (including by way of set off against the Subscription Monies) all costs and expenses of the Subscriber and any employee, officer, agent or contractor of the Subscriber in relation to:

(i)    the negotiation, preparation, execution, stamping and registration of this document and each Transaction Document;

(ii)    the negotiation, preparation, execution, stamping and registration any ancillary documents necessary to give effect to the transactions contemplated by this document and each Transaction Document; and

(iii)    any additional matters (such as due diligence) required, necessary or desirable to implement the transactions contemplated by the documents set out in this clause.

(c)    Allegiance USA's liability in respect of the following legal costs and expenses of the Subscriber set out in clause 20.2(b) are capped at a maximum amount of:

(i)    in respect of this document and any associated document, including to avoid doubt, Australian legal advice required in respect of the Tranche 1 Security Documents and the Tranche 2 Security Documents, $150,000 excluding GST; and

(ii)    in respect of the Security Documents, USD 200,000 excluding GST, sales taxes and applicable US taxes.

**20.3    Indemnity**

AHQ and Allegiance USA jointly and severally indemnify the Subscriber against any claim, action, damage, loss, liability, cost, charge, expense (including legal expenses on a full indemnity basis), outgoing or payment which the Subscriber pays, suffers, incurs or is liable for, in respect of any of the following:

(a)    the occurrence of an Event of Default; and

(b)    the Subscriber exercising its powers consequent upon or arising out of the occurrence of an Event of Default.

# 21    Goods and services tax

(a)    In this clause 21:

(i)    **GST** means GST as defined in *A New Tax System (Goods and Services Tax) Act 1999* as amended (**GST Act**) or any replacement or other relevant legislation and regulations; and

(ii)    words or expressions used in this clause which have a particular meaning in the GST law (as defined in the GST Act, and also including any applicable legislative determinations and Australian Taxation Office public rulings) have the same meaning, unless the context otherwise requires;

(b)    Unless GST is expressly included, the consideration to be paid or provided under any other clause of this Agreement for any supply made under or in connection with this Agreement does not include GST.

(c)    To the extent that any supply made under or in connection with this Agreement is a taxable supply, the GST exclusive consideration to be paid or provided for that taxable supply is increased by the amount of any GST payable in respect of that taxable supply and that amount must be paid at the same time and in the same manner as the GST exclusive consideration is to be paid or provided.

(d)    A party's right to payment under clause 21(c) is subject to a valid tax invoice being delivered to the party who is the recipient of the taxable supply.

## 22    General

### 22.1    Prohibition and enforceability

(a)    Any provision of, or the application of any provision of, this Agreement that is prohibited in any jurisdiction is ineffective only in that jurisdiction and only to the extent of that prohibition.

(b)    Any provision of, or the application of any provision of, this Agreement which is void, illegal, unenforceable or prohibited in any jurisdiction does not affect the validity, legality or enforceability of that provision in any other jurisdiction or of the remaining provisions in that or any other jurisdiction.

(c)    The application of this clause 22 is not limited by any other provision of this Agreement in relation to severability, prohibition or enforceability.

### 22.2    Severability

Any provision in this Agreement which is invalid or unenforceable in any jurisdiction is to be read down for the purpose of that jurisdiction, if possible, so as to be valid and enforceable, and otherwise must be severed to the extent of the invalidity or unenforceability, without affecting the remaining provisions of this Agreement or affecting the validity or enforceability of that provision in any other jurisdiction.

### 22.3    Waivers

(a)    A waiver or election in relation to a provision of, or any right, power, authority, discretion or remedy arising on a breach of or default under this Agreement must be in writing and signed by the party granting the waiver.

(b)    A party is not entitled to rely on the conduct of another party or on a delay in the exercise or non-exercise of a right, power, authority, discretion or remedy arising from a breach of this Agreement or default under this Agreement as constituting a waiver of that right, power, authority, discretion or remedy.

### 22.4    Variation

A variation of any term of this Agreement must be in writing and signed by all of the parties.

### 22.5    Cumulative rights

The powers and rights of a party under this Agreement do not exclude any other power or right.

### 22.6    No merger

The rights and obligations of the parties under this Agreement do not merge on completion of any transaction contemplated by this Agreement.

### 22.7    Assignment

Subject to clause 13, no party may assign or otherwise purport to transfer its rights or obligations under this Agreement to any other person without the prior written consent of the other parties (which must not be unreasonably withheld).

