**Exhibit 5**
**Guaranty and Security Agreement**

**GUARANTY AND SECURITY AGREEMENT**

**among**

**ALLEGIANCE COAL LIMITED,**

**ALLEGIANCE COAL USA LIMITED,**

**NEW ELK COAL COMPANY LLC,**

**NEW ELK COAL HOLDINGS LLC,**

**BLACK WARRIOR MINERALS, INC., and**

**COLLINS ST CONVERTIBLE NOTES PTY LTD ACN 657 773 754 NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS TRUSTEE OF THE COLLINS ST CONVERTIBLE NOTE FUND ACN 149 490 353**

**dated as of**

**May 24, 2022**

# TABLE OF CONTENTS

ARTICLE I. DEFINITIONS AND INTERPRETATION ................................................................ 2
    Section 1.01    Definitions. ............................................................................................. 2
    Section 1.02    Interpretation. ....................................................................................... 12
    Section 1.03    Resolution of Drafting Ambiguities. ..................................................... 12

ARTICLE II. GRANT OF SECURITY INTEREST ................................................................ 13
    Section 2.01    Grant of Security Interest. ..................................................................... 13
    Section 2.02    Filings. ................................................................................................. 14

ARTICLE III. PERFECTION AND FURTHER ASSURANCES ............................................ 14
    Section 3.01    Perfection of Certificated Securities Collateral. ..................................... 14
    Section 3.02    Perfection of Uncertificated Securities Collateral. ................................. 15
    Section 3.03    Maintenance of Perfected Security Interest. ........................................... 15
    Section 3.04    Other Actions for Perfection. ................................................................ 15
    Section 3.05    Joinder of Additional Grantors. ............................................................ 18
    Section 3.06    Further Assurances. ............................................................................. 18

ARTICLE IV. REPRESENTATIONS, WARRANTIES AND COVENANTS ....................................... 19
    Section 4.01    Note Agreement Representation. ............................................................ 19
    Section 4.02    Existence. ............................................................................................. 19
    Section 4.03    Compliance With Laws. ........................................................................ 20
    Section 4.04    Power; Authorization; Enforceability. ................................................... 20
    Section 4.05    No Contravention. ................................................................................ 21
    Section 4.06    No Litigation. ....................................................................................... 21
    Section 4.07    Ownership of Property and No Other Liens. .......................................... 21
    Section 4.08    Perfected First Priority Security Interest. ............................................... 21
    Section 4.09    No Transfer of Collateral. ..................................................................... 21
    Section 4.10    Claims Against Collateral. ..................................................................... 22
    Section 4.11    Other Financing Statements. ................................................................. 22
    Section 4.12    Changes in Name, Jurisdiction of Organization, Etc. ............................. 22
    Section 4.13    Location of Inventory and Equipment. ................................................... 23
    Section 4.14    Pledged Securities and Pledged Debt. ................................................... 24
    Section 4.15    Approvals. ............................................................................................ 24
    Section 4.16    Collateral Information. .......................................................................... 25
    Section 4.17    Insurance. ............................................................................................. 25
    Section 4.18    Mining Rights. ...................................................................................... 25
    Section 4.19    Availability of Utilities. ......................................................................... 25
    Section 4.20    Limitation on Liens. ............................................................................. 26
    Section 4.21    Environmental Matters. ......................................................................... 27
    Section 4.22    Loss or Damage. .................................................................................. 28
    Section 4.23    Inspection of Collateral. ........................................................................ 28

ARTICLE V. SECURITIES COLLATERAL ........................................................................ 29
    Section 5.01    Existing Voting Rights and Distributions. .............................................. 29
    Section 5.02    Certain Agreements of Grantors. ........................................................... 30

ARTICLE VI. INTELLECTUAL PROPERTY COLLATERAL.........................................................30
  Section 6.01    Intellectual Property License.........................................................30

ARTICLE VII. GUARANTY .........................................................................................31

ARTICLE VIII. EVENTS OF DEFAULT; REMEDIES .............................................................37
  Section 8.01    Events of Default.......................................................................37
  Section 8.02    Remedies. ..............................................................................38
  Section 8.03    No Waiver and Cumulative Remedies. ....................................................41
  Section 8.04    Application of Proceeds.................................................................41

ARTICLE IX. MISCELLANEOUS ...................................................................................42
  Section 9.01    [Reserved]..............................................................................42
  Section 9.02    Performance By Noteholder...............................................................42
  Section 9.03    Power of Attorney.......................................................................42
  Section 9.04    Continuing Security Interest and Assignment. ...........................................42
  Section 9.05    Termination and Release. ...............................................................43
  Section 9.06    Modification in Writing.................................................................44
  Section 9.07    Notices. ...............................................................................44
  Section 9.08    Indemnity and Expenses..................................................................45
  Section 9.09    Governing Law, Consent to Jurisdiction and Waiver of Jury Trial.........................46
  Section 9.10    Severability of Provisions..............................................................47
  Section 9.11    Counterparts; Integration; Effectiveness................................................47
  Section 9.12    No Release. ............................................................................48
  Section 9.13    Obligations Absolute...................................................................48

## GUARANTY AND SECURITY AGREEMENT

This GUARANTY AND SECURITY AGREEMENT (this "**Agreement**"), dated as of May 24, 2022, is entered into by and among Allegiance Coal USA Limited, a Delaware corporation (the "**ACL**"), Allegiance Coal Limited, an Australia corporation ACN 149 490 353 ("**AHQ**"), New Elk Coal Company LLC, a Colorado limited liability company ("**NECC**"), New Elk Coal Holdings LLC, a Delaware limited liability company ("**NECH**"), North Central Energy Company, a Colorado corporation ("**NCEC**"), Raton Basin Analytic LLC, a Colorado limited liability company ("**RBA**") and Black Warrior Minerals, Inc., an Alabama corporation ("**BWM**," and together with ACL, AHQ, NECC, and NECH, and any other entities that that are party to this Agreement, the "**Grantors**" or the "**Guarantors**" and ACL, NECC, NECH, NCEC, RBA and any other entities, other than AHQ, that are parties to this Agreement that are incorporated or formed under the laws of the United States of America or any state thereof, the "**US Grantors**") and Collins St Convertible Notes Pty Ltd ACN 657 773 754 not in its individual capacity but solely as trustee of the Collins St Convertible Note Fund ACN 149 490 353, (the "**Noteholder**").

## RECITALS

WHEREAS, AHQ, ACL and the Noteholder are parties to the Convertible Note Agreement, dated the date hereof (the "**Note Agreement**") pursuant to which the Noteholder will receive a Note (as defined in the Note Agreement) on the date hereof ("**Tranche 1**") and is expected to receive a Notes or Notes in the future ("**Tranche 2**");

WHEREAS, ACL will use part of the proceeds of the Notes of Tranche 1 to repay outstanding indebtedness owed by ACL to Nebari Natural Resources Credit Fund I, LP, a Delaware limited partnership, and guaranteed by AHQ and the Grantors;

WHEREAS, AHQ and each Grantor will receive substantial direct and indirect benefits from the use of the proceeds of the Note and each is, therefore, willing to enter into this Agreement.

WHEREAS, this Agreement is given by each Grantor in favor of the Noteholder to secure the payment and performance of all of the Secured Obligations.

WHEREAS, it is a condition to the acquisition of the Note by the Noteholder that each Grantor execute and deliver the applicable Note Documents and the other Transaction Documents (each as defined below), including this Agreement.

NOW THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor and the Noteholder hereby agree as follows:

# ARTICLE I.
## DEFINITIONS AND INTERPRETATION

**Section 1.01   Definitions.**

(a)    Unless otherwise defined herein or in Note Agreement, capitalized terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9.

(b)    The following terms shall have the following meanings:

"**Affiliate**" as to any Person, means any other Person that, directly or indirectly through one or more intermediaries, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person, or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"**Agreement**" has the meaning set forth in the Preamble hereof.

"**Black Warrior Mine**" means the fully permitted and operational coal mine located in central Alabama, south-east of Jasper and is owned by BWM.

"**Business Day**" means any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan institutions in New York, New York and Melbourne, Australia are authorized or obligated by law or executive order to be closed.

"**Capital Lease Obligations**" with respect to any Person, means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases under IFRS on the balance sheet of such Person and the amount of such obligations shall be the capitalized amount thereof determined in accordance with IFRS.

"**Claims**" means any and all property and other taxes, assessments and special assessments, levies, fees and all governmental charges imposed upon or assessed against, and landlords', carriers', mechanics', workmen's, repairmen's, laborers', materialmen's, suppliers' and warehousemen's Liens and other claims arising by operation of law against, all or any portion of the Collateral.

"**Collateral**" has the meaning set forth in Section 2.01.

"**Collateral Support**" means all Property assigned, hypothecated or otherwise securing any Collateral and shall include any security agreement or other agreement granting a Lien or security interest in such Property.

"**Commodity Account Control Agreement**" means a control agreement in form and substance satisfactory to the Noteholder establishing the Noteholder's Control with respect to any Commodity Account.

"**Contested Liens**" means, collectively, any Liens incurred in respect of any Claims to the extent that the amounts owing in respect thereof are not yet delinquent or are being contested in good faith and with proper reserves established with respect thereto in accordance with IFRS.

"**Contracts**" means, collectively, with respect to each Grantor, all sale, service, performance, equipment or property lease contracts, agreements and grants and all other contracts, agreements or grants (in each case, whether written or oral, or third party or intercompany), between such Grantor and any third party, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications thereof.

"**Contractual Obligation**" of any Person, means any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound, other than the Obligations.

"**Control**" means (i) with respect to any Deposit Account, "control," within the meaning of Section 9-104 of the UCC, (ii) with respect to any Securities Account, Security Entitlement, Commodity Contract or Commodity Account, control within the meaning of Section 9-106 of the UCC, (iii) with respect to any Uncertificated Security, control within the meaning of Section 8-106(c) of the UCC, (iv) with respect to any Certificated Security, control within the meaning of Section 8-106(a) or (b) of the UCC, (v) with respect to any Electronic Chattel Paper, control within the meaning of Section 9-105 of the UCC, (vi) with respect to Letter-of-Credit Rights, control within the meaning of Section 9-107 of the UCC and (vii) with respect to any "transferable record" (as that term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction), control within the meaning of Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in the jurisdiction relevant to such transferable record.

"**Control Agreements**" means, collectively, any Deposit Account Control Agreement, Securities Account Control Agreement or the Commodity Account Control Agreement.

"**Debt**" of any Person at any date, without duplication, means (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables and accrued expenses incurred in the ordinary course of business and not past due for more than thirty (30) days after the date on which each such trade payable or account payable was created; (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments; (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or Noteholder under such agreement in the event of default are limited to repossession or sale of such property); (e) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person or any warrants, rights or options to acquire such Equity Interests, valued, in the case of redeemable preferred interests, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities in respect of obligations of the kind referred to in subsections (a) through (e) of this definition; (g) all Capital Lease Obligations; and (h) all Guaranty Obligations of such Person in respect of obligations of the kind referred to in subsections (a) through (f) above.

"**Debtor Relief Law**" means the means Title 11 of the United States Code, as amended from time to time, or any similar federal or state law for the relief of debtors and all other liquidation, bankruptcy, assignment for the benefit of creditors, conservatorship, moratorium, receivership, insolvency, rearrangement, reorganization or similar debtor relief laws of the US or other applicable jurisdictions in effect from time to time.

"**Default**" means any of the events specified in Section 8.01 which constitutes an Event of Default or which, upon the giving of notice, the lapse of time, or both pursuant to Section 8.01 would, unless cured or waived, become an Event of Default.

"**Deposit Account Control Agreement**" means an agreement in a form and substance satisfactory to the Noteholder establishing the Noteholder's Control with respect to any Deposit Account of a Grantor.

"**Deposit Accounts**" means, collectively, with respect to each Grantor, (i) all "deposit accounts" as such term is defined in the UCC and all accounts and sub-accounts relating to any of the foregoing accounts and (ii) all cash, funds, checks, notes and instruments

from time to time on deposit in any of the accounts or sub-accounts described in clause (i) of this definition.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (whether in one transaction or in a series of transactions, and including any sale and leaseback transaction) of any property (including, without limitation, any Equity Interests) or any economic interest in any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Distributions**" means, collectively, with respect to each Grantor, all dividends, cash, options, warrants, rights, instruments, distributions, returns of capital or principal, income, interest, profits and other property, interests (debt or equity) or proceeds, including as a result of a split, revision, reclassification or other like change of the Pledged Securities, from time to time received, receivable or otherwise distributed or distributable to such Grantor in respect of or in exchange for any or all of the Pledged Securities or Pledged Debt.

"**Environmental Action**" means any action, suit, demand, demand letter, claim, notice of violation or non-compliance, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, any permit issued under any Environmental Law, or any Hazardous Material, or arising from alleged injury or threat to health, safety or the environment including (a) by any Governmental Authority for enforcement, clean-up, removal, response, remedial or other actions or damages and (b) any Governmental Authority or third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"**Environmental Law**" means any and all federal, state, foreign, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) as now or may at any time hereafter be in effect, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, regulating, relating to or imposing liability or standards of conduct concerning protection of the environment or cultural heritage or, to the extent relating to exposure to substances that are harmful or detrimental to the environment or human health or safety.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, costs of compliance, penalties or indemnities), of any Grantor, directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into

the environment or (e) any contract, agreement or other legally enforceable consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing

"**Equity Interests**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership (or profit) interests in a Person (other than a corporation), securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person, and any and all warrants, rights or options to purchase any of the foregoing, whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized or otherwise existing on any date of determination.

"**Event of Default**" has the meaning set forth in Section 8.01.

