**Exhibit 9**
**RECORDED Black Warrior Leasehold Mortgage, Security Agreement**

County Division Code: AL039 Inst. # 2022089485 Pages: 1 of 43  I certify this instrument filed on:  8/22/2022 1:55 PM
Doc: MTG Judge of Probate Jefferson County, AL Rec: $0.00
Clerk: CSBESS

Case 23-10234-CTG   Doc 110-9   Filed 03/14/23   Page 2 of 44

STATE OF ALABAMA - JEFFERSON COUNTY
I hereby certify that no mortgage tax or deed tax
has been collected on this instrument
Judge of Probate
NO TAX COLLECTED.

This Leasehold Mortgage was prepared by
and when recorded should be returned to:

Vasiliki Yiannoulis-Riva, Esq.
c/o Withers Bergman LLP
1700 East Putnam Avenue, Suite 400
Greenwich, CT 06870-1366

## LEASEHOLD MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES, RENTS AND PROFITS, FINANCING STATEMENT, FIXTURE FILING AND AS-EXTRACTED COLLATERAL FILING

made by

### Black Warrior Minerals, Inc.
as the Mortgagor

to

### Collins St Convertible Notes Pty Ltd ACN 657 773 754, as trustee for The Collins St Convertible Notes Fund ABN 30 216 289 383
as the Mortgagee

**THIS INSTRUMENT COVERS GOODS WHICH ARE OR ARE TO BECOME FIXTURES AND PROPERTY THAT IS OR IS TO BECOME AS-EXTRACTED COLLATERAL RELATED TO THE REAL ESTATE DESCRIBED HEREIN AND IS TO BE RECORDED IN THE MORTGAGE RECORDS AND IS ALSO TO BE INDEXED IN THE INDEX OF FINANCING STATEMENTS OR OF FIXTURE OR AS-EXTRACTED COLLATERAL FILINGS.  REFER TO SECTION 2.2 OF THE INSTRUMENT FOR INFORMATION CONCERNING THE DEBTOR AND SECURED PARTY.**

**NOTE TO PROBATE OFFICE: THIS MORTGAGE SECURES THE MORTGAGOR'S CONTINGENT GUARANTY OBLIGATIONS WITH RESPECT TO THE OBLIGATIONS MADE OR TO BE MADE TO THE COMPANY DESCRIBED HEREIN AND IT DOES NOT SECURE AN INDEBTEDNESS OR DEBT IN A CERTAIN AMOUNT. BECAUSE IT IS UNCERTAIN IF OR WHEN THE MORTGAGOR WILL BE CALLED ON TO PAY THE GUARANTEED OBLIGATION, NO MORTGAGE TAX IS DUE. SEE EX PARTE JIM WALTERS RESOURCES, INC., 91 So.3d 50 (Ala. Jan. 6, 2012)**

LEASEHOLD MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES, RENTS AND PROFITS, FINANCING STATEMENT, FIXTURE FILING AND AS-EXTRACTED COLLATERAL FILING

THIS LEASEHOLD MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES, RENTS AND PROFITS, FINANCING STATEMENT, FIXTURE FILING AND AS-EXTRACTED COLLATERAL FILING, dated as of August 11, 2022 (as amended, modified or supplemented from time to time, this "Mortgage"), made by **Black Warrior Minerals, Inc., an** Alabama corporation having an address of 4788 Hwy 78, Cordova, AL 35550 (collectively, the "Mortgagor"), , as the mortgagor, to **Collins St Convertible Notes Pty Ltd ACN 657 773 754, as trustee for The Collins St Convertible Notes Fund ABN 30 216 289 383** (together with any successor mortgagee, the "Mortgagee"), having an address Level 9, 365 Little Collins Street, Melbourne VIC 3000, Australia.

All capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Convertible Note.

<u>W I T N E S S E T H</u>

WHEREAS, the Mortgagor's affiliates, Allegiance Coal Limited ACN 149 490 353 and Allegiance Coal USA Limited (the "Company") have entered into that certain Convertible Note Agreement with Mortgagee on May 24, 2022 (as same may be amended, modified, or otherwise supplemented from time to time, the "Convertible Note"), and secured by a Guarantee executed by, among other parties, Mortgagor as a guarantor ("Guarantee");

WHEREAS, pursuant to the Guarantee, the Mortgagor has jointly and severally guaranteed to the Mortgagee the payment when due of all of the Company's obligations under the Transaction Documents and the Convertible Note;

WHEREAS, the Mortgagor is the owner of a leasehold interest in the Mortgaged Property (as hereinafter defined);

WHEREAS, the Mortgagor will derive substantial benefits from the execution, delivery and performance of its obligations under the Convertible Note, the Guarantee, and the Transaction Documents;

WHEREAS, as a condition subsequent to the making of the Loan, the Mortgagor is executing and delivering this Mortgage for the Mortgagee;

WHEREAS, the Mortgagor desires to enter into this Mortgage to secure (and this Mortgage shall secure) the following:

(i)    the full and prompt payment when due (whether at the stated Maturity Date, by acceleration or otherwise) of all obligations, liabilities and indebtedness (including, without limitation, principal, premium, interest (including, without limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of the Mortgagor at the rate provided for in the Convertible Note, whether or not a claim for post-petition interest is allowed in any such proceeding) fees, costs and indemnities) of the Mortgagor to the Mortgagee, whether now existing or hereafter incurred under, arising out of, or in connection with, the Guarantee, this Mortgage, and the Transaction Documents and the due performance and compliance by the Mortgagor with all of the terms, conditions, obligations and agreements contained in the Guarantee, the Transaction Documents, and this Mortgage,;

(ii)    any and all sums advanced by the Mortgagee in order to preserve the Mortgaged Property or preserve its security interest in the Mortgaged Property; and

(iii)    in the event of any proceeding for the collection or enforcement of any indebtedness, obligations, or liabilities of the Mortgagor referred to in clause (i) above, after an Event of Default shall have occurred and be continuing, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Mortgaged Property, or of any exercise by the Mortgagee of its rights hereunder, together with reasonable attorneys' fees and court costs; all such obligations, liabilities, indebtedness, fees, amounts, sums and expenses set forth in clauses (i) through (iii) above, whether outstanding on the date of this Mortgage or extended, accruing or paid from time to time after the date of this Mortgage, being herein collectively called the "Obligations".

NOW, THEREFORE, as security for the Obligations and in consideration of the payment of ten dollars ($10.00) and the other benefits accruing to the Mortgagor, the receipt and sufficiency of which are hereby acknowledged, THE MORTGAGOR HEREBY MORTGAGES, GIVES, GRANTS, BARGAINS, SELLS, CONVEYS AND CONFIRMS TO THE MORTGAGEE AND ITS SUCCESSORS AND ASSIGNS, with power of sale (subject to applicable law) all of the Mortgagor's estate, right, title and interest, whether now owned or hereafter acquired, whether as lessor or lessee and whether vested or contingent, in and to all of the following:

A.    The land described in **Exhibit A** hereto, together with all rights, privileges, franchises and powers related thereto which are appurtenant to said land or its ownership, including, all Minerals as defined in Section 6.27(a) hereof, waters, water courses, water stocks, water rights (whether riparian, appropriative, or otherwise, and whether or not appurtenant), sewer rights, shrubs, crops, trees, timber, and other emblements now or hereafter on, under or above the same or any part or parcel thereof (collectively, the "Land");

B.    All buildings, structures, tenant improvements and other improvements of every kind and description now or hereafter located in or on the Land and all component or integral parts thereof; including, but not limited to, all structures, improvements, rail spurs, dams, reservoirs, water, sanitary and storm sewers, drainage, electricity, steam, gas, telephone and other utility facilities, parking areas, roads, driveways, walks and other site improvements of every kind and description now or hereafter erected or placed on the Land, together with all additions thereto and all renewals, alterations, substitutions and replacements thereof (collectively, the "Improvements");

C.    All fixtures, attachments, appliances, equipment, machinery, building materials and supplies, and other tangible personal property, now or hereafter attached to said Improvements or now or at any time hereafter located on the Land and/or Improvements, including, but not limited to, artwork, decorations, draperies, furnaces, boilers, oil burners, piping, plumbing, refrigeration, air conditioning, lighting, ventilation, disposal and sprinkler systems, elevators, motors, dynamos and all other equipment and machinery, appliances, fittings and fixtures of every kind located in or used in the operation of the Improvements located on the Land, together with all additions thereto and all renewals, alterations, substitutions and replacements thereof (hereinafter sometimes collectively referred to as the "Equipment");

D.    The leasehold estate (the "Leasehold") of the Mortgagor as tenant or lessee under those leases described on **Exhibit A** hereto, together with any amendments, modifications, extensions, renewals or substitutions (collectively, the "Subject Leases") including all present and future options of any kind, rights of first refusal, privileges and other benefits of the Mortgagor under the Subject Leases, including, without limitation, all possessory interests in and to, or the right to mine, extract, process, stockpile, blend and sell Minerals, and to install and construct settling ponds, washers, scales and other equipment, appurtenances and facilities useful in connection with the mining and sale of Minerals;

E.    All surface rights, easements, rights of way, and other rights, titles, interests, privileges, liberties, and tenements appurtenant to the use and enjoyment of, or used in connection with, the Land and/or the Improvements;

F.    All streets, roads and public places (whether open or proposed) now or hereafter adjoining or otherwise providing access to the Land, the land lying in the bed of such streets, roads and public places, and all other sidewalks, alleys, ways, passages, vaults, water courses, strips and gores of land now or hereafter adjoining or used or intended to be used in connection with all or any part of the Land and/or the Improvements;

G.    Any leases, lease guaranties and in any other agreements relating to the use and occupancy of the Land and/or the Improvements or any portion thereof, including, but not limited to, any use or occupancy rights or arrangements retained or created pursuant to Section 365(h) of Title 11 of the United States Code (as the same may hereafter be amended, the "Bankruptcy Code") or otherwise in connection with the commencement or continuance of any bankruptcy, reorganization, arrangement, insolvency, dissolution, receivership or any similar proceedings, or any assignment for the benefit of creditors, in respect of any tenant or occupant of any portion of the Land and/or the Improvements (collectively, "Leases");

H.      All revenues, rents, receipts, income, accounts receivable, issues, royalties, products and profits of the Mortgaged Property (collectively, "Rents");

I.      All permits, licenses and rights relating to the use, occupation and operation of the Land and/or the Improvements or any business conducted thereon or therein, including, without limitation, all Permits as defined in Section 6.27(b) hereof;

J.      All presently existing or future operating agreements, contracts, leases, licenses, prospecting agreements and other agreements, including without limitation the Subject Leases, which relate to any of the Land or interests in the Land, or to the production, sale, purchase, blending, exchange, weighing, sampling, stockpiling, processing or transportation of coal or other Minerals from or attributable to the Land;

K.      All real estate tax refunds payable to the Mortgagor with respect to the Land or the Improvements, and refunds, credits or reimbursements payable with respect to bonds, escrow accounts or other sums payable in connection with the use, development, or ownership of the Land and/or Improvements;

L.      Any claims or demands with respect to any proceeds of insurance in effect with respect to the Land and/or the Improvements, including interest thereon, which the Mortgagor now has or may hereafter acquire and any and all awards made for the taking by eminent domain, condemnation or by any proceedings, transfer or purchase in lieu or in anticipation of the exercise of said rights, or for a change of grade, or for any other injury to or decrease in the value of, the whole or any part of the Land and/or Improvements;

M.      Any zoning rights, air rights and development rights which are or may become vested in the Mortgagor (including, without limitation, pursuant to zoning lot agreements); and

N.      All proceeds and products of the conversion, voluntary or involuntary, including, but not limited to, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement, of any of the foregoing, whether into cash, liquidated claims or otherwise.

All of the forgoing estates, rights, properties and interests hereby mortgaged to the Mortgagee are referred to collectively herein as the "Mortgaged Property".

TO HAVE AND TO HOLD the above granted and described Mortgaged Property unto the Mortgagee and to its successors and assigns forever, and the Mortgagor hereby covenants and agrees, on behalf of itself and its successors, assigns, and affiliates to warrant and defend the Mortgaged Property unto the Mortgagee, its successors and assigns against the claims of all Persons and parties whatsoever, subject, however, to the Permitted Liens to the extent the same are valid and subsisting and encumber the Mortgaged Property or any part thereof.

