**Exhibit 10**
**RECORDED New Elk Deed of Trust to Public Trustee, Mortgage, Security**
**Agreement, Assignment of Production and Filing**

202200765013
Filed for Record in LAS ANIMAS, CO
Patricia M. Vigil, COUNTY RECORDER
8/22/2022 3:27 PM
DEED O TRUS                        $278.00
Doc Fees                           $0.00
Book 1185 Page(s) 1796-1849

## DEED OF TRUST TO PUBLIC TRUSTEE,
## MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF PRODUCTION AND
## PROCEEDS, FINANCING STATEMENT AND FIXTURE FILING

FROM

### NEW ELK COAL COMPANY LLC, AS DEBTOR TO

THE PUBLIC TRUSTEE OF LAS ANIMAS COUNTY, COLORADO

AND TO AND FOR THE BENEFIT OF

### COLLINS ST COVERTIBLE NOTES PTY LTD ACN 657 773 754, AS TRUSTEE FOR THE
### COLLINS ST COVERTIBLE NOTES FUND ABN 30 216 289 383,
AS SECURED PARTY
DATED AS OF AUGUST 11, 2022

THIS INSTRUMENT CONTAINS AFTER-ACQUIRED PROPERTY PROVISIONS.

EXHIBIT A CONTAINS A LEGAL DESCRIPTION OF THE REAL ESTATE CONCERNED. DEBTOR HAS AN INTEREST OF RECORD IN THE REAL ESTATE. SOME OF THE PERSONAL PROPERTY CONSTITUTING A PORTION OF THE COLLATERAL IS OR IS TO BECOME FIXTURES RELATED TO THE REAL ESTATE. THIS INSTRUMENT COVERS FIXTURES.

A POWER OF SALE HAS BEEN GRANTED IN THIS INSTRUMENT.

THIS INSTRUMENT IS TO BE RECORDED IN THE REAL ESTATE RECORDS OF THE COUNTY RECORDER IN EACH COUNTY WHERE THE REAL ESTATE IS LOCATED AND SUCH FILING SHALL SERVE, AMONG OTHER PURPOSES, AS A FIXTURE FILING AND AS A FINANCING STATEMENT COVERING AS-EXTRACTED COLLATERAL.

THIS INSTRUMENT COVERS FIXTURES AND AS-EXTRACTED COLLATERAL PRODUCED FROM OR RELATED TO THE REAL ESTATE INCLUDING COAL OR OTHER SUBSTANCES OF VALUE THAT MAY BE EXTRACTED FROM THE COAL, AND ALL PRODUCTS PROCESSED OR OBTAINED THEREFROM, AND ALL PROCEEDS THEREOF, AND THE ACCOUNTS RELATING THERETO, INCLUDING ACCOUNTS RESULTING FROM THE SALE THEREOF AT THE MINEHEAD.

# DEED OF TRUST TO PUBLIC TRUSTEE,
## MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF PRODUCTION AND PROCEEDS, FINANCING STATEMENT AND FIXTURE FILING

This Deed of Trust to Public Trustee, Mortgage, Security Agreement, Assignment of Production and Proceeds, Financing Statement and Fixture Filing (this **"Instrument"),** dated as of August 11, 2022, is from **NEW ELK COAL COMPANY LLC,** a Colorado limited liability company **("Debtor"),** with an address of 12250 State Highway 12, Weston, Colorado 81091, to the **Public Trustee of Las Animas County, Colorado ("Trustee"),** to and for the benefit of **Collins St Convertible Notes Pty Ltd ACN 657 773 754, as trustee for The Collins St Convertible Notes Fund ABN 30 216 289 383, ("Secured Party")** for itself, with an address of 365 Little Collins Street, Melbourne VIC 3000. This Instrument is executed in connection with that certain Convertible Note Agreement, entered into by Allegiance Coal USA Limited, a Delaware corporation, Allegiance Coal Limited, an Australia corporation, both of which entities are affiliates of Debtor **(collectively, "Borrower"),** and Secured Party, as lender, on May 24, 2022 **(as same may be amended, modified or otherwise supplemented from time to time, the "Convertible Note").** In order to secure the full and punctual payment and performance of the Obligations (as hereafter defined), Debtor has agreed to execute and deliver this Instrument and to grant, bargain, sell, transfer, assign and convey to Trustee, in trust for the use and benefit of Secured Party and with power of sale, and to grant a continuing security interest in and to, the Collateral. Capitalized terms used herein but not defined herein shall have the meanings specified in the Convertible Note.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtor agrees as follows:

## COLLATERAL

All of the property described in paragraphs 1 through 7 below is herein collectively called the **"Collateral":**

 1. <u>Mine</u>. All right, title and interest of Debtor in and to the mine and related processing, loading, storage, transportation and other facilities commonly referred to as the New Elk Mine, located in Las Animas County, Colorado, and any and all other mines and facilities now or hereafter located in, on or under the Lands, as defined below (such mines and facilities are herein individually and collectively referred to as the **"Mine"),** and all property, interests and rights associated therewith or related thereto which Debtor owns or in which Debtor holds a leasehold or other contractual interest, including the following (whether now owned or hereafter acquired by operation of law or otherwise, and whether now or hereafter existing or created):

  (a) The entire fee simple estate in and to lands in Las Animas County, Colorado that are described in Part 1 of <u>Exhibit A</u> and all interests therein (but excluding any interest in such lands that is specifically excluded or identified as not being owned by Debtor or otherwise limited as set forth in <u>Exhibit A</u>) (collectively, the **"Fee Lands"):**

  (b) The entire leasehold estate in and to or created by the leases described in Part II of <u>Exhibit A</u> (the **"Mineral Leases"**) covering or relating to all or any portion of the

lands described either in Part II of <u>Exhibit A</u> or in the Mineral Leases (collectively, the ***"Mineral Leasehold Lands"***); together with any and all other right, title and interest of Debtor of whatever kind or character in, to and under or that covers, affects or otherwise relates to the Mineral Leasehold Lands or the Mineral Leases;

(c)     Debtor's interest in the contract described in Part III of <u>Exhibit A</u> (the *"Other Real Property Lease"*, and collectively with the Mineral Leases, the *"Leases"*) covering or relating to all or any portion of the lands described either in Part III of <u>Exhibit A</u> or in the Other Real Property Lease (collectively, the *"Other Leasehold Lands"*; the term *"Lands"* as used herein means collectively the Fee Lands, the Mineral Leasehold Lands and the Other Leasehold Lands), together with any and all other right, title and interest of Debtor of whatever kind or character in, to and under or that covers, affects or otherwise relates to the Other Leasehold Lands or the Other Real Property Leases;

(d)     Any and all coal or other substances of value that may be extracted from the coal and all minerals other than coal, whether or not similar to coal, which are found and necessarily produced in association with coal, all existing and future ores, minerals, mineral elements and compounds, veins, lodes and mineral deposits; whether solid, liquid or gaseous; whether organic or inorganic, metallic or nonmetallic, oil and gas, hydrocarbonaceous or non-hydrocarbonaceous; including rock, gravel, sand, methane, water, and geothermal steam, geothermal heat and geothermal resources (but excluding, with respect to particular portions of the Lands, those minerals specifically excluded from such portions as specified on <u>Exhibit A</u> or identified as Lands in which Debtor has no interest in the minerals or otherwise limited as set forth in <u>Exhibit A</u>) located in, on, under or produced from the Lands or pursuant to the Mineral Leases (the ***"Minerals"***);

(e)     Any and all tangible property, whether real, personal or mixed (whether now owned or hereafter acquired by operation of law or otherwise) located or found on, in or under or used in connection with all or any part of the Mine or the Lands or any other lands, any production from which, or profits or proceeds from such production, is attributed to any interest in the Lands or in the Mine or to any interest of the Debtor therein described in <u>Exhibit A</u> held for the following purposes: (i) exploration for and evaluation of deposits of Minerals, (ii) the development, operation, shutdown and closure (temporary and permanent) of a mine (whether an underground or a surface mine), (iii) handling, processing, refining and beneficiation of Minerals, including crushing, screening, non screen classifying, (iv) storage of Minerals, (v) transportation of Minerals by any means, including haulage within a mine and from a mine to a mill or to any other handling, processing, beneficiation, storage or marketing location, haulage between any of the foregoing locations, haulage of mine waste (including waste rock and overburden) and tailings, slag and other wastes resulting from handling, processing, and beneficiation and loading in connection with any haulage, (vi) marketing, and readying for market, Minerals, (vii) disposal (temporary and permanent) of mine waste (including waste rock and overburden) and tailings, slag and other wastes from handling, processing and

beneficiation, (viii) monitoring, maintaining, restoring and improving environmental quality, including elimination, treatment and mitigation of air and water pollution, and (ix) reclamation of lands and other natural resources affected by any of the foregoing activities, and, without limiting the foregoing, including generally, buildings; structures; improvements; furnishings; fixtures; equipment; apparatus; facilities; machinery; tools; vehicles; goods; supplies and inventory; and specifically, any wash plant or other facility for washing coal; headframes; Mine offices; maintenance and equipment repair shops; carpentry; tool and electrical shops; parts and supplies warehouses; change houses; laboratory and assay facilities; ore bins; air compressors; electrical generators and buildings for same; dynamos; staff, workers' and families' living and eating facilities; ventilation shafts and ducts; fans; refrigeration units; underground workings (including injection wells and recovery wells; adits; shafts; tunnels; crosscuts; laterals; drifts; raises; winzes; stopes; longwalls; and other openings to ore); pump rooms; underground hoist rooms; level stations; underground equipment and machinery storage and repair areas; escape shafts; ore storage areas; storehouses; hoist houses; drums; controls; and motors; wire rope for hoists; ore skips and man cars; timber; roof supports; track (including branch; cut off; spur; industrial; switch; connecting; storage; yard; terminal and other railroad tracks); roads and haulage ways; conveyor belts; electrical wire; apparatus; and controls (including transformers and switch boxes); pipe; water and fuel supply tanks, pumps and pipelines; rolling stock; including locomotives and cars; Mine vehicles; drills and related equipment; explosives and explosives storage facilities; continuous miner machines; mucking equipment; loaders and loading equipment; tipples; dewatering facilities; including pumps; sewage facilities; waste water treatment and disposal facilities; wells for the extraction or injection of water, or for the monitoring of water quality or supply; ditches; water drainage courses; dams; and silt ponds; telephones and other communications equipment; pipelines (including slurry and pneumatic pipelines); tractors; scrapers; power shovels; backhoes; bucket wheel excavators; draglines; dredges; haulage and water and maintenance trucks; inclined skips; graders; electrical power lines; port facilities; loading docks; tramways and aerial trams; recreation facilities; company townsite and buildings; mill or processing plants; sluices; wells; augers; overburden; waste rock or spoil; and other Mine wastes; load haul dump vehicles; conveyors (including screw and bucket conveyors); crushers (including jaw crushers; gyratory crushers; wire crushers; impact crushers; roll crushers; hammer mills; shredders and roller mills); screens (including grizzlies); grinding mills (including ball mills; rod mills; autogenous mills and semi autogenous mills); flotation circuits (including flotation cells; collection troughs and launders and flumes); washers (including hydrocyclones); gravity separation devices (including jigs; sluices; shaking tables; cones; spirals; vanners and heavy liquids); magnets; leaching circuits; thickening tanks; filters (including drum; disk; belt; and plate filters); driers; kilns; smelting furnaces (including reverberatory furnaces and flash smelters); converters; slag; tailings and tailings ponds, and any and all other surface or subsurface machinery, equipment, facilities, supplies or other property of whatsoever kind or nature now or hereafter located on, in or under or used in connection with any of the Lands or the Mine which are used or useful for the production, processing, preparation,

storage or transportation of Minerals, including all items of personal property or fixtures comprising all or part of the Mine (the *"Operating Equipment and Facilities")*;

(f)     Any and all agreements, equipment leases, assignments, options, licenses, concessions, profits a prendre, work agreements, joint venture agreements, partnerships (including mining partnerships), exploration agreements, operating agreements, surface use agreements and surface use and damage agreements, subsidence agreements, easements, net profits agreements, royalty agreements, nominee agreements, options, and all other conveyances, transfers, agreements or arrangements (whether mineral or otherwise, whether previously or hereafter made, and whether now or hereafter existing or created) relating to all or any part of the Lands or to any other lands any production from which, or profits or proceeds from such production is attributed to any interest in the Lands or the Mine or to any interest described in <u>Exhibit A</u> including the agreements described in Part IV of <u>Exhibit A</u> (subject to the limitations and conditions described in Part IV of <u>Exhibit A)</u>, together with all rentals, royalties and other rights of each Debtor thereunder (collectively, the *"Related Agreements")*;

(g)     Any and all contracts heretofore or hereafter entered into by Debtor, or which have been or hereafter are assigned to Debtor, for the marketing, sale, purchase, exchange, supply, handling, processing, refining, beneficiation, marketing or transportation of Minerals, or for the provision of services in connection therewith, which Minerals are produced at least in part from all or any part of the Lands or the Mine or from any other lands any production from which, or profits or proceeds from such production, is attributable to any interest in the Lands or the Mine or to any interest described in <u>Exhibit A</u>, including the agreements described in Part V of <u>Exhibit A</u> (collectively, *"Production Sale and Marketing Contracts")*;

(h)     Any and all governmental authorizations, approvals, permits, variances, land use entitlements, consents, licenses, franchises and agreements now or hereafter required for all stages of developing, operating and closing the Mine or any part of the Lands (or any other lands any production from which, or profits or proceeds from such production, is attributed to any interest in the Lands, the Mine or to any interest described in <u>Exhibit A)</u>, including construction of a mine and related improvements and all other activities described or referred to above or herein;

(i)     Any and all contracts and agreements between or among Debtor and any contractor, architect or engineer in connection with the design, construction or operation of any of the Lands or the Mine, including any contract or agreement executed by Debtor and any landscape architect, civil engineer, electrical engineer, soils engineer, mining engineer, mechanical engineer or other engineer, together with all plans and specifications prepared by any design architect for the construction of any improvements comprising any part of the Mine (the *"Plans")*;

(j)      Any and all other contracts, contract rights, title instruments, title opinions, land status reports, title abstracts, title materials and information, files, records, writings, data bases, information, systems, maps, plats, surveys, geological and geophysical (including electrical electromagnetic, gravity, and seismic), geochemical, and radiometric data and information, drilling data, test data, mineral samples (including drill cores), mineral assay reports, interpretative and analytical reports of any kind or nature (including reserve or deposit studies or evaluations), mine feasibility reports, mine development studies and plans, information concerning exploration and development of deposits of Minerals (including information concerning mine operation, shutdown, and closure and concerning reclamation of lands and other resources affected by mining), environmental data and related information and reports and studies, computer hardware and software and all documentation therefor or relating thereto (including all licenses relating to or covering such computer hardware, software or documentation), trade secrets, business names, trademarks, service marks and the goodwill of the business relating thereto, patented and unpatented inventions, copyrights, lease records (including rental and royalty payment records), the Permits and records and information concerning compliance with the Permits, mine development programs and budgets, financial statements and audits, reclamation plans and related data and reports, insurance policies, information and data and reports regarding the products and proceeds of mine operations (including quantities produced, proceeds from sale or other disposition, and disbursement of proceeds to persons entitled to a share thereof), information and data and reports relating to or associated with all aspects of all or any portion of the Mine and all of any Debtor's rights and interests therein, whether owned, licensed or otherwise (the *"Records and Data"*);

