# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ALLEGIANCE COAL USA LIMITED, *et al.*,[1]<br><br>Debtors. | ) Chapter 11<br>)<br>) Case No. 23-10234 (CTG)<br>)<br>) (Jointly Administered)<br>)<br>) **Related to Docket Nos. 115 and 117** |

## OBJECTION OF COLLINS ST CONVERTIBLE NOTES PTY LTD, AS TRUSTEE FOR THE COLLINS ST CONVERTIBLE NOTES FUND, TO MOTION FOR ENTRY OF ORDER APPROVING THE COAL SALE CONTRACT WITH MARCO INTERNATIONAL CORPORATION AND GRANTING RELATED RELIEF

Collins St Convertible Notes Pty Ltd, as trustee for The Collins St Convertible Notes Fund (the "Noteholder"), files this objection (the "Objection") to the *Motion for Entry of Order Approving the Coal Sale Contract with Marco International Corporation and Granting Related Relief* [Docket No. 115] (the "Motion"), filed by the above-captioned debtors and debtors in possession (together, the "Debtors") In support of this Objection, the Noteholder respectfully states as follows:

## PRELIMINARY STATEMENT

1. The number one priority for the Noteholder is for the Debtors to commence a sale process. The Noteholder has been trying to work with the Debtors since the original cash collateral order was entered to help stabilize the Debtors' operations, conserve cash and reduce expenses, and develop a timeline for a sale that can be effectuated with the combination of the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Allegiance Coal USA Limited (1324); New Elk Coal Holdings LLC (1314); New Elk Coal Company LLC (0615); and Black Warrior Minerals, Inc. (6486). The location of the Debtors' service address for purposes of these chapter 11 cases is 12250 Highway 12, Weston, Colorado 81091.

DOCS_SF:108622.2 15325/001

Debtors' cash and receivables plus a postpetition loan by the Noteholder. The parties have been working on a DIP term sheet since March 15, 2023 when the Debtors requested a loan because they were in danger of running out of cash and not able to satisfy their payroll and other obligations. The parties have exchanged term sheets and narrowed the issues substantially since that time but were not able to reach an agreement with sufficient time so that the approval of a postpetition loan could be heard at the same time as the Motion.

2. As the Debtors admitted at the cash collateral hearing, their operations were not sustainable prior to the petition date and they have continued to deteriorate rapidly over the four short weeks since these cases were filed. The Debtors are asking for authorization to enter into a sale when in fact they are entering into an inventory financing agreement without regard to the financing requirements under the Bankruptcy Code. As reflected by the Motion, the Debtors did not even invoke section 364 of the Bankruptcy Code or attempt to address the standard for seeking such relief.

3. By disguised financing Motion and entry into the Marco Contract, the Debtors are doing nothing more than obtaining short-term liquidity for the purpose of enabling them to continue operating at a loss while burning through the proceeds of the Noteholder's collateral. The Marco Contract does nothing to address the Debtors' long-term liquidity needs nor does it provide a means for the Debtors to resolve these cases. Even if the Motion is approved, the Debtors' projections show they will still run out of cash to operate before the end of April.

4. The financing under the Marco contract is extremely expensive. The Debtors "sell" coal to Marco in exchange for only 65% of the full potential purchase price (while still being responsible for all of the costs associated with the coal until it is sold to a third party) that results in an effective annual interest rate that is over 115%. At the present, the Debtors do not

2

have a buyer to purchase the coal inventory to be financed by Marco that is the basis for their cash forecasts. If the Debtors are not able to locate a willing buyer for the coal in exchange for an amount the covers all the costs associated with storing the coal with Marco, they will be subject to further financing charges, expenses, and potentially losing 35% of the purchase price that will never be paid by Marco.

5. The Noteholder has tried numerous times over the past four weeks to engage with the Debtors and their professionals regarding a consensual path forward. The Debtors' increasing liquidity problems worsen by day and can only be addressed by implementing cost-cutting measures that will enable the Debtors to operate more efficiently while they market their assets under a timeline dictated by available cash. The Debtors have refused and instead chose to ignore the lesson of their prior losses in the hope that a mining operation that has never been profitable or be perceived as potentially becoming profitable through some undefined change in their situation.

6. The Noteholder stands ready to negotiate the terms of a DIP that is tied to a sale process with recognized milestones that would stabilize the Debtors' operations and provide the pathway to resolving these case and exiting bankruptcy court protection. Such a sale process would enable the Debtors to best preserve the value of their assets and maximize the realization on the assets for the benefit of all creditors including the Noteholder. As currently proposed, the Motion must be denied as the relief requested is financing that primes the Noteholder's senior liens and the Noteholder does not consent to such relief.

