**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| ALLEGIANCE COAL USA LIMITED, *et al.*, | Case No. 23-10234 (CTG) |
|  | (Jointly Administered) |
| Debtors. | **Related Docket Nos. 372, 693-696, 698** |

## <u>AMENDED MEMORANDUM OPINION</u>

The debtors were coal mine operators. The debtors' relationship with its prepetition secured lender, Collins St, has been highly contentious. And these chapter 11 cases have not been successful.[1] The debtors were unable either to reorganize their business or find a going-concern buyer. In the end, the proceeds from the liquidation of the debtors' mining equipment brought in less than the cost of administering the estate in bankruptcy. As a result, the cases are administratively insolvent.

The Court entered an order providing for the dismissal of the case, with the remaining cash to be distributed in accordance with the statutory waterfall.[2] The Court previously ruled, in an adversary proceeding brought by Collins St, that the fees owed to the estate professionals that fall within the carve out to the DIP loan – not the fees owed to Collins St's counsel – are at the top of that waterfall. The cash

---

[1] Collins St Convertible Notes Pty Ltd, as trustee for The Collins St Convertible Notes Fund and in its capacity as both the DIP Lender and Prepetition Noteholder, is referred to as "Collins St".

[2] D.I. 687.

in the estate, however, is insufficient to pay the estate professionals' fees in full even if they are allowed.

Collins St has objected to the allowance of those fees. Collins St's principal argument is that the DIP Order permitted the debtors to make payments only as set forth in an agreed budget. And while the agreed budget contains an *accrual* of professional fees, the amount it shows as actually being paid on those fees is zero. Collins St therefore says that no amount may be paid in professional fees.

The debtors argue that Collins St is precluded from making that argument because it was or could have been decided in the adversary proceeding. The Court disagrees and will consider Collins St's argument on its merits. But on its merits, the Court rejects the argument. Relying only on the language of the DIP Order, and not on extrinsic evidence, the absence of any amount being shown as cash to be paid to estate professionals in any budget period means only that company's cash could not be used to pay professionals *in the period in question*. The DIP Order is otherwise clear, however, that the repayment of the DIP loan is subordinated to the payment of amounts protected by the carve out, which includes the professional fees shown as being accrued.[3] Accordingly, at this stage of the case, when the only remaining issue is to address fee applications and close the case, the DIP Order does not preclude the payment of professional fees.

Alternatively, even if the Court were to consider extrinsic evidence in construing the DIP Order, the Court would conclude that the parties' agreement was

---

[3] D.I. 308 ¶ 17.

that the estate professionals would be paid at the end of case, to the extent the debtors then had sufficient cash, up to the amounts protected by the carve out.

Finally, the Court is satisfied that the amounts sought by the estate professionals are for fees and expenses that are "reasonable compensation for actual, necessary services" within the meaning of § 330 of the Bankruptcy Code.[4]

### Factual and Procedural Background

These bankruptcy cases were filed on February 21, 2023.[5]  They began with a contested hearing, held on February 23, 2023, over the debtors' use of cash collateral. Payroll was due on the next day.[6]  Based on the evidence presented at that first-day hearing, the Court concluded that the debtors had demonstrated that they were able to provide adequate protection to Collins St sufficient to permit the debtors to use cash collateral for nine days – until March 4, 2023.[7]

The parties thereafter agreed to extend the debtors' right to use cash collateral.[8]  Ultimately, Court entered agreed orders, first on an interim and then on a final basis, under which Collins St first consented to the use of cash collateral and

---

[4] On May 7, 2024, the Court conducted an evidentiary hearing on the fee applications.  On May 10, 2024, the Court issued a bench ruling in which it determined it would allow the fees in question.  That bench ruling was incorporated into an order [D.I. 734] entered on May 20, 2024.  On May 31, 2024, Collins St filed a notice of appeal from that order.  [D.I. 741]. Pursuant to this Court's Local Rule 8003-2, this Court issues this Memorandum Opinion to supplement the Court's bench ruling.

[5] D.I. 1.

[6] Feb. 23, 2023 Hr'g Tr. at 6.

[7] D.I. 27 (authorizing the use of cash collateral through March 4, 2023 and granting Collins St replacement liens as adequate protection).

[8] D.I. 56, 150, 297.

later agreed to provide post-petition financing.[9]  The terms of the final DIP Order were heavily negotiated between the parties.

The present dispute between the parties turns, at least in part, on the terms of that order.  It bears note that by the time the Court entered the final DIP Order in May 2023, it was clear that the debtors' bankruptcy case was faring poorly.[10]  The debtors were not going to be able to reach a going concern sale, the mines had been scaled down to care and maintenance mode, and most of the employees had been laid off.  The agreed DIP loan was intended to provide the debtors with the financing necessary to conduct an orderly liquidation.[11]

The debtors were able to realize some value from the sale of some mining equipment.[12]  Once the debtors had liquidated those assets for which they were able to find a buyer, the debtors moved to dismiss the bankruptcy.[13]  The motion to dismiss proposed the payment of all administrative claims that were subject to the carve out in the DIP Order, with the return of any remaining value to Collins St, followed by the dismissal of the case.