### 22.8    Further assurances

Each party must do all things necessary (including executing documents) to give full effect to this Agreement and the transactions contemplated by this Agreement.

### 22.9    Counterparts

If this Agreement consists of a number of counterparts, each is an original and all of the counterparts together constitute the same document. Delivery of an executed counterpart of a

signature page of this Agreement by email or by PDF file (portable document format file) shall be effective as delivery of a manually executed counterpart of this Agreement.

22.10  **Entire agreement**

This Agreement embodies the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes any prior negotiation, arrangement, understanding or agreement with respect to the subject matter of any term of this Agreement.

22.11  **Time of the essence**

Time is of the essence in this Agreement.

22.12  **Announcements**

(a)  No party may make any public announcement in connection with, or regarding the existence of, this Agreement without the prior written consent of the other party except if required by law or regulatory body (including a recognised stock exchange), in which case, the party required to make the announcement must, to the extent practicable, first consult with and take into account all reasonable requirements of the other party.

(b)  Notwithstanding the foregoing, upon execution of this document AHQ must lodge an announcement on the announcements platform of the ASX regarding the subscription by the Subscriber for the Note, in the form and substance satisfactory to the Subscriber.

22.13  **Confidentiality**

(a)  A party may only use confidential information of another party for the purposes of this Agreement, and must keep the existence and the terms of this Agreement and any confidential information of another party confidential except where:

(i)  the information is public knowledge or the party has independently learned the information by a means other than as a result of a breach of this Agreement or any other obligation of confidentiality owed to the proprietor of the confidential information;

(ii)  disclosure is required by law or a regulatory body (including a recognised stock exchange); or

(b)  disclosure is made to a person who must know for the purposes of this Agreement on the basis that the person keeps the information confidential.

22.14  **Approvals and consents**

Except where this Agreement expressly states otherwise, a party may, in its discretion, give conditionally or unconditionally or withhold any approval or consent under this Agreement.

22.15  **Governing law and jurisdiction**

(a)  This agreement is governed by, and is to be construed in accordance with, the laws enforceable in Victoria.

(b)  Each party submits to the non-exclusive jurisdiction of the courts exercising jurisdiction in Victoria and any court hearing appeals from those courts.

Executed as an agreement on the date shown on the first page:

**AHQ**

**EXECUTED** by **ALLEGIANCE COAL LIMITED ACN 149 490 353** in accordance with section 127 of the *Corporations Act 2001* by being signed by the following officers:

_____
Signature of director

Mark Gray
_____
Name of director *(please print)*

_____
Signature of director / company secretary

_____
Name of director / company secretary
*(please print)*

**Allegiance USA**

ALLEGIANCE COAL USA LIMITED

By_____
Name: Mark Gray
Title: Director

**Subscriber:**

**EXECUTED** by **COLLINS ST CONVERTIBLE NOTES PTY LTD ACN 657 773 754 ATF THE COLLINS ST CONVERTIBLE NOTES FUND ABN 30 216 289 383** in accordance with the *Corporations Act 2001* by being signed by the following officers:

_____
Signature of director

**Vasilios Piperoglou**
_____
Name of director *(please print)*

_____
Signature of director / company secretary

**Michael Goldberg**
_____
Name of director / company secretary
*(please print)*

37

**Executed as an agreement on the date shown on the first page:**

**AHQ**

**EXECUTED by ALLEGIANCE COAL**
**LIMITED ACN 149 490 353** in accordance
with section 127 of the *Corporations Act*
*2001* by being signed by the following
officers:

_____          _____
Signature of director                      Signature of director / company secretary

**Mark Gray**                                 **Jonathan Reynolds**
Name of director *(please print)*          Name of director / company secretary
                                                   *(please print)*

**Allegiance USA**

ALLEGIANCE COAL USA LIMITED

By_____
      Name: Mark Gray
      Title: Director

**Subscriber:**

**EXECUTED by COLLINS ST CONVERTIBLE**
**NOTES PTY LTD ACN 657 773 754 ATF**
**THE COLLINS ST CONVERTIBLE NOTES**
**FUND ABN 30 216 289 383** in accordance
with the *Corporations Act 2001* by being
signed by the following officers:

_____          _____
Signature of director                      Signature of director / company secretary

**Vasilios Piperoglou**                      **Michael Goldberg**
Name of director *(please print)*          Name of director / company secretary
                                                   *(please print)*

37

## Schedule 1– Form of Conversion Notice

**Allegiance Coal USA Limited**

***Convertible Note***

**CONVERSION NOTICE**

**TO:**      The Directors
Allegiance Coal USA Limited

**AND TO:**      The Directors
Allegiance Coal Limited ACN 149 490 353

We...................................................................................................................................................

of....................................................................................................................................................

of being registered as the holder of the Note give notice that we wish to convert $[insert value] of the Note (**Conversion Amount**) in accordance with the terms of issue.

We agree to accept Ordinary Shares to be issued on conversion of the Conversion Amount subject to the terms of the Constitution of the Allegiance Coal Limited ACN 149 490 353.

Attached is the Note Certificate representing the Note.

[We request that Allegiance Coal USA Limited, issue to us and in our name a new Note Certificate in respect of the new Outstanding Face Value.]

Terms used in this notice have the same meanings as in the Convertible Note Agreement dated [          ].

DATED:

**EXECUTED *INSERT NAME OF SUBSCRIBER]* ACN [*INSERT*]** in accordance with section 127 of the *Corporations Act 2001* by being signed by the following officers:

_____

Signature of director

_____

Signature of director / company secretary

_____

Name of director *(please print)*

_____

Name of director / company secretary *(please print)*

Schedule 2 – Form of Note Certificate

## CONVERTIBLE NOTE CERTIFICATE

**Certificate Number: [   ]**

**Allegiance Coal USA Limited**

**("Company")**

**Convertible Note**

Head Office/Note Registry: [*insert address*]

**THIS IS TO CERTIFY** that [     ] ACN [   ] of [        ] (**"Subscriber"**) is the registered holder of the Note specified in the Schedule below which was issued on [    ].

A Note confers on the Subscriber the rights, power and privileges and shall be subject to the terms and conditions as set out in the document titled Convertible Note Agreement dated [    ] between the Company, Allegiance Coal Limited ACN 149 490 353 and the Subscriber (**Agreement**). By its subscription for or purchase of a Convertible Note, the registered holder is taken to have agreed to be bound by the terms contained in the Agreement.

| | |
|---|---|
| **Outstanding Face Value:** | **$[   ]** |
| **Repayment Date:** | **[   ].** |
| **DATED:** | |

**[execution block to be inserted]**

| This certificate must be surrendered to the Company on transfer, conversion or purchase by the Company of any convertible note represented by it. |
|---|

Schedule 3 – Option Certificate

**OPTION CERTIFICATE**

**Certificate Number: [   ]**

**Allegiance Coal Limited**

**ACN 149 490 353**

**("Company")**

Head Office/Note Registry: [*insert address*]

**THIS IS TO CERTIFY** that [        ] ACN [     ] of [          ] (**"Subscriber"**) is the registered holder of the options specified in the Schedule below which were issued on [      ].

Each option confers on the Subscriber the rights, power and privileges and shall be subject to the terms and conditions as set out in the document titled Convertible Note Agreement dated [      ] between the Company, Allegiance Coal USA Limited and the Subscriber (**Agreement**). By its subscription for or purchase of a Convertible Note, the register holder is taken to have agreed to be bound by the terms contained in the Agreement.

| **Number of options:** | [          ] |
| **Exercise Price:** | $[          ] per option |
| **Expiry:** | [          ] |
| **DATED:** | |

**EXECUTED** by **ALLEGIANCE COAL LIMITED ACN 149 490 353** in accordance with section 127 of the *Corporations Act 2001* by being signed by the following officers:

_____
Signature of director

_____
Signature of director / company secretary

_____
Name of director *(please print)*

_____
Name of director / company secretary
*(please print)*

---

This certificate must be surrendered to the Company on transfer, conversion or purchase by the Company of any option represented by it.

Schedule 4 – Option Terms

## Allegiance Coal Limited ACN 149 490 353 (Company)
## Terms of unlisted options

Unless expressly defined otherwise, capitalized words in these Option Terms have the meaning given in the document titled Convertible Note Agreement (**Agreement**) dated [    ] between Allegiance Coal Limited ACN 149 490 353 (the **Company**), Allegiance Coal USA Limited and Collins St Convertible Notes Pty Ltd ACN 657 773 754 ATF The Collins St Convertible Notes Fund ABN 30 216 289 383 (the **Optionholder**).