"**Excluded Property**" means, collectively:

(i)    all Equity Interests in Short Creek Holdings LLC, a Delaware limited liability company and Telkwa Coal Limited, a British Columbia corporation and each of their Subsidiaries, if any;

(ii)    any lease, license or other agreement or Contract or any property subject to a purchase money security interest, Lien securing a Capital Lease Obligation or similar arrangement to the extent that a grant of a security interest therein would require a consent not obtained or violate or invalidate such lease, license or agreement or Contract or purchase money arrangement, Capital Lease Obligation or similar arrangement or create a right of termination in favor of any other party thereto (other than any Grantor), in each case after giving effect to the applicable anti-assignment provisions of the UCC and other applicable law and other than Proceeds and receivables thereof, the assignment of which is expressly deemed effective under the UCC or other applicable law notwithstanding such prohibition;

provided, however, "Excluded Property" shall not include any Proceeds, products, substitutions or replacements of any Excluded Property (unless such Proceeds, products, substitutions or replacements would constitute Excluded Property). In addition, to the extent that such property constitutes "Excluded Property" due to the failure of a Grantor to obtain consent as described in clauses (ii), such Grantor shall use its commercially reasonable efforts to obtain such consent, and, upon obtaining such consent, such property shall cease to constitute "Excluded Property".

"**Governmental Authority**" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government.

6.

"**Grantor**" has the meaning set forth in the Preamble hereof.

"**Guaranteed Obligations**" has the meaning set forth in Section 7.01.

"**Guarantor Subordinated Debt**" has the meaning set forth in Section 7.09.

"**Guarantor Subordinated Debt Payments**" has the meaning set forth in Section 7.09.

"**Guarantors**" has the meaning set forth in the Preamble hereof.

"**Guaranty**" means the Guaranty of the Guaranteed Obligations made by each existing Grantors pursuant to this Agreement and any future Guaranty to be made by any future Subsidiary of ACL (other than Short Creek Holdings LLC, Telkwa Coal Ltd and their Subsidiaries) in favor of the Noteholder, substantially in the form of Annex 1 attached hereto.

"**Guaranty Obligation**" as to any Person, means any (a) obligation, contingent or otherwise, of such Person guaranteeing or having the effect of guaranteeing any Debt or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Debt or other obligation of the payment or performance of such Debt or other obligation, (iii) to maintain working capital, equity capital, net worth or solvency or liquidity or any level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Debt or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Debt or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) Lien on any assets of such Person securing any Debt or other obligation of any other Person, whether or not such Debt or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Debt to obtain any such Lien). The amount of any Guaranty Obligation shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guaranty Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.

"**Hazardous Materials**" means (a) any gasoline, petroleum or petroleum products or by-products, radioactive materials, friable asbestos or asbestos-containing materials, urea-formaldehyde insulation, polychlorinated biphenyls and radon gas, and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

"**Intellectual Property**" means any and all intellectual property, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know- how and processes, all rights therein, and all rights to sue at law or in equity for any past, present, or future infringement, violation, misuse, misappropriation or other impairment thereof, whether arising under United States, multinational or foreign laws or otherwise, including the right to receive injunctive relief and all proceeds and damages therefrom.

"**IFRS**" shall mean International Financial Reporting Standards (or Australian Accounting Standards, which are substantially the same as International Financial Reporting Standards) as adopted by the Australian Accounting Standards Board and the International Accounting Standards Board, applied in accordance with the consistency requirements thereof.

"**Joinder Agreement**" means an agreement substantially in the form of Exhibit [A] hereto.

"**Lien**" means any mortgage, pledge, hypothecation, assignment (as security), deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest, or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever having substantially the same economic effect as any of the foregoing (including any conditional sale or other title retention agreement and any capital lease).

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets, properties, liabilities (actual or contingent), operations, condition (financial or otherwise) or prospects of a Grantor, individually, or a Grantor and its Subsidiaries taken as a whole, (a) the validity or enforceability of any Transaction Document, (c) the perfection or priority of any Lien purported to be created by any Transaction Document, (d) the rights or remedies of the Noteholder under any Transaction Document or (e) the ability of any Grantor to perform any of its Secured Obligations under any Transaction Document to which it is a party.

"**Mining Rights**" means all interests in the surface of any lands, the minerals in (or that may be extracted from) any lands, all royalty agreements, water rights, patented and unpatented mining and millsite claims, fee interests, mineral leases, mining licenses, profits-a-prendre, joint ventures and other leases, rights-of-way, inurements, licenses and other rights and interests used by or necessary to exploration, mining and related processing operations.

"**Mortgages**" means each mortgage, leasehold mortgage deed to secure debt, security deed, or deed of trust or other similar document executed and delivered to the Noteholder with respect to the Black Warrior Mine and the New Elk Mine properties, pursuant to the terms hereof or otherwise in connection herewith by any Grantor, as security for the Obligations.

8.

"**Motor Vehicles**" means all motor vehicles covered by a certificate of title law of any state.

"**New Elk Mine**" means the permitted and operating coal mine located in southeast Colorado, west of Trinidad that is owned by NECC.

"**Note**" has the meaning set forth in the Note Agreement.

"**Note Agreement**" has the meaning set forth in the Recitals hereto.

"**Note Documents**" means, collectively, this Agreement, the Assignments, the Mortgages, any Note, the Subordination Agreements, all financing statements (or comparable documents now or hereafter filed in accordance with the UCC or other applicable law) against any Grantor in favor of Noteholder and all other agreements, documents, certificates and instruments executed and delivered to Noteholder by any Grantor in connection therewith.

"**Noteholder**" has the meaning set forth in the Preamble hereof.

"**Organizational Documents**" means the certificate of incorporation and by-laws or any comparable organizational documents of any corporate entity (including limited liability companies and partnerships).

"**Permitted Liens**" has the meaning set forth in Section 4.20.

"**Properties**" has the meaning set forth in Section 4.21.

"**PPSA**" means the *Personal Property Securities Act 2009* (Cth).

"**PPSR**" means the register established under section 147 of the PPSA.

"**Person**" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, Governmental Authority or other entity.

"**Pledged Debt**" means, with respect to each Grantor, all Debt (including intercompany notes) from time to time owed to such Grantor by any obligor, including the Debt described in Schedule 4.14 hereof and issued by the obligors named therein, and all interest, cash, instruments and other property, assets or proceeds from time to time received, receivable or otherwise distributed or distributable in respect of or in exchange for any or all of such Debt and all certificates, instruments or agreements evidencing such Debt, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications thereof.

"**Pledged Securities**" means, collectively, with respect to each Grantor, all issued and outstanding Equity Interests that are owned or that may be acquired by such Grantor in any manner; provided, however, that Pledged Securities shall not include any Excluded Property.

"**Prior Lender**" means Nebari Natural Resources Credit Fund I, LP, a Delaware limited partnership, as lender pursuant to the Prior Loan Agreement.

"**Prior Loan Agreement**" means the Loan and Security Agreement, dated as of November 24, 2021, by and among ACL, AHQ, NECC NECH, BWM, and Prior Lender.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the directors, officers, employees, partners, agents, trustees, administrators, managers, advisors and representatives of it and its Affiliates.

"**Requirement of Law**" as to any Person, means the certificate of incorporation and by- laws or other organizational or governing documents of such Person, and any law (including common law), statute, ordinance, treaty, rule, regulation, order, decree, judgment, writ, injunction, settlement agreement, requirement or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Responsible Officer**" with respect to any Person, means the chief executive officer, president or chief financial officer of such Person, except that with respect to financial matters, the Responsible Officer shall be the chief financial officer or treasurer of such Person.

"**Secured Obligations**" means all obligations and debts (including principal, interest, fees, costs, and expenses), liabilities, covenants, and indemnities of, any Grantor arising under the Note Agreement, any Note, any Note Document, and any other Transaction Document, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding

"**Securities Account Control Agreement**" means an agreement form and substance satisfactory to the Noteholder establishing the Noteholder's Control with respect to any Securities Account.

"**Securities Collateral**" means, collectively, the Pledged Securities, the Pledged Debt and the Distributions.

"**Solvent**" with respect to any Person as of any date of determination, means that on such date (a) the present fair salable value of the property and assets of such Person exceeds the debts and liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the property and assets of such Person is greater than the amount that will be required to pay the probable liability of such Person on its debts and other liabilities, including contingent liabilities, as such debts and other liabilities become absolute and matured, (c) such Person does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts and liabilities, including contingent liabilities, beyond its ability to pay such debts and liabilities as they become absolute and matured, and (d) such Person does not have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**Subordination Agreements**" means the subordination agreements between the Noteholder and other creditors of the Grantors, pursuant to which the Debt owed to such other creditors is or shall be subordinated to the Secured Obligations on terms and conditions, and pursuant to documents, satisfactory to the Noteholder.

"**Subsidiary**" as to any Person, means any corporation, partnership, limited liability company, joint venture, trust or estate of or in which more than 50% of (a) the issued and outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time capital stock of any other class of such corporation may have voting power upon the happening of a contingency), (b) the interest in the capital or profits of such partnership, limited liability company, or joint venture or (c) the beneficial interest in such trust or estate is at the time directly or indirectly owned or controlled through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of ACL other than the Excluded Assets.

"**Tranche 1**" has the meaning set forth in the Recitals hereof.

"**Tranche 2**" has the meaning set forth in the Recitals hereof.

"**Transaction Document**" has the meaning set forth in the Note Agreement.

"**UCC**" means the Uniform Commercial Code as in effect in any applicable jurisdiction.

"**US Grantor**" has the meaning set forth in the Preamble hereof.

**Section 1.02    Interpretation.**  With reference to this Agreement and each other Note Document, unless otherwise specified herein or in such other Note Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the respective meanings given to those terms in the UCC. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Note Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Note Document, shall be construed to refer to such Note Document in its entirety and not to any particular provision thereof, (iv) all references in a Note Document to Articles, Sections, Annexes and Schedules shall be construed to refer to Articles and Sections of, and Annexes and Schedules to, the Note Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, (vi) the word "or" is not exclusive; and (vii) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data required to be submitted pursuant to this Agreement shall be prepared in conformity with, IFRS as in effect from time to time, and applied on a consistent basis in a manner consistent with that used in preparing each Grantor's audited financial statements, except as otherwise specifically prescribed herein.

**Section 1.03    Resolution of Drafting Ambiguities.**  Each Grantor acknowledges and agrees that any rule of construction to the effect that ambiguities are to be resolved against the drafting party (i.e., the Noteholder) shall not be employed in the interpretation of this Agreement.

## ARTICLE II.
## GRANT OF SECURITY INTEREST

**Section 2.01   Grant of Security Interest.**  As collateral security for the payment and performance in full of all the Secured Obligations, each Grantor hereby pledges to the Noteholder, and grants to the Noteholder a Lien on and security interest in and to, all of the right, title and interest of such Grantor in, to and under the following property, wherever located, and whether now existing or hereafter arising or acquired from time to time (collectively, the "**Collateral**"):

> (a)    all Accounts;

> (b)    all Equipment, Goods, Inventory and Fixtures;

> (c)    all Documents, Instruments and Chattel Paper;

> (d)    all Letters of Credit and Letter-of-Credit Rights;

> (e)    all Securities Collateral;

> (f)    all Investment Property;

> (g)    all Intellectual Property;

> (h)    the Commercial Tort Claims;

> (i)    all General Intangibles;

> (j)    all Money and all Deposit Accounts;

> (k)    all Supporting Obligations;

> (l)    all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records relating to the Collateral and any General Intangibles at any time evidencing or relating to any of the foregoing;

> (m)    all Motor Vehicles; and

> (n)    to the extent not covered by clauses (a) through (m) of this sentence, all other assets, personal property and rights of such Grantor, whether tangible or intangible, all Proceeds and products of each of the foregoing and all accessions of and to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to such Grantor from time to time with respect to any of the foregoing.

Notwithstanding anything to the contrary contained in clauses (a) through (n) above, the security interest created by this Agreement shall not extend to, and the term "Collateral" shall not include, any Excluded Property, provided that, if any Excluded Property would have otherwise constituted Collateral, when such property shall cease to be Excluded Property, such property shall be deemed at all times from and after the date hereof to constitute Collateral.

From and after the Closing Date, without the written consent of the Noteholder, no US Grantor shall permit to become effective, in any lease, license, Contract or other agreement, a provision that would prohibit or require the consent of any Person to the grant of a Lien on such lease, license, Contract or other agreement in favor of the Noteholder.

**Section 2.02   Filings.**

(a)      Each Grantor hereby irrevocably authorizes the Noteholder to file, without notice to any Grantor, financing statements under the UCC and the PPSA with all appropriate jurisdictions to perfect, maintain, preserve or protect the Noteholder's interest or rights hereunder or any Note Document in the Collateral the subject hereof or thereof, including a notice that any Disposition of all or any such collateral that is not otherwise permitted hereunder, whether by any Grantor that is a party hereto or any other Person, shall be deemed to violate the rights of the Noteholder hereunder and under applicable Laws. Without limiting the generality of the foregoing, each Grantor hereby: (a) authorizes the Noteholder to file, without notice to any such Grantor, financing statements under the UCC and the PPSA with all appropriate jurisdictions listing all assets or all personal property of such Grantor as the collateral covered by such financing statements; and (b) ratifies and approves the filing of any financing statements by or on behalf of the Noteholder prior to the Closing Date against such Grantor and listing the Collateral or all assets or all personal property of such Grantor as the collateral covered by such financing statements.

(b)      Each Grantor hereby further authorizes the Noteholder at any time and from time to time, with respect to Motor Vehicles, to file in any relevant jurisdiction with the registrar of motor vehicles or other appropriate Governmental Authority in such jurisdiction an application or other document requesting the notation or other indication of the security interest created hereunder on such certificate of title.