10874990/3

# ARTICLE I.
## REPRESENTATIONS, WARRANTIES, COVENANTS
## AND AGREEMENTS OF THE MORTGAGOR

1.1.    Title to the Mortgaged Property.  The Mortgagor represents and warrants: (a) it has a valid leasehold interest in and to the Land and Improvements and good and marketable fee simple title to the remainder of the Mortgaged Property, free and clear of any Liens, other than the Permitted Liens related thereto, and is lawfully seized and possessed of the Mortgaged Property; (b) this Mortgage is a valid first priority Lien upon the Mortgaged Property (subject only to the Permitted Liens related thereto); (c) it has full power and authority to encumber the Mortgaged Property in the manner set forth herein; and (d) there are no defenses or offsets to this Mortgage or to the Obligations which it secures.  The Mortgagor shall preserve such title and the validity and priority of this Mortgage and shall forever warrant and defend the same to the Mortgagee and the Mortgagee's successors and assigns against the claims of all Persons and parties whatsoever.  The Mortgagor shall take no action nor shall it fail to take any action which could result in an impairment of the Lien of this Mortgage or which could form the basis for any Person(s) to claim an interest in the Mortgaged Property (including, without limitation, any claim for adverse use or possession or any implied dedication or easement by prescription) other than Permitted Liens related thereto.  If any Lien (other than a Permitted Lien related to the Mortgaged Property) is asserted against the Mortgaged Property, the Mortgagor shall promptly, at its expense: (i) provide the Mortgagee with written notice of such Lien, including information relating to the amount of the Lien asserted; and (ii) pay the Lien in full or take such other action to cause the Lien to be released, or, so long as the lien of this Mortgage is not compromised, contest the same in accordance with the provisions of the Transaction Documents.  From and after the occurrence of an Event of Default, the Mortgagee may, but shall not be obligated, to pay any such asserted Lien if not timely paid by the Mortgagor.

1.2.    Payment and Performance of Obligations.  The Mortgagor shall pay all of the Obligations when due and payable without offset or counterclaim, and shall observe and comply in all respects with all of the terms, provisions, conditions, covenants and agreements to be observed and performed by it under this Mortgage, the Transaction Documents, the Convertible Note and the Subsidiary Guarantee (collectively, the "Transaction Documents").

1.3.    Maintenance, Repair, Alterations, Etc.  The Mortgagor shall: (a) keep and maintain the Mortgaged Property in good working order and condition, ordinary wear and tear excepted; (b) make or cause to be made, as and when necessary, all repairs, renewals and replacements, structural and nonstructural, exterior and interior, ordinary and extraordinary, foreseen and unforeseen which are necessary to so maintain the Mortgaged Property; (c) restore any Improvement which may be damaged or destroyed so that the same shall be at least substantially equal to its value, condition and character immediately prior to the damage or destruction; (d) not commit or permit any waste or deterioration (normal wear and tear excepted) of the Mortgaged Property; (e) not permit the Improvements to be demolished or altered in any manner that substantially decreases the value thereof; (f) promptly pay when due all claims for labor performed and materials furnished therefor; (g) comply with the provisions to be observed and performed by it of any lease, easement or other agreement affecting all or any part of the Mortgaged Property and (h) take no action nor shall it fail to take any action so as to compromise or adversely affect the zoning classification of the Mortgaged Property.

1.4.    Required Insurance.    The Mortgagor will, at its expense, at all times provide, maintain and keep in full force and effect policies of insurance with respect to the Mortgaged Property insuring against such risks and in such amounts that are consistent and in accordance with industry practice for companies similarly situated, owning similar properties and engaged in similar businesses.  All property insurance policies shall name the Mortgagee as loss payee and all liability insurance policies shall name the Mortgagee as an additional insured. The Mortgagor shall deliver the certificates of insurance evidencing that the required insurance is in force together with satisfactory lender's loss payable and additional insured endorsements, as applicable.  If any portion of the Improvements is located in an area identified as a special flood hazard area by Federal Emergency Management Agency or other applicable agency, the Mortgagor shall purchase flood insurance in an amount satisfactory to the Mortgagee, but in no event less than the maximum limit of coverage available under the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, each as amended from time to time.  The Mortgagor shall give prompt written notice to the Mortgagee of the occurrence of any damage to or destruction of the Improvements (which term as used in this Section 1.4 shall include Equipment).  In the event of foreclosure of the lien of this Mortgage or other transfer of title or assignment of the Mortgaged Property in extinguishment, in whole or in part, of the Obligations, all right, title and interest of the Mortgagor in and to all proceeds then payable under any policy of insurance required by this Mortgage shall inure to the benefit of and pass to the successor in interest of the Mortgagor, or the purchaser or mortgagor of the Mortgaged Property.  The Mortgagee shall have the right to participate in and approve the settlement of any claim made by the Mortgagor against any insurance company.

1.5.    Preservation of Property.    The Mortgagor agrees to pay for any and all reasonable fees, costs and expenses of whatever kind or nature incurred in connection with the creation, preservation or protection of the Mortgagee's Liens on, and security interest in, the Mortgaged Property, including, without limitation, all fees and taxes in connection with the recording or filing of instruments and documents in public offices (including stamp and mortgage recording taxes or other taxes imposed on the Mortgagee by virtue of its ownership of this Mortgage), which are imposed upon the recording of this Mortgage or thereafter, all reasonable attorneys' fees, payment or discharge of any taxes or Liens upon or in respect of the Mortgaged Property, premiums for insurance with respect to the Mortgaged Property and all other fees, costs and expenses in connection with protecting, maintaining or preserving the Mortgaged Property and the Mortgagee's interest therein, whether through judicial proceedings or otherwise, or in defending or prosecuting any actions, suits or proceedings arising out of or relating to the Mortgaged Property.

1.6.    Condemnation.    Should the Mortgagor receive any notice that the Mortgaged Property or any part thereof or interest therein may be taken or damaged by reason of any public improvements or condemnation proceeding or in any other similar manner (a "Condemnation"), the Mortgagor shall give prompt written notice thereof to the Mortgagee.  In the event of any Condemnation, the Mortgagee shall have the right to participate in any negotiations or litigation and shall have the right to approve any settlement.

1.7.    Inspections.    The Mortgagor hereby authorizes the Mortgagee, its agents, employees and representatives, upon reasonable prior written notice to the Mortgagor (except in an emergency or following the occurrence and during the continuance of any Event of Default, in

which case notice shall not be required) to visit and inspect the Mortgaged Property or any portion(s) thereof, all at such reasonable times and as often as the Mortgagee may reasonably request.

      1.8.   <u>Transfers</u>.  Except as otherwise permitted in accordance with the terms of the Transaction Documents, no part of the Mortgaged Property or any legal or beneficial interest in the Mortgaged Property shall be sold, assigned, conveyed, leased, transferred or otherwise disposed of (whether voluntarily or involuntarily, directly or indirectly, by sale of stock or any interest in the Mortgagor, or by operation of law or otherwise).

      1.9.   <u>After Acquired Property Interests</u>.  All right, title and interest of the Mortgagor in and to all improvements, betterments, renewals, substitutes and replacements of, and all additions and appurtenances to, the Mortgaged Property, hereafter acquired by, or released to, the Mortgagor or constructed, assembled or placed by the Mortgagor on the Land, and all conversions of the security constituted thereby (collectively, "After Acquired Property Interests"), immediately upon such acquisition, release, construction, assembling, placement or conversion, as the case may be, and in each such case, without any further mortgage, conveyance, assignment or other act by the Mortgagor, shall become subject to the Liens of this Mortgage (as provided in the granting clauses hereof) as fully and completely, and with the same effect, as though owned by the Mortgagor on the date hereof and specifically described in the granting clauses hereof. The Mortgagor shall execute and deliver to the Mortgagee all such other assurances, mortgages, conveyances or assignments thereof as the Mortgagee may reasonably require for the purpose of expressly and specifically subjecting such After Acquired Property Interests to the Lien of this Mortgage. The Mortgagor hereby irrevocably authorizes and appoints the Mortgagee as the agent and attorney-in-fact of the Mortgagor to, following the occurrence and during the continuance of an Event of Default, execute all such documents and instruments on behalf of the Mortgagor, which appointment shall be irrevocable and coupled with an interest.

ARTICLE II.<br>SECURITY AGREEMENT

      2.1.   <u>Grant of Security: Incorporation by Reference</u>.  In addition to constituting a mortgage lien on those portions of the Mortgaged Property classified as real property (including fixtures to the extent they are real property), this Mortgage shall constitute a security agreement within the meaning of the Uniform Commercial Code (the "UCC") or within the meaning of the common law with respect to those parts of the Mortgaged Property classified as personal property (including fixtures to the extent they are personal property). The Mortgagor hereby grants to the Mortgagee a security interest in and to the following property whether now owned or hereafter acquired (collectively, the "Secured Property") for the benefit of the Mortgagee to further secure the payment and performance of the Obligations:

      (a)   Those parts of the Mortgaged Property classified as personal property (including (i) fixtures to the extent they are personal property and (ii) personal property and fixtures that are leased by the Mortgagor, but only to the extent the Mortgagor can grant to the Mortgagee a security interest therein without breaching the terms of such lease);

(b)     As-extracted collateral pursuant to Code of Alabama Sections 7-9A-102(a)(6) and 502, and Minerals extracted, mined or otherwise removed from the Land;

(c)     All general intangibles, contract rights, accounts and proceeds arising from all insurance policies required to be maintained by the Mortgagor and related to the Mortgaged Property hereunder;

(d)     All proceeds of any judgment, award or settlement in any Condemnation in connection with the Mortgaged Property, together with all general intangibles, contract rights and accounts arising therefrom;

(e)     All permits, consents and other governmental approvals in connection with the construction of the Improvements or the operation of the Mortgaged Property;

(f)     All plans and specifications, studies, tests and design materials relating to the design, construction, repair, alteration or leasing of the Mortgaged Property; and

(g)     All cash and non-cash proceeds of the above-mentioned items.

2.2.     <u>Fixture Filing, As-Extracted Collateral Filing and Financing Statements</u>. This Mortgage constitutes a security agreement, fixture filing, as-extracted collateral filing and financing statement as those terms are used in the Uniform Commercial Code of the State in which the Mortgaged Property is located (the "UCC"). For purposes of this Section 2.2, this Mortgage is to be filed and recorded in, among other places, the real estate records of the County in which the Mortgaged Property is located and the following information is included: (1) the Mortgagor shall be deemed the "Debtor" with the address set forth for the Mortgagor on the first page of this Mortgage which the Mortgagor certifies is accurate; (2) the Mortgagee shall be deemed to be the "Secured Party" with the address set forth for the Mortgagee on the first page of this Mortgage and shall have all of the rights of a secured party under the UCC; (3) this Mortgage covers goods which are or are to become fixtures; (4) this Mortgage covers as- extracted collateral (including all Minerals); (5) the name of the record owner of the Land is listed on **Exhibit D** hereto; (6) the organizational identification number of the Debtor is 183-687; (7) the Debtor is a corporation, organized under the laws of the State of Alabama; and (8) the legal name of the Debtor is **Black Warrior Minerals, Inc.** The Debtor hereby authorizes the Mortgagee to file any financing statements and terminations thereof or amendments or modifications thereto without the signature of the Debtor, where permitted by law.

ARTICLE III.
ASSIGNMENT OF LEASES, RENTS AND PROFITS

3.1.     <u>Assignment</u>.     The Mortgagor hereby absolutely, irrevocably and unconditionally sells, assigns, transfers and conveys to the Mortgagee all of the Mortgagor's right, title and interest in and to all current and future Leases and Rents, including those now due, past due, or to become due by virtue of any Lease or other agreement for the occupancy or use of all or any part of the Mortgaged Property. The Mortgagor intends that this assignment constitute a present and absolute assignment and not an assignment for additional security only. Such assignment to the Mortgagee shall not be construed to bind the Mortgagee to the performance of any of the covenants, conditions or provisions contained in any Lease or otherwise impose any

obligation upon the Mortgagee. The Mortgagor covenants that it will not hereafter collect or accept payment of any Rents more than one month prior to the due dates of such Rents and that no Rents will be waived, released, reduced, discounted or otherwise discharged or compromised by the Mortgagor, except as may be previously approved in writing by the Mortgagee. The Mortgagor agrees that it will not assign any of the Leases or Rents to any other Person. The Mortgagee shall have no liability for any loss which may arise from a failure or inability to collect any Rents. The Mortgagor shall maintain all security deposits in accordance with applicable law.

3.2.    Revocable License; Agent.  Notwithstanding the foregoing, but subject to the terms of this Article III, the Mortgagee grants to the Mortgagor a revocable license to operate and manage the Mortgaged Property and to collect the Rents and hereby directs each tenant under a Lease to pay such Rents to, or at the direction of, the Mortgagor, until such time as the Mortgagee provides notice to the contrary to such tenants. The Mortgagor shall hold the Rents, or a portion thereof sufficient to discharge all sums currently due in respect of the Obligations, in trust for the benefit of the Mortgagee for use in the payment of such sums.