(k)      All water and water rights, including all rights to divert, appropriate or use water, all ditches and all ditch rights, dikes, embankments, dams, tanks, structures, diversions, laterals, headgates, pumps, pipes, reservoirs and reservoir rights and all other water development, storage or conservation facilities, all rights, shares, contracts or allotments of water in facilities owned by the United States, ditch and reservoir companies, conservancy districts, irrigation districts, conservation districts, or other water distribution organizations, and all shares of stock or other instruments evidencing a right to such water; all rights to water not derived from state Law; all water rights claimed under contract, exchange, changes of water rights, or plans for augmentation; all water wells and well rights, and springs and spring rights, all state water filings, well registration statements, well permits, permits to appropriate water and certificates of water rights, all entitlements to water and water rights arising by virtue of any covenants, conditions and restrictions relating to or burdening the Mine or the Lands as the same may be amended or restated; all rights pursuant to Colorado Law in and to all groundwater, whether considered to be tributary or nontributary, underlying, historically used or benefiting the Mine or the Lands, including, without limitation, the exclusive right to take, appropriate, produce, use, and otherwise dispose of said groundwater and including the right to reuse and otherwise dispose of sewage effluent or other return flows attributable to the use of said groundwater, relating to, on or for the benefit of the Mine or the Lands whether said rights be adjudicated, unadjudicated or subsequently decreed or adjudicated and all of the water, sanitary and

storm sewer systems now or hereafter owned by Debtor which are now or hereafter located by, over, and/or upon the Mine or the Lands or any part and parcel thereof, including but not limited to, all water mains, service laterals, manholes, vaults, hydrants, valves, lifting pumps and other appurtenances or apparatus; and including but not limited to the entire leasehold estate in and to or created by the lease described in Part VI of Exhibit A (the *"Water Rights Lease");* (all collectively the *"Water Rights");*

(l)      Any and all accounts, contract rights and general intangibles now or hereafter arising in connection with the production, treatment, storage, gathering, transportation, handling, processing, manufacturing, sale or marketing of Minerals produced from or allocated or attributed to any of the estates, property, interests or rights described or referred to above or herein arising out of the sale at the wellhead or Minehead or any other interest of any Debtor in, to or under or that covers, affects or otherwise relates to the Lands or the Mine or to any of the estates, property, interests or rights described or referred to above or herein and all other accounts, contract rights and general intangibles now or hereafter arising in connection with the estates, property, interests or rights described or referred to above or herein; and

(m)      Any and all Minerals extracted or produced from or allocated or attributed to any of the estates, property, interests or rights described or referred to above or herein or any other interest of Debtor in, to and under or that covers, affects or otherwise relates to the Lands or the Mine or to any of the estates, property, interests or rights described or referred to above or herein;

2.      Personalty. All accounts, as-extracted collateral, equipment, fixtures, inventory, general intangibles and any and all other personal/movable property of any kind or character constituting a part of, relating to or arising out of those portions of the Collateral which are described in paragraph 1 above, whether now owned or hereinafter acquired, and all proceeds and products of all such portions of the Lands, including, without limitation, all of Debtor's interest, to the extent assignable, in any (present or future) contracts (including contracts for the sale or exchange of all or any portion of the Lands or Operating Equipment and Facilities), franchises, licenses and permits whether executed, granted or issued by a private person or entity or a governmental or quasi-governmental agency, which are related to or connected with the development or sale of the Lands or Operating Equipment and Facilities, whether now or at any time hereafter existing, and all amendments and supplements thereto and renewals and extensions thereof at any time made, and all rebates, refunds, escrow accounts and funds, or deposits and all other sums due or to become due under and pursuant thereto and all powers, privileges, options and Debtor's other benefits thereunder.

3.      Revenues. Any and all other rights, titles, estates, and interests now owned or hereafter acquired by Debtor in and to all reversions, remainder, tolls, rents, revenues, issues, proceeds, earnings, income, and profits from the Lands, including any and all present and future rights of Debtor (including all rights to receive payments, including lease bonuses, rents, tolls, incomes, royalties, disposal fees, injection fees and withdrawal fees) under or by virtue of all

present and future operating agreements, contracts for the purchase, exchange, processing, transportation or sale of Minerals, and other contracts and agreements relating in any way to all or any part of the Collateral, as the same may be amended or supplemented from time to time.

4.  Renewals and Remainders. All renewals, extensions and restatements of, modifications, changes, amendments and supplements to, and substitutions for the estates, property, interests and rights described or referred to in paragraphs 1 through 3 above, and all additions and accessions thereto.

5.  Appurtenances. All of the rights, privileges, benefits, hereditaments and appurtenances in any way belonging, incidental or appertaining to the estates, property, interests and rights described or referred to in paragraphs 1 through 3 above.

6.  After-acquired Property. All estate, right, title and interest acquired by Debtor in or to the Collateral after execution of this Instrument.

7.  Other Interests; Proceeds. All other estates, easements, interests, licenses, rights, titles, powers or privileges of every kind and character which Debtor now has, or at any time hereafter acquires, in and to any of the foregoing, and all proceeds of or arising from the properties, rights, assets, titles and interests referred to in paragraphs 1 through 4 above, including, without limitation, the proceeds from condemnation, or threatened condemnation, and the proceeds of any and all insurance covering any part of the foregoing; and all related parts, accessions and accessories to any of the foregoing and all replacements or substitutions therefor.

8.  Notwithstanding any provision in this Instrument to the contrary, in no event is any Building (as defined in the applicable Flood Insurance Regulation) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulation) included in the definition of "Collateral," and no Building or Manufactured (Mobile) Home is hereby encumbered by this Instrument, in each case to the extent such Building or Manufactured (Mobile) Home is located in a Floodplain (as defined in the applicable Flood Insurance Regulation). As used herein, "Flood Insurance Regulations" shall mean (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 (amending 42 USC 4001, et seq.), as the same may be amended or recodified from time to time, and (iv) the Flood Insurance Reform Act of 2004 and any regulations promulgated thereunder.

9.  Notwithstanding any provision of this Instrument to the contrary, the security interest granted pursuant to the terms hereof and any grant, bargain, sale, assignment or transfer of Collateral pursuant to the terms hereof (the *"Collateral* **Assignments***"*) do not and shall not extend to, and Collateral shall not include, any agreement, right, franchise, lease, license or permit (the ***"Contractual Rights"*)** to the Debtor is a party or of which the Debtor has the benefit, to the extent that the creation of the security interests therein or the Collateral Assignments would constitute a breach of the terms of or permit any third party to terminate the Contractual Rights, but the Debtor shall hold its interest therein in trust for the Secured Party and shall assign such Contractual Rights

to the Secured Party forthwith upon obtaining the consent of the other party thereto. Upon the request of the Secured Party, the Debtor shall use commercially reasonable efforts to obtain any consent required to permit any Contractual Rights to be subjected to the liens granted pursuant hereto and the Collateral Assignments. This paragraph 9 shall not apply to any Contractual Rights in so far as they prohibit, restrict or require the consent of the account debtor for the assignment of, or the giving of a security interest in, the whole of an account or chattel paper for money due or to become due and Collateral shall, notwithstanding this paragraph 9, include such Contractual Rights.

## GRANTING CLAUSES

In consideration of ten dollars and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Debtor, and the matters hereinafter set forth, Debtor hereby:

A.     Real Property. Grants, bargains, sells, mortgages, assigns, transfers, hypothecates, pledges and conveys to Trustee, with POWER OF SALE, for the benefit and security of Secured Party, the; TO HAVE AND TO HOLD the Collateral, together with all of the rights, privileges, benefits, hereditaments and appurtenances in any way belonging, incidental or pertaining thereto, to Trustee and its successors and assigns, forever, IN TRUST, NEVERTHELESS, for the security and for the benefit of Secured Party and its successors and assigns, subject to all of the terms, conditions, covenants, agreements and trusts herein set forth; and

B.     Personal Property. Grants to Secured Party a continuing security interest in that part of the Collateral which is of a nature that a security interest therein can be created and perfected under the Uniform Commercial Code from time to time in effect in the State of Colorado, and all replacements and additions thereto and substitutions and proceeds thereof (including any fixtures and as-extracted collateral that are personal property under applicable state Law).

C.     Assignment of Production. Subject to the provisions hereof, absolutely assigns to Secured Party all of the severed and extracted Minerals produced from or allocated or attributed to any of the Collateral or any other interest of Debtor (whether now owned or hereafter acquired by operation of law or otherwise) in, to and under or that covers, affects or otherwise relates to the Lands or to any of the estates, property rights or other interests described or referred to above, together with all of the proceeds thereof and all supporting obligations ancillary to or arising in any way in connection therewith.

Any term used or defined in the Colorado Uniform Commercial Code (the *"Code"),* as in effect from time to time, and not defined in this Instrument has the meaning given to that term in the Code, as in effect from time to time, when used in this Instrument.

## ARTICLE I.
## OBLIGATIONS

**Section 1.1** **Obligations Secured.** This Instrument is executed, acknowledged and delivered by Debtor to secure and enforce certain obligations of the Borrower, Debtor and the other Guarantor Parties, including the following (the ***"Obligations"*):**

A.      Notes. All indebtedness (including principal, interest, fees and penalties), liabilities and obligations under or pursuant to the Convertible Note in the aggregate principal amount of USD $31,746,032 made by the Borrower and payable to the order of the Secured Party, and any renewals, extensions or restatements thereof, modifications, changes, amendments or supplements thereto and substitutions therefor.. This Instrument shall retain its priority position of record as to the full extent of the Obligations until (a) its termination, (b) the full, final and complete payment of all the Obligations, and (c) the full release and termination of the Liens and security interests created by this Instrument. Such amount does not in any way imply that Secured Party is obligated to make any future advances to Borrower or Debtor at any time unless specifically so provided in the Loan Agreement.

As of the date of this Instrument, the maturity date of the Convertible Note is the earlier of (i) three (3) years from the date the Convertible Note was issued, (ii) the happening of an Event of Default, unless the Event of Default is capable of remedy, in which case within five (5) Business Days of the happening of the Event of Default, where the Event of Default has not been remedied within that five (5) Business Day period, and (iii) any other date as agreed between Allegiance USA and the Secured Party.

B.      All Binding obligations (as defined in the Convertible Note), and all other indebtedness, liabilities and obligations of whatever kind or character, now existing or hereafter created or arising under or pursuant to the Convertible Note and the other Transaction Documents;

C.      All indebtedness, liabilities and obligations payable by each Guarantor Party pursuant to the Convertible Note;

D.      This Instrument. All indebtedness, liabilities and obligations payable by Debtor to Secured Party of whatever kind or character, now existing or hereafter created or arising under or pursuant to the provisions of and evidenced by this Instrument, including any amounts advanced to protect the Liens and security interests herein granted and all reasonable attorney's fees, court costs, and expenses of whatever kind or character now existing or hereafter created or arising, incident thereto or to the collection of the indebtedness, liabilities and obligations hereby secured and enforcement of the Liens and security interests herein granted and created;

E.      Other Obligations. All other indebtedness, liabilities and obligations of Debtor to Secured Party pursuant to the Loan Agreement of whatever kind or character now existing or hereafter created or arising, whether fixed, absolute or contingent, direct or indirect, primary or secondary, joint, several or joint and several, due or to become due, and however evidenced whether by note, open account, overdraft, endorsement, security agreement, guarantee or otherwise, it being contemplated that Borrower, Debtor or any other Guarantor Party may hereafter become indebted to Secured Party in such further sum or sums; and

F.    Renewals, Extensions and Amendments. All indebtedness, liabilities and obligations of whatever kind or character, now existing or hereafter created or arising under or pursuant to all renewals, extensions and restatements of, modifications, changes, amendments and supplements to and substitutions for, all or any part of the foregoing.

**Section 1.2    Limit on Obligations and Collateral.** It is the intention of Debtor and Secured Party that this Instrument not constitute a fraudulent transfer or fraudulent conveyance under any state or federal Law that may be applied hereto. Debtor and, by Secured Party's acceptance hereof, Secured Party hereby acknowledge and agree that, notwithstanding any other provision of this Instrument: (a) the indebtedness secured hereby shall be limited to the maximum amount of indebtedness that can be incurred or secured by Debtor without rendering this Instrument voidable under applicable Law relating to fraudulent conveyances or fraudulent transfers, and (b) the collateral granted by Debtor hereunder shall be limited to the maximum amount of collateral that can be granted by Debtor without rendering this Instrument voidable under applicable Law relating to fraudulent conveyances or fraudulent transfers.

## ARTICLE II.
## WARRANTIES, REPRESENTATIONS,
## COVENANTS AND INDEMNITIES

**Section 2.1    Representations and Warranties.** Debtor warrants and represents to Secured Party and Trustee as follows:

A.    Power and Authority. Debtor has the power and authority to mortgage, pledge and hypothecate the Collateral as provided herein.

B.    Title and Related Matters.

1.    Debtor is the lawful owner of the Collateral and has good leasehold title to the Leases with good right and authority to grant a Lien upon it and convey it, and that the Collateral is free and clear of all Liens, claims and encumbrances except Permitted Liens.

2.    Exhibit A attached hereto describes, as of the date hereof, all of the land, mineral estates, surface estates and real property leasehold estates (including easements and rights of way) in which Debtor owns an interest (including any rights obtained by adverse possession or any other similar rights under applicable law, if any) and all Water Rights owned or leased by Debtor.

3.    There are no purchase options, rights of first refusal or other similar contractual rights of Debtor pertaining to any of their interest in the Lands. All material Permits required to have been issued or appropriate to enable Debtor to lawfully occupy and use the Collateral for all of the purposes for which they are currently occupied and used, have been lawfully issued and are in full force and effect.

4.    The Collateral which consists of real property constitutes all real property necessary for Debtor, and, during the period following an Event of Default and the taking of possession of the Lands, the Mine and the Leases in exercise of remedies, Secured Party (or any Person in privity of contract with Secured Party with respect thereto), to (A) use, own, operate and maintain the Mine on substantially the same basis that Debtor uses, owns, operates and maintains the Mine on the date hereof, (B) enter and exit the Lands, and (C) in the case of Secured Party, to take and maintain possession of the Mine, except in any case for such land and other real property interests the absence of which would not reasonably be expected to be material to the Debtor.

5.    Each of the Leases is a valid, subsisting lease and is in full force and effect. All royalties payable under or with respect to the Leases described in Part II of Exhibit A have been properly and timely paid.

6.    Each of the Mineral Leases, except as otherwise provided in Part II of Exhibit A, is assignable without the prior written consent of the lessor or any other third party. No material default on the part of the Debtors has occurred under any such Mineral Lease, nor is there any existing condition which, but for the passage of time or the giving of notice or both, would result in such a material default under the terms of such Mineral Lease.