# THE MOTION SHOULD BE DENIED BECAUSE IT DOES NOT PROVIDE THE DEBTORS WITH THE LIQUIDITY NECESSARY TO OPERATE THEIR MINES WITHOUT BECOMING ADMINISTRATIVELY INSOLVENT

A. **The Proposed Marco Contract**

7. The salient terms under the Sale and Repurchase Agreement (the "**Marco Contract**") between the Debtors and Marco International Corporation ("**Marco**") are as follows:

- Debtors have until May 15, 2023 to deliver up to 70,000 metric tons of coal to Marco that meets certain specifications. Section 2.1.1 of Marco Contract.

- Marco pays Debtors 65% of the purchase price. Section 2.3.2 of the Marco Contract.

- Debtors pay Marco a "processing fee" equal to 4.5% of the purchase price; plus, all costs associated with the coal through the time it is repurchased or sold to a currently unidentified buyer. Section 2.3.3 of the Marco Contract.

- Debtors have 90 days to repurchase the coal and may seek extensions in exchange for paying another processing fee equal to 3% of the purchase price. Sections 3.1.1 and 3.3.1 of the Marco Contract.

- If Debtors fail to repurchase within 90 days they are required to pay Marco another fee equal to 3% of the purchase price with all other amounts owing accruing interest at 12%. Section 4 of the Marco Contract. After the 90 day holding period, Marco can sell the coal to any party it chooses with no motivation to realize more than the 65% paid plus any cost incurred (if the Debtors does not find a buyer in time they could lose the remaining 35% of the expected purchase price).

- $75,000 facilitation fee payable upon execution of the Marco Contract (and only subject to this contract that runs through May 15, 2023). Section 2.3.3 of the Marco Contract.

B. **The Marco Contract is a Bridge to Administrative Insolvency**

8. The Debtors' latest 13-week cash forecast (which changes daily) reflects that the Debtors will be administratively insolvent by April 21, 2023 without an infusion of cash or financing. *See* 13-Week Cash Forecast annexed hereto as **Exhibit A**. Based on the Debtors' 13-Cash Forecast, a minimum of $1,200,000 additional cash above and beyond the inventory

4

financing provided by Marco is still required before the Debtors will have readied first full vessel for sale approximately five weeks from now.

9. The Marco Contract is nothing more than a short-term liquidity fix that does not adequately address the Debtors' long-term problem of operating their mines at substantial losses. Prior to the petition date, the Debtors' accounts payable for the past 90 days exceeded $15,000,000. Since well before the petition date, the Debtors have not change their operations or attempted to create a new business plan that addresses unsustainable operational losses.

10. Since the petition date, the Debtors have continually fallen short of their weekly budget projections. They have burned through basically all of the $1.7 million of cash collateral and their short-term budgets do not include the postpetition administrative claims that have been incurred to date.

11. By the Cash Collateral Motion [Docket No. 9], the Debtors sought to use cash collateral for an initial period of two weeks. The Debtors' budget projected their cash receipts would total more than $7 million (without taking into consideration any of the restructuring costs over this same period). Actual receipts received over that initial period were approximately $3.6 million and ending cash was approximately $1.7 million below that original budget.

| $ in Millions | 1st Cash Collateral Budget | | | Actual Results | Variance |
| --- | --- | --- | --- | --- | --- |
| | 24-Feb | 3-Mar | Total | 2 Week Total | |
| Beginning Cash | 1,730 | 192 | 1,730 | 1,730 | - |
| Estimated Receipts | 475 | 6,625 | 7,100 | 3,574 | (3,526) |
| Estimated Disbursement | (2,013) | (2,545) | (4,558) | (2,670) | 1,888 |
| **Estimated Ending Cash** | 192 | 4,272 | 4,272 | 2,634 | (1,638) |

12. As reflected above, for the week ending March 3, 2023 (*i.e.*, the first two weeks of these cases) the Debtors missed their projections by 38%.