A week later, Collins St filed an adversary proceeding.  In that action, it sought a declaration that its own fees, which it was entitled to recover under the terms of

---

[9] D.I. 283 (interim DIP Order), 308 (final DIP Order).

[10] May 7, 2024 Hr'g Tr. at 58 (Collins St's financial advisor testified that, at the time of the DIP loan, "we just want to fund the minimum amount to allow for the completion of that sale process and then make a call on where we go from there.").

[11] *Id.*

[12] *Id.* at 79.

[13] D.I. 614.

the DIP loan, had priority over those of the estate professionals who are the beneficiaries of the DIP loan's carve out.[14]  And in an opposition to the debtors' motion to dismiss the bankruptcy, Collins St's principal argument was the one advanced in its adversary proceeding.  It said that while it was not opposed to a dismissal of the bankruptcy case, the distribution of proceeds should reflect the order of priority required under the theory advanced in its adversary proceeding, with the payment of its fees and expenses coming ahead of the carve out.[15]

In their reply, the debtors argued that Collins St's adversary proceeding was meritless, and in any event urged the Court effectively to moot the dispute by granting its motion to dismiss.[16]  In its sur-reply, Collins St reiterated that it "did not oppose dismissal of these cases as long as the claims asserted in the Adversary Proceeding are resolved by the Court prior to entry of the Final Dismissal Order."[17]

The Court concluded that Collins St was entitled to the opportunity to be heard on its adversary proceeding before permitting funds to be distributed in a manner that would effectively moot Collins St's case.  The Court accordingly made the following entry on its docket:

> The Court heard argument today on the debtor's motion to dismiss the bankruptcy case [D.I. 614].  That motion sought the entry of an interim dismissal order that would, among other things, establish procedures for considering final fee applications, followed by the subsequent entry of

---

[14] *Collins St Convertible Notes Pty Ltd v. Allegiance Coal USA Ltd, et al.*, Bankr. D. Del. Adv. Proc. No. 24-50016 (CTG), D.I. 1 (Feb. 14, 2024).  Citations to materials on the docket of this adversary proceeding are cited as "Adv. Proc. No. 24-50016, D.I. __."

[15] D.I. 623.

[16] D.I. 644.

[17] D.I. 662.

an order providing for the dismissal of the bankruptcy case.  For the reasons set forth on the record, the Court determined that it would not enter the interim order sought by the motion, as such relief would effectively moot the claims asserted by Collins St., as plaintiff, in the adversary proceeding docketed as Adv. Proc. No. 24-50016.  The Court accordingly set a briefing schedule on a motion to dismiss the adversary proceeding under which the motion will be fully briefed by March 27, 2024.   If the Court grants the motion to dismiss the adversary proceeding, it will take up the motion to dismiss the bankruptcy at a hearing set for April 2, 2024 at 2:00 pm.  If the Court denies the motion to dismiss the adversary proceeding, the hearing on April 2, 2024 at 2:00 will go forward as a status conference in both the adversary proceeding and the main bankruptcy case.[18]

On March 28, 2024, the Court issued a letter ruling indicating that it would grant the debtors' motion to dismiss the adversary proceeding.  The Court concluded as a matter of law, based on the language of the order approving the DIP financing, that obligations that fell within the carve out to the DIP lien were effectively the senior-most obligations in the debtors' capital structure.  Nothing in paragraph 10 of the DIP Order, the Court concluded, rendered the obligation to pay Collins St's attorneys' fees senior in priority to the obligations that were protected by the carve out.[19]

It is true that paragraph 10 required the debtors to pay Collins St's fees.  But the fact that the order created such an obligation does not say anything about the *priority* of that obligation.  As the letter opinion explained, "[s]tanding alone, language in a court order requiring a debtor to pay creates a post-petition obligation of the debtor that is entitled to administrative priority.  To the extent the obligation

---

[18] D.I. 668.

[19] Adv. Proc. No. 24-50016, D.I. 20.

to pay these fees also fall within the grant of super-priority status under § 364(c)(i) or are secured by the DIP liens (a point the parties here dispute), they would be entitled to a still higher level of priority."[20]  But the protections afforded to a DIP lender in a post-petition lien and superpriority claim are the greatest protections contemplated by the Bankruptcy Code.  Accordingly, claims that are "carved out" from the DIP lien are the very first obligations paid out of a bankruptcy estate.  Because nothing in paragraph 10 of the DIP Order could conceivably be read to suggest that the obligation to pay Collins St's fees came ahead of the carve out, the Court granted the debtors' motion to dismiss the adversary proceeding.[21]  That order has since become final and non-appealable.

After dismissing the adversary, the Court then entered an initial dismissal order, dated April 8, 2024, that provided a mechanism for the filing of final fee applications and objections thereto and set a final hearing with respect to dismissal of the case for May 7, 2024.[22]  The order made clear that it did not

> affect (a) the rights of [Collins St] to object to any of the Final Fee Applications on any grounds and to seek (i) the disallowance of the Retained Professionals' fees and expenses, (ii) a prohibition against the Debtors from making any payments to the Retained Professionals, and (iii) the disgorgement of any fees and expenses the Debtors have already paid the Retained Professionals, or (b) the Debtors' and the Committee's, and their professionals', rights, remedies, defenses, counterclaims, or claims.[23]

---

[20] *Id.* at 10.