(a)    *Entitlement*

    (i)    Each option entitles an Optionholder to subscribe for, and be allotted, one fully paid ordinary Share (**Share**) in the capital of the Company.

    (ii)    Shares issued on the exercise of options will rank equally with all existing Shares on issue, as at the exercise date, and will be subject to the provisions of the Constitution of the Company and any escrow restrictions imposed on them by the ASX.

(b)    *Issue Price*

    Nil.

(c)    *Exercise of Option*

    (i)    The options are exercisable at any time prior to the expiry date described in paragraph (c)(ii).

    (ii)    The final date and time for exercise of the options is 5:00pm (Melbourne time) on the date that is 36 months after the date of issue of the options. If such date falls on a day that is not a Business Day, the final date will be the next Business Day.

    (iii)    The exercise price per option is $[insert Conversion Price].

    (iv)    Each option is exercisable by the Optionholder signing and delivering a notice of exercise of option together with the exercise price in full for each Share to be issued upon exercise of each option to the Company's share registry. Unless a holder is exercising all of their options, options must be exercised in parcels of not less than 1,000.

    (v)    The options cannot be exercised if, as a result of the exercise, the Optionholder or any of its associates would breach the provisions of Chapter 6 (and specifically section 606) of the Corporations Act.

    (vi)    All options will lapse on the earlier of the:

        (A)    receipt by the Company of notice from the Optionholder that the Optionholder has elected to surrender the option; and

        (B)    expiry of the final date and time for exercise of the option.

    (vii)    In the event of liquidation of the Company, all unexercised options will lapse.

(d)    *Quotation*

    (i)    The options will be unlisted and the Company will not apply for quotation of options.

    (ii)    If the Shares of the Company are quoted on the ASX, the Company will apply to the ASX for, and will use its best endeavours to obtain, quotation of all Shares issued on the exercise of any options within 5 Business Days (as defined in the Listing Rules) of issue. The Company gives no assurance that such quotation will be granted.

    (iii)    If required for any Shares issued on exercise of the options to be freely tradable, the Company must on or within 5 Business Days after the issue date lodge with the ASX a notice in accordance with section 708A of the Corporations Act in relation to those Shares, or if the Company is unable to do

so, the Company must lodge a disclosure document with ASIC within five Business Days of the issue date provided that the holder must not dispose of the Shares, or grant any interest in the Shares, until such time as a disclosure document is lodged with ASIC.

(e) *Transferability*

The options are not transferable.

(f) *Participation in a Reorganisation of Capital*

(i) In the event of any reconstruction or reorganisation (including consolidation, sub-division, reduction or return of the capital of the Company), the rights of an Optionholder will be changed in accordance with the Listing Rules of the ASX applying to a restructure or reorganisation of the capital at the time of that restructure or reorganisation, provided always that the changes to the terms of the options do not result in any benefit being conferred on the Optionholder which is not conferred on shareholders of the Company.

(ii) In any reorganisation as referred to in the paragraph above, options will be treated in the following manner (or as may otherwise be required in order to comply with the Listing Rules of ASX):

(A) in the event of a consolidation of the share capital of the Company, the number of options will be consolidated in the same ratio as the ordinary share capital of the Company and the exercise price will be amended in inverse proportion to that ratio;

(B) in the event of a subdivision of the share capital of the Company, the number of options will be subdivided in the same ratio as the ordinary share capital of the Company and the exercise price will be amended in inverse proportion to that ratio;

(C) in the event of a return of the share capital of the Company, the number of options will remain the same and the exercise price will be reduced by the same amount as the amount returned in relation to each ordinary share;

(D) in the event of a reduction of the share capital of the Company by a cancellation of paid up capital that is lost or not represented by available assets where no securities are cancelled the number of options and the exercise price of each option will remain unaltered;

(E) in the event of a pro-rata cancellation of shares in the Company, the number of options will be reduced in the same ratio as the ordinary share capital of the Company and the exercise price of each option will be amended in inverse proportion to that ratio; and

(F) in the event of any other reorganisation of the issued capital of the Company, the number of options or the exercise price or both will be reorganised (as appropriate) in a manner which will not result in any benefits being conferred on the Optionholder which are not conferred on shareholders.