**ARTICLE III.**
**PERFECTION AND FURTHER ASSURANCES**

**Section 3.01   Perfection of Certificated Securities Collateral.**  Each Grantor represents and warrants that all certificates, agreements or instruments representing or evidencing the Securities Collateral in existence on the date hereof are listed on Schedule 3.01 and have been delivered to the Noteholder in suitable form for transfer by delivery or accompanied by duly executed undated instruments of transfer or assignment in blank and that (assuming continuing

possession by the Noteholder of any such Securities Collateral) the Noteholder has a perfected first priority security interest therein. Each Grantor hereby agrees that all certificates, agreements or instruments representing or evidencing the Securities Collateral acquired by such Grantor after the date hereof shall immediately upon receipt thereof by such Grantor be held by or on behalf of and delivered to the Noteholder in suitable form for transfer by delivery or accompanied by duly executed undated instruments of transfer or assignment in blank, all in form and substance satisfactory to the Noteholder.

The Noteholder shall have the right, at any time upon the occurrence and during the continuance of any Event of Default, to endorse, assign or otherwise transfer to or to register in the name of the Noteholder or any of its nominees or endorse for negotiation any or all of the Securities Collateral, without any indication that such Securities Collateral is subject to the security interest hereunder.

**Section 3.02  Perfection of Uncertificated Securities Collateral.**  Each Grantor represents and warrants that the Noteholder has a perfected first priority security interest in all uncertificated Pledged Securities pledged by it hereunder that are in existence on the date hereof. Each Grantor hereby agrees that if any of the Pledged Securities are at any time not evidenced by certificates of ownership, such Grantor will cause the issuer thereof either (a) to register the Noteholder as the registered owner of such securities or (b) to agree in an authenticated record with such Grantor and the Noteholder that such issuer will comply with instructions with respect to such securities originated by the Noteholder without further consent of such Grantor, such authenticated record to be in form and substance satisfactory to the Noteholder and (c) upon request by the Noteholder, provide to the Noteholder an opinion of counsel, in form and substance reasonably satisfactory to the Noteholder, confirming such pledge and perfection thereof.

**Section 3.03   Maintenance of Perfected Security Interest.**  Each Grantor represents and warrants that on the date hereof all financing statements, agreements, instruments and other documents necessary to perfect the security interest granted by it to the Noteholder in respect of the Collateral have been delivered to the Noteholder in completed and, to the extent necessary or appropriate, duly executed form for filing in each governmental, municipal or other office specified in Schedule 3.03 hereof other than with respect to the Motor Vehicles and the Deposit Accounts which will be delivered to the Noteholder no later than five Business Days prior to the occurrence of Tranche 2. Each Grantor agrees that at its sole cost and expense, such Grantor will maintain the security interest created by this Agreement in the Collateral as a perfected first priority security interest.

**Section 3.04   Other Actions for Perfection.**  In order to further insure the attachment, perfection and priority of, and the ability of the Noteholder to enforce, the Noteholder's security interest in the Collateral, each Grantor represents and warrants (as to itself) as follows and agrees,

in each case at such Grantor's own expense, to take the following actions with respect to the following Collateral:

(a)    Instruments and Tangible Chattel Paper. (i) As of the date hereof, no amounts payable to such Grantor under or in connection with any of the Collateral are evidenced by any Instrument or Tangible Chattel Paper other than Instruments and Tangible Chattel Paper listed on Schedule 3.04(a) hereof and (ii) each Instrument and each item of Tangible Chattel Paper listed on Schedule 3.04(a) hereof has been properly endorsed, assigned and delivered to the Noteholder, accompanied by undated instruments of transfer or assignment duly executed in blank. If any amount then payable under or in connection with any of the Collateral shall be evidenced by any Instrument or Tangible Chattel Paper, the Grantor acquiring such Instrument or Tangible Chattel Paper shall promptly (but in any event within five (5) Business Days after receipt thereof by such Grantor) endorse, assign and deliver the same to the Noteholder, accompanied by such undated instruments of transfer or assignment duly executed in blank as the Noteholder may from time to time specify.

(b)    Deposit Accounts. (i) As of the date hereof, no US Grantor has opened or maintains any Deposit Accounts other than the accounts listed in Schedule 3.04(b) and (ii) prior to Tranche 2, the Noteholder will have a perfected first priority security interest in each Deposit Account which is perfected by Control, except as otherwise permitted by the Noteholder and other than two bank accounts of BWM in which it holds funds in trust and an account of NECC with Leumi USA in connection with the financings with Marco International Corporation. No US Grantor shall hereafter establish and maintain any Deposit Account unless the applicable Grantor shall have given the Noteholder thirty (30) days prior written notice of its intention to establish such new Deposit Account with a depository bank.  Each US Grantor shall cause each applicable depository bank to execute and deliver to the Noteholder a Deposit Account Control Agreement with respect to such Deposit Account. No US Grantor shall grant Control of any Deposit Account to any Person other than the Noteholder and, with respect to NECC's account with Leumi USA, Marco International Corporation.

(c)    Investment Property.

(i)    As of the date hereof, no Grantor has any Securities Accounts or Commodity Accounts other than those listed in Schedule 3.04(c) or holds, owns or has any interest in any certificated securities or uncertificated securities other than those constituting Pledged Securities and those maintained in Securities Accounts or Commodity Accounts listed in Schedule 3.04(c) hereof. No Grantor shall hereafter establish or maintain any Securities Account or Commodity Account with any Securities Intermediary or Commodity Intermediary unless (A) the applicable Grantor shall have given the Noteholder thirty (30) days prior written notice of its intention to establish such new Securities Account or Commodity Account with such Securities

16.

Intermediary or Commodity Intermediary. Upon the request of the Noteholder, each Grantor will cause the applicable Securities Intermediary or Commodity Intermediary to delivered a Securities Account Control Agreement or a Commodity Account Control Agreement with respect to each Securities Account or Commodity Account. No Grantor shall grant Control over any Investment Property to any Person other than the Noteholder.

(ii)    If any Grantor shall at any time hold or acquire any certificated securities constituting Investment Property, such Grantor shall promptly endorse, assign and deliver the same to the Noteholder, accompanied by such undated instruments of transfer or assignment duly executed in blank, all in form and substance satisfactory to the Noteholder.

(iii)    If any securities now or hereafter acquired by any Grantor constituting Investment Property are uncertificated and are issued to such Grantor or its nominee directly by the issuer thereof, such Grantor shall promptly notify the Noteholder thereof and pursuant to an agreement in form and substance reasonably satisfactory to the Noteholder, either (1) cause the issuer to agree to comply with instructions from the Noteholder as to such securities, without further consent of any Grantor or such nominee, (2) cause a Security Entitlement with respect to such uncertificated security to be held in a Securities Account with respect to which the Noteholder has Control or (3) arrange for the Noteholder to become the registered owner of such securities.

(d)    Letter-of-Credit Rights. If any Grantor is at any time a beneficiary under a Letter of Credit now or hereafter issued in favor of such Grantor, such Grantor shall promptly notify the Noteholder thereof, and, except as may be otherwise agreed by the Noteholder, such Grantor shall maintain all Letter-of-Credit Rights assigned to the Noteholder so that the Noteholder has Control of the Letter-of-Credit Rights.

(e)    Commercial Tort Claims. On the date hereof, no Grantor holds any Commercial Tort Claim. Each Grantor will give promptly notice to the Noteholder of any Commercial Tort Claim that is commenced in the future and will immediately execute or otherwise authenticate a supplement to this Agreement, and otherwise take all necessary action, to subject such Commercial Tort Claim to the security interest created under this Agreement.

(f)    Landlord's Access Agreements/Bailee Letters. Upon the request of the Noteholder, each Grantor shall obtain a bailee letter, landlord access agreement or landlord's lien waiver, as applicable, from all bailees and landlords, as applicable, who from time to time have possession of Collateral in the ordinary course of such Grantor's business.

(g)    Motor Vehicles. With respect to each Motor Vehicle owned by a Grantor on the closing date or in which ownership is acquired by a Grantor after the date hereof, at the request of the Noteholder or as selected by the Noteholder, such Grantor shall deliver to the

Noteholder prior to the closing of Tranche 2 or within thirty (30) days after the date of such acquisition, as the case may be, originals of the certificates of title or ownership for all such Motor Vehicles owned by it with the Noteholder listed as lienholder therein.

**Section 3.05   Joinder of Additional Grantors.**   The Grantors shall cause each new Subsidiary of ACL which is not Excluded Property to execute and deliver to the Noteholder a Joinder Agreement within thirty (30) days of the date on which it was acquired or created and, upon such execution and delivery, such Subsidiary shall constitute a "Grantor" for all purposes hereunder with the same force and effect as if originally named as a Grantor herein. Upon the execution and delivery by any Subsidiary of a Joinder Agreement, the supplemental schedules attached to such Joinder Agreement shall be incorporated into and become part of and supplement the Schedules to this Agreement and each reference to such Schedules shall mean and be a reference to such Schedules as supplemented pursuant to each Joinder Agreement and from time to time. The execution and delivery of such Joinder Agreement shall not require the consent of any Grantor hereunder. The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

**Section 3.06   Further Assurances.**

(a)     Further Assurances. Each Grantor shall take such further actions, and execute or deliver to the Noteholder such additional financing statements, amendments, assignments, agreements, supplements, powers and instruments, as the Noteholder may in its judgment deem necessary or appropriate in order to create or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted in the Collateral as provided herein and the rights and interests granted to the Noteholder hereunder, and enable the Noteholder to exercise and enforce its rights, powers and remedies hereunder with respect to any Collateral, including the filing of any financing statements, continuation statements and other documents under the UCC (or other similar laws) in effect in any jurisdiction with respect to the security interest created hereby, and the execution and delivery of Control Agreements with respect to Securities Accounts, Commodities Accounts and Deposit Accounts, all in form satisfactory to the Noteholder and in such offices wherever required by law to perfect, continue and maintain the validity, enforceability and priority of the security interest in the Collateral as provided herein and to preserve the other rights and interests granted to the Noteholder hereunder, as against third parties, with respect to the Collateral. Without limiting the generality of the foregoing, but subject to applicable law, each Grantor shall make, execute, endorse, acknowledge, file or refile or deliver to the Noteholder from time to time upon request by the Noteholder such lists, schedules, descriptions and designations of the Collateral, statements, copies of warehouse receipts, bills of lading, documents of title, vouchers, invoices, schedules, confirmatory assignments, supplements, additional security agreements, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, reports and other assurances or instruments as the Noteholder shall

reasonably request. If an Event of Default has occurred and is continuing, the Noteholder may institute and maintain, in its own name or in the name of any Grantor, such suits and proceedings as the Noteholder may deem to be necessary or expedient to prevent any impairment of the security interest in or the perfection thereof in the Collateral. All of the foregoing shall be at the sole cost and expense of the Grantors.

(b)    Report. Within thirty (30) days after the end of each calendar year each Grantor shall furnish the Noteholder with a report listing for such quarter:

(i)    any Subsidiary formed or acquired by any Grantor in the United States, other than Excluded Property;

(ii)    any certificated securities, uncertificated securities, other equity interests or Debt not held in a Securities Account acquired by any Grantor;

(iii)    any change in name or jurisdiction of organization of any Grantor as permitted by the Transaction Documents;

(iv)    any new location of Inventory or Equipment of any Grantor;

(v)    all Promissory Notes, Instruments or Chattel Paper received by any Grantor;

(vi)    any Securities Account, Commodities Account or Deposit Account opened by any Grantor;

(vii)    all applications for and registration received by any Grantor in respect of any Intellectual Property;

(viii)    any Letter of Credit Rights acquired by any Grantor;

(ix)    any Commercial Tort Claims acquired by any Grantor; and

(x)    any Motor Vehicles acquired by any Grantor.

## ARTICLE IV.
## REPRESENTATIONS, WARRANTIES AND COVENANTS

Each Grantor represents, warrants and covenants as follows:

**Section 4.01    Note Agreement Representation.** Each Grantor acknowledges and agrees that each Note Document is a Transaction Document.

**Section 4.02    Existence.**

(a)      Each Grantor is (i) duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, (ii) duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification except to the extent that the failure to qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect, and (iii) in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)      Each Grantor will (i) preserve, renew and maintain in full force and effect its corporate or organizational existence, (ii) take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, as otherwise permitted under this Agreement, and (iii) maintain AHQ's listing on the Australian Stock Exchange.

**Section 4.03   Compliance With Laws.** Each Grantor is (a) duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, (b) duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification except to the extent that the failure to qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect, and (c) in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect. Each Grantor will comply with all Contractual Obligations and Requirements of Law.

**Section 4.04   Power; Authorization; Enforceability.**

(a)      Each Grantor has the power and authority, and the legal right, to own or lease and operate its property, and to carry on its business as now conducted and as proposed to be conducted, and to execute, deliver and perform the Note Documents to which it is a party. Each Grantor has taken all necessary organizational action to authorize the execution, delivery and performance of the Note Documents to which it is a party. No consent or authorization of, filing with, notice to or other act by, or in respect of, any Governmental Authority or any other Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Note Documents. Each Note Document has been duly executed and delivered by each Grantor party thereto.

(b)      This Agreement constitutes, and each other Note Document when delivered hereunder will constitute, a legal, valid and binding obligation of each Grantor party thereto, enforceable against each such Grantor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws

affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

**Section 4.05   No Contravention.** The execution, delivery and performance of this Agreement and the other Note Documents, the issuance of the Note and the use of the proceeds thereof will not violate any Requirement of Law or any Contractual Obligation of any Grantor and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or assets pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Transaction Documents). No Requirement of Law or Contractual Obligation applicable to any Grantor could reasonably be expected to have a Material Adverse Effect.

**Section 4.06   No Litigation.**  No action, suit, litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Grantors, threatened by or against any Grantor or against any of its property or assets (a) with respect to any of the Note Documents or any of the transactions contemplated hereby or thereby, or (b) that could reasonably be expected to have a Material Adverse Effect.

**Section 4.07   Ownership of Property and No Other Liens.**

(a)     Each Grantor has fee simple title to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in, all its Collateral, and none of such property is subject to any Lien, claim, option or right of others, except for the security interest granted to the Noteholder and Liens as permitted by Section 4.20.

(b)     None of the account debtors or other Persons obligated on any of the Collateral is a Governmental Authority covered by the Federal Assignment of Claims Act or like federal, state or local statute or rule in respect of such Collateral.