3.3.    Rents.

(a)    Upon the occurrence and during the continuance of an Event of Default, without the need for notice or demand, the license granted pursuant to this Article III shall immediately and automatically be revoked and the Mortgagee shall immediately and automatically be entitled to possession of all Rents, whether or not the mortgagee enters upon or takes control of the Mortgaged Property. Upon the revocation of such license, the Mortgagor grants to the Mortgagee the right, at its option, to exercise all the rights granted in Section 4.2(a) hereof. Nothing herein contained shall be construed as constituting the Mortgagee a mortgagee or trustee in possession in the absence of the taking of actual possession of the Mortgaged Property by the Mortgagee pursuant to such Section 4.2(a).

(b)    From and after the termination of such license, the Mortgagor may, at the Mortgagee's direction, be the agent for the Mortgagee in collection of the Rents and all of the Rents so collected by the Mortgagor shall be held in trust by the Mortgagor for the sole and exclusive benefit of the Mortgagee and the Mortgagor shall, within one (1) Business Day after receipt of any Rents, pay the same to the Mortgagee to be applied by the Mortgagee as provided herein. All Rents collected shall be applied against all expenses of collection (including, but not limited to, attorneys' fees), costs of operation and management of the Mortgaged Property and the Obligations, in whatever order or priority as to any of such items as the Mortgagee directs in its sole and absolute discretion and without regard to the adequacy of its security. Neither demand for nor collection of Rents by the Mortgagee shall constitute any assumption by the Mortgagee of any obligations under any Lease or agreement relating thereto.

(c)    The Mortgagor shall reimburse the Mortgagee for any funds expended by the Mortgagee to take control of and manage the Mortgaged Property and collect the Rents and the Mortgagor's reimbursement obligations shall become part of the Obligations secured hereby. Such amounts shall be payable upon demand from the Mortgagor to the Mortgagee and shall bear interest from the date of expenditure at the interest rate set forth in the Convertible Note.

3.4.    <u>Sale of Mortgaged Property</u>.

(a)    Upon any sale of any of the Mortgaged Property by or for the benefit of the Mortgagee pursuant to this Mortgage, the uncollected and future Rents attributable to the part of the Mortgaged Property so sold shall be included in such sale and shall pass to the purchaser free and clear of any rights granted herein to the Mortgagor.

(b)    The Mortgagor acknowledges and agrees that, upon recordation of this Mortgage, the Mortgagee's interest in the Rents shall be deemed to be fully perfected, "choate" and enforceable against the Mortgagor and all third parties, including, without limitation, any debtor in possession or trustee in any case under the Bankruptcy Code, without the necessity of (i) commencing a foreclosure action with respect to this Mortgage, (ii) furnishing notice to the Mortgagor or tenants under the Leases, (iii) making formal demand for the Rents, (iv) taking possession of the Mortgaged Property as a lender-in-possession, (v) obtaining the appointment of a receiver of the Rents, (vi) sequestering or impounding the Rents, or (vii) taking any other affirmative action.

3.5.    <u>Bankruptcy Provisions</u>.  Without limiting the provisions of this Article III or the absolute nature of the assignment of the Rents hereunder, the Mortgagor and the Mortgagee agree that, to the extent that the assignment of the Rents hereunder is deemed to be other than an absolute assignment, (a) this Mortgage shall constitute a "security agreement" for purposes of Section 552(b) of the Bankruptcy Code; (b) the security interest created by this Mortgage extends to property of the Mortgagor acquired before the commencement of a bankruptcy case and to all amounts paid as Rents; and (c) such security interest shall extend to all Rents acquired by the estate after the commencement of any bankruptcy cases.  Without limiting the absolute nature of the assignment of the Rents hereunder, to the extent the Mortgagor (or the Mortgagor's bankruptcy estate) shall be deemed to hold any interest in the Rents after the commencement of a voluntary or involuntary bankruptcy case, the Mortgagor hereby acknowledges and agrees that such Rents are and shall be deemed to be "cash collateral" under Section 363 of the Bankruptcy Code.

3.6.    <u>Subordination to Leases</u>.  At the option of the Mortgagee, this Mortgage shall become subject and subordinate, in whole or in part (but not with respect to the priority or entitlement to insurance proceeds or any award in condemnation or with respect to any option to purchase, right of first refusal or right of first offer), to any and all Leases, upon the execution by the Mortgagee and recording thereof, at any time hereafter in the appropriate recording office in the county wherein the Land is situate, of a unilateral declaration to that effect.

ARTICLE IV.
EVENTS OF DEFAULT AND REMEDIES

4.1.    <u>Events of Default</u>.  The occurrence of an Event of Default under, and as defined in, the Convertible Note (and shall in any event include, without limitation, any payment default on the Obligations after the expiration of any applicable grace period), shall constitute an event of default (each an "Event of Default") hereunder.

4.2.    <u>Remedies Upon Default</u>.  Upon the occurrence and during the continuance of an Event of Default, the Mortgagee may, in the Mortgagee's sole discretion, either itself or by

or through one or more trustees, agents, nominees, assignees or otherwise, to the fullest extent permitted by law, exercise any or all of the following rights and remedies individually, collectively or cumulatively:

     (a)   either in person or by its agent, with or without bringing any action or proceeding, or by a receiver appointed by a court and without regard to the adequacy of its security, (i) enter upon and take possession of the Mortgaged Property or any part thereof and of all books, records and accounts relating thereto or located thereon, in its own name or in the name of the Mortgagor, and do or cause to be done any acts which it deems necessary or desirable to preserve the value of the Mortgaged Property or any part thereof or interest therein, increase the income therefrom or protect the security hereof, (ii) with or without taking possession of the Mortgaged Property make such repairs, alterations, additions and improvements as the Mortgagee deems necessary or desirable and do any and all acts and perform any and all work which the Mortgagee deems necessary or desirable to complete any unfinished construction on the Mortgaged Property, (iii) make, cancel or modify Leases and sue for or otherwise collect the Rents thereof, including those past due and unpaid, (iv) make any payment or perform any act which the Mortgagor has failed to make or perform hereunder, (v) appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of the Mortgagee, (vi) pay, purchase, contest or compromise any encumbrance, charge or Lien on the Mortgaged Property, and (vii) take such other actions as the Mortgagee deems necessary or desirable;

     (b)   commence and maintain one or more actions at law or in equity or by any other appropriate remedy (i) to protect and enforce the Mortgagee's rights hereunder, including for the specific performance of any covenant or agreement herein contained (which covenants and agreements the Mortgagor agrees shall be specifically enforceable by injunctive or other appropriate equitable remedy), (ii) to collect any sum then due hereunder, (iii) to aid in the execution of any power herein granted, or (iv) to foreclose this Mortgage in accordance with Section 4.3 hereof;

     (c)   exercise any or all of the remedies available to a secured party under the UCC;

     (d)   by notice to the Mortgagor (to the extent such notice is required to be given under the Transaction Documents), but without formal demand, presentment, notice of intention to accelerate or of acceleration, protest or notice of protest, all of which are hereby waived by the Mortgagor, declare all of the Obligations immediately due and payable, and upon such declaration all of such Obligations shall become and be immediately due and payable, anything in this Mortgage or the other Transaction Documents to the contrary notwithstanding; and

     (e)   exercise any other right or remedy available to the Mortgagee under the Transaction Documents or under applicable law.

4.3.    <u>Right of Foreclosure.</u>

(a)    Power of Sale. If an Event of Default shall have occurred, Mortgagee may, during the legal hours of sale, sell the Mortgaged Property to the highest bidder at public auction in front of the courthouse door in the county or counties, as may be required, where the Mortgaged Property is located, either in person or by auctioneer, after having first given notice of the time, place and terms of sale, together with a description of the property to be sold, by publication once a week for three (3) successive weeks prior to said sale in some newspaper published in said county or counties, as may be required, and, upon payment of the purchase money, Mortgagee or any person conducting the sale for Mortgagee is authorized to execute to the purchaser at said sale a deed to the Mortgaged Property so purchased. Mortgagee may bid at said sale and purchase the Mortgaged Property, or any part thereof, if the highest bidder therefor. At the foreclosure sale the Mortgaged Property may be offered for sale and sold as a whole without first offering it in any other manner or may be offered for sale and sold in any other manner as Mortgagee may elect.  The provisions of this paragraph shall apply with respect to Mortgagee's enforcement of rights or interests in personal property which constitutes Mortgaged Property hereunder.  The Mortgagee may, to the extent permitted by law, adjourn from time to time any sale by it to be made under or by virtue of this Mortgage by announcement at the time and place appointed for such sale or for such adjourned sale or sales; and, to the extent permitted by law, the Mortgagee may make such sale at the time and place to which the same shall be so adjourned. Following the occurrence and during the continuance of an Event of Default, with respect to all components of the Mortgaged Property, the Mortgagee is hereby appointed the true and lawful attorney-in- fact of the Mortgagor (which appointment is irrevocable and coupled with an interest), in its name and stead, to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property, and for that purpose the Mortgagee may execute all necessary instruments of conveyance, assignment, transfer and delivery, and may substitute one or more persons with such power, the Mortgagor hereby ratifying and confirming all that its said attorney-in-fact or such substitute or substitutes shall lawfully do by virtue hereof. Notwithstanding the foregoing, the Mortgagor, if so requested by the Mortgagee, shall ratify and confirm any such sale or sales by executing and delivering to the Mortgagee or to such purchaser or purchasers all such instruments as may be advisable, in the judgment of the Mortgagee, for such purpose, and as may be designated in such request.  To the extent permitted by law, any such sale or sales made under or by virtue of this Article IV shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of the Mortgagor in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against the Mortgagor and against any and all persons claiming or who may claim the same, or any part thereof, from, through or under the Mortgagor.  Upon any sale made under or by virtue of this Article IV, the Mortgagee may, to the extent permitted by law, bid for and acquire the Mortgaged Property or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon the Obligations secured hereby the net sale price after deducting therefrom the expenses of the sale and the cost of the action and any other sums which the Mortgagee is authorized to deduct by law or under this Mortgage.

(b)    Any foreclosure of this Mortgage and any other transfer of all or any part of the Mortgaged Property in extinguishment of all or any part of the Obligations may, at the Mortgagee's option, be subject to any or all Leases of all or any part of the Mortgaged Property and the rights of tenants under such Leases. No failure to make any such tenant a defendant in any foreclosure proceedings or to foreclose or otherwise terminate any such Lease and the rights of any such tenant in connection with any such foreclosure or transfer shall be, or be asserted to be, a defense or hindrance to any such foreclosure or transfer or to any proceedings seeking collection of all or any part of the Obligations (including, without limitation, any deficiency remaining unpaid after completion of any such foreclosure or transfer).

(c)    If the Mortgagor retains possession of the Mortgaged Property or any part thereof subsequent to a sale, the Mortgagor will be considered a tenant at sufferance of the purchaser, and will, if the Mortgagor remains in possession after demand to remove, be guilty of forcible detainer and will be subject to eviction and removal, forcible or otherwise, with or without process of law, and all damages to the Mortgagor by reason thereof are hereby expressly waived by the Mortgagor.

4.4.    <u>Application of Proceeds</u>. The proceeds of any sale of, and the Rents and other amounts generated by the holding, leasing, management, operation or other use of, the Mortgaged Property (including, without limitation, the Secured Property) pursuant to this Mortgage (including all monies received in respect of post-petition interest) shall be applied by the Mortgagee (or the receiver, if one is appointed) in accordance with the provisions of the Transaction Documents.

4.5.    <u>Appointment of Receiver</u>. Upon the occurrence and during the continuance of an Event of Default, the Mortgagee as a matter of strict right and without notice to the Mortgagor or anyone claiming under the Mortgagor, and without regard to the adequacy or the then value of the Mortgaged Property or the interest of the Mortgagor therein or the solvency of any party bound for payment of the Obligations, shall have the right to apply to any court having jurisdiction to appoint a receiver or receivers of the Mortgaged Property, and the Mortgagor hereby irrevocably consents to such appointment and waives notice of any application therefor. Any such receiver or receivers shall have all the usual rights, powers and duties of receivers in like or simi Jar cases and all the rights, powers and duties of the Mortgagee in case of entry as provided in Section 4.2 hereof, including, but not limited to, the full power to rent, maintain and otherwise operate the Mortgaged Property upon such terms as are approved by the court and shall continue as such and exercise all such powers until the date of confirmation of sale of the Mortgaged Property unless such receivership is sooner terminated.

4.6.    <u>Exercise of Rights and Remedies</u>. The entering upon and taking possession of the Mortgaged Property, the collection of any Rents and the exercise of any of the other rights contained in this Article IV, shall not, alone, cure or waive any Event of Default or notice of default hereunder or invalidate any act done in response to such Event of Default or pursuant to such notice of default and, notwithstanding the continuance in possession of the Mortgaged Property or the collection, receipt and application of Rents, the Mortgagee shall be entitled to exercise every right provided for herein or in the Transaction Documents, or at law or in equity upon the occurrence of any Event of Default.