7.    Except for Permitted Encumbrances, (a) the Mineral Leases allow Debtor to explore for, mine, remove by underground mining methods only and sell all Minerals that are covered by the Mineral Leases in and under the Lands described in the Mineral Leases; and (b) Debtor owns all of the interest of the lessee under each Mineral Lease.

8.    To Debtor's knowledge, each Related Agreement described in Part IV of Exhibit A is in full force and effect and no material default thereunder has occurred and is continuing. Except as otherwise provided in Part IV of Exhibit A, each Related Agreement is assignable without the prior written consent of the other party thereto or any other third party.

9.    Except for the royalty obligations described in Exhibit A, no royalties, overriding royalties or payments out of production exist as a burden on the Lands or the Mineral Leases.

10.    Except for Permitted Encumbrances, and subject to the terms and conditions of the Note, Secured Party will obtain, as security for the Obligations, a legally valid and binding first perfected lien on, and security interest in, the Collateral.

11.    To the knowledge of the Debtor, the legal descriptions attached hereto correctly describe the tracts of fee and leasehold lands and the mineral and other

interests which, together with related facilities, in the aggregate constitute the Mine as of the date of this Instrument.

12.    Debtor will warrant and forever defend the Collateral unto Secured Party against every person whomsoever lawfully claiming the same or any part thereof, and Debtor will maintain and preserve the lien and security interest hereby created so long as any of the Obligations remains unpaid.

13.    Debtor represents to Secured Party that to the extent any waivers, consents or approvals have been supplied to Secured Party in connection with any of the Lands, Mineral Leases, and/or the Mine are true and correct copies of any and all such waivers, consents or approvals have been provided by Debtor to Secured Party, and same have not been revoked or otherwise nullified.

C.    Operation of Collateral. The Collateral (and all properties aggregated therewith) has been maintained, operated and developed in conformity in all material respects with all Permits, and applicable laws, rules, regulations and orders of all federal, state and local governmental bodies, authorities and agencies and in conformity in all material respects with the provisions of all leases, subleases or other contracts and agreements comprising a part of the Collateral. Debtor has all Permits necessary to maintain, operate and develop the Lands, Mineral Leases and the Mine as presently maintained, operated and developed.

D.    Condition of Personal Property. The inventory, Operating Equipment and Facilities, and other tangible personal property and fixtures forming a part of the Collateral are in good repair and condition and are adequate for the normal operation of the Collateral in accordance with prudent industry standards.

E.    Environmental Matters.

1.    The Collateral is, and at all times has been, operated in compliance in all material respects with all applicable Environmental Laws (as defined below) and Debtor has not received (A) from any third party, and Debtor does not have knowledge of, any Environmental Liabilities (as defined below) pertaining to the Collateral, or (B) any written notice alleging that it is in material violation of, or is materially liable under, any Environmental Law. There has been no Release (as defined below) or threatened Release of Hazardous Materials (as defined below) by the Debtor in contravention of Environmental Laws with respect to the Collateral or on, at, from, or under the Lands or the Mine, and the Debtor has not received a written notification, nor has knowledge, that any of the Lands (including soils, groundwater, and surface water located on any such Lands) or the Mine have been subject to any Release of or contaminated with any Hazardous Material which would reasonably be expected to result in any Environmental Liability, or a violation of Environmental Laws or the terms of any Permit held by, or any material liability to or obligation on the part of, the Debtor. The Debtor has not transported

any Hazardous Material to or from any of the Lands, other than in compliance with applicable Environmental Laws.

2. As used herein, the term *"Release"* means, as to any person, any release, spill, emission, leaking, pumping, injection, deposit, disposal, disbursement, leaching, or migration of Hazardous Materials into the indoor or outdoor environment or into or out of property owned by such person, including, without limitation, the movement of Hazardous Materials through or in the air, soil, surface water, ground water, or other property.

3. As used herein, the term *"Environmental Laws"* means any and all federal, state, and local Laws, regulations, judicial decisions, orders, decrees, plans, rules, permits, licenses, and other governmental restrictions and requirements pertaining to health, safety, or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq., the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., the Clean Water Act, 33 U.S.C. § 1251 et seq., and the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.

4. As used herein, the term *"Hazardous Materials"* means any substance, product, waste, pollutant, material, chemical, contaminant, constituent, or other material which is or becomes listed, regulated, or addressed under any Environmental Law, including, without limitation, asbestos, petroleum, and polychlorinated biphenyls.

5. As used herein, the term *"Environmental Liability"* means, as to any person, all liabilities, obligations, responsibilities, remedial actions, losses, damages, punitive damages, consequential damages, treble damages, costs, and expenses (including, without limitation, all reasonable fees, disbursements and expenses of counsel, expert and consulting fees and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, by any person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute, including any Environmental Law, permit, order or agreement with any governmental authority or other person, arising from environmental, health or safety conditions or the Release or threatened Release of a Hazardous Material into the environment, resulting from the past, present, or future operations of such person or its affiliates.

F. Sale of Production.

1. The agreements described in Part V of Exhibit A are the only Production Sale and Marketing Contracts currently in effect.

2. To the knowledge of the Debtor, all proceeds from the sale of Debtor's interests in Minerals produced from the Collateral will be paid in full to Debtor by the purchaser or remitter thereof on a timely basis and at prices and terms comparable

to market prices in terms generally available at the time such prices and terms were negotiated for production of coal of similar quality to be used for similar purposes.

        3.     Debtor has not entered into or is subject to any agreement or arrangement, nor to the Debtor's knowledge is the Collateral subject to any such agreement or arrangement, to deliver Minerals produced or to be produced from the Collateral at some future time without then or thereafter receiving full payment therefor.

        4.     None of the Collateral is or will become subject to any contractual or other arrangement whereby payment for production from such Collateral is to be deferred for a substantial period after the month in which such production is delivered.

        5.     None of the Collateral is or will become subject to any contractual or other arrangement for the sale of Minerals that cannot be cancelled on 30 days' or less notice; and none of the Collateral is or will become subject to a sales contract that contains terms that are not customary in the industry.

        G.     <u>Contracts and Agreements</u>. Except for contracts and agreements that do not have a material effect on the use, ownership, value or operation of the Collateral, <u>Exhibit A</u> sets forth all material operating agreements, production sales, purchase, exchange or processing agreements, transportation agreements, farmout or farmin agreements, disposal agreements, area of mutual interest agreements, rights-of-way, easements and other contracts and agreements that cover, affect or otherwise relate to Debtor's interest in the Lands, the Mineral Leases or the Mine or to operations thereon, or the production, treatment, storage, transportation, handling, processing, manufacturing, sale or marketing of Minerals produced therefrom or allocated or attributed thereto.

        H.     <u>Debtor's Name</u>. Debtor's exact legal name is correctly set forth in this Instrument. Debtor is an organization of the type and is incorporated or organized under the Laws of the state specified in the preamble of this Instrument.

        I.     <u>Organizational Identification Number</u>. Debtor's organizational identification number is correctly set forth on the signature page of this Instrument. Debtor will promptly notify Secured Party of any change in its organizational identification number.

        J.<u>Mechanic's</u> Liens. There has been no architectural service or other work of any kind, contracted for or otherwise ordered by Debtor, within the last 120 days, paid or unpaid, which could establish a priority for any future mechanics' lien claimant, or otherwise make sure the lender has vetted the performance and payment for work performed within 120 days prior to the loan closing which could give rise to mechanics' liens.

**Section 2.2**     <u>Covenants</u>. Debtor covenants and agrees as follows:

        A.     <u>Obligations</u>. Debtor shall pay when due and perform the Obligations set forth herein in accordance with the terms hereof.

B.    Recording and Filing; Authorization to File Financing Statements; Power of Attorney. Debtor hereby authorizes Secured Party, at any time and from time to time, to file any initial financing statements, amendments thereto and continuation statements. For purposes of such filings, Debtor agrees to furnish any information requested by Secured Party promptly upon request by Secured Party. Debtor also ratifies its authorization for Secured Party to have filed any like initial financing statements, amendments thereto or continuation statements if filed prior to the date of this Instrument. Debtor hereby irrevocably constitutes and appoints Secured Party and any officer or agent of Secured Party, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of Debtor or in Debtor's own name to execute in Debtor's name any such documents and to otherwise carry out the purposes of this Subsection 2.2-B, to the extent that Debtor's authorization above is not sufficient. To the extent permitted by Law, Debtor hereby ratifies all acts said attorneys-in-fact shall lawfully do, have done in the past or cause to be done in the future by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable.

C.    Modifications and Dispositions. Without the prior written consent of Secured Party, Debtor shall not (1) amend, modify or otherwise revise any lease, license or other agreement described in Exhibit A, other than the agreement described in Part V of Exhibit A; (2) release, surrender, abandon or forfeit the Collateral or any part thereof; (3) sell, convey, assign, lease, sublease, alienate, mortgage or grant security interests in or otherwise dispose of or encumber the Collateral or any part thereof, except to the extent explicitly permitted by the Note and except sales of severed Minerals in the ordinary course of such Debtor's business and for fair consideration, and except for the liens and security interests created by this Instrument and liens for taxes, assessments and governmental charges not delinquent; or (4) consent to, permit or authorize any such act by another party with respect to the Lands, the Collateral or any part thereof.

D.    Operation and Maintenance of Collateral.

1.    Debtor shall do or cause to be done all things necessary to keep unimpaired Debtor's rights in the Collateral and not, except as may be permitted under the terms of the Note, abandon any Mine or forfeit, surrender or release any interest in any Mine or any rights in the Collateral, without the prior written consent of Secured Party;

2.    Debtor shall cause the Mine to be regularly operated, maintained, developed and mined for Minerals in accordance with generally accepted mining practices and applicable operating agreements, and, in all material respects, all applicable Permits, and federal, state and local laws, rules and regulations, excepting those laws, rules and regulations being promptly contested in good faith and by appropriate proceedings promptly initiated and diligently conducted and as to which adequate reserves in accordance with generally accepted accounting principles have been set aside in the event that such proceedings are unsuccessful and Debtor must comply with such laws, rules and regulations;

3.      With respect to each Related Agreement listed in Part IV of Exhibit A and each Production Sale and Marketing Contract to which Debtor is party:

(a)      Debtor shall take, or cause to be taken, all actions required by the terms thereof in order to maintain the continuing existence and validity thereof and the interests and rights created thereby (except for the agreement listed in Part V of Exhibit A) and (B) necessary to prevent any material default thereunder or forfeiture thereof; and

(b)      Debtor shall not enter into any amendments, modifications, waivers or consents with respect thereto which would substantially impair the value of such Related Agreement or Production Sale and Marketing Contract to such Debtor;

4.      Cause to be paid, promptly as and when due and payable, all rentals and royalties payable in respect of the Collateral, and all expenses incurred in or arising from the operation or development of the Collateral;

5.      Do all things necessary to maintain, preserve, protect and keep the Operating Equipment and Facilities and other property comprising a portion of a Mine in good repair, working order and condition (allowing, in the case of equipment, for ordinary wear and tear to the extent not preventable by regular maintenance) and make all necessary and proper repairs, renewals and replacements so that its business carried on in connection therewith may be properly conducted at all times;

6.      Maintain in full force and effect the Mineral Leases and obtain and maintain all Permits necessary or advisable to use, own, develop, occupy, operate and conduct exploration and production operations on the Lands and the Mine;

7.      Make all payments required by and perform and comply with all material terms, provisions, covenants, conditions and agreements imposed upon or assumed by Debtor under any of the Mineral Leases, including any amendments or supplements thereto, in order that the Mineral Leases shall remain in full force and effect;

8.      Not surrender, terminate or cancel, or suffer any termination or cancellation of, or consent to any material alteration, modification, amendment, supplement or change to or in, (a) any Mineral Lease then being used in mining operations, or (b) any other Mineral Lease, without first obtaining Secured Party's prior written consent; and

9.      Cause the Collateral to be kept free and clear of Liens, charges and encumbrances of every character, other than Permitted Liens.

E.      <u>Notification of Breach</u>. Debtor shall promptly notify Secured Party (1) if any representation or warranty of Debtor contained in this Instrument or any other Loan Document is discovered to be or becomes untrue, or (2) Debtor fails to perform or comply

with any covenant or agreement contained in this Instrument or any other Loan Document or it is reasonably anticipated that Debtor will be unable to perform or comply with any covenant or agreement contained in this Instrument or any other Loan Document. Debtor shall cause all the representations and warranties of Debtor contained in this Instrument and any other Loan Document to be true and correct in all material respects from time to time and all times.

F.      Defense of Title. If the title or interest of Debtor or Secured Party to the Collateral or any part thereof, or the Lien or encumbrance created by this Instrument, or the rights or powers of Secured Party hereunder, shall be attacked, either directly or indirectly, or if any legal proceedings are commenced against Debtor or the Collateral, Debtor shall promptly give written notice thereof to Secured Party and at Secured Party's request, and at Debtor's own expense, shall take all reasonable steps diligently to defend against any such attack or proceedings, employing attorneys acceptable to Secured Party. Secured Party may take such action in connection therewith as it may in its reasonable discretion deem advisable, and all costs and expenses, including reasonable attorneys' fees and legal expenses, incurred by or on behalf of Secured Party in connection therewith shall be a demand obligation owing by Debtors to Secured Party and shall bear interest at a rate equal to 12% *per annum* based on a year of 365 or 366 days (as applicable) (the *"Interest Rate"*) until paid, and shall constitute a part of the Obligations and be indebtedness secured and evidenced by this Instrument..

G.      Liens. Except for matters contested in good faith and by appropriate proceedings in accordance with the Loan Agreement, Debtor agrees to promptly pay all bills for labor and materials incurred in connection with the Collateral and to prevent the fixing of any Lien against any part of the Collateral.

H.      Environmental Matters. In the event of any Release of any Hazardous Materials on, under or at the Collateral or any part thereof, for which Debtor is obligated under Environmental Laws to conduct remedial activities, or if any Hazardous Materials contamination is found on, under or about the Collateral, Debtor shall promptly take all necessary and appropriate actions and shall spend all sums necessary to cause the same to be cleaned up, remediated, treated, removed and disposed of, all as required by any Environmental Laws, and in the event of the failure of Debtor, after written notice, to resolve such event in accordance with all applicable Environmental Laws, Secured Party shall have the right, but not the obligation, to take such actions as it deems necessary or advisable to clean up, remove, remediate, resolve or minimize the impact of, or otherwise deal with, any such Hazardous Materials. Notwithstanding the foregoing, in no event shall Secured Party be liable or responsible for any costs or expenses incurred in so doing except to the extent Secured Party, or its agents caused such Release or Hazardous Materials contamination. Any and all sums expended by Secured Party for such purposes to resolve a legal obligation of any Debtor, together with interest thereon at the Interest Rate until paid, shall constitute a part of the Obligations and be indebtedness secured and evidenced by this Instrument.