13. The Debtors actual results for the following week was worse than the first two weeks of the case.

5

| $ in Millions | 2nd Cash Collateral Budget | | | | Actual Results | |
|---|---|---|---|---|---|---|
| | 3/10/23 | 3/17/23 | 3/24/23 | Total | 3/10/23 | Variance |
| Beginning Cash | 2,919 | 3,252 | 5,325 | **2,919** | 2,634 | **(285)** |
| Estimated Receipts | 3,233 | 4,173 | 929 | **8,335** | 50 | **(3,183)** |
| Estimated Disbursements | (2,900) | (2,100) | (2,800) | **(7,800)** | (1,638) | **1,262** |
| **Estimated Ending Cash** | 3,252 | 5,325 | 3,454 | **3,454** | 1,046 | **(2,206)** |

\* Per Debtor Ending Cash on 3/17 was $17K

14. As reflected above, for the week ending March 10, 2023, the Debtors again missed their projections but this time by approximately 68%.

15. On March 15, 2023, the Debtors sent the Noteholder the attached budget for the period running through March 31, 2023 that reflected they would have sufficient cash to operate through March 31, 2023. *See* **Exhibit B**. However, later that same day, the Debtors advisors represented they were in immediate danger of running out of cash. The Debtors requested an emergency DIP loan to carry them through the first vessel contemplated by the Marco Contract or through the conclusion of a 13-week period that could include a sale or other restructuring. Without the infusion of cash, the Debtors were doubtful they would finish the week without the operations coming to a crashing halt as they were left with approximately $17,000 on March 17, 2023. The Debtors have somehow scraped through last week further questioning their ability to forecast and avoid the losses they have suffered since the petition date that mirror the same pattern of losses they faced for months prior to the petition date.

16. Thus, the Marco Contract is nothing more than a short bridge that temporarily extends the Debtors' liquidity, allows them to further exhaust the Noteholder's collateral, and does nothing to address the Debtors' long-term liquidity issues or implement any plan regarding the much needed financial and operational restructuring needed by the Debtors.

DOCS_SF:108622.2 15325/001

## C. There are Significant Risks for the Debtors' Stockpiled Coal under the Marco Contract

17. The Debtors are asking the Court to authorize entry into the Marco Contract because they do not have sufficient liquidity to fully load the size of the ship that they anticipate in their forecasts that they project to be sold and shipped to an ultimate buyer. Generally, it is more profitable to sell to significant international purchasers of coal who are not willing to purchase in smaller quantities. Instead, such buyers structure their purchases so that an entire shipping vessel can immediately begin transporting the coal cargo to its destination. As a result, the Debtors, to meet the significant working capital burden of this type of sale, are required to stockpile the coal with a third-party (e.g., Marco) who holds and finances the storage of coal until the Debtors have mined a sufficient amount of coal that can be purchased and shipped to an end-user.

18. The Debtors do not currently have an ultimate buyer for the coal that will be financed by Marco. The Debtors' prospective purchasers are not willing to commit to purchase a full vessel of coal from the Debtors because it is unclear whether or not the Debtors will be able to stockpile a sufficient amount of coal within a defined period of time. Thus, any ultimate buyer elects to wait until there is sufficient coal to full stock a vessel or it will look to another seller that can provide the desired quantity pursuant to a single transaction.

19. Without having an ultimate buyer to "repurchase" the coal from Marco, the terms of the Marco Contract expose the Debtors to the following risks:

- Marco can sell the coal to whoever wants.

- The terms of the sale are entirely dictated by Marco.

- Because Marco purchased the coal at 65% of the total "sale price," Marco has no incentive to sell the coal in exchange for 100% of the full purchase price as any realization over the 65% paid by Marco is returned to the Debtors.

7

- The Debtors risk losing 35% of the value of their coal to Marco who receives all the upside while the Debtors are obligated to pay the costs associated with the stockpiled coal until it is purchased by an ultimate buyer.

20. Similarly, if the Debtors default under the Marco Contract for any reason, Marco immediately has the right to sell the coal without regard to any potential ultimate buyer thereby putting the Debtors at the same risk of losing up to 35% of the value of the coal. In addition, the Debtors do not have the financial or operational leverage to fight with Marco regarding potential triggers that might cause a default under the Marco Contract.

21. For example, the Debtors' failure to deliver coal that satisfies the coal specifications is a default under the Marco Contract. The Debtors' mining is susceptible to such a default given the Debtors' effort to blend coals of significantly different compositions. Currently, there is an interim agreement regarding the Debtors' use of cash collateral that expires on March 24, 2023. If the Debtors are no longer authorized to use cash collateral or they breach a future agreement with the Noteholder they effectively forfeit their rights to 35% of the value of the coal financed by Marco.