[21] Adv. Proc. No. 24-50016, D.I. 25.

[22] D.I. 687.

[23] *Id.* at 2.

The various debtor and committee professionals filed their final fee applications.[24]  On April 30, 2024, Collins St filed its omnibus objection to those applications.[25]  The committee and the debtors replied to the objections.[26]  The Court held an evidentiary hearing on May 7, 2024 and issued a bench ruling on May 10, 2024.  This Memorandum Opinion sets forth the same basic rationale that the Court sought to articulate in the bench ruling.  But because that ruling was drafted primarily for the benefit of the parties, this Memorandum Opinion is intended to provide additional context so that the Court's rationale will be more readily understandable to a reviewing court that will necessarily lack the background in these disputes.[27]

## Jurisdiction

The dispute now before the Court relates to the allowance of professional fees under § 330 of the Bankruptcy Code.  Accordingly, these are matters that "arise under" the Bankruptcy Code within the meaning of 28 U.S.C. § 1334(b) and are thus within the district court's jurisdiction.  These matters have been referred to this Court under 28 U.S.C. § 157(a) and the district court's standing order of reference dated

---

[24] D.I. 372, 693-696, 698.

[25] D.I. 703.

[26] D.I. 711, 713.

[27] Indeed, upon review of the original Memorandum Opinion it occurred to the Court that a point was left implicit that should have been set forth more expressly.  This Amended Memorandum Opinion revises part I.A. to add that additional context.

February 29, 2012.  This is a core matter under 28 U.S.C. § 157(b)(2)(B), such that

this Court may "hear and determine" it under 28 U.S.C. § 157(b)(1).

**Analysis**

Broadly speaking, Collins St offers two categories of objections.  *First*, it argues

that the DIP Order precludes the payment of professional fees out of the DIP proceeds

because the fees sought were never reflected in any Approved Budget (which term is

defined in the DIP Order), and thus cannot be paid under the DIP Order.  *Second*, it

objects to the allowance of the fees on the ground that they are unreasonable.  Neither

of those arguments is persuasive.

## I.    The DIP Order and terms of the Approved Budget do not preclude the payment of professional fees.

Collins St's principal argument is that the DIP Order prohibits the payment of

these fees.  In response, the debtors argue that Collins St should be precluded from

advancing that argument here, having made essentially the same argument (and

lost) in the adversary proceeding.  The debtors similarly contend that once the Court

granted the *initial* dismissal order, the only remaining issues were ones about

whether the fees sought were necessary and reasonable.  On this view, Collins St's

objection, that is premised on the DIP Order, might have been a basis to oppose the

entry of the *initial* dismissal order.  Now that the initial order has been entered,

however, the debtors argue that the only remaining issue is whether the fees are

necessary and reasonable and that everything else is now water over the dam.

As described more fully below, the Court concludes that the arguments Collins

St seeks to advance regarding the effect of the DIP Order are properly before it –

9

neither barred by preclusion nor the entry of the initial dismissal order, though the question on the latter point is a close one.  Despite being properly preserved, however, Collins St's argument fails on the merits.

To that end, the Court concludes, in the first instance, that relying only on the DIP documents themselves, not on any extrinsic evidence, that the DIP documents unambiguously subordinate the repayment of the DIP loan to the carve out. Accordingly, while the refusal to agree on a budget can give Collins St the ability to prevent the debtors from making a cash payment in any given period, it does not provide a basis, at the end of the case, to deny the estate professionals an award of fees that are otherwise appropriately awarded under § 330 of the Bankruptcy Code. Alternatively, if one were to consider extraneous evidence to determine the terms on which the parties agreed, the Court finds that the agreement of the parties was exactly the same – that at the end of the bankruptcy case, whatever cash the debtors had, up to the amount of the carve out, would be available to pay the professional fees.

### A.     Neither principles of preclusion nor the doctrine of waiver prevents Collins St from arguing that the DIP Order requires the disallowance of the estate professionals' fees.

The debtors first contend that the arguments Collins St advances in opposition to the payment of professional fees are all points that either were or could have been raised in connection with the adversary proceeding, and that principles of preclusion

accordingly prohibit Collins St from raising these points as a reason to disallow the professionals' fees.[28]

To that end, it bears note that Collins St's principal argument against the allowance of the professional fees is not an argument about *allowance* under § 330 of the Bankruptcy Code.  Rather, the argument is (even if Collins St did not put it in quite these terms) that if the DIP Order bars the payment of these fees out of the proceeds of the DIP loan or its cash collateral, then an order providing for the payment of these fees would be inconsistent with the otherwise applicable payment waterfall.  The Supreme Court held in *Jevic* that one may enter an order providing for the structured dismissal of a bankruptcy case, so long as the dismissal order does not alter the otherwise applicable priority scheme.[29]  And the point that Collins St is making is that – even accepting the Court's conclusion in the adversary proceeding that Collins St's own fees do not have special priority – that the DIP Order still bars the payment of the estate professionals ahead of repaying the DIP loan because the fees sought are not reflected in an approved budget.  So the substantive point Collins St is making is that regardless of whether the fees are reasonable ones for actual and necessary services within the meaning of § 330, an order that authorized their payment would still deviate from the priority scheme and thus violate *Jevic*.  The debtors contend that it is now too late for Collins St to make that argument.