(g) *Adjustments to Options and Exercise Price*

(i) Adjustments to the number of Shares over which options exist and/or the exercise price may be made as described in paragraph (g)(ii) to take account of changes to the capital structure of the Company by way of pro-rata bonus and cash issues.

(ii) The method of adjustment for the purpose of paragraph (g)(i) shall be in accordance with the Listing Rules of the ASX from time to time, which, under Listing Rules 6.22.2 and 6.22.3, currently provide:

(A) Pro Rata Cash Issues

Where a pro-rata issue is made (except a bonus issue) to the holders of underlying securities, the exercise price of an option may (at the discretion of the Board) be reduced according to the following formula:

$$O' = O - \frac{E[P-(S+D)]}{N + 1}$$

where:

O' = the new exercise price of the option.
O = the old exercise price of the option.
E = the number of underlying securities into which one option is Exercisable.
P = the average market price per security (weighted by reference to volume) of the underlying

|       |                                                                                                           |
|-------|-----------------------------------------------------------------------------------------------------------|
|       | securities during the 5 trading days ending on the day before the ex rights date or ex entitlements date. |
| S =   | the subscription price for a security under the pro-rata issue.                                            |
| D =   | the dividend due but not yet paid on the existing underlying securities (except those to be issued under the pro-rata issue). |
| N =   | the number of securities with rights or entitlements that must be held to receive a right to one new security. |

(h)    *Adjustment for bonus issues*

If the Company makes a bonus issue of Shares or other securities to existing shareholders (other than an issue in lieu or in satisfaction of dividends or by way of dividend reinvestment):

(i)    the number of Shares which must be issued on the exercise of an option will be increased by the number of Shares which the Optionholder would have received if the Optionholder had exercised the option before the record date for the bonus issue; and

(ii)    no change will be made to the exercise price.

(i)    *Participation in new issues*

There are no participation rights or entitlements inherent in the options and Optionholders will not be entitled to participate in new issues of capital offered to shareholders during the currency of the options without exercising the options.

(j)    *Entitlement to dividends*

The options do not confer any entitlement to a dividend, whether fixed or at the discretion of the directors, during the currency of the options without exercising the options.

(k)    *Entitlement to capital return*

The options do not confer any right to a return of capital, whether in a winding up, upon a reduction of capital or otherwise, and similarly do not confer any right to participate in the surplus profit or assets of the Company upon a winding up, in each case, during the currency of the options without exercising the options.

(l)    *Voting rights*

The options do not confer any right to vote at meetings of members of the Company, except as required by law, during the currency of the options without first exercising the options.

(m)    *ASX requirements*

Whilst the Company is admitted to the Official List of ASX, these Option Terms may be varied as required to comply with the requirements of ASX and the ASX Listing Rules.

## Schedule 5 – Securities on issue

**Ordinary Shares on issue**
389,820,140

**Options**

| Grant date | Expiry date | Exercise Price | Balance at the end of the half-year |
|---|---|---|---|
| *PSIP Options* | | | |
| 6/12/17 | 6/12/22 | $0.375 | 1,550,000 |
| 3/12/19 | 3/12/24 | $1.40 | 1,290,000 |
| | | | |
| *ESIP Options* | | | |
| 3/12/21 | 3/12/26 | $1.40 | 750,000 |
| | | | |
| *Lead Manager Options* | | | |
| 3/3/21 | 3/3/24 | $0.50 | 1,125,000 |
| 11/5/21 | 11/5/24 | $0.5625 | 1,033,333 |
| 5/8/21 | 5/8/24 | $0.8375 | 1,343,283 |
| 29/10/21 | 29/10/24 | $0.625 | 706,268 |
| 9/12/21 | 9/12/24 | $0.625 | 1,093,732 |
| | | | 8,891,616 |

1.5 million Options proposed to be issued under ESIP to P Vining and J Romcke, subject to shareholder approval (same terms as ESIP options in table above)

In addition, Options are planned to be issued to staff under the ESIP (same terms as ESIP options in table above)

**Performance rights**
5,500,000 subject to vesting conditions

2.5 million Performance rights proposed to be issued under ESIP to P Vining and J Romcke, subject to shareholder approval and subject to vesting conditions

## Schedule 6 – Budget