**Section 4.08   Perfected First Priority Security Interest.**  This Agreement is effective to create in favor of the Noteholder, a legal, valid and enforceable security interest in the Collateral and the Proceeds thereof. In the case of the certificated Pledged Securities, when stock certificates representing such Pledged Securities are delivered to the Noteholder and in the case of the other Collateral, when financing statements and other filings specified on Schedule 3.03 hereof in appropriate form are filed in the offices specified on Schedule 3.03 hereof and other actions described in Schedule 3.03 hereof are taken, this Agreement shall constitute, and will at all times constitute, a fully perfected first priority Lien on, and security interest in, all rights, title and interest of the Grantors in such Collateral and the Proceeds thereof, as security for the Secured Obligations.

**Section 4.09   No Transfer of Collateral.** No Grantor shall sell, offer to sell, dispose of, convey, assign or otherwise transfer, or grant any option with respect to, restrict, or grant, create,

21.

permit or suffer to exist any Lien on, any of the Collateral pledged by it hereunder or any interest therein except in the ordinary course of business.

Section 4.10   **Claims Against Collateral.**   Each Grantor shall, at its own cost and expense, defend title to the Collateral and the first priority perfected security interest and Lien granted to the Noteholder with respect thereto against all claims and demands of all Persons at any time claiming any interest therein adverse to the Noteholder other than Liens permitted under the Note. Except as expressly permitted by the Note Agreement or any other Note Document, there is no agreement, order, judgment or decree, and no Grantor shall enter into any agreement or take any other action, that could restrict the transferability of any of the Collateral or otherwise impair or conflict with such Grantors' obligations or the rights of the Noteholder hereunder.

Section 4.11   **Other Financing Statements.**   Such Grantor has not executed, filed, nor authorized any third party to file any financing statement or other instrument similar in effect covering all or any part of the Collateral or listing such Grantor as debtor in any recording office, except such as have been filed in favor of the Noteholder pursuant to this Agreement or as otherwise permitted under hereunder as a Permitted Lien.  No financing statement or other instrument similar in effect covering all or any part of the Collateral or listing such Grantor as debtor is on file in any recording office, except such as have been filed in favor of the Noteholder pursuant to this Agreement or for the benefit of the Prior Lender and is being released on the date hereof or as set forth on Schedule 4.11.

No Grantor shall execute, authorize or permit to be filed in any recording office any financing statement or other instrument similar in effect covering all or any part of the Collateral or listing such Grantor as debtor with respect to all or any part of the Collateral, except financing statements and other instruments filed in respect of Liens permitted hereunder or under the Note Agreement.

Section 4.12   **Changes in Name, Jurisdiction of Organization, Etc.** On the date hereof, such Grantor's type of organization, jurisdiction of organization, legal name, Federal Taxpayer Identification Number, organizational identification number (if any) and chief executive office or principal place of business are indicated next to its name in Schedule 4.12 hereof. Schedule 4.12 also lists all of such Grantor's jurisdictions and types of organization, legal names and locations of chief executive office or principal place of business at any time during the four months preceding the date hereof, if different from those referred to in the preceding sentence.

Such Grantor shall not, except upon not less than thirty (30) days' prior written notice to the Noteholder, and delivery to the Noteholder of all additional financing statements, information and other documents reasonably requested by the Noteholder to maintain the validity, perfection and priority of the security interests provided for herein:

(a)    change its legal name, identity, type of organization or corporate structure;

(b)    change the location of its chief executive office or its principal place of business;

(c)    change its Federal Taxpayer Identification Number or organizational identification number (if any); or

(d)    change its jurisdiction of organization (in each case, including by merging with or into any other entity, reorganizing, organizing, dissolving, liquidating, reincorporating or incorporating in any other jurisdiction).

Such Grantor shall, prior to any change described in the preceding sentence, take all actions requested by the Noteholder to maintain the perfection and priority of the security interest of the Noteholder in the Collateral intended to be granted hereunder.

Each Grantor agrees to promptly provide the Noteholder with certified Organizational Documents reflecting any of the changes described in this Section 4.12. Each Grantor also agrees to promptly notify the Noteholder of any change in the location of any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral is located (including the establishment of any such new office or facility).

**Section 4.13   Location of Inventory and Equipment.**  On the date hereof, the material Inventory and the material Equipment (other than mobile goods and goods in transit) of US Grantor are kept at locations listed in Schedule 4.12 hereof. Schedule 4.12 also lists the locations of such Grantor's material Inventory and the material Equipment (other than mobile goods and goods in transit) for the four months preceding the date hereof, if different from those referred in the preceding sentence.

Such Grantor shall not move any Equipment or Inventory (except any such sold in the ordinary course of business consistent with past practice), to any location, other any location that is listed in Schedule 4.12 hereof except upon not less than thirty (30) days' prior written notice to the Noteholder, of its intention so to do, clearly describing such new location and providing such other information and documents to the Noteholder reasonably requested by the Noteholder or the Noteholder to maintain the validity, perfection and priority of the security interests provided for herein.

Such Grantor shall, prior to any change described in the preceding sentence, take all actions requested by the Noteholder to maintain the perfection and priority of the security interest of the Noteholder in the Collateral, including using commercially reasonable efforts to obtain waivers of landlord's or warehousemen's liens with respect to such new location, if applicable, who from time

to time have possession of Collateral; provided that, in no event shall any Equipment or Inventory of any Grantor be moved to any location outside of the continental United States.

**Section 4.14    Pledged Securities and Pledged Debt.**  Schedule 4.14 sets forth a complete and accurate list of all Pledged Securities and Pledged Debt held by such Grantor other than the Excluded Property as of the date hereof. The Pledged Securities pledged by such Grantor hereunder constitute all of the issued and outstanding Equity Interests of each Subsidiary owned by such Grantor which is not Excluded Property. All of the Pledged Securities existing on the date hereof have been, and to the extent any Pledged Securities are hereafter issued, such Pledged Securities will be, upon such issuance, duly authorized, validly issued, fully paid and non-assessable. There is no amount or other obligation owing by any Grantor to any of issuer of the Pledged Securities in exchange for or in connection with the issuance of the Pledged Securities or any Grantor's status as a partner or a member of any issuer of the Pledged Securities. No Grantor is in default or violation of any provisions of any agreement to which such Grantor is a party relating to the Pledged Securities.

All of the Pledged Debt described on Schedule 4.14 has been duly authorized, authenticated or issued, and delivered and is the legal, valid and binding obligation of the issuers thereof, enforceable in accordance with their respective terms (subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law)) and is not in default. The Pledged Debt constitutes all of the issued and outstanding intercompany indebtedness owing to such Grantor and, if evidenced by promissory notes, such notes have been delivered to the Noteholder.

Each Grantor shall, upon obtaining any Pledged Securities or Pledged Debt of any Person, accept the same in trust for the benefit of the Noteholder and promptly (but in any event within five (5) Business Days after receipt thereof) deliver to the Noteholder an updated Schedule 4.14, and the certificates and other documents required under Section 3.01 and Section 3.02 in respect of the additional Pledged Securities or Pledged Debt which are to be pledged pursuant to this Agreement, and confirming the Lien hereby created on such additional Pledged Securities or Pledged Debt.

**Section 4.15    Approvals.**  If the Noteholder desires to exercise any remedies, voting or consensual rights or attorney-in-fact powers set forth in this Agreement and determines it necessary to obtain any approvals or consents of any Governmental Authority or any other Person therefor, then, upon the request of the Noteholder, such Grantor agrees to assist the Noteholder in obtaining as soon as practicable any necessary approvals or consents for the exercise of any such remedies, rights and powers.

**Section 4.16    Collateral Information.**    All information set forth herein, including the schedules annexed hereto, and all information contained in any documents, schedules and lists heretofore delivered to the Noteholder, in connection with this Agreement, in each case, relating to the Collateral, is accurate and complete in all material respects. The Collateral described on the schedules hereof constitutes all of the property of such type of Collateral owned or held by the Grantors.

**Section 4.17    Insurance.**

(a)    The Properties of the Grantors are and will continue to be insured with financially sound and reputable insurance companies which are not Affiliates of AHQ, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the applicable Grantor operates.  The insurance of the US Grantors shall name the Noteholder as the loss payee and additional insured.  Schedule 4.17 sets forth a description of all insurance maintained by or on behalf of the US Grantors as of the Closing Date. Each insurance policy listed on Schedule 4.17 is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

(b)    If the proceeds of any insurance claim are paid to any Grantor after the Noteholder has exercised its right to foreclose on all or any part of the Collateral during the existence of an Event of Default, such Proceeds shall be held in trust for the benefit of the Noteholder and immediately after receipt thereof shall be paid to the Noteholder for application in accordance with herein or the Note Agreement.

**Section 4.18    Mining Rights.**    Each of NECC and BWM owns all Mining Rights that are required in connection with the current status of the New Elk Mine and the Black Warrior Mine, respectively. Each of NECC and BWM has obtained such other surface and other rights as are necessary for access rights, water rights, plant sites, tailings disposal, waste dumps, ore dumps, abandoned heaps or ancillary facilities that are required in connection with operation of the New Elk Mine and Black Warrior Mine, respectively. All current Mining Rights and other rights with respect to the New Elk Mine and Black Warrior Mine are sufficient in scope and substance for NECC's current activities in relation to the New Elk Mine and BWM's current activities in relation to the Black Warrior Mine.

**Section 4.19    Availability of Utilities.**    All utility facilities and services necessary for the operation of the New Elk Mine and the Black Warrior Mine are part of the current development studies and plans and associated permit applications, including, without limitation, water, storm and sanitary sewer, electricity and telephone.

**Section 4.20    Limitation on Liens.** No Grantor will create, incur, assume or permit to exist any Lien on any property or assets (including Equity Interests of any of its Subsidiaries) now owned or hereafter acquired by it or on any income or rights in respect of any thereof, except each of the following (collectively, "**Permitted Liens**"):

(a)    Liens created pursuant to or arising under any Transaction Document;

(b)    Liens imposed by law for taxes, assessments or governmental charges not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted if adequate reserves with respect thereto are maintained in accordance with IFRS on the books of the applicable Person;

(c)    Carriers', warehousemen's, mechanics', materialmen's, repairmen's and other similar Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than thirty (30) days or that are being contested in good faith and by appropriate proceedings diligently conducted including but not limited to those items listed in Schedule 4.20(c);

(d)    Liens arising solely by virtue of any statutory or common law provision relating to banker's liens rights or set-off or similar rights;

(e)    Pledges and deposits and other Liens (i) made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, and (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to a Grantor;

(f)    Liens (including deposits) to secure the performance of bids, tenders, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of like nature, in each case in the ordinary course of business;

(g)    Easements, zoning restrictions, rights-of-way, minor defects or irregularities in title and similar encumbrances on real property imposed by law or arising in the ordinary course of business which, in the aggregate, are not material in amount and which do not materially detract from the value of the affected property or interfere materially with the ordinary conduct of business of a Grantor or any of its Subsidiaries including, but not limited to those items listed on Schedule 4.20(g);

(h)    Liens securing a purchase money obligation or Debt arising under Capital Lease Obligations, provided that, in each case, any such Lien (i) attaches only to the specific item(s) of property or asset(s) acquired or financed with the proceeds of the corresponding Debt, and (ii) does not exceed $100,000;

26.

(i)        Liens in existence as of the date hereof which are all listed on Schedule 4.20(i);

(j)        Liens on Excluded Property;

(k)        Liens on inventory and receivables or trade finance financings as may be approved by the Noteholder in its sole judgment; and

(l)        Liens for the benefit of the Prior Lender being terminated on the date hereof.

**Section 4.21    Environmental Matters.**

(a)        Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(i)        none of the properties currently or formerly owned, leased or operated by any Grantor (the "**Properties**") contain or previously contained, any Hazardous Materials in amounts or concentrations or under circumstances that would reasonably be expected to constitute, or in the past have constituted, a violation of, or could result in material liability under, any Environmental Law;

(ii)        no Grantor has received any notice of actual or alleged violation, non-compliance or liability regarding compliance with Environmental Laws or other environmental matters or with respect to any of the Properties or the business operated by any Grantor, nor is there any reason to believe that any such notice will be received or is being threatened;

(iii)        the Properties and all operations at the Properties are and formerly have been in compliance with all applicable Environmental Laws, and there is no contamination at, under or about the Properties or violation of any Environmental Law with respect to the Properties or the business operated by any Grantor;

(iv)        Hazardous Materials have not been transported or disposed of from the Properties in violation of, or in a manner or to a location that could result in liability under, any Environmental Law; no Hazardous Materials have been generated, treated, stored or disposed of at, on or under any of the Properties in violation of, or in a manner that could result in liability under, any applicable Environmental Law; and there has been no release or threat of release of Hazardous Materials at or from the Properties, or arising from or related to the operations of any Grantor in connection with the Properties or the business operated by any Grantor, in violation of or in amounts or in a manner that could result in liability under Environmental Laws;

(v)        no administrative or governmental action or judicial proceeding is pending or, to the knowledge of the Grantors, threatened, under any Environmental Law to which

any Grantor is or will be a party with respect to the Properties or the business operated by any Grantor, nor are there any decrees or orders or other administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the business operated by any Grantor; and

(vi)    no Grantor has assumed any liability of any other Person under Environmental Laws.

(b)    Each Grantor shall:

(i)    Obtain, comply and maintain in all material respects, with all applicable Environmental Laws, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws.

(ii)    Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions necessary to remove and clean up all Hazardous Materials from any of its properties as required under Environmental Laws, except those Hazardous Materials that are necessary to such Grantor's operations and must be stored on such Grantor's properties in connection with such operations (provided that any such storage shall be in compliance with all applicable Environmental Laws), and promptly comply in all material respects with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws.