4.7.    <u>Remedies Not Exclusive</u>. The Mortgagee shall be entitled to enforce payment and performance of the Obligations and to exercise all rights and powers under this Mortgage or any other agreement or any laws now or hereafter in force, notwithstanding that some or all of the Obligations may now or hereafter be otherwise secured, whether by mortgage, deed of trust, security deed, pledge, lien, assignment or otherwise. Neither the acceptance of this Mortgage nor its enforcement, whether by court action or pursuant to the powers herein contained, shall prejudice or in any manner affect the Mortgagee's right to realize upon or enforce any other security now or hereafter held by the Mortgagee, it being agreed that the Mortgagee shall be entitled to enforce this Mortgage and any other security now or hereafter held by the Mortgagee in such order and manner as it may in its absolute and sole discretion and election determine. No remedy herein conferred upon or reserved to the Mortgagee is intended to be exclusive of any other remedy herein or in any of the other Transaction Documents or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute. Every power or remedy to which the Mortgagee is entitled may be exercised, concurrently or independently, from time to time and as often as may be deemed expedient by the Mortgagee, and the Mortgagee may pursue inconsistent remedies. No delay or omission of the Mortgagee to exercise any right or power accruing upon any Event of Default shall impair any right or power or shall be construed as a waiver of any Event of Default or any acquiescence therein. If the Mortgagee shall have proceeded to invoke any right or remedy hereunder or under the Transaction Documents and shall thereafter elect to discontinue or abandon it for any reason, the Mortgagee shall have the unqualified right to do so and, in such an event, the rights and remedies of the Mortgagee shall continue as if such right or remedy had never been invoked and no such discontinuance or abandonment shall waive any Event of Default which may then exist or the right of the Mortgagee thereafter to exercise any right or remedy under the Transaction Documents for such Event of Default.

4.8.    <u>WAIVER OF REDEMPTION, NOTICE, MARSHALLING, ETC.</u> NOTWITHSTANDING ANYTHING HEREIN CONTAINED TO THE CONTRARY, TO THE EXTENT PERMITTED BY LAW, THE MORTGAGOR: (A) ACKNOWLEDGING THAT IT IS AWARE OF AND HAS HAD THE ADVICE OF COUNSEL OF ITS CHOICE WITH RESPECT TO ITS RIGHTS HEREUNDER, WILL NOT (I) AT ANY TIME INSIST UPON, OR PLEAD, OR IN ANY MANNER WHATSOEVER, CLAIM OR TAKE ANY BENEFIT OR ADVANTAGE OF ANY STAY OR EXTENSION OR MORATORIUM LAW, PRESENT OR FUTURE STATUTE OF LIMITATIONS, ANY LAW RELATING TO THE ADMINISTRATION OF ESTATES OF DECEDENTS, APPRAISEMENT, VALUATION, REDEMPTION, STATUTORY RIGHT OF REDEMPTION, OR THE MATURING OR DECLARING DUE OF THE WHOLE OR ANY PART OF THE OBLIGATIONS, NOTICE OF INTENTION OF SUCH MATURING OR DECLARING DUE, OTHER NOTICE (WHETHER OF DEFAULTS, ADVANCES, THE CREATION, EXISTENCE, EXTENSION OR RENEWAL OF ANY OF THE OBLIGATIONS OR OTHERWISE, EXCEPT FOR RIGHTS TO NOTICES EXPRESSLY GRANTED HEREIN OR IN THE TRANSACTION DOCUMENTS), SUBROGATION, ANY SET-OFF RIGHTS, HOMESTEAD OR ANY OTHER EXEMPTIONS FROM EXECUTION OR SALE OF THE MORTGAGED PROPERTY OR ANY PART THEREOF, WHEREVER ENACTED, NOW OR AT ANY TIME HEREAFTER IN FORCE, WHICH MAY AFFECT THE COVENANTS AND TERMS OF PERFORMANCE OF THIS MORTGAGE, OR (II) CLAIM, TAKE OR INSIST UPON ANY BENEFIT OR ADVANTAGE OF ANY LAW NOW OR HEREAFTER IN FORCE PROVIDING FOR THE VALUATION OR

APPRAISAL OF THE MORTGAGED PROPERTY OR ANY PART THEREOF, PRIOR TO ANY SALE OR SALES THEREOF WHICH MAY BE MADE PURSUANT TO ANY PROVISION HEREOF, OR PURSUANT TO THE DECREE, JUDGMENT OR ORDER OF ANY COURT OF COMPETENT JURISDICTION; OR (III) AFTER ANY SUCH SALE OR SALES, CLAIM OR EXERCISE ANY RIGHT UNDER ANY STATUTE HERETOFORE OR HEREAFTER ENACTED TO REDEEM THE MORTGAGED PROPERTY SO SOLD OR ANY PART THEREOF; AND (B) COVENANTS NOT TO HINDER, DELAY OR IMPEDE THE EXECUTION OF ANY POWER HEREIN GRANTED OR DELEGATED TO THE MORTGAGEE, BUT TO SUFFER AND PERMIT THE EXECUTION OF EVERY POWER AS THOUGH NO SUCH LAW OR LAWS HAD BEEN MADE OR ENACTED.    THE MORTGAGOR, FOR ITSELF AND ALL WHO MAY CLAIM UNDER IT, WAIVES, TO THE EXTENT THAT IT LAWFULLY MAY, ALL RIGHTS, LEGAL AND EQUITABLE, IT MAY NOW OR HEREAFTER HAVE TO REQUIRE MARSHALLING OF ASSETS OR TO REQUIRE UPON FORECLOSURE, SALES OF ASSETS IN A PARTICULAR ORDER. EACH SUCCESSOR AND ASSIGN OF THE MORTGAGOR, INCLUDING WITHOUT LIMITATION, A HOLDER OF A LIEN SUBORDINATE TO THE LIEN CREATED HEREBY (WITHOUT IMPLYING THAT THE MORTGAGOR HAS, EXCEPT AS EXPRESSLY PROVIDED HEREIN, A RIGHT TO GRANT AN INTEREST IN, OR A SUBORDINATE LIEN ON, THE MORTGAGED PROPERTY), BY ACCEPTANCE OF ITS INTEREST OR LIEN AGREES THAT IT SHALL BE BOUND BY THE ABOVE WAIVER, AS IF IT GAVE THE WAIVER ITSELF.

4.9.    Expenses of Enforcement.  In connection with any action to enforce any remedy of the Mortgagee under this Mortgage, the Mortgagor agrees to pay all costs and expenses which may be paid or incurred by or on behalf of the Mortgagee, including, without limitation, reasonable attorneys' fees, receiver's fees, appraiser's fees, outlays for documentary and expert evidence, stenographer's charges, publication costs, and costs (which may be estimated as to items to be expended after entry of the decree) of procuring all such abstracts of title, title searches and examinations, title insurance policies and similar data and assurances with respect to title and value as the Mortgagee may deem necessary or desirable, and neither the Mortgagee nor any other Person shall be required to accept tender of any portion of the Obligations unless the same be accompanied by a tender of all such expenses, costs and commissions. All of the costs and expenses described in this Section 4.9, and such expenses and fees as may be incurred in the protection of the Mortgaged Property and the maintenance of the Lien of this Mortgage and the Mortgagee's security interest in the Mortgaged Property, including the fees of any attorney employed by the Mortgagee in any litigation or proceeding, including appellate proceedings, affecting this Mortgage or the Mortgaged Property (including, without limitation, the occupancy thereof or any construction work performed thereon), including probate and bankruptcy proceedings, or in preparation for the commencement or defense of any proceeding or threatened suit or proceeding whether or not an action is actually commenced, shall be immediately due and payable by the Mortgagor, with interest thereon at the interest rate set forth in the Convertible Note and shall be part of the Obligations secured by this Mortgage.

4.10.    Indemnity.

(a)    The Mortgagor agrees to indemnify, reimburse and hold the Mortgagee and each other Secured Party and their respective successors, assigns, employees, affiliates,

advisors and agents (referred to in this Mortgage individually as an "Indemnitee", and collectively as "Indemnitees") harmless from any and all liabilities, obligations, damages, injuries, penalties, claims, demands, actions, suits, judgments and any and all costs, expenses or disbursements (including reasonable attorneys' fees and expenses) (for the purposes of this Section 4.10 the foregoing are collectively called "expenses") of whatsoever kind and nature imposed on, asserted against or incurred by any of the Indemnitees in any way relating to or arising out of this Mortgage or in any way connected with the administration of the transactions contemplated hereby or the enforcement of any of the terms of, or the preservation of any rights under this Mortgage, or in any way relating to or arising out of the manufacture, ownership, ordering, purchase, delivery, control, acceptance, lease, financing, possession, operation, condition, sale, return or other disposition, or use of the Mortgaged Property (including, without limitation, latent or other defects, whether or not discoverable), the violation of the laws of any country, state or other governmental body or unit, any tort (including, without limitation, claims arising or imposed under the doctrine of strict liability, or for or on account of injury to or the death of any person (including any Indemnitee), or property damage), or contract claim; provided that no Indemnitee shall be indemnified pursuant to this Section 4.10 for any portion of such losses, damages or liabilities to the extent caused by the gross negligence or willful misconduct of such Indemnitee (as determined by a court of competent jurisdiction in a final and non-appealable decision). The Mortgagor agrees that upon written notice by any Indemnitee of the assertion of such a liability, obligation, damage, injury, penalty, claim, demand, action, suit or judgment, the Mortgagor shall assume full responsibility for the defense thereof. Each Indemnitee agrees to use its best efforts to promptly notify the Mortgagor of any such assertion of which such Indemnitee has knowledge.

(b)    Without limiting the application of Section 4.10(a) hereof, the Mortgagor agrees to pay or reimburse the Mortgagee for all expenses, fees and costs described in Section 1.5 of this Mortgage which are expended or incurred by the Mortgagee or any Indemnitee pursuant to Section 4.9 of this Mortgage.

(c)    Without limiting the application of Sections 4.10(a) and (b) of this Mortgage, the Mortgagor agrees to pay, indemnify and hold each Indemnitee harmless from and against any loss, costs, damages and expenses which such Indemnitee may suffer, expend or incur or incur in consequence of or growing out of any misrepresentation by the Mortgagor in this Mortgage or in any writing contemplated by or made or delivered pursuant to or in connection with this Mortgage.

(d)    If and to the extent that the obligations of the Mortgagor under this Section 4.10 are unenforceable for any reason, the Mortgagor hereby agrees to make the maximum contribution to the payment and satisfaction of such obligations which is permissible under applicable law.

4.11.    Indemnity Obligations Secured by Mortgaged Property; Survival.    Any amounts paid by any Indemnitee as to which such Indemnitee has the right to reimbursement shall constitute Obligations secured by the Mortgaged Property.  The indemnity obligations of the Mortgagor contained in this Article IV shall continue in full force and effect notwithstanding the full payment of all of the other Obligations.

## ARTICLE V.
## ADDITIONAL COLLATERAL

5.1.    Additional Collateral.

(a)    The Mortgagor acknowledges and agrees that the Obligations are secured by the Mortgaged Property and various other collateral under the Transaction Documents including, without limitation, at the time of execution of this Mortgage certain personal property of the Mortgagor and other parties described in the Transaction Documents. The Mortgagor specifically acknowledges and agrees that the Mortgaged Property, in and of itself, if foreclosed or realized upon would not be sufficient to satisfy the outstanding amount of the Obligations.  Accordingly, the Mortgagor acknowledges that it is in the Mortgagor's contemplation that the other collateral pledged to secure the Obligations may be pursued by the Mortgagee in separate proceedings in the various States, counties and other countries where such collateral may be located and additionally that the Mortgagor and other parties liable for payment of the Obligations will remain liable for any deficiency judgments in addition to any amounts the Mortgagee may realize on sales of other property or any other collateral given as security for the Obligations. Specifically, and without limitation of the foregoing, it is agreed that it is the intent of the parties hereto that in the event of a foreclosure of this Mortgage, the Indebtedness evidencing the Obligations shall not be deemed merged into any judgment of foreclosure, but rather shall remain outstanding. It is the further intent and understanding of the parties that the Mortgagee, following an Event of Default, may pursue all of its collateral with the Obligations remaining outstanding and in full force and effect notwithstanding any judgment of foreclosure or any other judgment which the Mortgagee may obtain.