I.      Change in Debtor. Except to the extent permitted by the Loan Agreement, Debtor shall not cause or permit any change to be made in its name, identity, corporate structure or state of organization, unless Debtor shall have notified Secured Party of such change at least 30 days prior to the effective date of such change, and shall have first

taken all action required by Secured Party for the purpose of further perfecting or protecting the security interest in favor of Secured Party in the Collateral.

J.    Taxes, Assessments, Liens and Encumbrances. Except for matters contested in good faith and by appropriate proceedings in accordance with the Loan Agreement, Debtor shall pay prior to delinquency all taxes, levies, charges and assessments, including assessments on appurtenant water stock, imposed by any public or quasi-public authority or utility company which are (or if not paid, may become) a Lien on all or part of the Collateral or any interest in it, or which may cause any decrease in the value of the Collateral or any part of it. Debtor shall not permit any Lien on the Collateral, other than Permitted Liens, and shall immediately discharge any such Lien to the extent that any such Lien now or hereafter encumbers all of any portion of the Collateral.

K.    Damages and Condemnation Proceeds. Debtor shall immediately notify Secured Party in writing if: (i) any damage occurs or any injury or loss is sustained to all or part of the Collateral, or any action or proceeding relating to any such damage, injury or loss is commenced; or (ii) any offer is made, or any action or proceeding is commenced, which relates to any actual or proposed condemnation or taking of all or part of the Collateral. Secured Party, if it so chooses, may participate in any action or proceeding relating to condemnation or taking of all or part of the Collateral.

L.    Insurance. Debtor shall provide and maintain in force at all times all risk property damage insurance on the Collateral and such other type of insurance on the Collateral as may be required pursuant to the terms and conditions of the Loan Agreement.

M.    Inspection. Secured Party may make or cause to be made reasonable entries upon and inspections of the Collateral during normal business hours and upon reasonable prior notice to Debtor.

N.    Books and Records. Debtor shall keep and maintain at all times complete and accurate books of accounts and records adequate to reflect correctly the results of the operation of the Collateral and copies of all written contracts, leases and other mortgages that materially affect the Collateral. Such books, records, contracts, leases and other mortgages shall be subject to examination and inspection at any reasonable time by Secured Party upon reasonable prior notice to Debtor.

O.    Mechanic's Liens. Debtor shall pay when due all claims for work performed and materials furnished on or in connection with the Mine or any part thereof, provided, however, that Debtor may contest in good faith the validity or amount thereof as provided in the Loan Documents, and shall pay, discharge, or cause to be removed, all mechanic's, artisan's, laborer's or materialman's charges, liens, claims of liens or encumbrances upon the Mine.

P.    Further Assurances. Debtor shall execute, acknowledge and deliver, or cause to be executed, acknowledged or delivered, to Secured Party such other and further instruments and do such other acts as in the reasonable opinion of Secured Party may be necessary

or desirable to effect the intent of this Instrument, promptly upon request of Secured Party and at Debtor's expense.

**Section 2.3**     **Costs, Expenses and Indemnities.** Debtor agrees to pay and indemnify Secured Party and Trustee as follows:

A.     Costs and Expenses. Debtor shall indemnify Secured Party from and reimburse and pay Secured Party for all fees, costs and expenses (including reasonable attorneys' fees, court costs and legal expenses and consultant's and expert's fees and expenses), incurred or expended by Secured Party in connection with (1) the breach by Debtor of any representation or warranty contained in this Instrument, (2) the failure by Debtor to perform any agreement, covenant, condition, indemnity or obligation contained in this Instrument, (3) any of Secured Party's exercise of any of its rights and remedies under this Instrument, or (4) the protection of the Collateral and the Liens thereon and security interests therein. All such fees, costs and expenses shall be a demand obligation owing by Debtor to Secured Party, shall bear interest at the Interest Rate, shall constitute a part of the Obligations and be indebtedness secured and evidenced by this Instrument.

B.     Indemnity. Debtor shall defend, indemnify and hold harmless Secured Party and persons or entities owned or controlled by or affiliated with Secured Party and their respective directors, officers, shareholders, members, partners, employees, consultants and agents (herein individually, an ***"Indemnified Party,"*** and collectively, ***"Indemnified Parties")*** from and against, and reimburse and pay Indemnified Parties with respect to, any and all claims, demands, liabilities, losses, damages, causes of action, judgments, penalties, fees, costs and expenses (including reasonable attorneys' fees, court costs and legal expenses and consultant's and expert's fees and expenses), of any and every kind or character, known or unknown, fixed or contingent, that may be imposed upon, asserted against or incurred or paid by or on behalf of any Indemnified Party on account of, in connection with, or arising out of (1) any bodily injury or death or property damage occurring in or upon or in the vicinity of the Collateral through any cause whatsoever, (2) any act performed or omitted to be performed hereunder or the breach of or failure to perform any warranty, representation, indemnity, covenant, agreement or condition contained in this Instrument, (3) any transaction, act, omission, event or circumstance arising out of or in any way connected with the Collateral or with this Instrument, and (4) the violation of or failure to comply with any statute, Law, rule, regulation, order or other Law, including Environmental Laws and statutes, Laws, rules, regulations or orders relating to Hazardous Materials. Without limiting the generality of the foregoing, it is the intention of Debtor and Debtor agrees that the foregoing indemnities shall apply to each Indemnified Party with respect to claims, demands, liabilities, losses, damages, causes of action, judgments, penalties, fees, costs and expenses (including reasonable attorneys' fees, court costs and legal expenses and consultant's and expert's fees and expenses) of any and every kind or character, known or unknown, fixed or contingent, that in whole or in part are caused by or arise out of the negligence of such Indemnified Party; however, such indemnities shall not apply to any Indemnified Party to the extent the subject of the indemnification is caused by or arises out of the gross negligence or willful misconduct of such Indemnified Party. The foregoing indemnities shall not terminate upon the release, foreclosure or other termination of this Instrument,

and shall survive the foreclosure of the Liens and security interests created by this Instrument or conveyance in lieu of foreclosure and the repayment and performance of the Obligations and the discharge and release of the Liens and security interest created by this Instrument, the other Transaction Documents and the other instruments and documents evidencing, securing or relating to the Obligations. The rights, powers and remedies herein conferred are cumulative, and not exclusive, of any and all other rights, powers and remedies existing at law or in equity (including rights, powers and remedies under Laws) or provided for in any other documents or instruments evidencing, securing or relating to the Obligations and nothing in this paragraph or elsewhere in this Instrument or in any other documents or instruments evidencing, securing or relating to the Obligations shall limit or impair any rights, powers or remedies of Secured Party under any Laws, including any rights of contribution or indemnification available thereunder. The liabilities of Debtor as set forth in this Section 2.3-B shall survive the termination of this Instrument.

**Section 2.4      Performance by Secured Party.** Debtor agrees that, if Debtor fails to perform any act which Debtor is required to perform hereunder, then upon the occurrence and continuance of an Event of Default, Secured Party may, but shall not be obligated to, perform or cause to be performed such act, and any expense so incurred by Secured Party in connection therewith shall be a demand obligation owing by Debtor to Secured Party, bearing interest at the Interest Rate, and shall constitute a part of the Obligations and be indebtedness secured and evidenced by this Instrument, and Secured Party shall be subrogated to all of the rights of the party receiving such payment. Debtor hereby irrevocably appoints Secured Party as Debtor's attorney-in-fact and proxy, with full authority in the place and stead of Debtor and in the name of Debtor or otherwise, from time to time to take any action and to execute any instrument which Secured Party may deem necessary or advisable to accomplish the purposes of this Instrument. Such appointment is coupled with an interest and shall be irrevocable from the date hereof and so long as any part of the Obligations is outstanding.

**ARTICLE III.**
**COLLECTION OF PROCEEDS OF PRODUCTION.**

**Section 3.1      Assignment of Proceeds.**

A.      Pursuant to Paragraph C of the granting clause of this Instrument, subject to the provisions of this Section 3.1, Secured Party is absolutely assigned and entitled to receive all of the severed and extracted Minerals produced from or allocated or attributed to the Collateral, together with all of the proceeds thereof and payments in lieu thereof. Debtor acknowledges and agrees that said assignment is intended to be an absolute and unconditional assignment and not merely a pledge of or creation of a security interest in said Minerals and proceeds or an assignment as additional security. Debtor shall execute, acknowledge and deliver or cause to be executed, acknowledged and delivered, such documents and instruments as requested by Secured Party directing all purchasers of Minerals to make payments directly to Secured Party upon the occurrence of any event which constitutes an Event of Default (as hereinafter defined) or which upon the giving (or receiving) of notice or lapse of time, or both, would constitute such an Event of Default. All parties producing, purchasing, receiving or having in their possession any such

Minerals or proceeds are hereby authorized and directed by Debtor to treat and regard Secured Party as the party entitled in Debtor's place and stead to receive such Minerals and proceeds upon the occurrence of any Event of Default, or at any time thereafter except if such Event of Default has been fully cured; and said parties shall be fully protected in so treating and regarding Secured Party and shall be under no obligation to see to the application by Secured Party of any such proceeds received by it. For its convenience, Secured Party may, with respect to any or all such Minerals or proceeds, permit Debtor to receive such Minerals or proceeds until such time as Secured Party shall have made written demand therefor. Such election by Secured Party shall not in any way waive the right of Secured Party to demand and receive such Minerals and proceeds thereafter allocated or attributed to the Collateral and shall not in any way diminish the absolute and unconditional right of Secured Party to receive all of such Minerals and proceeds and cash proceeds not theretofore expended by or distributed to Debtor. Any such Minerals or proceeds received by Debtor shall, when received, constitute trust funds in Debtor's hands and shall be held by Debtor for the benefit of Secured Party. Notwithstanding the foregoing, Debtor shall be permitted to use the proceeds from the sale of Minerals as permitted in the Secured Note. Debtor hereby agrees that upon the occurrence of any Event of Default, or at any time thereafter except if such Event of Default has been fully cured, all cash, proceeds, instruments and other property, of whatever kind or character, received by Debtor on account of the Collateral, whether received by Debtor in the exercise of its collection rights hereunder or otherwise, shall, in accordance with instructions then given by Secured Party, be remitted to Secured Party or deposited to an account designated by Secured Party, in the form received (properly assigned or endorsed to the order of Secured Party or for collection and in accordance with Secured Party's instructions) not later than the first Business Day following the day of receipt, to be applied as provided in Section 3.2 and, until so applied, may be held by Secured Party in a separate account on which Debtor may not draw. Debtor agrees not to commingle any such property, following the occurrence of an Event of Default, with any of its other funds or property and agrees to hold the same upon an express trust for Secured Party until remitted to Secured Party.

B.    The office where the records of Debtor with respect to the accounts and contract rights concerning the Collateral are kept is located at the address shown above in the preamble for Debtor to this Instrument, and Debtor agrees that the place at which such records are kept will not be changed without the prior written consent of the Secured Party.

C.    Nothing herein contained shall detract from or limit the absolute obligation of Debtor to make prompt payment of the Obligations, of all amounts owing thereon, and of all amounts owing hereunder at the time and in the manner provided in the Loan Agreement or provided herein, regardless of whether the proceeds herein assigned are sufficient to pay the same, and the rights under this assignment shall be cumulative of all other security of any and every character now or hereafter existing to secure the payment of the Obligations.

**Section 3.2    Application of Proceeds.** Subject to the provisions of the Note, Secured Party shall apply all of the proceeds received pursuant to Section 3.1 to such part or parts of the Obligations as Secured Party shall in its sole discretion determine. Secured Party shall at all times and from time to time have the right to change any application so made.

21.

**Section 3.3**    **Inclusion in Sale.** Upon any sale of any of the Collateral pursuant to Article V hereof and expiration of any mandatory redemption periods, the Minerals thereafter produced from or attributed to the part of the Collateral so sold, and the proceeds thereof, shall be included in such sale and shall pass to the purchaser free and clear of the provisions of this Article III.

**Section 3.4**    **No Liability in Secured Party.** Secured Party is hereby absolved from all liability for failure to enforce collection of any such proceeds and from all other responsibility m connection therewith, except the responsibility to account to Debtors for proceeds actually received.

**Section 3.5**    **Rights of Secured Party.** Subject to the provisions of Section 3.1, Secured Party shall have the immediate and continuing right to demand, collect, receive and receipt for all production, proceeds and payments assigned hereunder, and Secured Party is hereby appointed agent and attorney-in- fact of Debtor (which appointment is coupled with an interest and is irrevocable) for the purpose of executing any release, receipt, relinquishment or other instrument that Secured Party deems necessary in order for Secured Party to collect and receive such production, proceeds and payments. In addition, Debtor agrees that, upon the request of Secured Party, it will promptly execute and deliver to Secured Party such instruments as Secured Party may deem necessary, convenient or appropriate in connection with the payment and delivery directly to Secured Party of all proceeds, production, and payments assigned hereunder. Debtor hereby authorizes and directs that, upon the occurrence of any Event of Default, or at any time thereafter except if such Event of Default has been fully cured, upon the request of Secured Party, all parties now or hereafter purchasing mineral production produced from or allocated or attributed to the Collateral or any other interest of Debtor (whether now owned or hereafter acquired by operation of law or otherwise), in, to or relating to the Lands or to any of the estates, property, rights or other interests included in the Collateral, or any part thereof, or now or hereafter having in their possession or control any production from or allocated to the Collateral or any other interest of Debtor (whether now owned or hereafter acquired by operation of law or otherwise), in, to or relating to the Lands or to any of the estates, property, rights or other interests included in the Collateral, or any part thereof, or the proceeds therefrom, or now or hereafter otherwise owing monies to Debtor under contracts and agreements herein assigned, shall, until Secured Party directs otherwise, pay and deliver such proceeds, production or amounts directly to Secured Party at Secured Party's address set forth in the introduction to this Instrument, or in such other manner as Secured Party may direct such parties in writing, and this authorization shall continue until the assignment of production and proceeds contained herein is released and reassigned. Each Debtor agrees that all instruments that Secured Party may from time to time execute and deliver for the purpose of collecting and receipting for such proceeds, production or payments may be relied upon in all respects, and that the same shall be binding upon Debtor and its successors and assigns. No payor making payments to Secured Party at its request under the assignment of production and proceeds contained herein shall have any responsibility to see to the application of any of such funds, and any party paying or delivering proceeds, production or amounts to Secured Party under such assignments shall be released thereby from any and all liability to Debtor to the full extent and amount of all payments, production or proceeds so delivered. Debtor agrees to indemnify and hold

harmless any and all parties making payments to Secured Party, at the request of Secured Party under the assignment of production and proceeds contained herein, against any and all liabilities, actions, claims, judgments, costs, charges and attorneys' fees and legal expenses resulting from the delivery of such payments to Secured Party. The indemnity agreement contained in the previous sentence is made for the direct benefit of and shall be enforceable by all such persons and shall survive the termination of this Instrument. Should Secured Party bring suit against any third party for collection of any amounts or sums included within the assignment of production and proceeds contained herein (and Secured Party shall have the right to bring any such suit), it may sue either in its own name or in the name of the Debtor, or both.