22. The Marco Contract requires the Debtors to maintain all arrangements and relationships with any third-party necessary to perform the terms of the Marco Contract. This includes, for example, transportation providers, port-authorities, and other intermediary agents who are all owed money by the Debtors. It is unclear how the Debtors will be able to maintain these relationships when the 13-Week Cash Forecast reflects they will not have sufficient cash on hand to operate the business beyond the week ending April 21, 2023. For example, if a barge company, trucking/shipping company, or other service provider is owed money they have the ability to refuse service thereby preventing the Debtors from performing the terms of the Marco Contract, which in the end will permit Marco to sell the coal for its benefit and to the detriment of the Debtors (and ultimately the Noteholder).

23. In the end, the above demonstrates that the Debtors' entry into the Marco Contracts brings substantial risk while at the same time not providing for a path toward resolving this case through a sale or any other feasible restructuring. The Marco Contract does nothing more than permit the Debtors to operate their business at a loss. At this point, the Noteholder does not consent to the Debtors using their collateral to finance their short-term liquidity problems. Until the Debtors can document, or even espouse, a cogent and realistic restructuring that has the chance of succeeding, the Motion should be denied.

**D.   The Annualized Interest on the Marco Contract is Exorbitant**

24. The Marco Contract is incredibly expensive because the "sale" is actually disguised working capital financing. The Debtors are charged a $75,000 facilitation fee for a five-week period during which time the coal is stockpiled at the Debtors' expense and until they mine a sufficient amount of call that can stock an entire vessel and an ultimate buyer located willing to purchase the coal. The Debtors are required to pay an additional 4.5% of total sale proceeds plus legal fees and other cost in exchange for receiving only 65% of potential purchase price. The following chart outlines the financing charges associated with Marco's "purchase" of the coal.

|  | Tonnes Sold | Price | Total |
|---|---|---|---|
| Facilitation Fee |  |  | $ 75,000 |
| Processing Fee @ 4.5% of Price | 77,000 | $ 208 | 720,720 |
| **Total Cost** |  |  | $ 795,720 |
|  |  |  |  |
| Maximum Advanced @ 65% |  |  | 10,410,400 |
| Return Rate (Total cost/Advanced Amount) |  |  | 7.6% |
| Duration of that return (in weeks) |  |  | 5 |
| **Annualized Rate of Return $(1+7.6\%)^{365/35}-1$** |  |  | **116%** |

25. As reflected above, the effective annual interest rate under the Marco Contract is over 115%. The Marco Contract is nothing more than disguised financing of the

9

Debtors' coal inventory (and the Noteholder's collateral) that primes the Noteholder's collateral in exchange for only 65% of the potential value available. If the Debtors are not able to locate and sell the coal to an ultimate buyer or default for any reason under the Marco Contract they can seek extensions by paying another 3% of the purchase price. If the coal is not repurchased Marco can declare default, charge another 3% fee, resell for any price and still look to the Debtors to satisfy all of the associated costs arising from the storage of the coal until it is sold. Under these circumstances, the Noteholder does not consent to an effective priming lien when the Marco Contract does not provide the Debtors with sufficient liquidity to operate or run a process by which the Debtors' assets could be sold or otherwise restructured.

26. The Debtors have lost tens of millions of dollars over the last few months. The Debtors also have a long history of missed projections. The first month of the case has demonstrated that the Debtors' prior cash projections were unrealistic and unsustainable. The Noteholder has lost all faith in the Debtors' management team who refuse to engage and work toward a consensual resolution that will preserve the value of the Debtors' operations so they can be stabilized with the little available cash on hand.

## CONCLUSION

27. Since the first day hearing, the Noteholder has tried to engage with the Debtors to find a consensual path forward. Given the mounting operational losses, the best path forward is one where the Debtor preserves the value available while embarking on a sale process that will pay the Noteholder and fund this case. The Noteholder is prepared to loan the Debtors cash subject to customary milestones that require the Debtors to commence an orderly sale process under section 363 of the Bankruptcy Code. However, the Noteholder's willingness to provide a loan lessens each day as the Debtors continue to recklessly mine while incurring substantial losses

with no realistic restructuring goals. Absent a consensual resolution regarding financing and sale milestones, the Noteholder urges the Court to deny the Motion in its present form.

## RESERVATION OF RIGHTS

28. Given the short timing between the filing of the Motion and the initial emergency hearing thereon, the Noteholder expressly reserves all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Objection, to raise further and other objections to the Motion and the form of any interim or final order, and to introduce evidence prior to or at any hearing regarding the Motion in the event that the Noteholder's objections are not resolved prior to such hearing.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Noteholder respectfully requests that the Court deny the Motion and grant such other and further relief as may be just and proper under the circumstances.