---

[28] *See Duhaney v. Att'y Gen. of U.S.*, 621 F.3d 340, 348 (3d Cir. 2010).

[29] *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 466 (2017) (court lacks authority, upon "ordering a dismissal to [authorize the debtor to] make general end-of-case distributions of estate assets to creditors" that "would be flatly impermissible in a Chapter 7 liquidation or a Chapter 11 plan because they violate priority without the impaired creditors' consent").

*First*, the debtors assert that argument is precluded by virtue of the final and non-appealable order the Court entered in the adversary proceeding. Claim preclusion (or *res judicata*), however, is limited to circumstances in which a party seeks to relitigate a *claim* that has already been litigated. It is true that the question of what is the "same claim" is often viewed through the lens of asking whether the second claim arises out of the same transaction or occurrence as the first. But the problem with invoking *res judicata* is that the doctrine is designed to prevent a party from improperly engaging in claim splitting. In the current motion, however, Collins St is not asserting a "claim."[30] The debtors are seeking relief, and Collins St is simply opposing it.

It is, of course, true that *res judicata* also applies to a "defense." That point, however, is best understood to apply to affirmative defenses.[31] Here, Collins St is just arguing that the debtors cannot establish their entitlement to the relief they seek. Otherwise put, *res judicata* is about the assertion of claims or defenses, and that is not what Collins St is doing here. Under the analytically distinct doctrine of issue preclusion (or collateral estoppel), one cannot make an argument in a second case on which one previously had a fair opportunity to be heard, fully litigated the issue, and lost.[32] But no one suggests that issue preclusion applies here because the issue that Collins St is raising is, in fact, different from the one decided in the adversary

---

[30] *See generally Restatement (Second) of Judgments* § 24.

[31] *See In re Ameriserve Food Distrib., Inc.* 315 B.R. 24, 35 (Bankr. D. Del. 2004) (addressing application of *res judicata* to an affirmative defense).

[32] *Restatement (Second) of Judgments* § 27; see also *Doe v. Hesketh*, 828 F.3d 159, 171 (3d Cir. 2016).

proceeding.  Accordingly, traditional doctrines of preclusion do not operate to prevent Collins St from objecting to the allowance of the estate professionals' fees on the ground that such allowance is prohibited by the terms of the DIP Order.

*Second*, the debtors suggest that even if preclusion does not apply, the argument was nevertheless forfeited by virtue of Collins St failing to raise it in opposition to the *initial* dismissal order.  Recall that the debtors' original motion to dismiss proposed a two-part process.  *First*, the Court would determine that dismissal of the case was appropriate, with the remaining cash to be distributed in accordance with the applicable waterfall.  And then *second*, the Court would address the allowance of the professionals' fees under § 330.

To the extent that Collins St contended that the initial order should leave open anything beyond claims allowance under the standards set forth in § 330 of the Bankruptcy Code (like the argument it is now making that the fees cannot be paid ahead of the DIP loan because they are not reflected in an approved budget), it was required to make that argument in its opposition to the entry of the initial order.  Whether Collins St in fact made the argument in that opposition is a debatable question.[33]  Fairly read, the principal point made in that brief was that the relief sought was improper because it was inconsistent with the position that Collins St advanced in the adversary proceeding.  And the brief makes no mention of the provision of the DIP Order that is central to its current position – paragraph 2 –which

---

[33] Collins St's brief in opposition is docketed at D.I. 623.

authorizes the debtors to make payments "only as and to the extent authorized by the Approved Budget."[34]

Collins St's sur-reply brief goes even further, noting that Collins St "did not oppose dismissal of these cases as long as the claims asserted in the Adversary Proceeding are resolved by the Court prior to entry of the Final Dismissal Order."[35] For that reason, a case could certainly be made that the point was forfeited.[36]

It is true that the April 8, 2024 order in which the Court granted the initial motion to dismiss subject to the resolution of the fee applications stated that the order did not "affect … the rights of Collins St … to object to any of the Final Fee Applications on any grounds."[37]  But if the argument had already been forfeited as of that time, there is no suggestion that anything in the order would operate to resuscitate an argument that had been forfeited by virtue of Collins St's prior litigation conduct.

That said, the Court concludes that Collins St has done enough to preserve the issue.  For example, the brief Collins St originally filed in opposition to the debtors' motion does make the argument that the amounts previously paid to estate professionals should be clawed back.[38]  And the basis for that argument was that the debtors were only authorized to make payments to the extent they were included in

---

[34] D.I. 308 ¶ 2.

[35] D.I. 662 at 2.

[36] *See United States v. Dowdell*, 70 F.4th 134, 140-141 (3d Cir. 2023).

[37] D.I. 687 at 2.

[38] D.I. 623 at 16-17.

an Approved Budget.[39]  Because that contention is the foundation for the argument that Collins St is making now, the Court believes that the better view is that the issue is sufficiently preserved, even if the question is a close one.  The Court will accordingly proceed to address the merits of the argument.