**Section 4.22   Loss or Damage.**  Each Grantor shall immediately notify the Noteholder in writing of any event causing material loss or depreciation in value of any of the Collateral and of the amount thereof (other than ordinary wear and tear).

**Section 4.23   Inspection of Collateral.**  Each Grantor shall keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. Each US Grantor shall hereto shall, with respect to any Collateral owned, leased or otherwise controlled by it, upon reasonable prior appointment during normal business hours, will:

(a)    provide access to such Collateral to the Noteholder and its officers, employees and agents, as frequently as is commercially reasonable or, at any time an Event of Default exists, as frequently as Noteholder determines to be appropriate, with the expenses of one such visit per year to be reimbursed by ACL but there shall be no such limitation if a Default has occurred;

(b)    permit the Noteholder or any of its officers, employees and agents to inspect, audit and make extracts and copies from all of such Grantor's books and records; and

(c)     permit the Noteholder to inspect, review, evaluate and make physical verifications and appraisals of the Inventory and other Collateral in any manner and through any means that the Noteholder considers reasonably advisable, and such Grantor agrees to render to the Noteholder, at the Grantor's sole cost and expense, such clerical and other assistance as may be reasonably requested with regard thereto; provided that, if an Event of Default shall have occurred and be continuing, no advance notice (whether during normal business hours or otherwise) shall be required.

**ARTICLE V.**
**SECURITIES COLLATERAL**

**Section 5.01     Existing Voting Rights and Distributions.**

(a)     So long as no Event of Default shall have occurred and be continuing:

(i)     Each Grantor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Securities Collateral or any part thereof for any purpose not inconsistent with the terms or purposes hereof, the Note or any other Transaction Document; provided, however, that no Grantor shall in any event exercise such rights in any manner which could reasonably be expected to have a Material Adverse Effect.

(ii)     Each Grantor shall be entitled to receive and retain, and to utilize free and clear of the Lien hereof, any and all Distributions, if and to the extent made in accordance with the provisions of the Note Agreement; provided, however, that any and all such Distributions consisting of rights or interests in the form of securities shall be immediately delivered to the Noteholder to hold as Collateral and shall, if received by any Grantor, be received in trust for the benefit of the Noteholder, be segregated from the other property or funds of such Grantor and be promptly (but in any event within five (5) Business Days after receipt thereof) delivered to the Noteholder as Collateral in the same form as so received (with any necessary endorsement).

(b)     Upon the occurrence and during the continuance of any Event of Default:

(i)     All rights of each Grantor to exercise the voting and other consensual rights it would otherwise be entitled to exercise pursuant to Section 5.01(a)(i) shall immediately cease, and all such rights shall thereupon become vested in the Noteholder, which shall have the sole right to exercise such voting and other consensual rights.

(ii)     All rights of each Grantor to receive Distributions which it would otherwise be authorized to receive and retain pursuant to Section 5.01(a)(ii) shall immediately

cease and all such rights shall thereupon become vested in the Noteholder, which shall have the sole right to receive and hold such Distributions as Collateral.

(c)      Each Grantor shall, at its sole cost and expense, from time to time execute and deliver to the Noteholder appropriate instruments as the Noteholder may request in order to permit the Noteholder to exercise the voting and other rights which it may be entitled to exercise pursuant to Section 5.01(b)(i) and to receive all Distributions which it may be entitled to receive under Section 5.01(b)(ii).

(d)      All Distributions which are received by any Grantor contrary to the provisions of Section 5.01(a)(ii) or Section 5.01(b) shall be received in trust for the benefit of the Noteholder, shall be segregated from other funds of such Grantor and shall immediately (but in any event within three (3) Business Days after receipt thereof by such Grantor) be paid over to the Noteholder as Collateral in the same form as so received (with any necessary endorsement).

**Section 5.02    Certain Agreements of Grantors.**

(a)      In the case of each Grantor which is an issuer of Securities Collateral, such Grantor agrees to be bound by the terms of this Agreement relating to the Securities Collateral issued by it and will comply with such terms insofar as such terms are applicable to it.

(b)      In the case of each Grantor which is a partner, shareholder or member, as the case may be, in a partnership, limited liability company or other entity, such Grantor hereby (i) consents to the extent required by the applicable Organizational Document to the pledge by each other Grantor, pursuant to the terms hereof, of the Pledged Securities in such partnership, limited liability company or other entity and, upon the occurrence and during the continuance of an Event of Default, to the transfer of such Pledged Securities to the Noteholder or its nominee and to the substitution of the Noteholder or its nominee as a substituted partner, shareholder or member in such partnership, limited liability company or other entity with all the rights, powers and duties of a general partner, limited partner, shareholder or member, as the case may be and (ii) irrevocably waives any and all provisions of the applicable Organizational Documents that conflict with the terms of this Agreement or prohibit, restrict, condition or otherwise affect the grant hereunder of any Lien on any of the Collateral or any enforcement action which may be taken in respect of any such Lien.

## ARTICLE VI.
## INTELLECTUAL PROPERTY COLLATERAL

**Section 6.01    Intellectual Property License.**    For the purpose of enabling the Noteholder, during the continuance of an Event of Default, to exercise rights and remedies under ARTICLE VIII hereof at such time as the Noteholder shall be lawfully entitled to exercise such

rights and remedies, and for no other purpose, each Grantor hereby grants to the Noteholder, to the extent of such Grantor's rights and effective only during the continuance of an Event of Default, an irrevocable, non-exclusive license to use and sublicense any of the Intellectual Property then owned by or licensed to such Grantor. Such license shall include access to all devices, products and media in which any of the Intellectual Property is embodied, embedded, recorded or stored and to all computer programs used for the compilation or printout hereof.

## ARTICLE VII.
## GUARANTY

**Section 7.01**    Each Guarantor unconditionally and irrevocably guarantees to the Noteholder the full and prompt payment when due (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise) and performance of the Secured Obligations (the "**Guaranteed Obligations**"). The Guaranteed Obligations include interest that, but for a proceeding under any Debtor Relief Law, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against any Guarantor for such interest in any such proceeding.

**Section 7.02**    Each Guarantor acknowledges and agrees that: (i) the Guaranteed Obligations are separate and distinct from any Debt arising under or in connection with any other document, including under any provision of this Agreement other than this Article VII, executed at any time by such Guarantor in favor of the Noteholder; and (ii) such Guarantor shall pay and perform all of the Guaranteed Obligations as required under this Article VII, and the Noteholder may enforce any and all of their respective rights and remedies hereunder, without regard to any other document, including any provision of this Agreement other than this Article VII, at any time executed by such Guarantor, irrespective of whether any such other document, or any provision thereof or hereof, shall for any reason become unenforceable or any of the Debt thereunder shall have been discharged, whether by performance, avoidance or otherwise. Each Guarantor acknowledges that, in entering into the Note Agreement and acquiring the Note, the Noteholder is relying upon the enforceability of this Article VII and the Guaranteed Obligations as separate and distinct Debt of such Guarantor, and each Guarantor agrees that the Noteholder would be denied the full benefit of their bargain if at any time this Article VII or the Guaranteed Obligations were treated any differently. The fact that the guaranty is set forth in this Agreement rather than in a separate guaranty document is for the convenience of the Grantors and shall in no way impair or adversely affect the rights or benefits of the Noteholder under this Article VII. Each Guarantor agrees to execute and deliver a separate document, immediately upon request at any time of the Noteholder, evidencing such Guarantor's obligations under this Article VII. Upon the occurrence of any Event of Default, a separate action or actions may be brought against such Guarantor, whether or not any Grantor, any other Guarantor or any other Person is joined therein or a separate

action or actions are brought against any Grantor, any such other Guarantor or any such other Person.

**Section 7.03**    To the extent that any court of competent jurisdiction shall impose by final judgment under applicable laws (including any Debtor Relief Law) any limitations on the amount of any Guarantor's liability with respect to the Guaranteed Obligations that the Noteholder can enforce under this Article VII, the Noteholder by its acceptance hereof accept such limitation on the amount of such Guarantor's liability hereunder to the extent needed to make this Article VII fully enforceable and non-avoidable.

**Section 7.04**    The liability of any Guarantor under this Article VII shall be irrevocable, absolute, independent and unconditional, and shall not be affected by any circumstance that might constitute a discharge of a surety or Guarantor other than the indefeasible payment and performance in full of all Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)    such Guarantor's liability hereunder shall be the immediate, direct, and primary obligation of such Guarantor and shall not be contingent upon the Noteholder's exercise or enforcement of any remedy it may have against any Grantor or any other Person, or against any collateral or other security for any Guaranteed Obligations;

(b)    this Guaranty is a guaranty of payment when due and not merely of collectability;

(c)    the Noteholder may enforce this Section 7.04 upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Noteholder and any Grantor or any other Person, with respect to the existence of such Event of Default;

(d)    such Guarantor's payment of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge such Guarantor's liability for any portion of the Guaranteed Obligations remaining unsatisfied; and

(e)    such Guarantor's liability with respect to the Guaranteed Obligations shall remain in full force and effect without regard to, and shall not be impaired or affected by, nor shall such Guarantor be exonerated or discharged by, any of the following events:

(i)    any proceeding under any Debtor Relief Law;

(ii)    any limitation, discharge, or cessation of the liability of any Grantor or any other Person for any Guaranteed Obligations due to any law, or any invalidity or unenforceability in whole or in part of any of the Guaranteed Obligations or the Transaction Documents;

32.

(iii)    any merger, acquisition, consolidation or change in structure of any Grantor, any Subsidiary thereof or any other Person, or any sale, lease, transfer or other Disposition of any or all of the assets or shares of any Grantor or any other Person;

(iv)    any assignment or other transfer, in whole or in part, of the Noteholder's interests in and rights under this Agreement (including this Article VII) or the other Transaction Documents;

(v)    any claim, defense, counterclaim or setoff, other than that of prior performance, such Guarantor, any other Guarantor or any other Person may have or assert, including any defense of incapacity or lack of corporate or other authority to execute any of the Transaction Documents;

(vi)    the Noteholder's amendment, modification, renewal, extension, cancellation or surrender of any Transaction Document or any Guaranteed Obligations;

(vii)    the Noteholder's exercise or non-exercise of any power, right or remedy with respect to any Guaranteed Obligations or any collateral;

(viii)    the Noteholder's vote, claim, distribution, election, acceptance, action or inaction in any proceeding under any Debtor Relief Law; or

(ix)    any other guaranty, whether by such Guarantor or any other Person, of all or any part of the Guaranteed Obligations or any other Debt, obligations or liabilities of the Grantor to the Noteholder.

**Section 7.05**  Each Guarantor hereby unconditionally consents and agrees that, without notice to or further assent from such Guarantor:

(a)    the principal amount of the Guaranteed Obligations may be increased or decreased and additional indebtedness or obligations of any Grantor under the Transaction Documents may be incurred and the time, manner, place or terms of any payment under any Transaction Document may be extended or changed, by one or more amendments, modifications, renewals or extensions of any Transaction Document or otherwise;

(b)    the time for any Grantor's (or any other Person's) performance of or compliance with any term, covenant or agreement on its part to be performed or observed under any Transaction Document may be extended, or such performance or compliance waived, or failure in or departure from such performance or compliance consented to, all in such manner and upon such terms as the Noteholder (as applicable under the relevant Transaction Documents) may deem proper;

(c)  the Noteholder may request and accept other guaranties and may take and hold security as collateral for the Guaranteed Obligations, and may, from time to time, in whole or in part, exchange, sell, surrender, release, subordinate, modify, waive, rescind, compromise or extend such other guaranties or security and may permit or consent to any such action or the result of any such action, and may apply such security and direct the order or manner of sale thereof; and

(d)  the Noteholder may exercise, or waive or otherwise refrain from exercising, any other right, remedy, power or privilege even if the exercise thereof affects or eliminates any right of subrogation or any other right of such Guarantor against a Grantor.

**Section 7.06**  Each Guarantor waives and agrees not to assert:

(a)  any right to require the Noteholder to proceed against any other Guarantor or any other Person, or to pursue any other right, remedy, power or privilege of the Noteholder whatsoever;

(b)  the defense of the statute of limitations in any action hereunder or for the collection or performance of the Guaranteed Obligations;

(c)  any defense arising by reason of any lack of corporate or other authority or any other defense of any Grantor, such Guarantor or any other Person;

(d)  any defense based upon the Noteholder's errors or omissions in the administration of the Guaranteed Obligations;

(e)  any rights to set-offs and counterclaims;

(f)  without limiting the generality of the foregoing, to the fullest extent permitted by applicable laws, any defenses or benefits that may be derived from or afforded by applicable laws limiting the liability of or exonerating guarantors or sureties, or that may conflict with the terms of this Article VII; and

(g)  any and all notice of the acceptance of this Guaranty, and any and all notice of the creation, renewal, modification, extension or accrual of the Guaranteed Obligations, or the reliance by the Noteholder upon this Guaranty, or the exercise of any right, power or privilege hereunder. The Guaranteed Obligations shall conclusively be deemed to have been created, contracted, incurred and permitted to exist in reliance upon this Guaranty. Each Guarantor waives promptness, diligence, presentment, protest, demand for payment, notice of default, dishonor or nonpayment and all other notices to or upon each Guarantor or any other Person with respect to the Guaranteed Obligations.

**Section 7.07**  No Guarantor shall have any right to require the Noteholder to obtain or disclose any information with respect to: the financial condition or character of AHQ or ACL and

any Grantor or the ability of AHQ or ACL and any Grantor to pay and perform the Guaranteed Obligations; the Guaranteed Obligations; any collateral or other security for any or all of the Guaranteed Obligations; the existence or nonexistence of any other guarantees of all or any part of the Guaranteed Obligations; any action or inaction on the part of the Noteholder or any other Person; or any other matter, fact or occurrence whatsoever. Each Guarantor hereby acknowledges that it has undertaken its own independent investigation of the financial condition of AHQ and ACL and each Grantor and all other matters pertaining to this Guaranty and further acknowledges that it is not relying in any manner upon any representation or statement of the Noteholder with respect thereto.