(b)    The Mortgagor acknowledges and agrees that the Mortgaged Property and the property which may from time to time be encumbered by the other Transaction Documents may be located in more than one State or country and therefore the Mortgagor waives and relinquishes any and all rights it may have, whether at law or equity, to require the Mortgagee to proceed to enforce or exercise any rights, powers and remedies it may have under the Transaction Documents in any particular manner, in any particular order or in any particular State or other jurisdiction. Furthermore, the Mortgagor acknowledges and agrees that the Mortgagee shall be allowed to enforce payment and performance of the Obligations and to exercise all rights and powers provided under this Mortgage, or the other Transaction Documents or under any provision of law, by one or more proceedings, (whether contemporaneous, consecutive or both) in any one or more States or countries in which the security is located. Neither the acceptance of this Mortgage or any Secured Debt Agreement nor the enforcement in one State or country, whether by court action, power of sale, or otherwise, shall prejudice or in any way limit or preclude enforcement of such documents through one or more additional proceedings, in that State or in any other State or country.

(c)    The Mortgagor further agrees that any particular remedy or proceeding, including, without limitation, foreclosure through court action (in a state or federal court) or power of sale, may be brought and prosecuted in the local or federal courts of any one or more States as to all or any part of the Mortgaged Property or the property encumbered

by the Transaction Documents, wherever located, without regard to the fact that any one or more prior or contemporaneous proceedings have been situated elsewhere with respect to the same or any other part of the Mortgaged Property and the property encumbered by the Transaction Documents.

(d)    The Mortgagee may resort to any other security held by the Mortgagee for the payment of the Obligations in such order and manner as the Mortgagee may elect.

(e)    Notwithstanding anything contained herein to the contrary, the Mortgagee shall be under no duty to the Mortgagor or others, including, without limitation, the holder of any junior, senior or subordinate mortgage on the Mortgaged Property or any part thereof or on any other security held by the Mortgagee, to exercise or exhaust all or any of the rights, powers and remedies available to the Mortgagee.

## ARTICLE VI.
## MISCELLANEOUS

6.1.    <u>Governing Law</u>.  The provisions of this Mortgage regarding the creation, perfection and enforcement of the liens and security interests herein granted shall be governed by and construed in accordance with the laws of the State in which the Mortgaged Property is located. All other provisions of this Mortgage shall be governed by and construed in accordance with the laws of the State of New York.

6.2.    <u>Limitation on Interest</u>.  It is the intent of the Mortgagor and the Mortgagee in the execution of this Mortgage and all other instruments evidencing or securing the Obligations to contract in strict compliance with applicable usury laws.  In furtherance thereof, the Mortgagee and the Mortgagor stipulate and agree that none of the terms and provisions contained in this Mortgage shall ever be construed to create a contract for the use, forbearance or retention of money requiring payment of interest at a rate in excess of the maximum interest rate permitted to be charged by relevant law.  If this Mortgage or any other instrument evidencing or securing the Obligations violates any applicable usury law, then the interest rate payable hereunder or thereunder shall be the highest rate permissible by law.

6.3.    <u>Notices</u>.  Except as otherwise expressly provided herein, all notices, requests, demands or other communications provided for hereunder shall be in writing and mailed, transmitted via facsimile, telegraph, telex, cable or delivered via courier service as set forth in the Convertible Note.  All such notices and communications shall be effective as provided in the Convertible Note.

6.4.    <u>Captions</u>.  The captions or headings at the beginning of each Article and Section hereof are for the convenience of the parties hereto and are not a part of this Mortgage.

6.5.    <u>Amendment</u>.  None of the terms and conditions of this Mortgage may be changed, waived, modified or varied in any manner whatsoever except in writing executed and delivered by the Mortgagor and the Mortgagee.  Any agreement made by the Mortgagor and the Mortgagee after the date of this Mortgage shall be superior to the rights of the holder of any intervening or subordinate mortgage, lien or encumbrance.

6.6.   _Obligations Absolute._  The obligations of the Mortgagor hereunder shall remain in full force and effect without regard to, and shall not be impaired by, (a) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of the Mortgagor; (b) any exercise or non-exercise, or any waiver of, any right, remedy, power or privilege under or in respect of this Mortgage or any other Secured Debt Agreement; or (c) any amendment to or modification of any Secured Debt Agreement or any security for any of the Obligations; whether or not the Mortgagor shall have notice or knowledge of any of the foregoing.

6.7.   _Further Assurances._  The Mortgagor shall, upon the request of the Mortgagee and at the expense of the Mortgagor: (a) promptly correct any defect, error or omission which may be discovered in this Mortgage or any Uniform Commercial Code financing statements filed in connection herewith; (b) promptly execute, acknowledge, deliver and record or file such further instruments (including, without limitation, further mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements and assignments of rents or leases) and promptly do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of this Mortgage and to subject to the Liens and security interests hereof any property intended by the terms hereof to be encumbered hereby, including, but not limited to, any renewals, additions, substitutions, replacements or appurtenances to the Mortgaged Property; and (c) promptly execute, acknowledge, deliver, procure and record or file any document or instrument (including specifically any financing statement) deemed advisable by the Mortgagee to protect, continue or perfect the Liens or the security interests hereunder against the rights or interests of third Persons.

6.8.   _Partial Invalidity._  If any of the provisions of this Mortgage or the application thereof to any person, party or circumstances shall to any extent be invalid or unenforceable, the remainder of this Mortgage, or the application of such provision or provisions to persons, parties or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of this Mortgage shall be valid and enforceable to the fullest extent permitted by law.

6.9.   _Partial Releases._  No release from the Lien of this Mortgage of any part of the Mortgaged Property by the Mortgagee shall in any way alter, vary or diminish the force or effect of this Mortgage on the balance of the Mortgaged Property or the priority of the Lien of this Mortgage on the balance of the Mortgaged Property.

6.10.   _Priority._  This Mortgage is intended to and shall be valid and have priority over all subsequent liens and encumbrances, including statutory liens, excepting solely taxes and assessments levied on the real estate, to the extent of the maximum amount secured hereby.

6.11.   _Covenants Running with the Land._  All Obligations are intended by the Mortgagor and the Mortgagee to be, and shall be construed as, covenants running with the Mortgaged Property. As used herein, the "Mortgagor" shall refer to the party named in the first paragraph of this Mortgage and to any subsequent owner of all or any portion of the Mortgaged Property. All persons who may have or acquire an interest in the Mortgaged Property shall be deemed to have notice of, and be bound by, the terms of the Transaction Documents and the other Transaction Documents; provided, however, that no such party shall be entitled to any rights thereunder without prior written consent of the Mortgagee.

6.12.  Successors and Assigns.  This Mortgage shall be binding upon and inure to the benefit of the Mortgagee and the Mortgagor and their respective successors and assigns. Except as expressly permitted by the Transaction Documents, the Mortgagor shall not assign any rights, duties, or obligations hereunder.

6.13.  Purpose of Convertible Note.  The Mortgagor hereby represents and agrees that the Obligations secured by this Mortgage are being obtained for business or commercial purposes, and the proceeds thereof will not be used for personal, family, residential, household or agricultural purposes.

6.14.  No Joint Venture or Partnership.  The relationship created hereunder and under the other Transaction Documents is that of creditor/debtor.  The Mortgagee does not owe any fiduciary or special obligation to the Mortgagor and/or any of the Mortgagor's officers, partners, agents, or representatives.  Nothing herein or in any other Secured Debt Agreement is intended to create a joint venture, partnership, tenancy-in-common or joint tenancy relationship between the Mortgagor and the Mortgagee.

6.15.  Intentionally Omitted.

6.16.  Full Recourse.  This Mortgage is made with full recourse to the Mortgagor and to all assets of the Mortgagor, including the Mortgaged Property and the Secured Property, and pursuant to and upon all the warranties, representations, covenants and agreements on the part of the Mortgagor contained herein and in the other Transaction Documents and otherwise in writing in connection herewith or therewith.

6.17.  Reduction of Secured Amount.  In the event that the maximum principal amount secured by this Mortgage is less than the aggregate Obligations, then the amount secured hereby shall be reduced only by the last and final sums that the Mortgagor or any other Credit Party repays with respect to the Obligations and shall not be reduced by any intervening repayments of the Obligations.  So long as the balance of the Obligations exceeds the amount secured hereby, any payments of the Obligations shall not be deemed to be applied against, or to reduce, the portion of the Obligations secured by this Mortgage.

6.18.  Acknowledgment of Receipt.  The Mortgagor hereby acknowledges receipt of a true copy of this Mortgage.

6.19.  Release.  Following the date of (i) the satisfaction and discharge of the Convertible Note and (ii) the performance of all obligations under the Transaction Documents and this Mortgage, this Mortgage shall be released of record, and the Mortgagee, at the request and expense of the Mortgagor, will promptly execute and deliver to the Mortgagor (without recourse and without representation or warranty) a proper instrument or instruments acknowledging the satisfaction and termination of this Mortgage; provided, however, that all indemnities set forth herein (including, without limitation Section 4.10 hereof) shall survive such termination.  In addition, this Mortgage shall be wholly or partially released of record, as appropriate, at any time prior to the Termination Date in connection with a sale or disposition of all or any portion of the Mortgaged Property permitted by the Transaction Documents and application of the proceeds of such disposition in accordance with the terms thereof, to the extent so required (a release under the

preceding clause is referred to herein as a "Permitted Release"). The Mortgagor shall deliver to the Mortgagee a certificate (the "Officer's Certificate") executed by an officer of the Mortgagor stating that the release of the Mortgaged Property is permitted pursuant to the terms and conditions of the Transaction Documents, that the proceeds of such sale, transfer or other disposition of the Mortgaged Property will be applied in accordance with the provisions of the Transaction Documents (to the extent required to be applied) and setting forth any further information and/or certifications which are required under the Transaction Documents as conditions to be met in order for the release to constitute a Permitted Release. Upon receipt by the Mortgagee of the Officer's Certificate, the Mortgagee shall, at the expense of the Mortgagor, promptly execute and deliver to the Mortgagor (without recourse and without representation or warranty) a proper instrument or instruments evidencing the Permitted Release; but provided that the indemnities set forth herein (including without limitation Section 4.10 hereof) shall survive the release of this Mortgage.

6.20.  <u>Time of the Essence</u>.  Time is of the essence with respect to the obligations of the Mortgagor under this Mortgage.

6.21.  <u>The Mortgagee's Powers</u>.  Without affecting the liability of any other Person liable for the payment and performance of the Obligations and without impairing the Lien of this Mortgage or the Mortgagee's security interest in the Mortgaged Property in any way, the Mortgagee may, from time to time, regardless of consideration and without notice to or consent by the holder of any subordinate Lien, right, title or interest in or to the Mortgaged Property, (a) release any Persons liable for the Obligations; (b) extend the maturity of, increase or otherwise alter any of the terms of the Obligations; (c) modify the interest rate payable on the principal balance of the Obligations; (d) release or reconvey, or cause to be released or reconveyed all or any portion of the Mortgaged Property; or (e) take or release any other or additional security for the Obligations.

6.22.  <u>Rules of Usage</u>.  The following rules of usage shall apply to this Mortgage unless otherwise required by the context:

(a)  Singular words shall connote the plural as well as the singular, and vice versa, as may be appropriate.

(b)  The words "herein", "hereof" and "hereunder" and words of similar import appearing in this Mortgage shall be construed to refer to such document as a whole and not to any particular section, paragraph or other subpart thereof unless expressly so stated.

(c)  References to any Person shall include such Person and its successors and permitted assigns.

(d)  Each of the parties hereto and their counsel have reviewed and revised, or requested revisions to, this Mortgage, and the usual rule of construction that any ambiguities are to be resolved against the drafting party shall be inapplicable in the construction and interpretation of such documents and any amendments or exhibits thereto.

(e)  Unless an express provision requires otherwise, each reference to "the Mortgaged Property" shall be deemed a reference to "the Mortgaged Property or any part

thereof', and each reference to "Secured Property" shall be deemed a reference to "the Secured Property or any part thereof'.

6.23.   No Off-Set.  All sums payable by the Mortgagor shall be paid without counterclaim, other compulsory counterclaims, set-off, or deduction and without abatement, suspension, deferment, diminution or reduction, and the Obligations shall in no way be released, discharged or otherwise affected (except as expressly provided herein) by reason of:  (a) any damage or any condemnation of the Mortgaged Property or any part thereof; (b) any title defect or encumbrance or any eviction from the Mortgaged Property or any part thereof by title paramount or otherwise; or (c) any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to the Mortgagee or the Mortgagor, or any action taken with respect to this Mortgage by any agent or receiver of the Mortgagee.  The Mortgagor waives, to the extent permitted by law, all rights now or hereafter conferred by statute or otherwise to any abatement, suspension, deferment, diminution or reduction of any of the Obligations.