Section 3.6    **No Delegation or Assumption.** Nothing in this Instrument shall be deemed or construed to create a delegation to or assumption by Secured Party, of the duties and obligations of Debtor under any agreement or contract relating to the Collateral or any portion thereof, and all of the parties to any such contract shall continue to look to the Debtor for performance of all covenants and other obligations and the satisfaction of all representations, warranties, covenants, indemnities and other agreements of Debtor thereunder, notwithstanding the assignment of production and proceeds contained herein or the exercise by Secured Party, prior to foreclosure, of any of its rights hereunder or under applicable law.

Section 3.7    **Cumulative.** The assignment of production and proceeds contained herein shall not be construed to limit in any way the other rights and remedies of Secured Party hereunder, including its right to accelerate the indebtedness evidenced by the Obligations upon an Event of Default and the other rights and remedies herein conferred, conferred in the other documents and instruments evidencing, securing or relating to the Obligation, or conferred by operation of law. Monies received under the assignment of production and proceeds contained herein shall not be deemed to have been applied in payment of the Obligations unless and until such monies actually are applied thereto by Secured Party.

## ARTICLE IV.
## TERMINATION AND RELEASE

Section 4.1    **Release Upon Termination.** If all of the Obligations shall be paid in full and otherwise satisfied pursuant to the terms and conditions of this Instrument, the Loan Agreement and the other documents and instruments evidencing, securing or relating to the Obligations, and Debtor's ability to borrow under the Loan Documents has terminated, and if Debtor shall have well and truly performed all of the covenants and agreements herein contained, and if Secured Party has no further obligation to advance any amounts to Debtor, then all of the Collateral shall revert to Debtor, the Liens and security interests created by this Instrument shall terminate and Secured Party shall, promptly after the request of Debtor, execute, acknowledge and deliver to Debtor a request to the Trustee to release or reconvey this Instrument, and Secured Party shall execute and deliver such other instruments as may be necessary to evidence the termination of the Liens and security interests created by this Instrument; provided, however, that no provision of this Deed of Trust or any other Loan Document which, by its own terms, is intended to survive such payment, performance, and

release (nor the rights of Secured Party under any such provision) shall be affected in any manner thereby and such provision shall, in fact, survive.

Section 4.2    **Partial Release.** No partial release or reconveyance from the Liens and security interests created by this Instrument of any part of the Collateral by Trustee or Secured Party shall in any way alter, vary or diminish the force or effect of this Instrument or impair, release or subordinate the Liens and security interests created by this Instrument on the remainder of the Collateral. Except as specifically provided in any such partial release or reconveyance (A) this Instrument and Liens and security interests created hereby shall remain in full force and effect, (B) such partial release or reconveyance will not modify or affect the terms, conditions or provisions of this Instrument, and (C) nothing contained in any such partial release or reconveyance shall be deemed to be, or construed as, a waiver of any such terms, conditions or provisions or as a waiver of any other term, condition or provιsιon.

Section 4.3    **Costs, Expenses and Effect.** Debtor shall pay all legal fees and other fees, costs and expenses incurred by Secured Party for preparing and reviewing instruments of termination and release or reconveyance and the execution and delivery thereof and Secured Party may require payment of the same prior to delivery of such instruments. The release and reconveyance of this Instrument and the termination of the liens and security interests created by this Instrument, shall not terminate or otherwise affect Secured Party's right or ability to exercise any right, power or remedy relating to any claim for breach of warranty or representation, for failure to perform any covenant or other agreement, under any indemnity or for fraud, deceit or other misrepresentation or omission, in each case, occurring prior to the date of such release and reconveyance.

## ARTICLE V.
## DEFAULT

Section 5.1    **Events of Default.** The occurrence of any of the following events shall constitute an event of default *("Event of Default"):*

A.    Failure of Debtor to pay as and when provided herein any fee or other amount due Secured Party under this Instrument when due;

B.    Failure of Debtor to perform or observe any covenant, agreement, indemnity, condition or provision in this Instrument;

C.    Any of Debtor's representations or warranties made in this Instrument or any statement or certificate at any time given in writing pursuant hereto or in connection herewith shall be false or misleading in any material respect as of the date made or deemed made;

D.    An "Event of Default" as defined in the Convertible Note shall occur; or

E.    A default, event of default, termination event or other similar event (however described) shall occur under any Loan Document.

**Section 5.2      Treatment of Fixtures.**  Upon the occurrence and during the continuance of any Event of Default, or at any time thereafter, if deemed appropriate by Secured Party or if required by applicable Law, Secured Party may elect to treat the fixtures included in the Collateral either as real property or as personal property, or both, and proceed to exercise such rights as apply to the type of property selected.

**Section 5.3      Acceleration.** If an Event of Default shall have occurred and be continuing, Secured Party at any time and from time to time may, without notice to Debtor, declare any or all of the Obligations immediately due and payable, and all such Obligations shall thereupon be immediately due and payable, without grace, demand, presentment, notice of demand or of dishonor and nonpayment, protest, notice of protest, notice of intention to accelerate, declaration or notice of acceleration, or any other notice or declaration of any kind, all of which are hereby expressly waived by Debtor.

**Section 5.4      Foreclosure.** If an Event of Default shall have occurred and be continuing, in addition to any other rights, powers and remedies herein conferred or conferred by operation of law, Secured Party shall have all of the rights, powers and remedies of a secured party, a mortgagee, a beneficiary under a deed of trust and  Public Trustee shall have all of the powers relative to a deed of trust granted under applicable Law. Secured Party may, without notice, demand or declaration of default, which are hereby waived by Debtor, proceed by one or more actions in equity or at law for the seizure and sale of the Collateral or any portion thereof, for the foreclosure or sale of the Collateral or any portion thereof by judicial foreclosure by appropriate proceedings in any court of competent jurisdiction, by a public trustee's sale or by a sale of the Collateral or any portion thereof under the power of sale granted herein, or in any other manner then permitted by Law, for the specific performance of any covenant or agreement of Debtor herein contained or in aid of the execution of any right, power or remedy herein granted, or for the enforcement of any other appropriate equitable or legal remedy and to recover judgment against Debtor. In furtherance, and not in limitation, thereof:

A.      Deed of Trust. This Instrument shall constitute a deed of trust under Articles 37, 38 and 39 of Title 38 of the Colorado Revised Statutes, as amended and as may be amended from time to time, or any future Law containing provisions under which the sale of property securing debts is authorized or permitted; and upon an Event of Default, or any time thereafter, Trustee shall, whenever requested by Secured Party, cause the Collateral to be sold in accordance with the provisions thereof and hereof. **A POWER OF SALE HAS BEEN GRANTED IN THIS INSTRUMENT. A POWER OF SALE MAY ALLOW SECURED PARTY OR TRUSTEE TO TAKE THE COLLATERAL AND SELL IT WITHOUT GOING TO COURT IN A FORECLOSURE ACTION UPON AN EVENT OF DEFAULT UNDER THIS DEED OF TRUST, IF ALLOWED BY APPLICABLE LAW.**

B.      Mortgage. This Instrument shall also constitute a mortgage under applicable Law, and if an Event of Default shall have occurred and be continuing may be foreclosed as to any of the Collateral by judicial action, by advertisement under power of sale or in any manner then permitted by applicable Law; and to the extent, if any, required to cause this Instrument to be

so effective as a mortgage as well as a deed of trust, Debtor hereby mortgages the Collateral to Secured Party.

C.    Election. Secured Party may elect to treat this Instrument, from time to time and at any time, either as a deed of trust to the public trustee or as a mortgage. In the event a public trustee's sale of the Collateral shall be commenced by Trustee, Secured Party may at any time before the sale of the Collateral, elect to abandon the public trustee's sale, and Secured Party may then institute a suit for the collection of the Obligations and for the foreclosure of this Instrument by judicial action. It is agreed that if Secured Party should institute a suit for the foreclosure of this Instrument by judicial action, Secured Party may at any time before the entry of a final judgment, dismiss such suit, and then direct the Trustee to cause the Collateral to be sold pursuant to a public trustee's sale in accordance with the provisions of this Instrument.

D.    Additional Actions. This Instrument shall also constitute and may be enforced from time to time as an assignment, chattel mortgage, contract, deed of trust, mortgage, financing statement and security agreement, and from time to time as any one or more thereof as appropriate under applicable Law. Secured Party shall be entitled to all of the rights, remedies and benefits of a secured party, mortgagee and a beneficiary granted under applicable Law; and, to the fullest extent of such Law, shall be entitled to enforce such rights, remedies and benefits. Debtor intends and hereby grants to Secured Party all rights, powers and remedies accorded a secured party, mortgagee and a beneficiary under applicable Law whether or not such rights, powers and remedies are expressly granted or reserved herein.

E.    Notice, Place and Manner of Sale. Any sale of the Collateral under this Article V shall take place at such place or places and otherwise in such manner and upon such notice as may be required by Law; or, in the absence of any such requirement, as Secured Party may deem appropriate. Debtor expressly agrees that, except as required by applicable Law, Secured Party or Trustee may offer the Collateral as a whole or in such parcels or lots as Secured Party or Trustee elects, regardless of the manner in which the Collateral may be described. Secured Party or Trustee may sell the Collateral without giving any warranties as to the Collateral, and specifically disclaim any warranties of title, merchantability, fitness for a specific purpose or the like, and this procedure will not be considered to affect adversely the commercial reasonableness of any sale of the Collateral.    Debtor acknowledges that a private sale of the Collateral may result in less proceeds than a public sale.

F.    Postponement of Sale. Any sale of the Collateral conducted under this Article V may be postponed from time to time as provided by applicable Law; or, in the absence of any such provisions, Secured Party may postpone the sale of the Collateral or any part thereof by public announcement at the time and place of such sale, and from time to time thereafter may further postpone such sale by public announcement made at the time of sale fixed by the preceding postponement. Sale of a part of the Collateral will not exhaust the power of sale, and sales may be made from time to time until all Collateral is sold or the Obligations are paid in full.

G.    Secured Party's Right to Purchase. Secured Party shall have the right to bid or to become the purchaser at any sale made pursuant to the provisions of this Article V, and

shall have the right to credit upon the amount of the bid made therefor the amount payable to it out of the net proceeds of such sale.

       H.     <u>Conveyance to Purchaser</u>. Any deed, bill of sale or other conveyance executed by or on behalf of Trustee, the sheriff or other official or party responsible for conducting the sale shall be prima facie evidence of the compliance with all statutory requirements for the sale and execution of such deed, bill of sale or other conveyance and will conclusively establish the truth and accuracy of the recitals and other matters stated therein, including nonpayment or nonperformance of the Obligations, violation of the terms and covenants contained herein and the advertisement and conduct of such sale in the manner provided herein or as provided by applicable Law. Debtor does hereby ratify and confirm all legal acts that Trustee and Secured Party may do in carrying out the provisions of this Instrument. Any sale of the Collateral or any portion thereof pursuant to the provisions of this Article V will operate to divest all right, title, interest, claim and demand of Debtor in and to the property sold and will be a perpetual bar against Debtor and shall, subject to applicable Law, vest title in the purchaser free and clear of all Liens, security interests and encumbrances, including Liens, security interests and encumbrances junior or subordinate to the Liens, security interests and encumbrances created by this Instrument. Upon any sale of the Collateral or any portion thereof pursuant to the provisions of this Article V, the receipt by Trustee, Secured Party, the sheriff or other official or party responsible for conducting the sale, shall be sufficient discharge to the purchaser or purchasers at any sale for the purchase money, and such purchaser or purchasers and the heirs, devisees, personal representatives, successors and assigns thereof shall not, after paying such purchase money and receiving such receipt of Trustee, Secured Party, the sheriff or such other official or party, be obliged to see to the application thereof or be in anywise answerable for any loss, misapplication or nonapplication thereof. Any purchaser at a sale will, subject to mandatory redemption periods, if any, receive immediate possession of the Collateral purchased, and Debtor agrees that if Debtor retains possession of the Collateral or any part thereof subsequent to such sale, Debtor will be considered a tenant at sufferance of the purchaser, and will, if Debtor remains in possession after demand to remove, be guilty of forcible detainer, and will be subject to eviction and removal, forcible or otherwise, with or without process of law and all damages to Debtor by reason thereof are hereby expressly waived by Debtor.

       I.     <u>Appraisement; Deficiency</u>. To the full extent Debtor may do so, Debtor agrees that it will not at any time insist upon, plead, claim or take the benefit or advantage of any applicable Law providing for any appraisement, valuation, stay, extension or redemption, and for Debtor and Debtor's successors and permitted assigns, and for any and all Persons ever claiming any interest in the Collateral, to the extent permitted by applicable Law, hereby waives and releases all rights of redemption, valuation, appraisement, stay of execution, notice of intention to mature or declare due the whole of the Obligations, notice of election to mature or declare due the whole of the Obligations and all rights to a marshaling of the assets of Debtor, including the Collateral, or to a sale in inverse order of alienation in the event of foreclosure of the Liens hereby created, and any and all rights Debtor may have under any other similar protections, including, without limitation, C.R.S. Sections 13-50-102 and 13-50-103. Debtor will not have or assert any right under any applicable Law pertaining to the marshaling of assets, sale in inverse order of alienation, or other matters whatsoever to defeat, reduce or affect the right of Secured Party under the terms of this Instrument to a sale of the Collateral for the collection of the Obligations without any prior or

different resort for collection, or the right of Secured Party under the terms of this Instrument to the payment of such indebtedness out of the proceeds of sale of the Collateral in preference to every other claimant whatever. If any applicable Law referred to in this Paragraph and now in force, of which Debtor or Debtor's successors and permitted assigns and such other Persons claiming any interest in the Collateral might take advantage despite this Paragraph, will hereafter be repealed or cease to be in force, such applicable Law will not thereafter be deemed to preclude the application of this Paragraph.