Dated: March 21, 2023

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Colin R. Robinson*
James E. O'Neill (DE Bar No. 4042)
John W. Lucas (CA Bar No.271038)
Maxim B. Litvak (CA Bar No. 215852)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
Telephone: 302-652-4100
Facsimile: 302-652-4400
E-mail: joneill@pszjlaw.com
jlucas@pszjlaw.com
mlitvak@pszjlaw.com
crobinson@pszjlaw.com

*Counsel for the Noteholder*

DOCS_SF:108622.2 15325/001

# **EXHIBIT A**

**(13 WEEK CASH FORECAST)**

|  | Week 1<br>3/24/23 | Week 2<br>3/31/23 | Week 3<br>4/7/23 | Week 4<br>4/14/23 | Week 5<br>4/21/23 | Week 6<br>4/28/23 |
|---|---|---|---|---|---|---|
| Ending Cash per 3/19/23 Company Budget | 2,889,591 | 3,052,101 | 1,376,505 | 1,694,274 | 3,807,394 | 8,577,194 |
| Assumed DIP Draws | 1,300,000 |  |  |  | 3,700,000 |  |
| Cumulative DIP Draws | 1,300,000 | 1,300,000 | 1,300,000 | 1,300,000 | 5,000,000 | 5,000,000 |
| Ending Cash **Excluding** DIP Draws | 1,589,591 | 1,752,101 | 76,505 | 394,274 | (1,192,606) | 3,577,194 |

|  | Week 7<br>5/5/23 | Week 8<br>5/12/23 | Week 9<br>5/19/23 | Week 10<br>5/26/23 | Week 11<br>6/2/23 | Week 12<br>6/9/23 | Week 13<br>6/16/23 |
|---|---|---|---|---|---|---|---|
|  | 6,483,412 | 6,706,733 | 3,380,282 | 3,699,832 | 1,436,195 | 1,878,354 | 5,395,380 |
| Assumed DIP Draws |  |  |  |  |  |  |  |
| Cumulative DIP Draws | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 |
| Ending Cash **Excluding** DIP Draws | 1,483,412 | 1,706,733 | (1,619,718) | (1,300,168) | (3,563,805) | (3,121,646) | 395,380 |

# **EXHIBIT B**

# **(BUDGET ENDING MARCH 31, 2023)**

**Allegiance Coal USA et al.**
*Forecast dated 3.15.2023*
*US$ in Thousands*

| Week # <br> Week Ending | 1 <br> 3/17/2023 | 2 <br> 3/24/2023 | 3 <br> 3/31/2023 | 4 <br> 4/7/2023 | Total |
|---|---|---|---|---|---|
| **Receipts** | | | | | |
|   Coal Sales | $ 1,605 | $ 5,889 | $ 838 | $ 2,684 | $ 11,016 |
|   Other Receipts | $ - | $ - | $ - | $ - | $ - |
| **Total Receipts** | $ 1,605 | $ 5,889 | $ 838 | $ 2,684 | $ 11,016 |
| | | | | | |
| **Operating Disbursements** | | | | | |
|   Payroll | $ (425) | $ (350) | $ (425) | $ (350) | $ (1,550) |
|   Other Disbursements | $ (2,000) | $ (2,391) | $ (2,469) | $ (1,710) | $ (8,569) |
| **Total Operating Disbursements** | $ (2,425) | $ (2,741) | $ (2,894) | $ (2,060) | $ (10,119) |
| | | | | | |
| **Net Cash Flow From Operations** | $ (820) | $ 3,148 | $ (2,056) | $ 624 | $ 897 |
| | | | | | |
| **Restructuring Disbursements** | | | | | |
|   Other | $ - | $ - | $ - | $ - | $ - |
| **Total Restructuring Disbursements** | $ - | $ - | $ - | $ - | $ - |
| | | | | | |
| **Total Cash Flow** | $ (820) | $ 3,148 | $ (2,056) | $ 624 | $ 897 |
| | | | | | |
| **Beginning Cash Balance** | $ 1,046 | $ 226 | $ 3,375 | $ 1,319 | $ 1,046 |
| **Ending Cash Balance** | $ 226 | $ 3,375 | $ 1,319 | $ 1,943 | $ 1,943 |

*Note 1: beginning cash balance on 3/17 represents ending balance on 3/10.*