> ### B.    The unambiguous language of the DIP Order and approved budgets does not preclude, at the conclusion of the bankruptcy case, the estate professionals from being paid for otherwise allowed fees and expenses out of cash held in the bankruptcy estate.

Collins St contends that paragraphs 2 and 3 of the DIP Order operate to prohibit the payment of any professional fees out of either the DIP proceeds or Collins St's cash collateral.  Paragraph 2 addresses the use of the proceeds of the DIP loan.  It states that:

> [a]vailable financing and advances under the DIP Term Sheet shall be made to fund, *in accordance with the DIP Documents and the Approved Budget*, working capital and general corporate requirements of the Debtors, adequate protection to the Prepetition Noteholder, bankruptcy-related professional fees, costs, and expenses (including interest, fees, and expenses in accordance with this Final Order and the DIP Documents), and any other amounts required or allowed to be paid in accordance with this Final Order, *but only as and to the extent authorized by the Approved Budget* and the DIP Documents.[40]

Paragraph 3 addresses the use of cash collateral.  It states that the "Debtors are authorized to use Cash Collateral *subject to and in accordance with the terms, conditions, and limitations set forth in this Final Order, the Approved Budget*, and the DIP Documents, without further approval by the Court."[41]

---

[39] *Id.*

[40] D.I. 308 ¶ 2 (emphasis added).

[41] *Id.* ¶ 3 (emphasis added).

The DIP Order included an approved budget covering the one-week period ending on May 19, 2023.[42]  The debtors subsequently filed (on May 24, 2023) a later approved budget covering the six-week period ending on June 30, 2023.[43]  Both of these budgets have a portion in the middle of the page showing the projected cashflows during the applicable period.  In both budgets, the amount of cash shown as going out to pay professional fees is zero.  Both budgets also have a section showing the estimated accrued but unpaid professional fees.  For the period ending May 19, 2023, this amount is $3,832,425.  And for the period ending June 30, 2023, the amount is $5,736,839.

---

[42] D.I. 308-2.

[43] D.I. 330-1.

A portion of the final budget (filed on May 24, 2023) is set forth below.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| BWM - Critical Equipment Leases | 135,000 | 135,000 | - | - | - | - | 270,000 |
| New Elk - Critical Equipment Leases | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - |
| **Total Operating Disbursements** | **570,000** | **420,401** | **136,314** | **233,500** | **215,962** | **466,938** | **2,043,115** |
| **Net Operating Cash Flow** | **(420,000)** | **(220,401)** | **(36,314)** | **1,056,889** | **(215,962)** | **(466,938)** | **(303,72x)** |
| | | | | | | | |
| Professional Fees | | | | | | | |
| Debtor's FA - Capstone - Hourly Fees | - | - | - | - | - | - | - |
| Debtor's IB - Capstone - Fixed Monthly Fee | - | - | - | - | - | - | - |
| Debtor's Legal Counsel - MNAT | - | - | - | - | - | - | - |
| Debtor's Claims Agent - Stretto | - | - | - | - | - | - | - |
| UCC Professional Fees | - | - | - | - | - | - | - |
| Third Party Experts & Consultants - Boyd | | | | | | | |
| US Trustee Fees | | | | | | | - |
| Total Professional Fees | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - |
| **Restructuring Disbursements** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | | |
| **Total Disbursements** | **570,000** | **420,401** | **136,314** | **233,500** | **215,962** | **466,938** | **2,043,115** |
| | | | | | | | |
| **Net Cash Flow** | **(420,000)** | **(220,401)** | **(36,314)** | **1,056,889** | **(215,962)** | **(466,938)** | **(303,725)** |
| | | | | | | | |
| DIP Draw | - | - | - | - | - | - | - |
| Ending Cash | 490,000 | 269,599 | 233,285 | 1,289,174 | 1,073,212 | 606,275 | 606,275 |
| | | | | | | | |
| **DIP Facility Summary** | | | | | | | |
| Beginning DIP Balance | 6,057,428 | 7,807,428 | 7,957,428 | 8,220,693 | 8,370,693 | 8,520,693 | 6,057,428 |
| DIP Draw | - | - | - | - | - | - | - |
| Roll-Up Amounts | - | - | - | - | - | - | - |
| PIK Interest | - | - | 113,265 | - | - | - | 113,265 |
| Lender Expense Accrual | 1,750,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 2,500,000 |
| **Ending DIP Balance** | **7,807,428** | **7,957,428** | **8,220,693** | **8,370,693** | **8,520,693** | **8,670,693** | **8,670,693** |