Section 7.08    Until the Guaranteed Obligations shall be paid in full, each Guarantor shall not have, and shall not directly or indirectly exercise: (i) any rights that it may acquire by way of subrogation under this Article VII, by any payment hereunder or otherwise; (ii) any rights of contribution, indemnification, reimbursement or similar suretyship claims arising out of this Article VII; or (iii) any other right that it might otherwise have or acquire (in any way whatsoever) that could entitle it at any time to share or participate in any right, remedy or security of Noteholder as against ACL or other Guarantors or any other Person, whether in connection with this Article VII, any of the other Transaction Documents or otherwise. If any amount shall be paid to any Guarantor on account of the foregoing rights at any time when all the Guaranteed Obligations shall not have been paid in full, such amount shall be held in trust for the benefit of the Noteholder and shall forthwith be paid to the Noteholder to be credited and applied to the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms of the Transaction Documents.

Section 7.09    All payments on account of all indebtedness, liabilities and other obligations of ACL or any other Guarantor to any Guarantor, whether now existing or hereafter arising, and whether due or to become due, absolute or contingent, liquidated or unliquidated, determined or undetermined (the "**Guarantor Subordinated Debt**") shall be subject, subordinate and junior in right of payment and exercise of remedies, to the extent and in the manner set forth herein, to the prior payment in full in cash or cash equivalents of the Guaranteed Obligations. As long as any of the Guaranteed Obligations shall remain outstanding and unpaid, each Guarantor shall not accept or receive any payment or distribution by or on behalf of ACL or any other Guarantor, directly or indirectly, or assets of ACL or any other Guarantor, of any kind or character, whether in cash, property or securities, including on account of the purchase, redemption or other acquisition of Guarantor Subordinated Debt, as a result of any collection, sale or other Disposition of collateral, or by setoff, exchange or in any other manner, for or on account of the Guarantor Subordinated Debt (**"Guarantor Subordinated Debt Payments"**). If any Guarantor Subordinated Debt Payments shall be received in contravention of this Article VII, such Guarantor Subordinated Debt Payments shall be held in trust for the benefit of the Noteholder and shall be paid over or delivered to the Noteholder for application to the payment in full in cash or cash equivalents of all Guaranteed Obligations remaining unpaid to the extent necessary to give effect to this Article VII

after giving effect to any concurrent payments or distributions to the Noteholder in respect of the Guaranteed Obligations.

**Section 7.10**    This Guaranty is a continuing guaranty and agreement of subordination and shall continue in effect and be binding upon each Guarantor until payment and performance in full of the Guaranteed Obligations, including Guaranteed Obligations which may exist continuously or which may arise from time to time under successive transactions, and each Guarantor expressly acknowledges that this Guaranty shall remain in full force and effect notwithstanding that there may be periods in which no Guaranteed Obligations exist.

**Section 7.11**    This Guaranty shall continue to be effective or shall be reinstated and revived, as the case may be, if, for any reason, any payment of the Guaranteed Obligations by or on behalf of ACL or any Grantor (or receipt of any proceeds of collateral) shall be rescinded, invalidated, declared to be fraudulent or preferential, set aside, voided or otherwise required to be repaid to ACL or any Grantor, its estate, trustee, receiver or any other Person (including under any Debtor Relief Law), or must otherwise be restored by the Noteholder, whether as a result of proceedings under any Debtor Relief Law or otherwise. All losses, damages, costs and expenses that the Noteholder may suffer or incur as a result of any voided or otherwise set aside payments shall be specifically covered by the indemnity in favor of the Noteholder hereunder.

**Section 7.12**    The proceeds of the Note provided to or for the benefit of ACL and its Subsidiaries by the Noteholder have been and are to be contemporaneously used by ACL and each Guarantor. It is the position, intent and expectation of the parties that ACL and each Guarantor have derived and will derive significant and substantial benefits from the Note Agreement and the Note to be made available by the Noteholder thereunder. Each Guarantor has received at least "reasonably equivalent value" (as such phrase is used in Section 548 of the U.S. Bankruptcy Code and in comparable provisions of other applicable Debtor Relief Laws) and more than sufficient consideration to support its obligations hereunder in respect of the Guaranteed Obligations. Immediately prior to and after and giving effect to the incurrence of each Guarantor's obligations under this Guaranty, such Guarantor will be Solvent.

**Section 7.13**    Each Guarantor acknowledges that it either has obtained the advice of legal counsel or has had the opportunity to obtain such advice in connection with the terms and provisions of this Article VII. Each Guarantor acknowledges and agrees that each of the waivers and consents set forth herein is made with full knowledge of its significance and consequences, that all such waivers and consents herein are explicit and knowing and that each Guarantor expects such waivers and consents to be fully enforceable.

**Section 7.14**    If, while any Guarantor Subordinated Debt is outstanding, any proceeding under any Debtor Relief Law is commenced by or against ACL or any Grantor or its or their property, the Noteholder is hereby irrevocably authorized and empowered, but shall have no

36.

obligation, to demand, sue for, collect and receive every payment or distribution in respect of all Guarantor Subordinated Debt and give acquittances therefor and to file claims and proofs of claim and take such other action (including voting the Guarantor Subordinated Debt) as it may deem necessary or advisable for the exercise or enforcement of any of the rights or interests of the Noteholder; and each Guarantor shall promptly take such action as the Noteholder may reasonably request: (i) to collect the Guarantor Subordinated Debt for the account of the Noteholder and to file appropriate claims or proofs of claim in respect of the Guarantor Subordinated Debt; (ii) to execute and deliver to the Noteholder such powers of attorney, assignments and other instruments as it may request to enable it to enforce any and all claims with respect to the Guarantor Subordinated Debt; and (iii) to collect and receive any and all Guarantor Subordinated Debt Payments.

## ARTICLE VIII.
## EVENTS OF DEFAULT; REMEDIES

**Section 8.01   Events of Default.**  The occurrence of any of the following events shall constitute an event of default (an "**Event of Default**") under this Agreement (whatever the reason for such event and whether or not it shall be voluntary or involuntary or be effected by operation of law or pursuant to any applicable law, rule, ordinance, order of a Governmental Authority):

(a)      default shall be made in the due observance or performance of any covenant, condition or agreement on the part of any Grantor to be observed or performed pursuant to the terms of the Note Agreement, the Note, or this Agreement (other than any covenant, condition or agreement, default in the observance or performance of which is elsewhere in this Section 8.01 specifically dealt with) and such default shall continue unremedied for a period of ten (10) days; or

(b)      any default or event of default, as therein defined, shall occur under any of the other Note Document including the Transaction Documents (after giving effect to any applicable notice, grace or cure period specified therein); or

(c)      any Grantor shall (1) apply for or consent to the appointment of a receiver, trustee, liquidator or other custodian of such Grantor or any of such Grantor's properties or assets, (2) fail or admit in writing such Grantor's inability to pay such Grantor's debts generally as they become due, (3) make a general assignment for the benefit of creditors, (4) suffer or permit an order for relief to be entered against such Grantor in any proceeding under Debtor Relief Law, or (5) file a voluntary petition in bankruptcy, or a petition or an answer seeking an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, or an answer admitting the material allegations of a

37.

petition filed against such Grantor in any proceeding under any such law or statute, or if corporate action shall be taken by any Grantor for the purpose of effecting any of the foregoing; or

(d)    a petition shall be filed, without the application, approval or consent of any Grantor in any court of competent jurisdiction, seeking bankruptcy, reorganization, insolvency, rearrangement, dissolution or liquidation of such Grantor or of all or a substantial part of the properties or assets of such Grantor, or seeking any other relief under any law or statute of Debtor Relief Law against such Grantor, or the appointment of a receiver, trustee, liquidator or other custodian of such Grantor or of all or a substantial part of the properties or assets of such Grantor, and such petition shall not have been stayed or dismissed within sixty (60) days after the filing thereof; or

(e)    any writ of execution, attachment or garnishment shall be issued against the assets of any Grantor and such writ of execution, attachment or garnishment shall not be dismissed, discharged or quashed within thirty (30) days of issuance; or

(f)    any representation or warranty made or deemed made by or on behalf of any Grantor in or in connection with any Note Document or any amendment or modification thereof, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Note Document or any amendment or modification hereof shall prove to have been incorrect in any material respect when made or deemed made.

**Section 8.02   Remedies.**

(a)    If any Event of Default shall have occurred and be continuing, the Noteholder may exercise, without any other notice to or demand upon any Grantor, in addition to the other rights and remedies provided for herein or in any other Transaction Document or otherwise available to it, all the rights and remedies of a secured party upon default under the UCC (whether or not the UCC applies to the affected Collateral) and also may:

(i)    require each Grantor to, and each Grantor hereby agrees that it will at its expense and upon request of the Noteholder immediately, assemble the Collateral or any part thereof, as directed by the Noteholder and make it available to the Noteholder at a place and time to be designated by the Noteholder;

(ii)    (1) enter upon the premises of each  Grantor or any other place where any Collateral is located, and through self-help and without judicial process, without first obtaining a final judgment or giving such Grantor notice and opportunity for a hearing and without any obligation to pay rent, remove the Collateral therefrom to the premises of Noteholder or its agent for such time as Noteholder may desire to collect or liquidate the Collateral; (2) require each Grantor to make available to Noteholder all of Grantor's premises and facilities for the purpose of Noteholder's taking possession of, removing or putting the Collateral in salable form; and (3) use,

and permit any purchaser of any of the Collateral from Noteholder to use, without charge, such Grantor's labels, General Intangibles and advertising matter or any property of a similar nature, as it pertains to or is included in the Collateral, in advertising, preparing for sale and selling any Collateral;

(iii)     without notice except as specified below, sell, resell, assign and deliver or grant a license to use or otherwise dispose of the Collateral or any part thereof, in one or more parcels at public or private sale, at any of the Noteholder's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Noteholder may deem commercially reasonable;

(iv)     occupy any premises owned or leased by any of the Grantors where the Collateral or any part thereof is assembled or located for a reasonable period in order to effectuate its rights and remedies hereunder or under law, without obligation to such Grantor in respect of such occupation; and

(v)     exercise any and all rights and remedies of any of the Grantors under or in connection with the Collateral, or otherwise in respect of the Collateral, including without limitation, (A) any and all rights of such Grantor to demand or otherwise require payment of any amount under, or performance of any provision of, any contract, and the other Collateral, (B) exercise all other rights and remedies with respect to the accounts receivables, and the other Collateral, including without limitation, those set forth in Section 9-607 of the UCC and (C) exercise any and all voting, consensual and other rights with respect to any Collateral.

(b)     Each Grantor agrees that, to the extent notice of sale shall be required by law, at least ten (10) days' notice to such Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. At any sale of the Collateral, if permitted by applicable law, the Noteholder may be the purchaser, licensee, assignee or recipient of the Collateral or any part thereof and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale. To the extent permitted by applicable law, each Grantor waives all claims, damages and demands it may acquire against the Noteholder arising out of the exercise by it of any rights hereunder. Each Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security for the Secured Obligations or otherwise. The Noteholder shall not be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing nor shall it be under any obligation to take any action with regard thereto. The Noteholder shall not be obligated to make any sale of Collateral

regardless of notice of sale having been given. The Noteholder may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Each Grantor agrees that it would not be commercially unreasonable for the Noteholder to dispose of the Collateral or any portion thereof by utilizing internet sites that provide for the auction of assets of the type included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets. The Noteholder shall not be obligated to clean-up or otherwise prepare the Collateral for sale.

(c)     If any Event of Default shall have occurred and be continuing, all payments received by any Grantor in respect of the Collateral shall be received in trust for the benefit of the Noteholder, shall be segregated from other funds of such Grantor and shall be forthwith paid over the Noteholder in the same form as so received (with any necessary endorsement).

(d)     If any Event of Default shall have occurred and be continuing, the Noteholder may, without notice to any Grantor except as required by law and at any time or from time to time, charge, set off and otherwise apply all or part of the Secured Obligations against any funds deposited with it or held by it.

(e)     If any Event of Default shall have occurred and be continuing, upon the written demand of the Noteholder, each Grantor shall execute and deliver to the Noteholder an assignment or assignments of any or all of the Intellectual Property Collateral and such other documents and take such other actions as are necessary or appropriate to carry out the intent and purposes hereof. Within five (5) Business Days of written notice thereafter from the Noteholder, each Grantor shall make available to the Noteholder, to the extent within such Grantor's power and authority, such personnel in such Grantor's employ on the date of the Event of Default as the Noteholder may reasonably designate to permit such Grantor to continue, directly or indirectly, to produce, advertise and sell the products and services sold by such Grantor under the Intellectual Property Collateral, and such persons shall be available to perform their prior functions on the Noteholder's behalf.

(f)     If the Noteholder shall determine to exercise its right to sell all or any of the Securities Collateral of any Grantor pursuant to this Section 8.02, each Grantor agrees that, upon request of the Noteholder, such Grantor will, at its own expense:

(i)     provide the Noteholder with such information and projections as may be necessary or, in the opinion of the Noteholder, advisable to enable the Noteholder to effect the sale of such Securities Collateral;

(ii)     cause any registration, qualification under or compliance with any Federal or state securities law or laws to be effected with respect to all or any part of the Securities

Collateral as soon as practicable and at the sole cost and expense of the Grantors. Each Grantor will cause such registration to be effected (and be kept effective) and will cause such qualification and compliance to be effected (and be kept effective) as may be so requested and as would permit or facilitate the sale and distribution of such Securities Collateral including registration under the Securities Act of 1933 (or any similar statute then in effect), appropriate qualifications under applicable blue sky or other state securities laws and appropriate compliance with all other requirements of any Governmental Authority; and

(iii)    do or cause to be done all such other acts and things as may be necessary to make such sale of such Securities Collateral or any part thereof valid and binding and in compliance with applicable law.