6.24.   Consent to Jurisdiction and Service of Process; Waiver of Jury Trial.

(a)   TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS MORTGAGE MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK, OR THE COURTS OF THE STATE WHERE THE MORTGAGED PROPERTY IS LOCATED AND, BY EXECUTION AND DELIVERY OF THIS MORTGAGE, THE MORTGAGOR HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS.   THE MORTGAGOR HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK JURISDICTION OVER THE MORTGAGOR, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS MORTGAGE BROUGHT IN ANY OF THE AFORESAID COURTS THAT ANY SUCH COURT LACKS JURISDICTION OVER THE MORTGAGOR.   THE MORTGAGOR FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE MORTGAGOR AT ITS ADDRESS FOR NOTICES PURSUANT TO SECTION 6.3 HEREOF, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.   THE MORTGAGOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER THAT SUCH SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE MORTGAGEE, OR ANY SECURED PARTY, TO SERVE PROCESS IN ANY OTHER MANNER

**PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST THE MORTGAGOR IN ANY OTHER JURISDICTION.**

(b)    **THE MORTGAGOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS MORTGAGE BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY, TO THE EXTENT PERMITTED BY APPLICABLE LAW, WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM**

(c)    **THE MORTGAGOR HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS MORTGAGE.**

6.25.    <u>Future Advances</u>. This Mortgage is given to secure the Obligations under, or in respect of, the Transaction Documents and shall secure not only obligations with respect to presently existing indebtedness under the foregoing documents and agreements but also any and all other indebtedness which may hereafter be owing to the Secured Parties under the Transaction Documents, however incurred, whether interest, discount or otherwise, and whether the same shall be deferred, accrued or capitalized, including future advances with respect to and pursuant to the Transaction Documents, whether such advances are obligatory or to be made at the option of the Mortgagee, or otherwise, to the same extent as if such future advances were made on the date of the execution of this Mortgage. The Lien of this Mortgage shall be valid as to all indebtedness secured hereby, including future advances, from the time of its filing for record in the recorder's office of the county in which the Mortgaged Property is located. This Mortgage is intended to and shall be valid and have priority over all subsequent Liens and encumbrances, including statutory Liens, excepting solely taxes and assessments levied on the real estate, to the extent of the maximum amount secured hereby, and Permitted Liens related thereto.

6.26.    <u>Leasehold Mortgage Provisions</u>. If **Exhibit A** includes a leasehold estate, the terms and conditions set forth in **Exhibit B** attached hereto are made a part hereof and are incorporated into this Mortgage by reference.

6.27.    <u>Transaction Document</u>. The Mortgagor acknowledges and agrees that this Instrument is a "Transaction Document" as such term is defined in the Convertible Note

6.28.    <u>Special Provisions Governing Minerals and Coal Rights</u>. The following special provisions are in addition to the other provisions and agreements in this Mortgage and are not in limitation of any such provisions or agreements:

(a)    "<u>Minerals</u>" shall mean collectively all rights, titles, interests, and estates now owned or hereafter acquired by the Mortgagor in and to (i) the coal in, upon and under, and whether or not extracted from, the Land, and whether or not produced or processed;

and (ii) any and all of the following, whether or not extracted from the Land: any other minerals, including oil, lignite, liquid and solid hydrocarbons, and their respective constituent products, sulfur, coal seam gas, carbon dioxide, helium and other gasses (whether or not produced in association with oil and gas), industrial minerals, lead, zinc, iron ore, phosphate, bauxite, limestone, granite, sand, gravel, aggregate and other mined or quarried stone, bedrock and other rock materials, geothermal energy (including entrained methane, hydrostatic pressure and thermal energy) and all other substances and ore deposits of any kind or character, whether solid, liquid or gaseous, now owned or hereafter acquired by the Mortgagor without limitation of the foregoing.

(b)    "Mineral Properties" shall mean all Land that contains Minerals.

(c)    "Permits" shall mean all licenses, permits and bonds for mining or otherwise related to the Minerals.

(d)    The warranties and representations of the Mortgagor shall include, in addition to those stated in Article I, the following:

(i)    The Mortgagor has full power and lawful authority to bargain, grant, sell, mortgage, assign, transfer, convey, and grant a security interest in all of the Mineral Properties, all in the manner and form herein provided and without obtaining the waiver, consent, or approval of any lessor, sublessor, governmental agency or entity, or party whomsoever or whatsoever other than any required waivers, consents or approvals previously obtained by Mortgagor from any such lessor, sublessor, governmental agency or entity, or other party, as applicable. Mortgagor represents that true and correct copies of any and all such required waivers, consents or approvals have been provided by Mortgagor to Mortgagee, and same have not been revoked or otherwise nullified.

(ii)    "**Exhibit C**" identifies each material Permit now in effect, and each such Permit is in full force and effect, is not subject to any contest or challenge and is adequate for its intended purpose, and such Permits together constitute all of the permits required for the mining or extraction of Minerals from and the operation of the Mineral Properties.

(e)    The affirmative covenants of the Mortgagor shall include, in addition to those stated in Article I, the following:

(i)    The Mortgagor shall operate, or cause to he operated, all of the Mineral Properties, in accordance with the practice of the industry, and shall mine coal in accordance with Reasonable Mining Practices. "Reasonable Mining Practices" as used herein shall mean those modern mining methods and practices employed by a prudent mining operator under conditions similar to those existing on the Mineral Properties using modern mining equipment and techniques in the conduct of diligent and aggressive mining

operations in an attempt to recover the maximum amount of reasonably economically mineable coal ("Recoverable Coal") on said property.

(ii)    To the extent failure to do so would have a material adverse effect on the value of the Mineral Properties, the Mortgagor will not:  (i) commit or suffer any waste of any of the Mineral Properties, fail to use Reasonable Mining Practices, or cause Recoverable Coal to be blocked off, damaged, destroyed or otherwise made unmineable; or (ii) fail to guard every part of the Mineral Properties from removal, destruction and damage.  The Mortgagor, if required to do so by the Mortgagee, promptly shall replace any of the Mineral Properties which may be removed, lost, destroyed, or unsuitable for use to maintain production of coal or other Minerals from the affected Mineral Properties.

(iii)    If, at any time, the Mortgagor materially changes the nature or method of operations on the Mineral Properties, any mine is hereafter closed on the Mineral Properties, there occurs any event (whether natural or due to man) that materially affects the amount, cost, rate or lifespan of recovery of coal or other Minerals from the Mineral Properties, or there is a material change in the price received for the sale of coal or other Minerals produced from the Mineral Properties, upon receiving notice thereof, the Mortgagor shall promptly inform the Mortgagee of such change in operations, events, or change in price.

The Mortgagor hereby acknowledges that it has received a copy of this Mortgage.

IN WITNESS WHEREOF, the Mortgagor has caused this Mortgage to be executed on the date of the acknowledgment below, to be effective as of the day and year first written above.

MORTGAGOR:

**Black Warrior Minerals, Inc.**, an Alabama corporation

By: _____

Name: Rance Perry

Title: President

STATE OF _Alabama_     )

COUNTY OF _Jefferson_     )

    I, the undersigned, a Notary Public in and for said County, in said State, hereby certify that [Rance Perry], whose name as [President] of **Black Warrior Minerals, Inc.**, an Alabama corporation, is signed o the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

    Given under my hand and official seal this _11_ of [August], 2022.

_____
Notary Public

My Commission Expires: _June 12, 2026_

EXHIBIT A

DESCRIPTION OF LAND AND ENCUMBERED LEASES

Leasehold Estate         Legal Description

| | | |
|---|---|---|
| Leasehold 1 | Coal Mining Lease, dated February 20, 2014, between Black Warrior Minerals, Inc. and Jefferson Tree Farms, as renewed, and as recorded by the officer of the Judge of Probate of Jefferson County Instrument #2021132711. | Jefferson County, AL: Township 15 South, Range 3 west. Section 10: W 1/2 of the SW 1/4. Surface rights only. |
| Leasehold 2 | Coal Mining Lease, dated May 30, 2014, between Black Warrior Minerals, Inc., Matthew W. Kennamer, William H. Willis and Mary T. Willis, as renewed, and as recorded by the officer of the Judge of Probate of Jefferson County Instrument #2021132711. | Jefferson County, AL: Township 15 South, Range 3 west. Section 10: E 1/2 of the SW 1/4. Surface rights only. |
| Leasehold 3 | Coal Mining Lease, dated May 21, 2013, between Black Warrior Minerals, Inc., M, LLC and M1, LLC, as renewed, and as recorded by the officer of the Judge of Probate of Jefferson County Instrument #2021132710. | Jefferson County, AL: Township 15 South, Range 3 west. (i) Section 16: NE 1/4 of NE 1/4 and N 1/2 of the SE 1/4 of NE 1/4. Surface rights only; and (ii) Section 15: N 1/2 of NW 1/4, NE 1/4, A part of the N 1/2 of the SE 1/4 lying North of creek. Surface rights only. |
| Leasehold 4 | Coal Mining Lease, dated June 3, 2015, between Black Warrior Minerals, Inc., Kenneth S. Rogers and Eileen Rogers, as renewed, and as recorded by the officer of the Judge of Probate of Jefferson County Instrument #2021132709. | Jefferson County, AL: Section 15 Township 15 South, Range 3 west, All that part of the S 1/2 of the NW 1/4 lying north of unnamed creek. Surface rights only. |

| Leasehold 5 | Coal Mining Lease, dated January 12, 2012, between Black Warrior Minerals, Inc. and Sumlearan, LLC, as renewed by that certain Amendment of Coal Mining Lease, dated January 5, 2019, as recorded by the officer of the Judge of Probate of Jefferson County Instrument #'s 2021132713 and 2021132714. | **Parcel I**<br><br>Tract I:  The South 1/2 of the NE 1/4 of the NE 1/4 of Section 9.  Township 15 South, Range 3 West, Jefferson County, Alabama<br><br>LESS AND EXCEPT that part conveyed to James Ronald Rogers In Instrument #200409-7880 being described as follows:  Commence at the SW corner of the NE 1/4 of the NE 1/4 of Section 9, Township 15 South, Range 3 West.  and run North along the West line thereof for 480.16 feet to the point of beginning of the herein described tract thence from this point of beginning continue along the last, named course for 185.0 feet thence angle right 91 degrees, 20 minutes, 50 seconds for 71.10 feet, thence angle right 88 degrees, 39 minutes, 10 seconds for 185.0 feet thence angle right 91 degrees, 20 minutes, 50 seconds for 71.10 feet to the point of beginning.<br><br>Tract 2:  The NE 1/4 of the SE 1/4 of the NE 1/4 of Section 9.  Township 15 South, Range 3 West, Jefferson County, Alabama<br><br>Tract 3:  The South 1/2 of the SE 1/4 of the NE 1/4 of Section 9.  Township 15 South, Range 3 West, Jefferson County Alabama.<br><br>Tract 4:  The North 1/2 of the SE 1/4 of Section 9, Township 15 South.  Range 3 West, Jefferson County.  Alabama.<br><br>**Parcel II**<br><br>The SW 1/4 of the NE 1/4 of Section 9, Township 15 South, Range 3 West.  Jefferson County, Alabama.<br><br>LESS AND EXCEPT that part conveyed to Michael Stevenson Thomas, Sr. and Michael Stevenson Thomas, Jr. In Inst. No. 200403-673 described as follows:  Begin at the NW corner of the SW 1/4 of the NE 1/4 of Section 9, Township 15 South, Range 3 West |

and run South along the West line of said 1/4 1/4 for 609.23 feet to an existing capped rebar being the SE corner of lot 1, Dogwood Bend, Phase II, recorded In Map Book 188, Page 14; thence turn 113 degrees, 10 minutes. 23 seconds left, Northeasterly along the Northerly right of way of Sardis Road for 57.63 feet to a curve to the left having a central angle of 10 degrees, 00 minutes. 55 seconds and a radius of 1214.85 feet thence run along the arc of said curve for 1.57 feet to a curve to the left having a central angle of 11 degrees, 08 minutes, 08 seconds and a radius of 770.11 feet thence run along the Arc of said curve 149.67 feet thence continue tangent to said curve for 204.18 feet to a curve to the left having a central angle of 8 degrees. 36 minutes, 05 seconds and a radius of 1327.07 feet thence run along the arc if the said curve for 199.22 feet thence continue tangent to said curve for 126.11 feet thence turn 127 degrees, 29 minutes, 05 seconds left. Westerly for a 459.94 feet to a 1 inch solid bar, thence turn 0 degrees 23 minutes, 13 seconds right, for 250.48 feet to the point of beginning.