1.      Notwithstanding the provisions of any applicable Law, and to the extent permitted by applicable Law, Debtor agrees that Secured Party will be entitled to seek a deficiency judgment from Debtor and any other Person obligated on the Obligations equal to the difference between the amount owing on the Obligations and the amount for which the Collateral was sold pursuant to a judicial or non-judicial foreclosure sale;

2.      Debtor expressly recognizes that this Paragraph will constitute a waiver of certain protections under applicable Laws which would otherwise permit Debtor and other Persons against whom recovery of deficiencies is sought or guarantors independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Collateral as of the date of foreclosure and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than fair market value;

3.      Subject to C.R.S. § 38-38-106(1), in any action by Secured Party to recover a deficiency judgment for any balance due under the Convertible Note upon the foreclosure of this Instrument or in any action to recover the Obligations secured hereby, and as a material inducement to making the loan evidenced by the Convertible Note, Debtor acknowledges and agrees that the successful bid amount made at any foreclosure sale, if any, shall be conclusively deemed to constitute the fair market value of the Collateral included in the sale, that such bid amount shall be binding against Debtor in any proceeding seeking to determine or contest the fair market value of the Collateral being sold and that such bid amount shall be the preferred alternative means of determining and establishing the fair market value of the Collateral being sold.  To the extent permitted by law, Debtor hereby waives and relinquishes any right to have the fair market value of the Collateral being sold determined by a judge or jury in any action seeking a deficiency judgment or any action on the Obligations secured hereby;

4.      Debtor further recognizes and agrees that this waiver will create an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Collateral for purposes of calculating deficiencies owed by Debtor, other mortgagors on the Obligations, guarantors, and others against whom recovery of a deficiency is sought;

5.      Alternatively, in the event this waiver is determined by a court of competent jurisdiction to be unenforceable, the following will be the basis for the finder of

fact's determination of the fair market value of the Collateral as of the date of the foreclosure sale proceedings:

> (a) The Collateral will be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Collateral will be repaired or improved in any manner before a resale of the Collateral after foreclosure;

> (b) The valuation will be based upon an assumption that the foreclosure purchaser desires a prompt resale of the Collateral for cash promptly (but no later than twelve months) following the foreclosure sale;

> (c) All reasonable closing costs customarily borne by the seller in a commercial real estate transaction should be deducted from the gross fair market value of the Collateral, including, without limitation, commercially reasonable brokerage commissions, title insurance (without endorsement), a survey of the Collateral, tax prorations, reasonable attorney's fees, and reasonable marketing costs;

> (d) The gross fair market value of the Collateral will be further discounted to account for any estimated holding costs associated with maintaining the Collateral pending sale, including, without limitation, utilities expenses, reasonable property management fees (for property similar to the Collateral), taxes and assessments (to the extent not accounted for in (d)(iii) above), and other reasonable maintenance expenses; and

> (e) Any expert opinion testimony given or considered in connection with a determination of the fair market value of the Collateral must be given by Persons having at least five years' experience in appraising property similar to the Collateral and who have conducted and prepared a complete written appraisal of the Collateral taking into consideration the factors set forth above.

**Section 5.5    Personal Property.** If an Event of Default shall have occurred and be continuing, in addition to all other rights, powers and remedies herein conferred or conferred by operation of law, Secured Party shall have all of the rights and remedies of an assignee and secured party granted by applicable Law, including the applicable Uniform Commercial Code as then in effect, and shall, to the extent permitted by applicable Law, have the right and power, but not the obligation, to take possession of the personal property included in the Collateral and any proceeds thereof wherever located, and for that purpose Secured Party may enter upon any premises on which any or all of such personal property is located and take possession of and operate such personal property or remove the same therefrom. Secured Party may require Debtor to assemble such personal property and make it available to Secured Party at a place to be designated by Secured Party that is reasonably convenient to both parties.

**Section 5.6    Possession.** If an Event of Default shall have occurred and be continuing, in addition to all other rights, powers and remedies herein conferred or conferred by operation of law, Secured Party shall, to the extent not prohibited by applicable Law, have the right and power, but not the obligation, to enter upon and take immediate possession of the Collateral or any portion thereof, to exclude Debtor therefrom, to hold, use, operate, manage, enjoy and control such Collateral, to make all such repairs, replacements, alterations, additions and improvements to the same as Secured Party may deem proper or expedient, to demand, collect and retain all other earnings, rents, issues, profits, proceeds and other sums due or to become due with respect to such Collateral accounting for and applying to the payment of the Obligations only the net earnings arising therefrom after charging against the receipts therefrom all fees, costs, expenses, charges, damages and losses incurred by reason thereof plus interest thereon at the Interest Rate without any liability to Debtor in connection therewith. Such possession shall at once be delivered to Secured Party upon request, and on refusal or failure to so deliver possession, the delivery of such possession may be enforced by Secured Party by any appropriate legal proceeding. All costs, expenses and liabilities of every character incurred by Secured Party in administering, managing, operating, and controlling the Collateral will constitute a demand obligation (which obligation Debtor hereby expressly promises to pay) owing by Debtor to Secured Party and will bear interest from date of expenditure until paid at the Interest Rate, all of which will constitute a portion of the Obligations and will be secured by this Instrument and all other Transaction Documents. Upon such payment of all such costs and payment and performance of the Obligations, the Collateral shall be returned to Debtor in its then condition. Secured Party shall not be liable to Debtor for any damage or injury to the Collateral except such as may be caused through his, its or their gross negligence or willful misconduct as determined by a final non-appealable judgment rendered by a court of competent jurisdiction.

**Section 5.7    Appointment of Receiver.** If an Event of Default shall have occurred and be continuing, in addition to all other rights, powers and remedies herein conferred or conferred by operation of law, Secured Party shall be entitled to the appointment of a receiver of the Collateral without the necessity of the posting of a bond or notice; and shall, to the extent not prohibited by applicable Law, be entitled to such receiver as a matter of right, without regard to the solvency or insolvency of Debtor, the value or adequacy of the Collateral or the Collateral being in danger of being materially injured or reduced in value as security by removal, destruction, deterioration, accumulation of prior Liens or otherwise; and such receiver may be appointed by any court of competent jurisdiction upon ex parte application, and without notice, notice being expressly waived. Debtor does hereby consent to the appointment of such receiver or receivers, waives any and all defenses to such appointment, and agrees not to oppose any application therefor by Secured Party, and agrees that such appointment shall in no manner impair, prejudice or otherwise affect the other rights of Secured Party under this Article V. Nothing herein is to be construed to deprive Secured Party of any other right, remedy or privilege it may now or hereafter have under Law to have a receiver appointed. Any money advanced by Secured Party in connection with any such receivership shall be a demand obligation owing by Debtor to Secured Party, shall bear interest at the Interest Rate, shall constitute a part of the Obligations and be indebtedness evidenced and secured by this Instrument. Any such receiver shall have all powers conferred by the court appointing such receiver, which powers shall, to the extent not prohibited by applicable Law

include the right to enter upon and take immediate possession of the Collateral or any part thereof, to exclude Debtor therefrom, to hold, use, operate, sell, manage and control such Collateral, to make all such repairs, replacements, alterations, additions and improvements to the same as such receiver or Secured Party may deem proper or expedient, to demand and collect all of the other earnings, rents, issues, profits, proceeds and other sums due or to become due with respect to such Collateral, accounting for only the net earnings arising therefrom after charging against the receipts therefrom all fees, costs, expenses, charges, damages and losses incurred by reason thereof plus interest thereon without any liability to Debtor in connection therewith which net earnings shall be turned over by such receiver to Secured Party to be applied by Secured Party to the payment of the Obligations in the order set forth in Section 5.11.

**Section 5.8    Waiver by Debtor.** To the extent not prohibited by applicable Law, Debtor agrees that Debtor shall not at any time have, invoke, utilize or assert any right under any Laws pertaining to the marshalling of assets or Liens, the sale of property in the inverse order of alienation, the exemption of homesteads, the administration of estates of decedents, appraisement, moratorium, valuation, stay, extension or redemption now or hereafter in force; and Debtor hereby waives the benefit of all such Laws to the fullest extent not prohibited by applicable Law.

**Section 5.9    Remedies Cumulative.** All rights, powers and remedies herein conferred are cumulative, and not exclusive, of (A) any and all other rights and remedies herein conferred, (B) any and all rights, powers and remedies existing at law or in equity, and (C) any and all other rights, powers and remedies provided for in any other documents or instruments evidencing, securing or relating to the Obligations; and Secured Party shall, in addition to the rights, powers and remedies herein conferred, be entitled to avail itself of all such other rights, powers and remedies as may now or hereafter exist at law or in equity for the collection of and enforcement of the Obligations and the enforcement of the warranties, representations, covenants, indemnities and other agreements contained in this Instrument, the other Transaction Documents and the other documents and instruments evidencing, securing or relating to the Obligations and the foreclosure of the Liens and security interests created thereby or hereby. Each and every such right, power and remedy may be exercised from time to time and as often and in such order as may be deemed expedient by Secured Party and the exercise of any such right, power or remedy shall not be deemed a waiver of the right to exercise, at the same time or thereafter, any other right, power or remedy. No delay or omission by Secured Party or by Trustee, the sheriff or other official or person in the exercise of any right, power or remedy will impair any such right, power or remedy or operate as a waiver thereof or of any other right, power or remedy then or thereafter existing.

**Section 5.10    Costs and Expenses.** All fees, costs and expenses (including reasonable attorneys' fees and legal expenses, court costs, filing fees, and mortgage, transfer, stamp and other excise taxes, inspection fees, appraisers' fees, outlays for documentary and expert evidence, stenographers' charges, publication, notice and advertising costs, postage, photocopies, telephone charges and costs of procuring all abstracts of title, title searches and examinations, title opinions, title insurance policies and similar title data and assurances as Secured Party or Trustee may deem appropriate either to prosecute such suit or to evidence to bidders at the sales that may be had pursuant to such proceeding the condition of the title to or the value of the Collateral, public trustee's fees and expenses, sheriffs fees and expenses, receiver's fees and expenses, and fees and expenses

of agents of Secured Party and Trustee, costs and expenses of defending, protecting and maintaining the Collateral and Secured Party's and Trustee's interest therein including repair and maintenance costs and expenses and costs and expenses of protecting and securing the Collateral including insurance costs and all other fees, costs and expenses provided for or authorized by applicable Law), incurred by or on behalf of Secured Party or Trustee in protecting and enforcing its rights hereunder or incident to the enforcement of this Instrument and the Liens and security interests created hereby, shall be a demand obligation owing by Debtor to Secured Party and shall bear interest at the Interest Rate and shall constitute a part of the Obligations and be indebtedness secured and evidenced by this Instrument.

Section 5.11    **Application of Proceeds.** The proceeds of any sale of the Collateral or any part thereof made pursuant to this Article V shall be applied in the manner set forth in the Loan Agreement.

Section 5.12    **Limitation on Rights and Waivers.** All rights, powers and remedies herein conferred shall be exercisable by Trustee and Secured Party only to the extent not prohibited by applicable Law; and all waivers and relinquishments of rights and similar matters shall only be effective to the extent such waivers or relinquishments are not prohibited by applicable Law.

## ARTICLE VI.
## MISCELLANEOUS PROVISIONS

Section 6.1    **Waiver.** The failure or delay of Secured Party to file or give any notice as to this Instrument, or to exercise any right, remedy or option to declare the maturity of the principal debt, or any other sums hereby secured, or the payment by Secured Party of any taxes, Liens, charges or assessments, shall not be taken or deemed a waiver of any rights to exercise such right or option or to declare any such maturity as to any past or subsequent violations of any of such covenants or stipulations, and shall not waive or prejudice any right or Lien hereunder. Any and all covenants of Debtor in this Instrument may from time to time, be waived by Secured Party by an instrument in writing signed by Secured Party to such extent and in such manner as Secured Party may desire, but no such waiver will ever affect or impair Secured Party's rights hereunder, except to the extent specifically stated in such written instrument. All changes to, amendments and modifications of this Instrument must be in writing and signed by Secured Party.

Section 6.2    **Severability.** If any provision of this Instrument, the other Transaction Documents or any of the instruments and documents evidencing, securing or relating to the Obligations is invalid or unenforceable in any jurisdiction, such provision shall be fully severable from this Instrument and the other provisions hereof and said instruments and documents shall remain in full force and effect in such jurisdiction and the remaining provisions hereof shall be liberally construed in favor of Secured Party and Trustee in order to carry out the provisions and intent hereof. The invalidity of any provision of this Instrument in any jurisdiction shall not affect the validity or enforceability of any such provision in any other jurisdiction.

**Section 6.3    Subrogation.** This Instrument is made with full substitution and subrogation of Secured Party in and to all covenants and warranties by others heretofore given or made with respect to the Collateral or any part thereof.

**Section 6.4    Financing Statement.** This Instrument shall be deemed to be and may be enforced from time to time as an assignment, contract, deed of trust, mortgage, financing statement, fixture filing, real estate mortgage or security agreement, and from time to time as any one or more thereof as appropriate under applicable state Law. Debtor hereby authorizes Secured Party to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral without the signature of Debtor at any time after the execution of this Instrument, and hereby ratifies any thereof filed prior to the execution of this Instrument. In this connection, this Instrument will be presented to a filing officer under the Code to be filed in the real property records as a Financing Statement covering coal or other substances of value that may be extracted from coal, minerals and fixtures and as-extracted collateral produced from or allocated or attributed to any of the Collateral, pursuant to Section 9-502(c) of the Code (Colorado Revised Statutes section 4-9-502(c)). For purposes of filing this Instrument as a financing statement, the addresses for Debtor, as the debtor, and Secured Party, as the secured party, are as set forth hereinabove.

**Section 6.5    Rate of Interest.** All interest required under this Instrument and shall be calculated as provided under the Loan Agreement. Notwithstanding anything to the contrary contained herein, no rate of interest required hereunder or under the Obligations shall exceed the maximum legal rate under applicable Law, and, in the event any such rate is found to exceed such maximum legal rate, Debtor shall be required to pay only such maximum legal rate.

**Section 6.6    Governing Law.** This Instrument shall be construed under and governed by the Laws of the state of Colorado.

**Section 6.7    Recording.** All recording references in the Exhibits hereto are to the official real property records of the county in which the affected Real Property is located and in which records such documents are or in the past have been customarily recorded. The references in this Instrument and in the Exhibits hereto to Liens, encumbrances and other burdens are for the purposes of defining the nature and extent of Debtor's warranties and shall not be deemed to ratify, recognize or create any rights in third parties.

**Section 6.8    Execution in Counterparts.** This Instrument may be executed in one or more original counterparts. To facilitate filing and recording, there may be omitted from any counterpart the parts of Exhibit "A" containing specific descriptions of the Collateral that relate to land located in counties other than the county in which the particular counterpart is to be filed or recorded. Each counterpart shall be deemed to be an original for all purposes, and all counterparts shall together constitute but one and the same instrument.

**Section 6.9    Notices.** All notices and other communications under this Instrument shall be in writing and delivered in the manner required by the Loan Agreement, directed to the intended recipient as follows:

If to Debtor:
c/o Allegiance Coal USA Limited
Attn: Mark Gray
1415 Suite D, Hankin Ave.
Telkwa BC V0J 2X0 Canada
Email: mgray@allegiancecoal.com.au

If to Secured Party:

Collins St Convertible Notes Pty Ltd ACN 657 773 754,
as trustee for The Collins St Convertible Notes Fund
Level 9 of 365 Little Collins Street
Melbourne VIC 3000
Email: ntorelli@csvf.com.au

Either Debtor or Secured Party may change the address to which notices and other communications hereunder can be delivered by giving the other party notice in the manner herein set forth.