*Note: Assumptions and inputs are based solely on management internal judgement and estimates.*

| Week Ending | 5/26/23 | 6/2/23 | 6/9/23 | 6/16/23 | 6/23/23 | 6/30/23 | Total |
|---|---|---|---|---|---|---|---|
| **Estimated Accrued but Unpaid Professional Fees** | | | | | | | |
| Debtor's FA - Capstone - Hourly Fees | 667,742 | 42,258 | 35,000 | 35,000 | 35,000 | 35,000 | 850,000 |
| Debtor's IB - Capstone - Fixed Monthly Fee | 216,129 | 22,796 | 23,333 | 23,333 | 23,333 | 23,333 | 332,258 |
| Debtor's Legal Counsel - MNAT | 2,322,945 | 154,839 | 175,000 | 175,000 | 175,000 | 175,000 | 3,177,784 |
| Debtor's Claims Agent - Stretto | 90,334 | 5,699 | 5,833 | 5,833 | 5,833 | 5,833 | 122,366 |
| UCC Professional Fees | 850,558 | 67,599 | 71,944 | 71,944 | 71,944 | 71,944 | 1,205,935 |
| Third-Party Experts & Consultants - Boyd | 48,497 | | | | | | 48,497 |
| **Total Professional Fees** | **4,199,205** | **293,190** | **311,111** | **311,111** | **311,111** | **311,111** | **5,736,839** |
| | | | | | | | |
| **Estimated Accrued but Unpaid Obligations** | | | | | | | |
| Employee Obligations | | | | | | | |
| BWM Payroll Liabilities | 18,000 | 36,000 | 18,000 | 36,000 | 18,000 | 36,000 | - |
| BWM Accrued PTO & Sick Leave | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | - | - |
| New Elk Payroll Liabilities | 147,500 | 73,750 | 147,500 | 21,000 | 42,000 | 21,000 | - |
| New Elk Accrued PTO & Stick Leave | 151,000 | 151,000 | 151,000 | 120,000 | 120,000 | - | - |
| Total Employee Obligations | 368,500 | 312,750 | 368,500 | 229,000 | 232,000 | 57,000 | - |
| | | | | | | | |
| AP and Royalty Obligations | | | | | | | |
| BWM Unpaid Post-Petition AP | 1,250,000 | 1,250,000 | 1,250,000 | 1,250,000 | 1,250,000 | 1,250,000 | - |
| New Elk Unpaid Post-Petition AP | 1,290,000 | 1,290,000 | 1,290,000 | 1,290,000 | 1,290,000 | 1,290,000 | - |
| BWM Post-Petition Royalties | 34,500 | 59,500 | 72,000 | 915,898 | 881,398 | 881,398 | - |
| New Elk Post-Petition Royalties | 35,592 | 35,592 | 35,592 | 310,656 | 310,656 | 175,083 | - |

The Court has circled in blue the portion of the budget under the header "Net Operating Cash Flow." And it has circled in red the portion headed "Estimated Accrued but Unpaid Professional Fees." The ultimate question is whether the payment of the approximately $5.75 million in fees circled in red, upon conclusion of the bankruptcy case, is permitted by the DIP Order.

The debtors' argument that the fees may be paid relies on paragraph 17 of the DIP Order, which is the provision that establishes the carve out. It does so by

providing that the DIP liens are subordinate to "the payment of … (iii) up to the amounts set forth in the Approved Budget, *including the amounts in the professional accrual schedule attached to the Approved Budget*, to the extent allowed at any time, whether by interim order, procedural order, or otherwise [any unpaid expenses of estate professionals]."[44]

This language is important for two separate reasons. *First*, the express reference to the accrual schedule makes clear that the carve out, as of June 30, was the $5.75 million (circled in red) reflected in the approved budget as of that date. And consistent with the basic operation of a carve out as described in the letter opinion in the adversary proceeding, the DIP lender's recovery on its DIP loan is subordinated to the payments that are protected by the carve out.

*Second*, paragraph 17 says that the repayment of the DIP loan is subordinated to the repayment of "the amounts set forth in the Approved Budget, *including* the amounts in the professional fee accrual schedule."[45]  The key word for current purposes is "including."  As a matter of ordinary English, this language means that the accrual schedule is "included" in the Approved Budget.  Accordingly, when the defined term "Approved Budget" is otherwise used in the DIP Order, there is at least a reasonable argument that the term also "includes" the amounts set forth in the accrual schedule (circled in red).

---

[44] D.I. 308 ¶ 17 (emphasis added).

[45] *Id.*

The consequence of this literal reading of the document would be that the debtors prevail.  Paragraph 2 authorizes payments "to the extent authorized by the Approved Budget."[46]  If one reads the defined term "Approved Budget" to "include" the accrual schedule, as paragraph 17 states, then the debtors are authorized to pay the amounts reflected in the accrual schedule at any time.

But that reading of the DIP Order is not without some difficulties.  The problem with this reading is that the Approved Budget also has a section (the one circled in blue) that shows the projected cashflows during each period.  And Collins St has a fair point that there would be something odd about reading an approved budget that, for any given period, expressly states that $0 will be paid to estate professionals, to authorize the cash payment of millions of dollars of fees to estate professionals in that very period.  Otherwise put, the problem with the debtors' reading of the documents is that it renders meaningless the portion of the agreed budget that is circled in blue.