(g)    The Noteholder is authorized, in connection with any sale of the Securities Collateral pursuant to this Section 8.02, to deliver or otherwise disclose to any prospective purchaser of the Securities Collateral: (i) any registration statement or prospectus, and all supplements and amendments thereto, prepared pursuant to Section 8.02(f); (ii) any information and projections provided to it pursuant to Section 8.02(f), and (iii) any other information in its possession relating to such Securities Collateral.

(h)    Each Grantor acknowledges the impossibility of ascertaining the amount of damages that would be suffered by the Noteholder by reason of the failure of such Grantor to perform any of the covenants contained in Section 8.02(f); and consequently, agrees that, if such Grantor shall fail to perform any of such covenants, it will pay, as liquidated damages and not as a penalty, an amount equal to the value of the Securities Collateral on the date the Noteholder demands compliance with Section 8.02(f).

**Section 8.03    No Waiver and Cumulative Remedies.** The Noteholder shall not by any act (except by a written instrument pursuant to Section 9.06), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any default or Event of Default. No failure on the part of the Noteholder to exercise, no course of dealing with respect to, and no delay on the part of the Noteholder in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power, privilege or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy; nor shall the Noteholder be required to look first to, enforce or exhaust any other security, collateral or guaranties. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

**Section 8.04    Application of Proceeds.** Upon the exercise by the Noteholder of its remedies hereunder, any proceeds received by the Noteholder in respect of any realization upon any Collateral shall be applied, together with any other sums then held by the Noteholder pursuant

41.

to this Agreement, first, to the payment of any fees, expenses or indemnities, second to the payment of interest, third to the payment of principal and fourth for payment to ACL. Each Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay the Secured Obligations and the fees and other charges of any attorneys employed by the Noteholder to collect such deficiency.

**ARTICLE IX.**
**MISCELLANEOUS**

**Section 9.01    [Reserved].**

**Section 9.02    Performance By Noteholder.**  If any Grantor shall fail to perform any covenants contained in this Agreement (including covenants to pay insurance, taxes and claims arising by operation of law in respect of the Collateral and to pay or perform any Grantor obligations under any Collateral) or if any representation or warranty on the part of any Grantor contained herein shall be breached, the Noteholder may (but shall not be obligated to) do the same or cause it to be done or remedy any such breach, and may make payments for such purpose; provided, however, that the Noteholder shall in no event be bound to inquire into the validity of any tax, Lien, imposition or other obligation which such Grantor fails to pay or perform as and when required hereby and which such Grantor does not contest in accordance with the provisions of the Note. Any and all amounts so paid by the Noteholder shall be reimbursed by the Grantors in accordance with the provisions of Section 9.08. Neither the provisions of this Section 9.02 nor any action taken by the Noteholder pursuant to the provisions of this Section 9.02 shall prevent any such failure to observe any covenant contained in this Agreement nor any breach of representation or warranty from constituting an Event of Default.

**Section 9.03    Power of Attorney.**  Each Grantor hereby appoints the Noteholder its attorney-in-fact, with full power and authority in the place and stead of such Grantor and in the name of such Grantor, or otherwise, from time to time during the existence of a Default in the Noteholder's discretion to take any action and to execute any instrument consistent with the terms of the Note and the other Transaction Documents which the Noteholder may deem necessary or advisable to accomplish the purposes hereof (but the Noteholder shall not be obligated to and the Noteholder shall have any liability to such Grantor or any third party for failure to so do or take action). The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable for the term hereof. Each Grantor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof.

**Section 9.04    Continuing Security Interest and Assignment.**  This Agreement shall create a continuing security interest in the Collateral and shall (a) be binding upon the Grantors, their respective successors and assigns and (b) inure, together with the rights and remedies of the

42.

Noteholder hereunder, to the benefit of the Noteholder and each of its permitted successors, transferees and assigns and their respective officers, directors, employees, affiliates, agents, advisors and controlling Persons; provided that, no Grantor shall assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Noteholder and any attempted assignment or transfer without such consent shall be null and void. Without limiting the generality of the foregoing clause (b), the Noteholder may assign or otherwise transfer any indebtedness held by it secured by this Agreement to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Noteholder, herein or otherwise, subject however, to the provisions of the Note.

### Section 9.05    Termination and Release.

(a)    At such time as the Loans and the other Secured Obligations shall have been paid in full (other than contingent indemnification obligations in which no claim has been made or is reasonably foreseeable), the Collateral shall be released from the Liens created hereby, and this Agreement and all obligations (other than those expressly stated to survive such termination) of the Noteholder and each Grantor hereunder shall terminate, all without delivery of any instrument or any further action by any party, and all rights to the Collateral shall revert to the Grantors. At the request and sole expense of any Grantor following any such termination, the Noteholder shall deliver to such Grantor any Collateral held by the Noteholder hereunder, and execute and deliver to such Grantor such documents as such Grantor shall reasonably request to evidence such termination.

(b)    If any of the Collateral shall be sold, transferred or otherwise disposed of by any Grantor in a transaction permitted by any Transaction Document, then the Lien created pursuant to this Agreement in such Collateral shall be released, and the Noteholder, at the request and sole expense of such Grantor, shall execute and deliver to such Grantor all releases and other documents necessary or advisable for the release of the Liens created hereby on such Collateral; provided that AHQ shall provide to the Noteholder evidence of such transaction's compliance with the Note Agreement and the other Transaction Documents as the Noteholder shall reasonably request. At the request and sole expense of ACL, a Grantor shall be released from its obligations hereunder if all the Equity Interests of such Grantor are sold, transferred or otherwise disposed of in a transaction permitted by the Note and other Loan Documents; provided that ACL shall have delivered to the Noteholder, at least ten (10) Business Days (or such shorter period reasonably acceptable to the Noteholder) prior to the date of the proposed release, a written request for release identifying the relevant Grantor and the terms of the sale or other disposition in reasonable detail, including the price thereof and any expenses in connection therewith, together with a certification by AHQ stating that such transaction is in compliance with the Note Agreement and the other Transaction Documents.

**Section 9.06  Modification in Writing.**  None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by any Grantor therefrom shall be effective, except by a written instrument signed by the Noteholder in accordance with the terms of the Note. Any amendment, modification or supplement of any provision hereof, any waiver of any provision hereof and any consent to any departure by any Grantor from the terms of any provision hereof in each case shall be effective only in the specific instance and for the specific purpose for which made or given. This Agreement shall be construed as a separate agreement with respect to each Grantor and may be amended, modified, supplemented, terminated or waived with respect to any Grantor without the approval of any other Grantor and without affecting the obligations of any other Grantor hereunder.

**Section 9.07  Notices.**

Unless otherwise provided herein, any notice or other communication required or permitted to be given under this Agreement shall be in writing and mailed by certified or registered mail, delivered by hand or overnight courier as follows:

If to Noteholder, to it at:

> Collins St Convertible Notes Pty Ltd ACN 657 773 754 as trustee for The Collins St Convertible Note Fund ABN 30 216 289 383
> Level 9, 365 Little Collins Street,
> Melbourne VIC 3000
> ntorelli@csvf.com.au

With a copy to:

> Wither Bergman LLP
> Attention: Patricia Lee and Vasiliki Yiannoulis-Riva
> 1700 East Putnam Avenue, Suite 400
> Greenwich, Connecticut 06870-1366
> Patricia.Lee@withersworldwide.com and
> vasi.yiannoulis-riva@withersworldwide.com

If to any Grantor, to it at:

> Allegiance Coal USA
> Limited 1415 Suite D, Hankin Ave.
> Telkwa BC V0J 2X0 Canada Attention: Mark Gray
> mgray@allegiancecoal.com.au

Notices mailed by certified or registered mail or sent by hand or overnight courier service will be deemed to have been given when received. The Noteholder may permit notices and other communications to be delivered by email and, if so permitted, will be deemed received, if received during normal business hours and, if received after normal business hours, upon the opening of business on the next Business Day.

**Section 9.08    Indemnity and Expenses.**

(a)    Each Grantor hereby agrees to indemnify and hold harmless the Noteholder (and any sub-agent thereof), and each Related Party of the Noteholder (each such Person being called an **"Indemnitee"**) from any losses, damages, liabilities, claims and related expenses (including the fees and expenses of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees, expenses and time charges for attorneys who are employees of any Indemnitee incurred by any Indemnitee or asserted against any Indemnitee by any Person (including any Grantor) other than such Indemnitee and its Related Parties arising out of, in connection with or resulting from this Agreement (including, without limitation, enforcement of this Agreement) or any failure of any Secured Obligations to be the legal, valid, and binding obligations of any Grantor enforceable against such Grantor in accordance with their terms, whether brought by a third party or by such Grantor, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (i) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (ii) result from a claim brought by any Grantor against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Transaction Document, if such Grantor has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(b)    To the fullest extent permitted by applicable law, each Grantor hereby agrees not to assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Transaction Document or any agreement or instrument contemplated hereby, or the transactions contemplated hereby or thereby. No Indemnitee shall be liable for any damages arising from the use of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Transaction Documents or the transactions contemplated hereby or thereby by unintended recipients.

(c)    Each Grantor agrees to pay or reimburse the Noteholder for all its costs and expenses incurred in collecting against such Grantor its Secured Obligations or otherwise

protecting, enforcing or preserving any rights or remedies under this Agreement and the other Transaction Documents to which such Grantor is a party, including the fees and other charges of counsel (including the allocated fees and expenses of internal counsel) to the Noteholder.

(d)       All amounts due under this Section 9.08 shall be payable not later than ten (10) days after demand therefor, shall constitute Secured Obligations and shall bear interest until paid at a rate per annum equal to the highest rate per annum at which interest would then be payable on the Note and the Note Agreement.

(e)       Without prejudice to the survival of any other agreement of any Grantor under this Agreement or any other Transaction Documents, the agreements and obligations of each Grantor contained in this Section 9.08 shall survive termination of the Transaction Documents and payment in full of the Obligations and all other amounts payable under this Agreement.

**Section 9.09    Governing Law, Consent to Jurisdiction and Waiver of Jury Trial.**

(a)       This Agreement and the other Note Documents, other than the Note or the Note Agreement, and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Note Document (except, as to any other Note Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of the State of New York.

(b)       Each Grantor irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise, against the Noteholder or any of its Related Parties in any way relating to this Agreement or any other Note Document (except, as to any other Note Document, as expressly set forth therein) or the transactions contemplated hereby or thereby, in any forum other than the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees that any such action, litigation or proceeding may be brought in any such New York State court or, to the fullest extent permitted by applicable law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing herein or in any other Note Document shall affect any right that the Noteholder may otherwise have to bring any action or proceeding relating to this Agreement or any other Note Document against any Grantor or its properties in the courts of any jurisdiction.

(c)     Each Grantor irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Note Document in any such court referred to in subsection (b) of this Section 9.09. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each Grantor irrevocably consents to the service of process in the manner provided for notices in Section 9.07 and agrees that nothing herein will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

(e)     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY. EACH PARTY HERETO (A) CERTIFIES THAT NO AGENT, ATTORNEY, REPRESENTATIVE OR ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF LITIGATION, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.09.

**Section 9.10   Severability of Provisions.**   Any provision hereof which is invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without invalidating the remaining provisions hereof or affecting the validity, legality or enforceability of such provision in any other jurisdiction.

**Section 9.11   Counterparts; Integration; Effectiveness.**   This Agreement and any amendments, waivers, consents or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. This Agreement and the other Note Documents, and any separate letter agreements with respect to fees payable to the Noteholder, constitute the entire contract among the parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto. This Agreement shall become effective when it shall have been executed by the Noteholder and when the Noteholder shall have received counterparts hereof signed by each of the other parties hereto. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in

47.

electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement. The words "execution," "signed," "signature," and words of similar import in this Agreement shall be deemed to include electronic or digital signatures or electronic records, each of which shall be of the same effect, validity, and enforceability as manually executed signatures or a paper-based recordkeeping system, as the case may be, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000 (15 U.S.C. §§ 7001 to 7031), the Uniform Electronic Transactions Act (UETA), or any state law based on the UETA, including the New York Electronic Signatures and Records Act (N.Y. Tech. §§ 301 to 309).

**Section 9.12    No Release.**  Nothing set forth in this Agreement or any other Transaction Document, nor the exercise by the Noteholder of any of the rights or remedies hereunder, shall relieve any Grantor from the performance of any term, covenant, condition or agreement on such Grantor's part to be performed or observed in respect of any of the Collateral or from any liability to any Person in respect of any of the Collateral or shall impose any obligation on the Noteholder to perform or observe any such term, covenant, condition or agreement on such Grantor's part to be so performed or observed or shall impose any liability on the Noteholder for any act or omission on the part of such Grantor relating thereto or for any breach of any representation or warranty on the part of such Grantor contained in this Agreement, the Note Agreement or the other Transaction Documents, or in respect of the Collateral or made in connection herewith or therewith. Anything herein to the contrary notwithstanding, the Noteholder shall not have any obligation or liability under any contracts, agreements and other documents included in the Collateral by reason of this Agreement, nor shall the Noteholder be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any such contract, agreement or other document included in the Collateral. The obligations of each Grantor contained in this Section 9.12 shall survive the termination hereof and the discharge of such Grantor's other obligations under this Agreement, the Note, the Note Agreement and the other Transaction Documents.

**Section 9.13    Obligations Absolute.** Each Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description. All obligations of each Grantor hereunder shall be absolute and unconditional irrespective of:

(a)    any illegality or lack of validity or enforceability of any Secured Obligation or any Transaction Document or any related agreement or instrument;

(b)    any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations or any other obligation of any Grantor under any Transaction

48.