ALSO LESS AND EXCEPT a triangle 30 feet on each side in the extreme Northeast corner of the SW 1/4 of the NE 1/4

ALSO LESS AND EXCEPT that part conveyed to Cecil and Janice Hatcher described as follows: Begin at the northeast corner of SW ¼ of the NE¼ of Section 9, Township 15 South, Range 3 West and run South along the east line thereof for 434.79 feet; thence angle right 90 degrees, 59 minutes, 45 seconds for 200.40 feet; thence angle right 89 degrees, 00 minutes, 15 seconds for 434.79 feet to the north line of said ¼ ¼ thence angle right 90 degrees, 59 minutes, 45 seconds and run east along the said north line of said ¼ ¼ section for 200.40 feet to the point of beginning.

| | | **Parcel III** |
|---|---|---|
| | | Commence at the Southeast corner of the NW 1/4 of the NE 1/4 of section 9, township 15 south, range 3 west and run north along the east line thereof for 108.42 feet to the point of beginning of the herein described tract; thence from this point of beginning continue along the last named course for 30.29 feet thence angle left 82 degrees, 00 minutes 21 seconds for 31.57 feet thence angle right 34 degrees 42 minutes 03 seconds for 69.54 feet; thence angle left 46 degrees, 15 minutes, for 62.53 feet; thence angle right 32 degrees 06 minutes, 04 seconds for 38.98 feet: thence angle right 43 degrees. 50 minutes. 16 seconds for 88.04 feet thence angle right 22 degrees, 39 minutes, 13 seconds for 151.36 feet to the Southeasterly right of way line of Sardis Road; thence angle left 15 I degrees. 50 minutes, 25 seconds and Southwesterly along the said right of way line for 63.57 feet to the centerline or Rocky Branch: thence In a Southeasterly direction along the said centerline of Rocky Branch for 436.73 feet, more or less, to the point of beginning. |
| | | **Parcel IV** |
| | | The South 1/2 of the SE 1/4 of Section 9, Township 15 South, Range 3 West, Jefferson County. Alabama. |
| Leasehold 6 | Coal Mining Lease, dated April 28, 2011, between Black Warrior Minerals, Inc. and Huddleston Minerals, LLC, as renewed by that certain Amendment of Coal Mining Lease, dated March 31, 2021 and that certain Second Amendment of Coal Mining Lease, dated October 2021, as recorded by the officer of the Judge of Probate of Jefferson County Instrument #'s | Jefferson County, AL: Township 15 South, Range 3 west, Section 9: SE 1/4, containing 160 acres, no more or less. Coal rights only. |

| | | |
|---|---|---|
| | 2021132706, 2021132707 and 2021132706. | |
| Leasehold 7 | North Pratt Coal Preparation Plant Agreement dated May ___, 2022, effective May 11, 2022, between Cane Creek, LLC and Black Warrior Minerals, Inc. [as recorded by the officer of the Judge of Probate of Jefferson County Instrument #'s _____] | PARCEL I: The Southwest 1/4 of the Northeast 1/4 of said Section 30, Township 16 South, Range 4 West, Jefferson County, Alabama.<br><br>PARCEL II: Commence at a 3" capped pipe at the Southeast corner of the Northeast 1/4 of the Southwest 1/4 of said Section 30, Township 16 South, Range 4 West, Jefferson County, Alabama and run Northerly along the East boundary of said Northeast 1/4 of the Southwest 1/4, 293.42 feet to a set 5/8" capped rebar (PERC Eng. 16689) on the Northern right of way of BNSF Railroad and the Point of Beginning; thence continue Northerly along the East boundary thereof, 329.28 feet to n set 5/8" capped rebar (PERC Eng. 16689); thence with a deflection angle of 90°00'00" to the left and run Westerly a distance of 498.00 feet to a set 5/8" capped rebar (PERC Eng. 16689); thence with a deflection angle of 75°00'00" to the left and run Southwesterly, 207.84 feet to a set 5/8" capped rebar (PERC Eng. 16689) on the Northerly right of way of BNSF Railroad; thence with a deflection angle of 91°53'19" to the left and run Southeasterly along said right of way, 566.56 feet to the Point of Beginning.<br><br>PARCEL III: The NW 1/4 of the SE l/4 of Section 30, Township 16 South, Range 4 West, Jefferson County, Alabama.<br><br>PARCEL IV: A strip of land located in the SE 1/4 of the SW 114, SW 114 of the SE 114, SE 1/4 of the SE 1/4, NE 1/4 of the SE 1/4 and the SE 1/4 of the NE 114 of Section 19, Township 16 South, Range 4 West, also located in the SW 114 of the NW 1/4 of Section 20, Township 16 South, Range 4 West, being a |

roadway easement 100.00 feet in width lying 50.00 feet on each side of the following described centerline:

Commence at the Southeast corner of said Section 19, and run North 87°48' 14" West along the South boundary thereof 2936.93 feet to the point of beginning of said centerline; thence North 67°19'13" East, 146.63 feet to the point of beginning of a curve to the right having a radius of 300.00 feet, a delta angle of 15°30'01", a chord bearing of North 75°04'13" East, and 11 chord length of 80,91 feet; thence along the arc of said curve, 81.16 feet to the point of beginning of a curve to the left having a radius of 665.67 feet, a delta angle of 25°05'22", a chord bearing of North 70°16'32" East, and a chord length of 289.17 feet; thence along the arc of said curve, 291.49 feet; thence North 57°43'52" East, 369.63 feet to the point of beginning of a curve to the left having a radius of 267.00 feet, a delta angle of 38°21 '49", a chord bearing of North 38°32 '57" East, and a chord length of 175.46 feet; thence along the arc of said curve, 178.78 feet; thence North 19°22'02" East, 386.80 feet to the point of beginning of a curve to the right having a radius of 130.00 feet, a delta angle of 103°02'22", a chord bearing of North 70°53'13" East, and a chord length of 203.53 feet; thence along the arc of said curve 233,79 feet to the point of beginning of a curve to the left having a radius of 223.85 feet, a delta angle of 61°44'21", a chord bearing of South 88°27'46" East and a chord length of 229.70 feet; thence along the arc of said curve, 241.21 feet; thence North 60°40'03" East, 284.77 feet to the point of beginning of a curve to the left having a radius of 93.50 feet, a delta angle of 37°10'15", a chord bearing of North 42°04'56" East, and a chord length of 59.60 feet; thence along the arc of said curve, 60.66 feet to the point of beginning of a

curve to the right having a radius of 5584.29 feet, a delta angle of 3°46'30", a chord bearing of North 25°23'03" East, and a chord length of 367.85 feet; thence along the arc of said curve, 367.91 feet to tile point of beginning of a curve to the right having a radius of 295.00 feet, a delta angle of 29°57'43", a chord bearing of North 42°15'09" East, and 11 chord length of 152.51 feet; thence along the arc of said curve, 154.27 feet, to the point of beginning of a curve to the left having a radius of 800.00 feet, a delta angle of 29°54'58", a chord bearing of North 42°16'34" East, and a chord length of 412.96 feet; thence along the arc of' said curve, 417.69 feet; thence North 27°19'07" East, 188.67 feet; thence North 27°43'06" East, 252.84 feet to the point of beginning of a curve to the right having a radius of 500.00 feet, a delta angle of 23°10'48", a chord bearing of North 39°18'30" East, and a chord length of 200.91 feet; thence along the arc of said curve, 202.28 feet; thence North 50°53'54" East, 128.73 feet to the point of beginning of a curve to the right having a radius of 425.00 feet, a delta angle of 27°45'26", a chord bearing of North 64°45'37" East and a chord length of 208.89 feet; thence along the arc of a curve, 205.89 feet to a point on the West boundary of Section 20 located North 00°44'32" West, 2697.20 feet from the Southwest corner thereof, said point being the point of beginning of a curve to the right having a radius of 426.00 feet, a delta angle of 11°49'48", a chord bearing of North 84°34'14" East, and a chord length of 87.60 feet; thence along the arc of said curve, 87.75 feet; thence South 89°30'52" East, 354.49 feet to the point of beginning of a curve to the left having a radius of 150.15 feet, a delta angle of 79°58'53", a chord bearing of North 50°29'41" East, and a chord length of 192.99 feet; thence along the arc of said curve, 209.60 feet; thence North 10°30'14" East, 306.15 feet to the point of

beginning of a curve to the right having a radius of 200.00 feet, a delta angle of 37°27'27", a chord bearing of North 29°13'58" East, and a chord length of 128.44 feet; thence along the arc of said curve, 130.75 feet, to the Southwest right of way of County Road 12 and the end of said centerline.

Shorten or extend sidelines to terminate at the property lines.

HAULROAD 2 P

A strip of land In the SW 1/4 of the NW 114 and the SE 1/4 of the NW 114 of Section 20, Township 16 South, Range 4 West, being a roadway easement 100.00 feet in width lying 50.00 feet on each side of the following described centerline: Commence at the Southwest corner of said Section 20 and run North 00°44'3211 West along the West boundary thereof 2911.01 feet; thence North 89°15'28" East, 610.77 feet to the point of beginning of said centerline and the point of beginning of a non-tangent curve to the right having a radius of 113.72 feet, a delta angle of 92°11'13", a chord bearing of North 56°35'51" East, and a chord length of 163.85 feet; thence along the arc of said curve, 182.97 feet; thence South 77°18'33" East, 130.75 feet to the point of beginning of a curve to the right having a radius of 499.38 feet, a delta angle of 14°07'29", a chord bearing of South 70°14'48" East, and a chord length of 122.80 feet; thence along the arc of said curve, 123.11 feet; thence South 63°11'04" East, 459,65 feet; thence South 67°15156" East, 94.37 feet to the Southwest right of way of County Road 12 and the end of said centerline.

Shorten or extend sidelines to terminate at the property lines.

HAULROAD 3 P

A strip of land located in the SE 1/4 of the SE 1/4 and the NE 114 of the SE 1/4 of Section 19, Township 16 South, Range 4 West, being a roadway easement 100.00 feet in width lying 50.00 feet on each side of the following described centerline:

Commence at the Southeast corner of said Section 19, and run North 87°48'14" West along the South boundary thereof 509.83 feet to the point of beginning of said centerline and the point of beginning of a non-tangent curve to the right having a radius of 841.00 feet, a delta angle of 23°58'18", a chord bearing of North 13°21 '35" East and a chord length of 349,30 feet; thence along the arc of said curve, 351.86 feet; thence North 25°20'44" East, 389.02 feet to the point of beginning of a curve to the left having a radius of 100.00 feet, a delta angle of 37°16'33", a chord bearing of North 06°42'28" East and a chord length of 63.92 feet; thence along the arc of said curve, 65.06 feet North 11°55'4911 West, 507.96 feet to the point of beginning of a curve to the right having a radius of 500.00 feet, a delta angle of 14°23'00", a chord bearing of North 04°44'1911 West, and a chord length of 125.19 feet; thence along the arc of said curve, 125.52 feet, to the point of beginning of a curve to the left having a radius of 500.00 feet, a delta angle of l7°11'27", a chord bearing of North 06°08'32"  West, and a chord length of 149.46 feet; thence along the arc of said curve, 150.02 feet; thence North 14°44'15" West, 167.21 feet to the point of beginning of a curve to the left having a radius of 175.00 feet, a delta angle of 37°01'53", a chord bearing of North 33°15'12" West, and a chord length of 111.15 feet; thence along the arc of said curve, 113.11 feet to the point of beginning of a curve to the right having a radius of 280.00 feet, a delta angle of 79°29'14", a chord bearing of North 12°01 '31" West and a chord length of 358.04 feet; thence along

|  |  | the arc of said curve, 388.45 feet to the end of said centerline.

Shorten or extend to terminate at the property lines.


Situated in Jefferson County, Alabama, Birmingham Division. |
|--|--|--|

EXHIBIT B

LEASEHOLD MORTGAGE PROVISIONS

Notwithstanding anything contained herein to the contrary, and in addition to any rights, privileges and remedies granted to the Mortgagee elsewhere in this Mortgage, the Mortgagee shall have, and the Mortgagor hereby grants to the Mortgagee, any and all rights, privileges and remedies of the Leasehold provided for in the Subject Leases (including without limitation, any renewal rights and options to purchase contained in the Subject Leases) without the necessity of particularly specifying any or all of such rights, privileges and remedies that are or could be granted to leasehold mortgagees pursuant to the Subject Leases.

The Mortgagor hereby represents, covenants and agrees that:

(a)     Each Subject Lease is a valid and subsisting lease for the term therein set forth, is in full force and effect in accordance with the terms thereof, has not been modified except as expressly set forth herein and Mortgagor is the holder of lessee's or tenant's interest thereunder. No material default exists, and to the best knowledge of Mortgagor, no event or act has occurred and no condition exists which with the passage of time or the giving of notice or both would constitute a default, under any Subject Lease.

(b)     This Mortgage is lawfully executed and delivered in conformity with each Subject Lease and any and all consents required therefor under each Subject Lease have been timely received and are effective.

(c)     The Mortgagor will pay when due the rents, taxes and other sums and charges mentioned in and made payable by the Mortgagor under each Subject Lease.