**Section 6.10    Usury Savings.** Debtor and Secured Party intend to contract in strict compliance with applicable usury Laws from time to time in effect. In furtherance thereof, the parties stipulate and agree that none of the terms and provisions contained in this Instrument shall ever be construed to create a contract to pay, for the use, forbearance or detention of money, interest in excess of the maximum amount of interest permitted to be charged by applicable Law from time to time in effect. Neither Borrower, Debtor or any other present or future guarantors, endorsers or other Persons hereafter becoming liable for payment of the Obligations shall ever be liable for unearned interest thereon or shall ever be required to pay interest thereon in excess of the maximum amount that may be lawfully charged under applicable Law from time to time in effect. Secured Party expressly disavows any intention to charge or collect excessive unearned interest or finance charges in the event the maturity of any Obligations is accelerated. If (a) the maturity of any Obligations is accelerated for any reason, (b) any Obligations are prepaid and as a result any amounts held to constitute interest are determined to be in excess of the legal maximum, or (c) Secured Party or any other holder of any or all of the Obligations shall otherwise collect moneys which are determined to constitute interest which would otherwise increase the interest on any or all of the Obligations to an amount in excess of that permitted to be charged by applicable Law then in effect, then all such sums determined to constitute interest in excess of such legal limit shall, without penalty, be promptly applied to reduce the then outstanding principal of the related Obligations or, at Debtor's or such holder's option, promptly returned to Debtor or the other payor thereof upon such determination. In determining whether or not the interest paid or payable under any specific circumstance exceeds the maximum amount permitted under applicable Law, Debtor or Secured Party (and any other payors thereof) shall to the greatest extent permitted under applicable Law, (x) characterize any non-principal payment as an expense, fee or premium rather than as interest, (y) exclude voluntary prepayments and the effects thereof, and (z) amortize,

prorate, allocate and spread the total amount of interest throughout the entire contemplated term of the instruments evidencing the Obligations in accordance with the amounts outstanding from time to time thereunder and the maximum legal rate of interest from time to time in effect under applicable Law in order to lawfully charge the maximum amount of interest permitted under applicable Law

**Section 6.11    Binding Effect.** This Instrument shall bind and inure to the benefit of the respective successors and permitted assigns of Debtor, Trustee and Secured Party, and the covenants and agreements herein contained shall constitute covenants running with the land.

**Section 6.12    References.** All references in this Instrument to Exhibits, Articles, Sections, Subsections, paragraphs, subparagraphs and other subdivisions refer to the Exhibits, Articles, Sections, Subsections, paragraphs, subparagraphs and other subdivisions of this Instrument unless expressly provided otherwise. Titles and headings appearing at the beginning of any subdivision are for convenience only and do not constitute any part of any such subdivision and shall be disregarded in construing the language contained in this Instrument. The words "this Instrument," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Instrument as a whole and not to any particular subdivision unless expressly so limited. The phrases "this Section," "this Subsection" "this paragraph," "this subparagraph" and similar phrases refer only to the Sections, Subsections, paragraphs or subparagraphs hereof in which the phrase occurs. The word "or" is not exclusive and the word "including" (in its various forms) means "including without limitation." All references to days are to calendar days unless otherwise specifically stated. Pronouns in masculine, feminine and neuter gender shall be construed to include any other gender. Words in the singular form shall be construed to include the plural and words in the plural form shall be construed to include the singular, unless the context otherwise requires.

**Section 6.13    Filing.** Some of the above described goods are or are to become fixtures on the Real Property described in _Exhibit A_. This Instrument is to be filed for record in, among other places, the real estate records of each county identified in _Exhibit A_. Debtor is the owner of an interest of record in the real estate concerned.

**Section 6.14    Legal Counsel and Drafting.** Debtor represents and warrants that it has consulted with (or had the opportunity to consult with) its legal counsel regarding this Instrument and all waivers contained hereunder. This Instrument and the language used in this Instrument are the product of all parties' efforts and Debtor hereby irrevocably waives the benefit of any rule of contract construction which disfavors the drafter of an agreement.

**Section 6.15    Transaction Document.** The Debtor acknowledges and agrees that this Instrument is a "Transaction Document" as such term is defined in the Convertible Note.

**Section 6.16    Entire Agreement.** THIS INSTRUMENT SUPERSEDES ALL PRIOR AGREEMENTS BETWEEN THE PARTIES WITH RESPECT TO ITS SUBJECT MATTER AND CONSTITUTES (ALONG WITH THE DOCUMENTS REFERRED TO IN THIS DEED OF TRUST) A COMPLETE AND EXCLUSIVE STATEMENT OF THE TERMS OF THE AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO ITS SUBJECT MATTER THIS INSTRUMENT WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH,

THE LAWS OF THE STATE OF COLORADO, REGARDLESS OF THE LAWS THAT MIGHT OTHERWISE GOVERN UNDER PRINCIPLES OF CONFLICT OF LAWS THEREOF.

[*Signature Page Follows*]

Executed to be effective as of the date first above written.

**DEBTOR:**

**NEW ELK COAL COMPANY LLC,**
a Colorado limited liability company

By: _____

Name: Saravanan Sivapathasundaram
Title: CFO
Organizational I.D. No.    20061150078

## ACKNOWLEDGMENT CERTIFICATE

STATE OF                    ) Colorado
                           )
COUNTY OF                   ) Las Animas

This instrument was acknowledged before me this 11ᵗʰ day of August, 2022, by Saravanan Sivapathasundaram of New Elk Coal Company LLC, a Colorado limited liability company, on behalf of the limited liability company.

Witness my hand and official seal.

My commission expires: _08 -19- 2023_     _____
                                          Notary Public

                    Address:    209 Prospect St.
                                Trinidad Co 81082

```
MELISSA CRUZ
Notary Public
State of Colorado
Notary ID # 20194031639
My Commission Expires 08-19-2023
```

[DEED OF TRUST, MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF PRODUCTION AND
PROCEEDS, FINANCING STATEMENT AND FIXTURE FILING SIGNATURE PAGE]

11126872.1

Instrument # 202300765013 Book: 1185 Page: 1834

**PREAMBLE TO**

**EXHIBIT A**

Attached to and made a part of that certain
Deed of Trust, Mortgage, Security Agreement, Assignment of
Production and Proceeds, Financing Statement and Fixture Filing,
dated as of 11th August , 2022] (the *"Deed of Trust"),* from
New Elk Coal Company LLC, as Debtor,
to the Public Trustee of Las Animas County, Colorado, as Trustee,
and for the benefit of
Collins St Convertible Notes Pty Ltd ACN 657 773 754, as trustee for The Collins St Convertible Notes
Fund ABN 30 216 289 383, as Secured Party

1.  Capitalized terms used herein without definition shall have the meaning ascribed thereto in the Deed of Trust.

2.  The Deed of Trust covers all right, title and interest of Debtor (whether now owned or hereafter acquired by operation of law or otherwise) in and to the land specifically described in Part I of this Exhibit A and the land described in or covered by the leases, licenses, subleases, sublicenses, easements, rights-of-way, agreements and other documents and instruments described in this Exhibit A whether or not such land is specifically described in Part I of Exhibit A.

3.  The Exhibits consists of this Preamble and Part I, II, III, IV, V and VI of this Exhibit A as follows:

    **PART I-LANDS**

    **PART II - MINERAL LEASES**

    **PART III - OTHER REAL PROPERTY LEASES**

    **PART IV - RELATED AGREEMENTS**

    **PART V - PRODUCTION SALE AND MARKETING CONTRACTS**

    **PART VI-WATER RIGHTS**

# EXHIBIT A

Attached to and made a part of that certain
Deed of Trust, Mortgage, Security Agreement, Assignment of
Production and Proceeds, Financing Statement and Fixture Filing,
dated as of August 11, 2022 (the *"Deed of Trust")*, from
New Elk Coal Company LLC, as Debtor,
to the Public Trustee of Las Animas County, Colorado, as Trustee,
and for the benefit of Collins St Convertible Notes Pty Ltd ACN 657 773 754, as trustee for The Collins
St Convertible Notes Fund ABN 30 216 289 383, as Secured Party

## PART I - FEE LANDS

| LAS ANIMAS COUNTY, COLORADO | | | | |
|---|---|---|---|---|
| **Property** | **Interest-holder** | **Instrument** | **Legal Description** | **Comments** |
| New Elk Mine - Wash Plant Tract (Surface Rights only) | New Elk Coal Company LLC (as owner) | Quitclaim Deed and Bill of Sale dated May 8, 2008 from Picketwire Processing, LLC to New Elk Coal Company LLC, recorded in Book 1076, Page 1716 of the records of Las Animas County, Colorado<br><br>Quitclaim Deed dated July 14, 2009 from Pacesetter Energy Leasing, LLC to New Elk Coal Company LLC, recorded in Book 1086, Page 1048 of the records of Las Animas County, Colorado | The two tracts of land described in Exhibit A-1 attached hereto and depicted on the plats contained in said exhibit, excluding the 1.87-acre tract conveyed to the Department of Transportation, State of Colorado in that certain Warranty Deed recorded October 17, 2011 in Book 1099, Page 1651 of the records of Las Animas County, Colorado that is more specifically described in Exhibit A-9 attached hereto | (1) |

A-2

| | | | LAS ANIMAS COUNTY, COLORADO | |
|---|---|---|---|---|
| **Property** | **Interest-holder** | **Instrument** | **Legal Description** | **Comments** |
| New Elk Mine-Underground Mine Workings | New Elk Coal Company LLC (as owner) | Quitclaim Deed and Bill of Sale from Picketwire Processing, LLC to New Elk Coal Company, LLC dated May 8, 2008, recorded in Book 1076, Page 1710 of the records of Las Animas County, Colorado | Real property interests associated with underground mine workings (including mine portals, existing underground passages, pockets and spaces, and mine equipment and facilities for transporting coal located in such passages) located within the boundary of mine permit C-81-012 for the New Elk Mine as it existed on June 1, 1997 (which permit area is described in Exhibit A-2), as more particularly shown in Exhibit A-3 attached hereto | (2) |
| New Elk Mine-Part of Jansen Railroad Yard | New Elk Coal Company LLC (as owner) | Quitclaim Deed dated May 8, 2008 from Trinidad Railway Holding, LLC and Trinidad Railway, Inc. to New Elk Coal Company LLC, recorded in Book 1076, Page 1731 | A tract of land located in part of the Sl/2SE1/4 of Section 22, Township 33 South, Range 64 West of the 6th P.M., County of Las Animas, State of Colorado, more particularly described as follows:<br><br>Beginning at a point on the northeasterly boundary of the Trinidad Railroad, Inc. tract, from which the southeast corner of Section 22 bears S 29°35'32" E, 1502.41 feet; thence S 30°25'09" E, 103.41 feet to a point on the north boundary of the Kem Valley Railroad Right of Way; thence S 59°54'19" W, along the northerly boundary of said Kem Valley (formerly C&W) Railroad R.O.W., 514.29 feet to a point; thence departing said Railroad R.O.W., N 69°28'59" W, along the southerly boundary of a 30 foot wide access road, 6409.95 feet to a point; thence N 66°11'09" W, along the southerly boundary of said access road, 51.10 feet to a point; thence N 62°55'34" W, 37.19 feet to a point on the east boundary of County Road 63.9; thence N 16°12'07" E, along the east boundary of said county road, 30.55 feet to a point on the northerly boundary of said 30 foot wide access road; thence S 62°55'34" E, along the north boundary of said access road, 42.10 feet to a point; thence S 66°11'09" E, along the north boundary of said access road, 49.39 feet | (1) |

| | | | LAS ANIMAS COUNTY, COLORADO | |
|---|---|---|---|---|
| Property | Interest-holder | Instrument | Legal Description | Comments |
| | | | to a point; S 69°28'59" E, along the northerly boundary of said access road, 530.74 feet to a point; thence departing said access road, N 55°59'10" E, 559.90 feet to the point of beginning, containing 1.74 acres. | |
| New Elk Mine | North Central Energy Company (owner of coal estate) | Special Warranty Deeds from CF&I Steel Corporation to North Central Energy Company dated February 28, 1984, recorded in Book 830, Page 619, Book 834, Page 905 and Book 837, Page 225 of the records of Las Animas County, Colorado | Township 33 South, Range 67 West, 6th P.M. <br> Section 5:   Lot 4 (NW1/4NW1/4), S1/2N1/2, S/2 <br> Section 6:   Lot 1 (NE1/4NE1/4), S1/2NE1/4, SE1/4 <br> Section 7:   NW1/4NE1/4 <br> Section 18:  S1/2SE1/4 <br><br> Township 33 South, Range 68 West, 6th P.M. <br><br> Section 12: NE1/4SE1/4, SW1/4SE1/4 | (3) (4) (5) (6) (7) |
| New Elk Mine | North Central Energy Company (owner of coal estate, continued) | Special Warranty Deeds from CF&I Steel Corporation to North Central Energy Company dated February 28, 1984, recorded in Book 830, Page 619, Book 834, Page 903 and Book 837, Page 227 of the records of Las Animas County, Colorado | Township 33 South, Range 67 West, 6thP.M. <br> Section 19: E/2NE/4, SW/4NE/4, SE/4NW/4 <br><br> *And also that that portion of the following land lying north of the centerline of Colorado State Highway No. 12:* <br><br> Township 33 South, Range 67 West, 6thP.M. <br><br> Section 19: Part of Lot 2 (SW/4NW/4) and part of Lot 3 described as follows: Commencing at the northwest corner of the SE/4NW/4 of Section 19, T33S, R67W, thence West 443 feet to a point; thence in a southerly direction 1779 feet more or less to the North line of the Maxwell Land Grant; thence in a southeasterly direction along the northerly line of said Grant line 498 feet to a point; thence in | (3)(4)(5) (6) (7) |

| | | | | |
|---|---|---|---|---|
| **LAS ANIMAS COUNTY, COLORADO** | | | | |
| **Property** | **Interest-holder** | **Instrument** | **Legal Description** | **Comments** |
| | | | a northerly direction 1920 feet more or less to the place of beginning, said tract containing 20 acres more or less<br><br>Section 19: Lot 4 (37.30), except that part of said tract which was included in the following conveyance: Warranty Deed from Jose De LaLuz Lovato to Leonardo Chavez, dated March 23, 1903, recorded in the office of the County Clerk and Recorder of Las Animas County on March 25, 1903 at Book 121, Page 72 conveying: That part of the Northeast quarter (NE/4) of Southwest Quarter (SW/4) of Section 19, T33S, R67W; described as follows: Beginning at a point that bears South 81°30' West and is 135 feet distant from the Southwest corner of an adobe building owned by one Agapito Abeyta; thence South 15° West a distance of 70 feet to a point; thence South 21° East a distance of 23 feet to a point; thence North 66° West a distance of 100 feet to a point; thence North 21° West a distance of 23 feet to point; thence North 15° East a distance of 70 feet to a point that is 100 feet from the point of beginning, thence south 66° East a distance of 100 feet to the point of beginning, containing .16 acres | |

| LAS ANIMAS COUNTY, COLORADO | | | | |
|---|---|---|---|---|
| Property | Interest-holder | Instrument | Legal Description | Comments |
| | | | <u>Township 33 South, Range 67 West, 6th P.M. (cont.)</u><br><br>Section 19: Lot 5 (40.00) except that part of said tract which was included in the following conveyance: Warranty Deed from Felix N. Samora to Antonio D. Martinez, dated March 3, 1893, filed in the office of the County Clerk and Recorder of Las Animas County on March 3, 1893, recorded in Book 79 at Page 186, conveying: Beginning at a point (a post and stones) on the North bank of the North Fork of the Las Animas River; thence North 2° East 10.4 chains to a point that is East 8.55 chains to the Northeast corner of the NE/4SW/4; thence West 3.42 chains or 75 yards to a point; thence South 2° West along land of party of the second part, but formerly of Agapito A. Vigil, the distance of 14 chains to a point on the North bank of said North Fork; thence along the North Bank of said North Fork, by its several meanderings, in a northeasterly direction to the place of beginning, containing 4 acres, being a part of the West part of the NW/4SE/4<br><br>Section 19: Lot 8 (30.38), except that part of said tract which was included in the following conveyance: Warranty Deed from Epifano Greigo to Antonio Domingo Martinez, dated August 1, 1906, recorded in the office of the County Clerk and Recorder of Las Animas County on September 14, 1906, recorded in | |

| LAS ANIMAS COUNTY, COLORADO | | | | |
|---|---|---|---|---|
| **Property** | **Interest-holder** | **Instrument** | **Legal Description** | **Comments** |
| | | | Book 143, Page 35 conveying about one-seventh of an acre situated in the bend of the Las Animas River, being a part of the W/2SE/4 of Section 19, T33S, R67W, containing .14 acres | |
| New Elk Mine-Land adjacent to Wash Plant tract (Surface and mineral rights) | New Elk Coal Company LLC (as owner) | Special Warranty Deed dated effective April 16, 2012 from Colleen Anne Millard, as Trustee of the Millard Family Trust, to New Elk Coal Company LLC, recorded on April 19, 2012 in Book 1103, Page 67 of the Las Animas County, Colorado records | The tract of land described in Exhibit A-10 attached hereto | (8) |

## Comments:

(1)   New Elk Coal Company LLC owns the surface estate only; coal and other minerals are owned by third parties.