The debtors, however, have a strong response to this point.  They argue that whatever one might think about the payments that are authorized in a given period, one thing is clear from the structure of the DIP Order as a whole – the repayment of the DIP obligations is subordinated to the carve out.  As the debtors' point out in their reply brief, in addition to the language of paragraph 17, there is other language to this effect that permeates the DIP Order, including paragraph 21(g), which says that even in an event of default, the DIP Lender can sweep the available cash "provided

---

[46] *Id.* ¶ 2.

that sufficient funds are (or have been) set aside to fund the Carve-Out," and paragraph 27, which makes Collins St's right to realize on its collateral "subject to the payment of the Carve-Out."[47]

In the Court's view, there is a way to reconcile all of these provisions so that each of them has meaning. In a period that is covered by an approved budget, the fact that the budget for that period shows no cash payments going out must mean that no cash payment is authorized *in that period*. In this sense, the fact that the accrual schedule is "included" in the Approved Budget does not mean that it is included for the purpose of authorizing a cash payment. That reading would render meaningless the fact that the parties agreed on a budget under which no cash would be paid to the professionals in that period. So for any period for which there is an agreed budget, the only cash payments authorized in that period are those reflected in the (blue-circled) cashflow portion of the budget.

But in a period in which the parties are unable to agree on a budget, there is no such express understanding that nothing will be paid. Rather, in such a period, there simply is not an agreement at all. Does that mean (as Collins St suggests) that fees protected by the carve out are *never* paid to the parties who are the beneficiaries of the carve out? Notwithstanding paragraph 2 of the DIP Order, the answer to that must be no. The parties obviously hoped and expected that they would be able to reach an agreed budget. But where they cannot – and particularly at a point when the case is otherwise complete and set to be dismissed – one is left to decide where

---

[47] *Id.* ¶¶ 21(g), 27.

the proceeds should go. And it bears emphasis that no one suggests that those funds should stay where they are. The only question is to whom they should be distributed.

Principles of contract law typically govern the construction of orders like the current DIP Order, which was extensively negotiated between the parties.[48] And under ordinary contract principles, the obvious touchstone is that when confronted with a specific circumstance that is not expressly addressed by the agreement, one should look to the overall structure of the agreement to ascertain how the parties intended to address it.[49] Here, that requires one to look at the broader structure of the DIP Order to determine where the funds should be distributed at the end of the case in the absence of an approved budget. The overall structure of the DIP Order clearly provides that as between the beneficiaries of the carve out and the DIP lender, the repayment of the DIP loans is subordinated to the carve out.

Note that this reading leaves unanswered the question whether the debtors were authorized, by the DIP Order, to make interim payments to professionals earlier in the case. The debtors argue that such payments were authorized by paragraph 17, which states that the DIP liens are subordinate to "the payment of [professional fees]

---

[48] *In re Trico Marine Services, Inc.*, 450 B.R. 474, 482 (Bankr. D. Del. 2011) ("When construing an agreed or negotiated form of order, such as the Sale Order in this case, the Court approaches the task as an exercise of contract interpretation rather than the routine enforcement of a prior court order.").

[49] *See In re American Home Mortg. Holdings, Inc.*, 388 B.R. 69, 79 (Bankr. D. Del. 2008) (focusing on the structure of agreement to determine whether the agreement was a "repurchase agreement" under the Bankruptcy Code).

up to the amounts set forth in the Approved Budget … to the extent allowed at any time, whether by interim order, procedural order, or otherwise."[50]

But one can also read this language to mean only that the repayment of the DIP loan does not become subordinated to the obligation to pay professional fees unless and until there is a court order authorizing the payment of the fees.  On that reading, this provision of paragraph 17 would not override the provision of paragraph 2 that prohibits actual payments except as authorized by an approved budget.

But even if the interim payments the debtors made were unauthorized at the time, the result now would be the same.  Because the documents make plain that in the end, the repayment of the DIP loan is subordinated to the carve out, those proceeds would ultimately be paid to the professionals rather than to Collins St.  And while Collins St has a fair argument that those fees were perhaps paid too soon, the premature payment of those funds to the parties who are ultimately entitled to receive them caused Collins St no injury.

As noted, these conclusions follow from the language of the DIP Order itself, without reliance at all on any of the testimony that was offered in the evidentiary hearing about the parties' understanding of the deal at the time it was negotiated.  This Court's principal holding is that this is the unambiguous meaning of the agreement without reliance on any parol evidence.  For that reason, a case can be made that the Court need not and should not have permitted testimony to be elicited

---

[50] D.I. 308 ¶ 17.

at the evidentiary hearing about the parties' subjective intentions.[51]  As described below, however, that turns out to be of little moment, as the testimony confirmed that the intent of the parties was fully consistent with the language of the DIP Order.

### C. The testimony elicited at the evidentiary hearing regarding the parties' subjective intent was fully consistent with the construction of the DIP Order set forth above.

During the evidentiary hearing, the witness testimony suggested that, in effect, the parties had reached an impasse in their efforts to agree on a budget.  The record indicates that Collins St had lost faith in the debtors' efforts to conduct a sale process, and essentially took the view that by refusing to agree on a budget, Collins St could effectively require the estate professionals to work on a contingency, such that they would be paid only if the sale process ultimately yielded favorable results.

Even as far as it goes, that argument does not hold together.  There is no evidence to suggest that the parties ever discussed the terms of a contingency under which the professionals would be paid some amount based on the results of the sale process.  And on Collins St's theory, regardless of the results of the sale process, Collins St would have been entitled to block *any* payment to the professionals by refusing to agree on an approved budget, at least unless and until Collins St was paid in full on all obligations secured by the liens granted in the DIP Order.