Document, or any rescission, waiver, amendment or other modification of any Transaction Document or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

      (c)    any taking, exchange, substitution, release, impairment or non-perfection of any Collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for the Secured Obligations;

      (d)    any manner of sale, disposition or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations;

      (e)    any default, failure or delay, willful or otherwise, in the performance of the Secured Obligations;

      (f)    any change, restructuring or termination of the corporate structure, ownership or existence of any Grantor or any of its Subsidiaries or any insolvency, bankruptcy, reorganization or other similar proceeding affecting a Grantor or its assets or any resulting release or discharge of any Secured Obligations;

      (g)    any failure of the Noteholder to disclose to any Grantor any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Grantor now or hereafter known to Noteholder; each Grantor waiving any duty of the Noteholder to disclose such information;

      (h)    the failure of any other Person to execute or deliver this Agreement, any Joinder Agreement or any other agreement or the release or reduction of liability of any Grantor or other grantor or surety with respect to the Secured Obligations;

      (i)    the failure of Noteholder to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of any Transaction Document or otherwise;

      (j)    any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, a Grantor against any Noteholder; or

      (k)    any other circumstance (including, without limitation, any statute of limitations) or manner of administering the Loans or any existence of or reliance on any representation by Noteholder that might vary the risk of any Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, any Grantor or any other guarantor or surety.

[signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**GRANTORS:**

ALLEGIANCE COAL USA LIMITED

By_____
    Name:Mark Gray
    Title: Director

ALLEGIANCE COAL LIMITED

By_____
    Name: Mark Gray
    Title: Director

NEW ELK COAL COMPANY LLC

By_____
    Name: Mark Gray
    Title: Director

NEW ELK COAL HOLDINGS LLC

By_____
    Name: Mark Gray
    Title: Director

BLACK WARRIOR MINERALS, INC.

By_____
    Name: Mark Gray
    Title: Director

NORTH CENTRAL ENERGY COMPANY

By_____
  Name: Mark Gray
  Title: Director

RATON BASIN ANALYTIC LLC

By_____
  Name: Mark Gray
  Title: Director

**NOTEHOLDER**:

**EXECUTED** by **COLLINS ST
CONVERTIBLE NOTES PTY LTD
ACN 657 773 754 ATF THE COLLINS
ST CONVERTIBLE NOTES FUND
ABN 30 216 289 383** in accordance with
the *Corporations Act 2001* by being
signed by the following officers:

| | |
|---|---|
| ............................................................ | ............................................................ |
| Signature of director | Signature of director / company secretary |
| **Vasilios Piperoglou** | **Michael Goldberg** |
| Name of director | Name of director / company secretary |

NORTH CENTRAL ENERGY COMPANY

By_____

    Name:

    Title:

RATON BASIN ANALYTIC LLC

By_____

    Name:

    Title:

**NOTEHOLDER**:

**EXECUTED** by **COLLINS ST**
**CONVERTIBLE NOTES PTY LTD**
**ACN 657 773 754 ATF THE COLLINS**
**ST CONVERTIBLE NOTES FUND**
**ABN 30 216 289 383** in accordance with
the *Corporations Act 2001* by being
signed by the following officers:

_____
Signature of director

**Vasilios Piperoglou**
Name of director

_____
Signature of director / company secretary

**Michael Goldberg**
Name of director / company secretary

## EXHIBIT A

## FORM OF JOINDER AGREEMENT

THIS JOINDER AGREEMENT (the "**Joinder Agreement**"), dated as of [DATE] is made by [JOINING GRANTOR], a [STATE OF ORGANIZATION] [ENTITY TYPE] (the "**Joining Grantor**"), and delivered to Collins St Convertible Notes Pty Ltd ACN 657 773 754 not in its individual capacity but solely as trustee of the Collins St Convertible Note Fund ACN 149 490 353, in its capacity as Noteholder (in such capacity and together with any successors in such capacity, the "**Noteholder**") under the Guaranty and Security Agreement (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"; capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Security Agreement), dated as of dated as of May 24, 2022, among Allegiance Coal USA Limited, a Delaware corporation (the "**ACL**"), Allegiance Coal Limited, an Australia corporation ACN 149 490 353 ("**AHQ**"), New Elk Coal Company LLC, a Colorado limited liability company ("**NECC**"), New Elk Coal Holdings LLC, a Delaware limited liability company ("**NECH**"), North Central Energy Company, a Colorado corporation ("**NCEC**"), Raton Basin Analytic LLC, a Colorado limited liability company ("**RBA**") and Black Warrior Minerals, Inc., an Alabama corporation ("**BWM**," and together with ACL, AHQ, NECC, and NECH, and any other entities that that are party to this Agreement, the "**Grantors**" or the "**Guarantors**", and the Noteholder.

WHEREAS, the Joining Grantor is a Subsidiary of [NAME] and required by the terms of the Security Agreement to become a Guarantor (as defined in the Note) and be joined as a party to the Security Agreement as a Grantor;

WHEREAS, this Joinder Agreement supplements the Security Agreement and is delivered by the Joining Grantor pursuant to Section 3.05 of the Security Agreement; and

WHEREAS, the Joining Grantor will materially benefit directly and indirectly from the Loans made available and to be made available to the Grantors by the Noteholders under the Note;

NOW, THEREFORE, the Joining Grantor hereby agrees as follows with the Noteholder:

        (i)    **Joinder.** The Joining Grantor hereby irrevocably, absolutely and unconditionally becomes a party to the Security Agreement as a Grantor and Guarantor and agrees to be bound by all the terms, conditions, covenants, obligations, liabilities and undertakings of each Grantor or to which each Grantor is subject thereunder, all with the same force and effect as if the Joining Grantor were a signatory to the Security Agreement. Without limiting the generality of the foregoing, as collateral security for the payment and performance in full of all the Secured

Obligations, the Joining Grantor hereby pledges to the Noteholder, and grants to the Noteholder a Lien on and security interest in and to, all of its right, title and interest in, to and under the Collateral owned by it, wherever located, and whether now existing or hereafter arising or acquired from time to time and expressly assumes all obligations and liabilities of a Grantor thereunder.

(ii)    **Affirmations**. The Joining Grantor hereby makes each of the representations and warranties and agrees to each of the covenants and the Guaranty applicable to the Grantors contained in the Security Agreement. The Joining Grantor also represents and warrants to the Noteholder that (i) it has the [corporate] power and authority, and the legal right, to make, deliver and perform this Joinder Agreement and has taken all necessary [corporate] action to authorize the execution, delivery and performance of this Joinder Agreement; (ii) no consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person [that has not been obtained, made or completed] is required in connection with the execution, delivery and performance, validity or enforceability of this Joinder Agreement; (iii) this Joinder Agreement has been duly executed and delivered on behalf of the Joining Grantor; and (iv) this Joinder Agreement constitutes a legal, valid and binding obligation of the Joining Grantor enforceable against such Joining Grantor in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing.

(iii)    **Supplemental Schedules.** Attached to this Joinder Agreement are duly completed schedules (the **"Supplemental Schedules"**) supplementing the respective Schedules to the Security Agreement. The Joining Grantor represents and warrants that the information contained on each of the Supplemental Schedules with respect to such Joining Grantor and its properties is true, complete and accurate as of the date hereof. Such Supplemental Schedules shall be deemed to be part of the Security Agreement.

(iv)    **Severability.** The provisions of this Joinder Agreement are independent of and separable from each other. If any provision hereof shall for any reason be held invalid or unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of any other provision hereof, but this Joinder Agreement shall be construed as if such invalid or unenforceable provision had never been contained herein.

(v)    **Counterparts.** This Joinder Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Joinder Agreement by facsimile or

in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Joinder Agreement.

(vi)    **Delivery.** The Joining Grantor hereby irrevocably waives notice of acceptance of this Joinder Agreement and acknowledges that the Secured Obligations are incurred, and credit extensions under the Note and the other Transaction Documents made and maintained, in reliance on this Joinder Agreement and the Joining Grantor's joinder as a party to the Security Agreement as herein provided.

(vii)    **Governing Law; Venue; Waiver of Jury Trial.** This Joinder Agreement [and the other Note Documents] and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Joinder Agreement [or any other Note Document (except, as to any other Note Document, as expressly set forth therein)] and the transactions contemplated hereby and thereby shall be governed by and construed in accordance with the laws of the State of New York. The provisions of Section 9.09 of the Security Agreement are hereby incorporated by reference as if fully set forth herein.

[Signature page follows.]

IN WITNESS WHEREOF, the parties hereto have caused this Joinder Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

[NAME OF JOINING GRANTOR]

By_____

    Name:

    Title:

Address for Notices:

_____

_____

_____

AGREED TO AND ACCEPTED:

**EXECUTED** by **COLLINS ST CONVERTIBLE NOTES PTY LTD ACN 657 773 754 ATF THE COLLINS ST CONVERTIBLE NOTES FUND ABN 30 216 289 383** in accordance with the *Corporations Act 2001* by being signed by the following officers:

.......................................................    .......................................................

Signature of director    Signature of director / company secretary

_____    _____

Name of director    Name of director / company secretary

Address for Notices:

_____

_____

_____

[Schedules to be attached]

## SCHEDULES TO GUARANTY AND SECURITY AGREEMENT

**Schedule 3.01 Certified Securities Collateral**

Pledged Debt

None

Shares:

- Allegiance Coal USA Limited

- Black Warrior Minerals, Inc.

- New Elk Coal Holdings LLC

**Schedule 3.03 Maintenance of Perfected Security Interest**

Financing statements to be filed in the following recording offices:

AHQ: Recorder of Deeds, Washington, DC

ACL: Secretary of State of the State of Delaware

NECC: Secretary of State of the State of Colorado

NECH: Secretary of State of the State of Delaware

NCEC: Secretary of State of the State of Colorado

BWM:  Secretary of State of the State of Alabama and Office of the Judge of Probate of Jefferson County, Alabama

**Schedule 3.04 Other Actions for Perfection**

-   3.04(a) Instruments and Tangible Chattel Paper
    none

-   3.04(b) Deposit Accounts

    US Deposit accounts

    Allegiance Coal USA Limited

    BMO Harris Bank 1654508

    Black Warrior Minerals Inc

    BMO Harris Bank 1842707

    ServisFirst Bank 5001236792

    ServisFirst Bank 5001236768

    New Elk Coal Company LLC

    BMO Harris Bank 1212505

    IN Bank 80085814

-   3.04(c) Investment Property

    None

**Schedule 4.11 Other Financing Statements**

None

**Schedule 4.12 Changes in Name, Jurisdiction of Organization, Etc**

Allegiance Coal Limited, an Australia public limited liability company ACN 149 490 353 whose registered office and place of business is suite 107, 104 Pitt Street, Sydney, NSW 2000, Australia

Allegiance Coal USA Limited, a Delaware corporation whose place of business is 12250 Highway 12, Weston 81091 Colorado

New Elk Coal Company LLC, a Colorado limited liability company whose place of business is 12250 Highway 12, Weston 81091 Colorado

New Elk Coal Holdings LLC, a Delaware limited liability company whose place of business is 12250 Highway 12, Weston 81091 Colorado

North Central Energy Company, a Colorado corporation whose place of business is 12250 Highway 12, Weston 81091 Colorado

Raton Basin Analytic LLC, a Colorado limited liability company whose place of business is 12250 Highway 12, Weston 81091 Colorado

Black Warrior Minerals, Inc., an Alabama corporation whose place of business is 4788 Highway 78, Cordova, 35550 Alabama

**Schedule 4.13 US Grantor Inventory and the material Equipment locations l**

**Black Warrior Minerals Inc**

Black Warrior Mine, Walker County, Alabama

North Pratt Wash Plant, Jefferson County, Alabama

Powhatan Barge Load Out, Jefferson County, Alabama

Alabama State Port, City of Mobile, Alabama

**New Elk Coal Company LLC**

New Elk Mine, Weston, Las Animas County, Colorado

Jansen Rail Load Out, City of Trinidad, Las Animas County, Colorado

Alabama State Port, City of Mobile, Alabama

Port of Guaymas, Mexico

Long Beach Terminal, Los Angeles

**Schedule 4.14**

**Pledged Securities and Pledged Debt**

None

**Schedule 4.17 Insurance**

Attached for New Elk Coal Company LLC and Black Warrior Minerals, Inc.

**Schedule 4.20 Permitted Liens**

- Certain Liens

    o   Assignment of coal sale proceeds to Marco International Limited in relation to the financing of coal inventory and receivables from time to time substantially in the form of such financings on the date hereof

- Liens on Real Property

    o   None

- Liens in Existence as of the date hereof namely:

    o   New Elk: to Wagner CAT 982M Loader serial number 0K1Y00473

    o   New Elk: to Wagner CAT D9T Dozer serial number 0RJS01751

    o   New Elk: to Wagner CAT 815F11 Soil Compactor serial number BYN00454

    o   New Elk: to Wagner End Dump Trailer serial number 4E7AA35285ATA0788

    o   New Elk: to Wagner End Dump Trailer serial number 4E7AA35285ATA0782

    o   New Elk: to Wagner End Dump Trailer serial number 4E7AA35285ATA0784

    o   New Elk: to Wagner End Dump Trailer serial number 4E7AA35285ATA0786

    o   New Elk: to Wagner End Dump Trailer serial number 4E7AA35277ASA1432

    o   New Elk: to Wagner End Dump Trailer serial number 4E7AA352X5ATA0789

    o   New Elk: to Komatsu Battery Hauler serial number BH1777

    o   New Elk: to Komatsu Battery Hauler serial number BH1780

    o   New Elk: to Komatsu Battery Hauler serial number BH1776

    o   New Elk: to Komatsu Battery Hauler serial number BH1781

    o   New Elk: to Komatsu Diesel Transport serial number 19609

    o   New Elk: to Komatsu Power Center serial number 16367

    o   New Elk: to Phil Long Toyota a Toyota Tundra VIN 5TFDY5F11MX032704

    o   New Elk: to Phil Long Toyota a Toyota 4Runner VIN JTEKU5JRXN5971746

14.

o   Black Warrior: to John Deere Excavator serial number HCMKFB90E00007003

o   Black Warrior: to Thompson Tractor 993k Loader serial number Z9K00356

o   Black Warrior: to Noreast Capital Corporation modular mine office

o   New Elk: Cline Mining Corporation, a British Columbia corporation