(d)     The Mortgagor will promptly, in all material respects, perform and observe all of the terms, covenants and conditions required to be performed and observed by it under each Subject Lease, within the periods (including any grace or cure periods) provided therein, and will do all things reasonably necessary to preserve and to keep unimpaired its rights under each Subject Lease.  In the event of the failure of the Mortgagor to make any payment required to be made by the Mortgagor pursuant to the provisions of any Subject Lease or to observe, abide by, discharge or perform, or cause to be observed, kept, discharged or performed, any of the terms, obligations, covenants, conditions, agreements, indemnities, representations, warranties or liabilities of such Subject Lease on the part of the Mortgagor thereunder to be observed, kept, discharged and performed, the Mortgagor does hereby irrevocably appoint and constitute the Mortgagee as its true and lawful attorney in fact, which appointment is irrevocable and coupled with an interest, in its name, place and stead, to take any and all actions deemed necessary or desirable by the Mortgagee to perform and comply with all of the obligations of the Mortgagor under such Subject Lease, to do and take, but without any obligation so to do, any action which the Mortgagee deems necessary or desirable to prevent or cure any default by the Mortgagor under such Subject Lease, to enter into and upon the Mortgaged Property or any part thereof to such extent and as often as the Mortgagee, in its reasonable discretion, deems necessary or desirable in order to prevent or cure any default of the Mortgagor pursuant thereto, to the end that the rights of the Mortgagor in and to the Leasehold created by such Subject Lease shall be kept unimpaired and free from default, and

all sums so expended by the Mortgagee, with interest thereon at the interest rate set forth in the Convertible Note from the date of each such expenditure, shall be paid by the Mortgagor to the Mortgagee promptly upon demand by the Mortgagee and shall be added to the indebtedness secured hereby and the Mortgagee shall have, in addition to any other remedy of the Mortgagee, the same rights and remedies in the event of non-payment of any such sum by the Mortgagor as in the case of a default by the Mortgagor in the payment of any sums due under the Transaction Documents. The Mortgagor shall, within five (5) days after written request by the Mortgagee, execute and deliver to the Mortgagee, or to any person designated by the Mortgagee, such further instruments, agreements, powers, assignments, conveyances or the like as may be necessary to complete or perfect the interest, rights or powers of the Mortgagee pursuant hereto.

(e)    The Mortgagor will promptly (i) notify the Mortgagee in writing of the receipt by it of any notice of default from the lessor under any Subject Lease; (ii) notify the Mortgagee in writing of the receipt by it of any notice under any Subject Lease of the termination of any Subject Lease; (iii) cause a copy of each such notice received by the Mortgagor from the lessor under any Subject Lease to be delivered to the Mortgagee; and (iv) cause a copy of any notice of election or the exercise of any rights of option, purchase or renewal under any Subject Lease sent by the Mortgagor to the lessor under such Subject Lease, to be delivered to the Mortgagee.

(f)    The Mortgagor will not, without the prior written consent of the Mortgagee, terminate or surrender or suffer or permit any termination or surrender of any Subject Lease, nor modify any Subject Lease, if the modification shall materially impair the Mortgagee's security interest in the Mortgaged Property or the rights and remedies of the Mortgagee under this Mortgage.

(g)    The Mortgagor will, within twenty (20) days after written demand from the Mortgagee, use reasonable efforts to obtain from the lessor under any Subject Lease and deliver to the Mortgagee an estoppel certificate in the form provided for in such Subject Lease or if none is provided, in a form provided by the Mortgagee.

(h)    The Mortgagor will furnish to the Mortgagee upon demand, proof of payment of all items which are required to be paid by the Mortgagor pursuant to any Subject Lease and a statement of any such payments which the Mortgagor is contesting or arbitrating pursuant to the terms of such Subject Lease.

(i)    Except as otherwise provided in any Subject Lease, the Mortgagor will not consent to the subordination of any Subject Lease to any lien on the fee estate of the lessor under such Subject Lease.

(j)    So long as any of the Obligations shall remain outstanding, and if an Event of Default has occurred and is continuing, the Mortgagor shall not fail to exercise any option or right to renew or extend the term of any Subject Lease without the prior written consent of the Mortgagee. The Mortgagor shall give the Mortgagee simultaneous written notice of the exercise of any such option or right to renew or extend, together with a copy of the instrument given to the lessor under such Subject Lease exercising such option or right, and thereafter, shall promptly deliver to the Mortgagee a copy of any acknowledgment by such lessor with respect to the exercise of such option or right. If any such option or right has not been exercised as aforesaid, then, not

more than three hundred sixty (360) and not less than two hundred seventy (270) days before the right of the Mortgagor to exercise any such option or right, the Mortgagor shall give the Mortgagee written notice specifying (i) the date on which, (ii) the term for which and (iii) the manner in which such option or renewal is to be exercised. If an Event of Default has occurred and is continuing, within ten (10) Business Days of written demand by the Mortgagee, the Mortgagor shall exercise any such option or renewal which is necessary to extend the term of any Subject Lease beyond the outside maturity date set forth in the Transaction Documents.

(k)     Upon the occurrence and during the continuance of any Event of Default, all options, election, consents and approval rights conferred upon Mortgagor as lessee under each Subject Lease, together with the right of termination, cancelation, modification, change, supplement, alteration or amendment of each Subject Lease, all of which have been assigned for collateral purposes to Mortgagee, shall automatically vest exclusively in and be exercisable solely by Mortgagee.

(l)     So long as this Mortgage is in effect, there shall be no merger of any Subject Lease or any interest therein, or of the leasehold estate created thereby, with the fee estate in the Land or any portion thereof by reason of the fact that such Subject Lease or such interest therein may be held directly or indirectly by or for the account of any person who shall hold the lessor's fee estate in the Land or any portion thereof or any interest of the lessor under such Subject Lease. In case the Mortgagor acquires fee title to the Land, this Mortgage shall attach to and cover and be a Lien upon the fee title so acquired, and such fee title shall, without further assignment, mortgage or conveyance, become and be subject to the Lien of and covered by this Mortgage, and the Lien of this Mortgage shall be prior to the Lien of any mortgage placed on the acquired fee estate after the date of this Mortgage. Mortgagor shall notify Mortgagee of any such acquisition and, on written request by Mortgagee, shall cause to be executed and recorded all such other and further assurances or other instruments in writing as may in the reasonable opinion of Mortgagee be necessary or appropriate to effect the intent and meaning hereof and shall deliver to Mortgagee an endorsement to Mortgagee's loan title insurance policy insuring that such fee title or other estate is subject to the Lien of this Mortgage.

(m)     If any Subject Lease shall be terminated prior to the natural expiration of its terms, and if, pursuant to any provision of any Subject Lease or otherwise, Mortgagee or its designee shall acquire from the lessor under such Subject Lease a new lease of the Land or any part thereof, Mortgagor shall have no right, title or interest in or to such new lease or the leasehold estate created thereby, or renewal privileges therein contained.

(n)     The Lien of this Mortgage shall attach to all of Mortgagor's rights and remedies at any time arising under or pursuant to Section 365(h) of the Bankruptcy Code, including all of Mortgagor's rights to remain in possession of the Land. Mortgagor shall not, without Mortgagee's prior written consent, elect to treat any Subject Lease as terminated under Section 365(h)(l)(A)(i) of the Bankruptcy Code. Any such election made without Mortgagee's consent shall be void.

(o)     Mortgagor hereby unconditionally assigns, transfers and sets over to Mortgagee all of Mortgagor's claims and rights to the payment of damages arising from any rejection of any Subject Lease by the lessor or any other fee owner of any leasehold parcel or any portion thereof

under the Bankruptcy Code. Mortgagee shall have the right, if an Event of Default shall have occurred and be continuing or if Mortgagor fails to do so at least five (5) Business Days prior to the last day on which Mortgagor has the right to do so, to proceed in its own name or in the name of Mortgagor in respect of any claim, suit, action or proceeding relating to the rejection of any Subject Lease by the lessor or any other party, including the right to file and prosecute under the Bankruptcy Code, without joining or the joinder of Mortgagor, any proofs of claim, complaints, motions, applications, notices and other documents. Any amounts received by Mortgagee as damages arising out of the rejection of any Subject Lease as aforesaid shall be applied first to all costs and expenses of Mortgagee (including, without limitation, reasonable attorneys' fees) incurred in connection with the exercise of any of its rights or remedies under this paragraph and thereafter in accordance with Section 4.4 hereof. Mortgagor acknowledges that the assignment of all claims and rights to the payment of damages from the rejection of any Subject Lease made under this Mortgage constitutes a present irreversible and unconditional assignment and Mortgagor shall, at the request of Mortgagee, promptly deliver, in form and substance satisfactory to Mortgagee, a UCC Financing Statement in connection with such assignment, and Mortgagor authorizes Mortgagee to file such UCC Financing Statement and any amendments or modifications thereto. Mortgagor shall, at the request of Mortgagee, make, execute, acknowledge, and deliver, in form and substance satisfactory to Mortgagee, all such additional instruments, agreements and other documents, as may at any time hereafter be required by Mortgagee to carry out such assignment.

(p)     If pursuant to Section 365(h)(l)(B) of the Bankruptcy Code, Mortgagor shall seek to offset against the rent reserved in any Subject Lease the amount of any damages caused by the nonperformance by the lessor or any other party of any of their respective obligations under such Subject Lease after the rejection by the lessor or such other party of such Subject Lease under the Bankruptcy Code, then Mortgagor shall, prior to effecting such offset, notify Mortgagee of its intent to do so, setting forth the amount proposed to be so offset and the basis therefor. In such event, Mortgagee shall have the right to object to all or any part of such offset that, in the reasonable judgment of Mortgagee, would constitute a breach of such Subject Lease, and in the event of such objection, Mortgagor shall not effect any offset of the amounts found objectionable by Mortgagee. Neither Mortgagee's failure to object as aforesaid nor any objection relating to such offset shall constitute an approval of any such offset by Mortgagee.

(q)     Mortgagor shall, after obtaining knowledge thereof, promptly notify Mortgagee of any filing by or against the lessor or other party with an interest in the Land of a petition under the Bankruptcy Code. Mortgagor shall promptly deliver to Mortgagee, following receipt, copies of any and all notices, summonses, pleadings, applications and other documents received by Mortgagor in connection with any such petition and any proceedings relating thereto.

(r)     If there shall be filed by or against Mortgagor a petition under the Bankruptcy Code and Mortgagor, as lessee under any Subject Lease, shall determine to reject such Subject Lease pursuant to Section 365(a) of the Bankruptcy Code, then Mortgagor shall give Mortgagee not less than twenty (20) days' prior notice of the date on which Mortgagor shall apply to the Bankruptcy Court for authority to reject such Subject Lease. Mortgagor shall not reject such Subject Lease without the prior written consent of Mortgagee.

EXHIBIT C

PERMITS

ALABAMA SURFACE MINING COMMISSION

(ASMC) MINING LICENSE L-0698

ALABAMA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT (ADEM)-NPDES PERMITS:

ADEM - License Number AL0079707 Permit Numbers P-3987 and P-3950

## EXHIBIT D

### FEE OWNER OF LAND UNDERLYING SUBJECT LEASES

Leasehold Estate        Fee Owner

| Leasehold 1 | Coal Mining Lease, dated February 20, 2014, between Black Warrior Minerals, Inc. and Jefferson Tree Farms, as renewed. | Jefferson Tree Farms |
|---|---|---|
| Leasehold 2 | Coal Mining Lease, dated May 30, 2014, between Black Warrior Minerals, Inc., Matthew W. Kennamer, William H. Willis and Mary T. Willis, as renewed. | Matthew W. Kennamer, William H. Willis and Mary T. Willis |
| Leasehold 3 | Coal Mining Lease, dated May 21, 2013, between Black Warrior Minerals, Inc., M, LLC and M1, LLC, as renewed. | M, LLC and M1, LLC |
| Leasehold 4 | Coal Mining Lease, dated June 3, 2015, between Black Warrior Minerals, Inc., Kenneth S. Rogers and Eileen Rogers, as renewed. | Kenneth S. Rogers and Eileen Rogers |
| Leasehold 5 | Coal Mining Lease, dated January 12, 2012, between Black Warrior Minerals, Inc. and Sumlearan, LLC, as renewed. | Sumlearan, LLC |
| Leasehold 6 | Coal Mining Lease, dated April 28, 2011, between Black Warrior Minerals, Inc. and Huddleston Minerals, LLC, as renewed. | Huddleston Minerals, LLC |
| Leasehold 7 | North Pratt Coal Preparation Plant Agreement dated May ___, 2022, effective May 11, 2022, between Cane Creek, LLC and Black Warrior Minerals, Inc. | Cane Creek, LLC |