(2)   Ownership of underground mine workings does not include ownership of coal or other minerals.

(3)   Ownership is limited to coal estate; third parties own surface and minerals other than coal.

(4)   Lands are subject to Conveyance of Nonparticipating Royalty Interest from North Central Energy Company to GASCO, Inc. dated April 3, 1991 (recorded in Book 880, Page 279), as modified by a Correction to Conveyance of Nonparticipating Royalty dated May 31, 1991 but effective April 3, 1991 (recorded in Book 880, Page 477), conveying a nonparticipating royalty of $0.35 per ton, subject to adjustment for inflation as provided therein.

(5)   Lands are subject to Grant of Royalty dated May 12, 2008 (recorded May 30, 2008 in Book 1077, Page 490) from New Elk Coal Company LLC to Westmoreland Coal Company, its successors and assigns of "a royalty of

(i)   two dollars ($2.00) per ton (2,000 pounds) or (ii) seven percent (7%) of the total gross realization received by Grantor, its successors or assigns, whichever is the greater, with respect to any and all coal mined, removed and sold."

(6)   The Option Agreement dated as of July 25, 2008 between JMC and Cline Mining Corporation relating to the acquisition of North Central Energy Company provides: "The Parties agree that, in the event Cline exercises the Option, the coal mineral interest owned by NCE will be deemed to be subject to that certain Royalty Agreement dated July 25, 2008 by and among Wayne Coverdale, Mark Justus, John McCulloch and JMC (collectively 'Sellers'), Cline and New Elk Coal Company LLC, and Cline shall cause NCE to execute a Royalty Deed to Sellers

substantially in the form attached as Exhibit B to said Royalty Agreement." The referenced Royalty Agreement provided for New Elk Coal Company LLC's execution of a royalty deed granting to Sellers a royalty in the amount of US $1.00 per metric ton with respect to all coal that is mined and sold from New Elk Coal Company's property.

(7)   In the event that coal from these lands are removed underground through the lands in the DOW Lease (as defined in Part II of this Exhibit A) a haulage royalty in the amount of$0.05 per ton is payable.

(8)   Subject to Royalty Deed dated effective April 16, 2012 from New Elk Coal Company LLC to Colleen Anne Millard, as Trustee of the Millard Family Trust, recorded on April 19, 2012 in Book 1103, Page 77 of the Las Animas County, Colorado records granting an 8% royalty on coal mined and sold from that portion of the property referenced as Permit Area-Parcel 2 that is described in Exhibit A-11 attached hereto.

## PART II - MINERAL LEASES

| LAS ANIMAS COUNTY, COLORADO | | | | |
|---|---|---|---|---|
| **Property** | **Interest-holder** | **Instrument** | **Legal Description** | **Comments** |
| New Elk Mine | New Elk Coal Company LLC (as lessee) | Coal Mining Lease dated March 14, 2008 between the State of Colorado, acting by and through the Department of Natural Resources, for the use and benefit of the Division of Wildlife and Wildlife Commission, as lessor, and New Elk Coal Company LLC, as lessee, recorded in Book 1075, Page 1935 of the records of Las Animas County, Colorado ("DOW Lease")<br><br>Stipulation Regarding Coal Mining Lease dated March 14, 2008 between the State of Colorado, acting by and through the Department of Natural Resources, for the use and benefit of the Division of Wildlife and Wildlife Commission and New Elk Coal Company LLC, recorded in Book 1075, Page 1970 of the records of Las Animas County, Colorado<br><br>Lease Amendment dated effective December 23, 2011, between the State of Colorado, acting by and through the Department of Natural Resources, for the use and benefit of the Division of Parks and Wildlife and Parks and Wildlife Board and New Elk Coal Company LLC. | The following portions of the land described in Exhibit A-4 attached hereto:<br><br>Parcel 1:<br>Land within boundaries of the permit area for New Elk Mine as of June 1, 1997 shown as Parcel 1 in the plat attached hereto as Exhibit A-5, which permit area is also described in Exhibit A-2<br><br>Parcel 2:<br>Southern portion of the land described by metes and bounds in the deed recorded in Book 967 at Page 1002, being that portion of said land that would be located in Sections 19, 30 and 31 in Township 33 South, Range 67 West, in Sections 6, 7, 8, 15, 16,<br><br>17, 18, 19, 20, 21, 22, 28, 29 and 30, Township 34 South, Range 67 West, and in Sections 1, 2, 12, 13 and 24, Township 34 South, Range 68 West if the township surveys were projected into land with the Maxwell Land Grant which land is shown as Parcel 2 in the plat attached hereto as Exhibit A-5<br><br>Additional Leased Premises:<br><br>The remainder of land in Bosque del Oso State Wildlife Area that was acquired by the State of Colorado in certain Warranty Deed dated November 10, 1998 and recorded in Book 967 at Page 1002, not heretofore leased, being approximately 14,387 acres (as depicted on the plat attached hereto as Exhibit A-12) | (1) (2) (4) (5) |

| | | | LAS ANIMAS COUNTY, COLORADO | | |
|---|---|---|---|---|---|
| Property | Interest-holder | Instrument | Legal Description | | Comments |
| | | Lease Amendment dated effective May 9, 2012 between the State of Colorado, acting by and through the Department of Natural Resources, for the use and benefit of the Division of Parks and Wildlife and Parks and Wildlife Board and New Elk Coal Company LLC, recorded in Book 1103, Page 1259 of the records of Las Animas County, Colorado

Lease Amendment dated March 3, 2020, between the State of Colorado, acting by and through the Department of Natural Resources, for the use and benefit of the Division of Parks and Wildlife and Parks and Wildlife Board and New Elk Coal Company LLC. | | | |
| New Elk Mine | New Elk Coal Company LLC (as lessee) | Underground Coal Lease dated May 3, 2007 between XTO Energy Inc., as lessor, and New Elk Coal Company LLC, as lessee, evidenced of record by a Memorandum of Underground Coal Lease recorded May 22, 2007 in Book 1068, Page 259 of the records of Las Animas County, Colorado | Township 33 South, Range 67 West, 6thP.M.

Section 7:  NE1/4NE1/4, S1/2NE1/4, E1/2NW1/4, Lot 1 (NW1/4NW1/4), E1/2SW1/4, SE1/4
Section 8:  All
Section 9:  SW1/4SW/14
Section 17: NW1/4, W1/2NE1/4, N1/2SW1/4, NW1/4SE1/4
Section 18: NE1/4, E1/2NW1/4, N1/2SE1/4 | | |

**Comments:**

(1)    This lease requires the lessor's consent to assignment.

(2)    Lease provides for production royalty of 8.5% of the Gross Sales Price (as defined therein) for coal mined from Parcel **1** of the Leased Premises, and 8% of the Gross Sales Price for coal mined from Parcel 2 of the Leased Premises and from the Additional Leased Premises, but in no case less than $1.30 per ton.

(3)    Lease provides for a production royalty in the amount of the greater of 7% of gross realization or $3.75 per ton.

(4)  Lands are subject to Conveyance of Nonparticipating Royalty Interest from North Central Energy Company to GASCO, Inc. dated April 3, 1991 (recorded in Book 880, Page 279), as modified by a Correction to Conveyance of Nonparticipating Royalty dated May 31, 1991 but effective April 3, 1991 (recorded in Book 880, Page 477), conveying a nonparticipating royalty of $0.35 per ton, subject to adjustment for inflation as provided therein.

(5)  Lands are subject to Royalty Agreement dated July 25, 2008 among Wayne Coverdale, Mark Justus, John McCulloch, JMC Engineering, LLC (collectively Sellers), Cline Mining Corporation and New Elk Coal Company LLC, and Royalty Deed dated July 25, 2008 (recorded July 31, 2008 in Book 1078, Page 1390) in which New Elk Coal Company LLC conveying to JMC Engineering, LLC, Wayne Coverdale, Mark Justus and John McCulloch a royalty of $1 per metric ton on coal produced.

(6)  Lands are subject to Agreement dated July 25, 2006 between New Elk Coal Company LLC and James A. Erickson providing for payment by NECC to Erickson of a royalty of 7.5¢ per ton of coal sold, "which royalty shall not have offset against it the costs of transportation, mining, marketing, stripping or any and all other expenses."

(7)  In the event that coal from these lands are removed underground through the lands in the DOW Lease, a haulage royalty in the amount of $0.05 per ton is payable.

## PART III - OTHER REAL PROPERTY LEASES

<table>
<tr><td colspan="5" align="center"><strong>LAS ANIMAS COUNTY,<br>COLORADO</strong></td></tr>
<tr><td><strong>Property</strong></td><td><strong>Interest-holder</strong></td><td><strong>Instrument</strong></td><td><strong>Legal Description</strong></td><td><strong>Comments</strong></td></tr>
<tr><td>New Elk Mine-Coal Storage and Loading Facility</td><td>New Elk Coal Company LLC (as lessee)</td><td>Coal Storage and Loading Facility Agreement dated September 28th, 2010 between Kem Valley Railroad Company and New Elk Coal Company LLC</td><td>Tract of land being part of the SE1/4 of Section 22, NW1/4SW1/4 of Section 23, and NW1/4NE/4 and NE1/4NW1/4 of Section 27, Township 33 South, Range 64 West of the 6thP.M., which land is more particularly described and shown in <u>Exhibit A-6</u> attached hereto</td><td>(1)</td></tr>
</table>

**Comments:**

(1)     This lease requires the lessor's consent to assignment.

# PART IV - RELATED AGREEMENTS

## EASEMENTS AND RIGHTS-OF-WAY

| LAS ANIMAS COUNTY, COLORADO | | | | |
|---|---|---|---|---|
| **Property** | **Interest-holder** | **Instrument** | **Legal Description** | **Comments** |
| New Elk Mine - Right-of-Way | New Elk Coal Company LLC (as owner) | Quitclaim Deed dated May 8, 2008 from Trinidad Railway Holding, LLC and Trinidad Railway, Inc. to New Elk Coal Company LLC, recorded in Book 1076, Page 1731 of the records of Las Animas County, Colorado | Those portions of the former Trinidad Railway right-of-way described in the instruments listed in Exhibit A-7 attached hereto that were not conveyed to third parties in the instruments listed in Exhibit B to the Quitclaim Deed recorded in Book 1076, Page 1731 | (1) (2) |
| New Elk Mine - Rail Spur | New Elk Coal Company LLC (as lessee) | Right of Way Lease Agreement dated September 1, 2011 between American Trails Association, as Lessor, New Elk Coal Company LLC, as Lessee, and Kem Valley Railroad Company | Parcel #1: All that certain strip of land located in and crossing through Sections 26, 27, 31, 32, 33, 34 and 35, in Township 33 South Range 64 West of the 6th P.M., and Sections 35 and 36 in Township 33 South of Range 65 West of the 6th P.M. Parcel #2: All of the Colorado & Wyoming Railroad right of way West of the U.S. Corps of Engineers C&W Railroad relocation for the Trinidad Lake Project, running across Sections 31, 32, 33, 34 and 35 in Township 33 South, Range 65 West of the 6thP.M. and across Section 36 in Township 33 South, Range 66 West of the 6thP.M. Parcel #3: All that parcel of land situate in Sections 26 and 35, in Township 33 South, Range 64 West of the 6thP.M. which Parcel #1, Parcel #2 and Parcel #3 are more particularly described in Exhibit A-8 attached hereto. | |

**Comments:**

(1)    Lands are subject to Access Easement, granted by New Elk Coal Company LLC to the State of Colorado acting by and through the Department of Natural Resources, for the use and benefit of the Division of Parks and Wildlife and the Parks and Wildlife Commission, dated May 6, 2016 (recorded March 16, 2017 in Book 1135, Page 1532).

(2)    Lands are subject to Right-of-Way Easement, granted by New Elk Coal Company LLC to the State of Colorado acting by and through the Department of Natural Resources, for the use and benefit of the Division of Parks and Wildlife and the Parks and Wildlife Commission, dated May 6, 2016 (recorded March 16, 2017 in Book 1135, Page 1539).

## PART V - PRODUCTION SALE AND MARKETING CONTRACTS

| Instrument | Comments |
|---|---|
| Sales Agency Agreement dated May 18, 2011 between New Elk Coal Company LLC and Mitsui Matsushima Co., Ltd. | (1) (2) (3)(4) |

## Comments:

(1)   This agreement requires payment of commission as more specifically described therein.

(2)   This agreement requires consent to assignment.

(3)   This agreement prohibits New Elk Coal Company LLC from assigning any part or all of its interest in a Mine or a coal property without first obtaining the agreement of the acquirer or assignee to assume and be bound by New Elk Coal Company LLC's obligations under this agreement.

(4)   This agreement provides that following the initial three (3) year term, either party may terminate the agreement by giving the other at least 60 days' notice of termination in writing prior to the end of any three (3) year term.

## PART VI- WATER RIGHTS

<table>
<tr><td colspan="5" align="center"><strong>LAS ANIMAS COUNTY,<br>COLORADO</strong></td></tr>
<tr><td><strong>Property</strong></td><td><strong>Interest-holder</strong></td><td><strong>Instrument</strong></td><td><strong>Legal Description</strong></td><td><strong>Comments</strong></td></tr>
<tr><td>New Elk Mine - Water Rights</td><td>New Elk Coal Company LLC (as lessee)</td><td>Water Lease Agreement dated May 16, 2007 between Hill Ranch, Ltd. and New Elk Coal Company, LLC</td><td>Covers water rights that divert water from the South Fork of the Purgatoire River and its tributaries in Las Animas County, Colorado, including water rights confirmed in the decree entered by the District Court for Water Division No. 2 in Case No. 83CW129</td><td></td></tr>
</table>