Rather, based on the evidence adduced at the hearing, the Court concludes that the professionals' decision to continue work in the face of Collins St's refusal to agree on a budget was premised on the parties' understanding of the DIP Order.  And that

---

[51] *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980).

understanding was that the estate professionals would be entitled to receive, at the end of the case, whatever cash the debtors held, up to the amounts of the carve out.

That is reflected in a May 21, 2023 email from Matthew Hart of Capstone, the debtors' investment banker and financial advisor, in which he described a conversation with FTI (which was the financial advisor to Collins St). That email was admitted into evidence as debtors' exhibit 1. Hart stated in that email that FTI said that "Collins St is not going to fund any further DIP draws for the time being" and that the "professionals will need to have faith in the DIP carveout."[52]

Based on that email and the other evidence adduced at the hearing, the Court concludes as a matter of fact that the parties' understanding at the time is precisely the one described above as the best reading of the DIP Order itself. That is, that Collins St had the right, by refusing to agree on an Approved Budget, to prevent cash payments from being made in any given period. But even the indefinite exercise of that right would not mean that Collins St would recover ahead of the carve out. To the extent the debtors found themselves at the end of the bankruptcy case in the possession of cash, the professionals were entitled to rely on the carve out to ensure that they were paid from those funds ahead of Collins St. So even if there were ambiguity in the DIP Order, and as described above, the Court concludes that there is not, the parties' contemporaneous understanding of their respective rights and duties under the DIP Order in any event leads to the same result.

\* \* \*

---

[52] May 7, 2024 Hr'g Tr. at 137.

For those reasons, the order dismissing the case should provide that the distribution of the debtors' remaining cash should be paid, up to the amount of the carve out, to the debtors' professionals (to the extent those professionals' fee applications are allowed under § 330 of the Bankruptcy Code) before any such proceeds are paid to Collins St.

## II.    The fees sought should be allowed under § 330 of the Bankruptcy Code.

That leaves the question whether the fees at issue should be allowed under § 330.  In arguing that they should not be, Collins St relies primarily on its contention that Capstone did not have the requisite expertise to run an effective sales process and on the overall disappointing results of that process.

The case law is, of course, clear that the professionals involved in a case are not guarantors of the result.  And the caselaw also stands for the related proposition, which is just a commonsense point, that one must view the reasonableness of a professional's work based on the circumstances present at the time the professional undertook to perform the work, not with the benefit of hindsight.[53]

At the May 7, 2024 hearing, David Beckman of FTI testified that Capstone and its personnel that were working on the Allegiance sale process had far more limited experience in distressed coal transactions than Beckman did.[54]  While Beckman's extensive experience in distressed coal company sales is impressive, that does not mean that Capstone was not qualified or that the work it did was not reasonable.

[53] *See generally In re Hospital Partners of Am., Inc.*, 597 B.R. 763, 766 (Bankr. D. Del. 2019).

[54] May 7, 2024 Hr'g Tr. at 78.

Finally, Collins St argues that certain fees should be disallowed because the time entries were "lumped."[55]  In this Court's view, the better practice is for a professional's time entries to indicate how much time is spent performing each of the tasks being billed, rather than combining multiple tasks in a single entry.  Such detailed time records, as most of the professionals in the case have submitted, certainly facilitate the Court's review of the reasonableness of the time spent on each task.  That said, in the circumstances of this case, the Court is satisfied that the billing records submitted contained enough detail to permit the Court to form a judgment with respect to the reasonableness of the tasks performed and the fees being charged.  Based on that review, the Court concludes that the work performed by each of the estate professionals was reasonable in light of the circumstances presented and that the fees sought are in the range of what one would expect in a case of comparable size and complexity.  So based on the whole record, the Court believes it appropriate to enter an order that allows each of the fee applications at issue.

## Conclusion

The Court appreciates that this case did not end well.  The Court also understands Collins St's frustration.  Its view from the outset was that the effort to reorganize the debtors was a fool's errand and that the value of its collateral would have been better preserved had the case had proceeded differently.  In retrospect, Collins St may well have been right about that.  Nevertheless, the Bankruptcy Code

---

[55] D.I. 703 at 37.

allocates the rights between a chapter 11 debtor and its secured creditors as it does. A secured creditor is entitled to adequate protection against the risk that its collateral may diminish in value over the course of a bankruptcy case. But a debtor that can meet its evidentiary burden of showing its ability to provide adequate protection (as the Court found the debtors had here – at least for nine days at the very beginning of the bankruptcy case) is entitled in the first instance to manage the business affairs of the estate.

At bottom, even if Collins St's frustration is justified, it does not provide a basis for re-writing the terms of the DIP Order. The basic work of a carve out is to ensure that the allowed fees of estate professionals are paid, up to the amount of the carve out, ahead of the repayment of the DIP loan. Nothing in the documents in this case provides an exception to that usual principle. For that reason, an order providing that whatever cash is in the estate be paid, upon dismissal, in that order, is appropriately entered here.

Dated: June 7, 2024

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE